*CTJ (TE)*
ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

JUN 1 5 2016

12:46 pm

CLERK, U.S. DISTRICT COURT
By _____
Deputy

| | |
|---|---|
| EXXON MOBIL CORPORATION, | § |
| | § |
| Plaintiff, | § |
| | § |
| v. | § |
| | § |
| MAURA TRACY HEALEY, Attorney | § |
| General of Massachusetts, in her | § |
| official capacity, | § |
| | § |
| Defendant. | § |
| | § |

No. 4:16-CV-469-A

**ORAL ARGUMENT REQUESTED**

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF EXXON MOBIL CORPORATION'S MOTION FOR A PRELIMINARY INJUNCTION

Patrick J. Conlon (*pro hac vice* pending)
Daniel E. Bolia
EXXON MOBIL CORPORATION
1301 Fannin Street
Houston, TX 77002
(832) 624-6336

Theodore V. Wells, Jr.  (*pro hac vice* pending)
Michele Hirshman (*pro hac vice* pending)
Daniel J. Toal (*pro hac vice* pending)
Justin Anderson (*pro hac vice* pending)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Tel: (212) 373-3000
Fax: (212) 757-3990

Ralph H. Duggins
Philip A. Vickers
Alix D. Allison
CANTEY HANGER LLP
600 West 6th Street, Suite 300
Fort Worth, TX 76102
Tel: (817) 877-2800
Fax: (817) 877-2807

Nina Cortel
HAYNES & BOONE, LLP
2323 Victory Avenue
Suite 700
Dallas, TX 75219
Tel: (214) 651-5579
Fax: (214) 200-0411

*Counsel for Exxon Mobil Corporation*

## **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ...................................................................................................... iii

PRELIMINARY STATEMENT ................................................................................................. 1

STATEMENT OF FACTS ......................................................................................................... 4

LEGAL STANDARD ................................................................................................................ 11

ARGUMENT .............................................................................................................................. 11

I.      ExxonMobil Has a Substantial Likelihood of Prevailing on the Merits ......................... 11

        A.      The CID Violates ExxonMobil's First Amendment Rights. .............................. 11

                1.      The CID Constitutes Impermissible Viewpoint Discrimination. ............. 12

                2.      The CID Cannot Survive the Demanding Test Applicable to
                        Subpoenas that Burden First Amendment Rights ..................................... 14

        B.      The CID Is a Burdensome and Baseless Fishing Expedition that Violates
                the Fourth Amendment. ..................................................................................... 16

                1.      The CID Imposes an Unreasonable Burden on ExxonMobil. ................... 17

                2.      The CID Is a Baseless Fishing Expedition. .............................................. 18

        C.      The Attorney General Cannot Serve as the Disinterested Prosecutor that
                Due Process Requires. ....................................................................................... 20

        D.      The CID Regulates Interstate Commerce, in Violation of the Dormant
                Commerce Clause. ............................................................................................. 22

II.     ExxonMobil Faces a Substantial Threat of Irreparable Injury. ....................................... 24

III.    The Threatened Injury to ExxonMobil Outweighs any Potential Harm to the
        Attorney General, and an Injunction Would Serve the Public Interest. ........................... 25

CONCLUSION ........................................................................................................................... 25



## **TABLE OF AUTHORITIES**

**Page(s)**

### CASES

*American Booksellers Foundation* v. *Dean,*
    342 F.3d 96 (2d Cir. 2003) ..................................................................................23

*W. Va. Bd. of Educ.* v. *Barnette,*
    319 U.S. 624 (1943)..........................................................................................12

*Berger* v. *United States,*
    295 U.S. 78 (1935).............................................................................................21

*United States* v. *Bowen,*
    799 F.3d 336 (5th Cir. 2015)........................................................................21, 22

*Brown* v. *Entm't Merchs. Ass'n,*
    564 U.S. 786 (2011)..........................................................................................15

*U.S. ex rel. S.E.C.* v. *Carter,*
    907 F.2d 484 (5th Cir. 1990) ............................................................................21

*Cohen* v. *Coahoma Cnty.,*
    805 F. Supp. 398 (N.D. Miss. 1992)..................................................................24

*Fed. Trade Comm'n* v. *Am. Tobacco Co.,*
    264 U.S. 298 (1924)....................................................................................17, 18

*First Nat'l Bank of Boston* v. *Bellotti,*
    435 U.S. 765 (1978)..........................................................................................14

*Garrison* v. *Louisiana,*
    379 U.S. 64 (1964)............................................................................................15

*Gibson v. Fla. Legis. Investigation Comm.,*
    372 U.S. 539 (1963)..........................................................................................16

*In re Grand Jury Proceedings,*
    707 F. Supp. 1207 (D. Haw. 1989)....................................................................17

*In re Grand Jury Investigation of Possible Violation of 18 U.S.C. § 1461 et seq.,*
    706 F. Supp. 2d 11 (D.D.C. 2009).....................................................................14

*In re Grand Jury Proceedings Witness Bardier,*
    486 F. Supp. 1203 (D. Nev. 1980)...............................................................17, 18

*Louisiana ex rel. Gremillion* v. *NAACP*,
    366 U.S. 293 (1961).................................................................15

*Healy* v. *Beer Inst., Inc.*,
    491 U.S. 324 (1989)..............................................................22, 23

*Humana, Inc.* v. *Jacobson*,
    804 F.2d 1390 (5th Cir. 1986) ................................................24

*Major League Baseball* v. *Crist*,
    331 F.3d 1177 (11th Cir. 2003) ..........................................17, 18

*Marshall* v. *Jerrico, Inc.*,
    446 U.S. 238 (1980).................................................................21

*Mills* v. *Alabama*,
    384 U.S. 214 (1966).................................................................14

*New York Times Co.* v. *Sullivan*,
    376 U.S. 254 (1964).................................................................25

*Opulent Life Church* v. *City of Holly Springs*,
    697 F.3d 279 (5th Cir. 2012) ..................................................25

*Palmer ex rel. Palmer* v. *Waxahachie Indep. Sch. Dist.*,
    579 F.3d 502 (5th Cir. 2009) ..................................................24

*Pharm. Research Mfrs. of Am.* v. *Concannon*,
    249 F.3d 66 (1st Cir. 2001)......................................................23

*Pleasant Grove City, Utah* v. *Summum*,
    555 U.S. 460 (2009).................................................................12

*Reed* v. *Town of Gilbert*,
    135 S. Ct. 2218 (2015)............................................................12

*Ridley* v. *Mass. Bay Transp. Auth.*,
    390 F.3d 65 (1st Cir. 2004).................................................12, 14

*Rosenberger* v. *Rector & Visitors of Univ. of Va.*,
    515 U.S. 819 (1995).................................................................12

*See* v. *City of Seattle*, 387 U.S. 541 (1967) ..............................16, 17

*Simon & Schuster, Inc.* v. *Members of N.Y. State Crime Victims Bd.*,
    502 U.S. 105 (1991).................................................................12

*Tex. Med. Providers Performing Abortion Servs.* v. *Lakey*,
    667 F.3d 570 (5th Cir. 2012) ..................................................11

*Walden* v. *Fiore,*
    134 S. Ct. 1115 (2014)..................................................................20

*Ward* v. *Rock Against Racism,*
    491 U.S. 781 (1989)....................................................................12

*White* v. *Baker,*
    696 F. Supp. 2d 1289 (N.D. Ga. 2010)......................................25

*Wright* v. *United States,*
    732 F.2d 1048 (2d Cir. 1984) .....................................................22

*Young* v. *U.S. ex rel. Vuitton et Fils S.A.,*
    481 U.S. 787 (1987)....................................................................21

*Zurcher* v. *Stanford Daily,*
    436 U.S. 547 (1978)........................................................16, 17, 18

## STATUTES

15 U. S. C. § 77c(a)(3) ........................................................................10

Mass. Gen. Law ch. 93A, § 2 ....................................................*passim*

Mass. Gen. Law. ch. 260, § 5A .......................................................3, 16, 19

Mass. Gen. Laws ch. 110A, § 402(a)(10)..........................................10

## OTHER AUTHORITIES

First Amendment ........................................................................*passim*

Fourth Amendment.....................................................................*passim*

Fourteenth Amendment .....................................................................24

Exxon Mobil Corporation ("ExxonMobil" or the "Company") respectfully submits this memorandum of law in support of its motion for a preliminary injunction.

## PRELIMINARY STATEMENT

This case is about freedom of political speech. Even though ExxonMobil's forthright and public recognition of the risks associated with climate change long predates the limitations period and independently forecloses the possibility of securities or consumer fraud in this case, Defendant Maura Healey, the Attorney General of Massachusetts (the "Attorney General"), has misused her law enforcement authority by deploying it against her political opponents in the debate over climate change. Because the Attorney General does not believe that ExxonMobil shares her views on climate change, her office served ExxonMobil with a civil investigative demand ("CID") that requires ExxonMobil to produce 40 years' worth of documents relating to climate change. The Attorney General's actions violate ExxonMobil's constitutional rights and fly in the face of the universally recognized principle that the coercive machinery of law enforcement should not be used to limit debate on public policy.

The Attorney General issued the CID according to a plan devised by state officials, climate change activists, and plaintiffs'-side environmental attorneys who support certain policy responses to climate change and aim to silence those who disagree. The public officials made their intentions known at a joint press conference held on March 29, 2016, featuring the remarks of former Vice President and private citizen Al Gore. During that press conference, a coalition of attorneys general with a goal to end the world's reliance on fossil fuels announced their frustration with perceived congressional inaction on climate change and pledged to use law



enforcement tools "creatively" and "aggressively," not to investigate violations of law, but to impose their preferred policy response to climate change.[1]

This public announcement was the culmination of years of planning. Since at least 2012, climate change activists have sought to obtain the internal records of fossil fuel companies, and they identified the use of law enforcement tools as a particularly powerful means of obtaining records that would be otherwise beyond their grasp.[2]  At a 2012 workshop entitled "Climate Accountability, Public Opinion, and Legal Strategies," the attendees discussed at considerable length "Strategies to Win Access to Internal Documents" of companies like ExxonMobil.[3]  They concluded that "a single sympathetic state attorney general might have substantial success in bringing key internal documents to light."[4]  And, those activists were on call at the press conference.  During a private session with the attorneys general, a climate change activist and a private environmental lawyer, who has previously sued ExxonMobil, made presentations on the "imperative of taking action now on climate change" and on "climate change litigation."[5]

The attorneys general recognized that the involvement of these individuals—especially a private attorney likely to seek fees from any private litigation made possible by a government investigation of ExxonMobil—could expose the special interests behind their announcement. When that same private attorney asked the New York Attorney General's office what he should tell a reporter if asked about his involvement, the chief of that office's environmental unit, in an attempt to conceal the private attorney's participation in these meetings from the press and public, told him not to confirm his attendance at the conference.[6]  This desire to shield from the

---

[1]   *See* Ex. A at App. 3 (transcript of press conference prepared by counsel based on video recording).  All citations in format "Ex. _" refer to exhibits to the Declaration of Justin Anderson, dated June 14, 2016.
[2]   Ex. N at App. 125.
[3]   *Id.* at App. 119-20, 125, 145-49.
[4]   *Id.* at App. 125.
[5]   Ex. I at App. 76-85.
[6]   Ex. P at App. 155.

public the origins of the state officials' initiative speaks volumes about their own assessment of its propriety.

The CID is a product of this misguided enterprise. The CID purports to investigate whether ExxonMobil misled consumers and investors about the risks of climate change, but the pretextual character of the Attorney General's investigation follows from even a brief review of the statute under investigation and of a few facts that are not subject to reasonable dispute. First, the offense that the CID purports to investigate has a four-year statute of limitations.[7] For the last decade, however, ExxonMobil has publicly recognized that "the risk to society and ecosystems from rising greenhouse gas emissions could prove to be significant" and that "strategies that address the risk need to be developed and implemented."[8] Second, during the limitations period, ExxonMobil has not engaged in the activity supposedly under investigation in Massachusetts.

Having nothing to do with a legitimate investigation, the CID runs afoul of several constitutional provisions. First, the government may not prescribe what shall be orthodox in matters of public concern. Because the CID is aimed at one side of a policy debate and unjustifiably burdens ExxonMobil's political speech, it violates the First Amendment. Second, the CID's demand that ExxonMobil produce four decades' worth of records in connection with a baseless fishing expedition constitutes an unreasonable search of the kind proscribed by the Fourth Amendment. Third, the Attorney General cannot serve as the disinterested prosecutor that due process requires because she has improperly prejudged the outcome of her investigation, as demonstrated by her public comments on the matter. Finally, in the Attorney General's rush to fill a perceived legislative "breach" concerning climate change, she has improperly trod on

---

[7] *Infra* Section I.B.2; *see also* Mass. Gen. Law ch. 93A, § 2; Mass. Gen. Law. ch. 260, § 5A.
[8] Ex. T at App. 193.



exclusively federal turf and regulated out-of-state speech in violation of the Dormant Commerce Clause.

To protect ExxonMobil's constitutional rights, an injunction should be issued prohibiting the enforcement of the CID.

## STATEMENT OF FACTS

### A.     The "Green 20" Coalition of Attorneys General Announces a Plan to Use Law Enforcement Tools to Achieve Political Goals.

The CID is the product of a coordinated campaign of partisan state officials urged on by climate change activists and attorneys motivated by private interests.  This campaign first exposed itself to the public on March 29, 2016, when the Attorney General of New York hosted a press conference in New York City with certain other attorneys general as the self-proclaimed "AGs United for Clean Power."[9]  The purpose of the conference was to discuss the coalition's plans to take "progressive action on climate change," including investigating ExxonMobil.[10]  Former Vice President Al Gore was the event's featured speaker.  The Attorney General, along with attorneys general or staff members from over a dozen other states, attended and participated in the press conference.[11]

The attorneys general, calling themselves the "Green 20," explained that their mission was to "com[e] up with creative ways to enforce laws being flouted by the fossil fuel industry."[12] Expressing dissatisfaction with the perceived "gridlock in Washington" regarding climate change legislation, Eric Schneiderman, the Attorney General of New York, said that the coalition had to work "creatively" and "aggressively" to advance that agenda.[13]

---

[9]   Ex. A at App. 2-21.
[10]   *See* Ex. MM at App. 327.
[11]   *See* Ex. A at App. 2-21.
[12]   *Id.* at App. 3.
[13]   *Id.* at App. 3-4.

He announced that the assembled "group of state actors [intended] to send the message that [they were] prepared to step into this [legislative] breach."[14] He continued:

> We know that in Washington there are good people who want to do the right thing on climate change but everyone from President Obama on down is under a relentless assault from well-funded, highly aggressive and morally vacant forces that are trying to block every step by the federal government to take meaningful action. So today, we're sending a message that, at least some of us—actually a lot of us—in state government are prepared to step into this battle with an unprecedented level of commitment and coordination.[15]

The purpose of the coalition's "coordination" was "to deal with th[e] most pressing issue of our time," namely, the need to "preserve our planet and reduce the carbon emissions that threaten all of the people we represent."[16]  Attorney General Schneiderman declared that the debate about climate change and the range of permissible policy responses to it was over: "[W]e are here for a very simple reason.  We have heard the scientists.  We know what's happening to the planet.  There is no dispute but there is confusion, and confusion sowed by those with an interest in profiting from the confusion and creating misperceptions in the eyes of the American public that really need to be cleared up."[17]  Attorney General Schneiderman then reminded the press that his office "had served a subpoena on ExxonMobil," to investigate "theories relating to consumer and securities fraud."[18]

Attorney General Schneiderman next introduced Al Gore.  Gore cited perceived inaction by the federal government to justify action by state attorneys general, observing that "our democracy's been hacked . . . but if the Congress really would allow the executive branch of the federal government to work, then maybe this would be taken care of at the federal level."[19]  Gore went on to condemn those who question the viability of renewable energy sources, faulting them

---

[14]  *Id.* at App. 4.
[15]  *Id.* at App. 5.
[16]  *Id.* at App. 2.
[17]  *Id.* at App. 3.
[18]  *Id.* at App. 4.
[19]  *Id.* at App. 10.

for "slow[ing] down this renewable revolution" by "trying to convince people that renewable energy is not a viable option."[20] He then accused the fossil fuel industry of "using [its] combined political and lobbying efforts to put taxes on solar panels and jigger with the laws."[21]

When it was his turn to speak, Claude Walker, the Attorney General of the United States Virgin Islands, began by hailing Gore as one of his "heroes." Attorney General Walker announced that his office had "launched an investigation into a company that we believe must provide us with information about what they knew about climate change and when they knew it."[22] That thinly veiled reference to ExxonMobil was later confirmed in a press release naming ExxonMobil as the target of his investigation.[23] Attorney General Walker admitted that his investigation of ExxonMobil was aimed at changing public policy, not investigating actual violations of existing law: "we will not stop until we get to the bottom of this and make it clear to our residents as well as the American people that we have to do something transformational. We cannot continue to rely on fossil fuel."[24]

During her turn at the podium, the Attorney General began by thanking Gore "who, today, I think, put most eloquently just how important this is, this commitment that we make."[25] She explained that, "in my view, there's nothing we need to worry about more than climate change."[26] The Attorney General therefore pledged to take "quick, aggressive action" to "address climate change and to work for a better future."[27] To advance this shared agenda on climate change policy, the Attorney General announced that she "too, ha[d] joined in

---

[20] *Id.*
[21] *Id.*
[22] *Id.* at App. 16.
[23] Ex. C at App. 53-55.
[24] Ex. A at App. 17.
[25] *Id.* at App. 13.
[26] *Id.* at App. 13.
[27] *Id.* at App. 14.

investigating the practices of ExxonMobil."[28]  She also announced the pre-ordained outcome of

that investigation:  "We can all see today the troubling disconnect between what Exxon knew,

what industry folks knew, and what the company and industry chose to share with investors and

with the American public."[29]

The political motivations articulated by the Green 20 struck a discordant note with those

who rightfully expect government attorneys to conduct themselves in a neutral and unbiased

manner.  One reporter reacted by asking whether the press conference and the investigations

were mere "publicity stunt[s]."[30]

### B.    In Closed-Door Meetings, the Green 20 Privately Meet with Climate Activists and Plaintiffs' Lawyers.

The impropriety of the attorneys general's statements at the press conference is surpassed

only by what they said behind closed doors.  On the morning of the press conference, the

attorneys general attended two presentations.[31]  Those presentations were not announced

publicly, and they were not open to the press or general public.  The identity of the presenters

and the titles of the presentations, however, were later released by the state of Vermont in

response to a request under that state's Freedom of Information Act.[32]

The first presenter was Peter Frumhoff, the director of science and policy for the Union

of Concerned Scientists.[33]  His subject was the "imperative of taking action now on climate

change."[34]  According to the Union of Concerned Scientists, those who do not share its views

about climate change make it "difficult to achieve meaningful solutions to global warming."[35]

---

[28]  *Id.* at App. 13.
[29]  *Id.*
[30]  *Id.* at App. 18.
[31]  Ex. I at App. 76-85.
[32]  Ex. II at App. 298-304.
[33]  Ex. J at App. 87-93.
[34]  Ex. I at App. 78.
[35]  Ex. K at App. 95.

The group accuses "[m]edia pundits, partisan think tanks, and special interest groups" of being "contrarians," who "downplay and distort the evidence of climate change, demand policies that allow industries to continue polluting, and attempt to undercut existing pollution standards."[36]

Matthew Pawa of Pawa Law Group, P.C. hosted the second presentation on the topic of "climate change litigation."[37] The Pawa Law Group, which boasts of its "role in launching global warming litigation," previously sued ExxonMobil and sought to hold it liable for causing global warming.[38] That suit was dismissed because, as the court properly held, "regulating global warming emissions is a political rather than a legal issue that needs to be resolved by Congress and the executive branch rather than the courts."[39]

Frumhoff and Pawa have sought for years to initiate legal actions against fossil fuel companies in the service of their political agenda and for private profit. In 2012, for example, Frumhoff hosted and Pawa presented at a conference entitled "Climate Accountability, Public Opinion, and Legal Strategies."[40] The conference's goal was to consider "the viability of diverse strategies, including the legal merits of targeting carbon producers (as opposed to carbon emitters) for U.S.-focused climate mitigation."[41] The 2012 conference's attendees discussed at considerable length "Strategies to Win Access to Internal Documents" of companies like ExxonMobil.[42] Even then, Frumhoff and Pawa suggested that "a single sympathetic state attorney general might have substantial success in bringing key internal documents to light."[43] Indeed, that conference's attendees were "nearly unanimous" regarding "the importance of legal actions, both in wresting potentially useful internal documents from the fossil fuel industry and,

---

[36] *Id.* at App. 95-96.
[37] Ex. I at App. 77.
[38] Ex. M at App. 112.
[39] Ex. N at App. 126.
[40] *Id.* at App. 119-20, 145-49.
[41] *Id.* at App. 117-18.
[42] *Id.* at App. 125.
[43] *Id.*

more broadly, in maintaining pressure on the industry that could eventually lead to its support for legislative and regulatory responses to global warming."[44]   The press conference thus represented the culmination of Frumhoff and Pawa's collective efforts to enlist state law enforcement officers in their quest to enact their preferred policy responses to global warming.

The attorneys general who attended the press conference understood that the participation of Frumhoff and Pawa, if reported, could expose the private, financial, and political interests behind the investigations. The day after the conference, a reporter from *The Wall Street Journal* called Pawa.[45]  In response, Pawa asked the New York Attorney General's Office "[w]hat should I say if she asks if I attended?"  The environmental bureau chief at the office, in an effort to conceal from the press and public the closed-door meetings, responded "[m]y ask is if you speak to the reporter, to not confirm that you attended or otherwise discuss the event."[46]

### C.     The CID Demands 40 Years' of ExxonMobil's Records.

The Massachusetts Attorney General's Office served ExxonMobil with the CID three weeks after the conference, on April 19, 2016.  The CID demands production of essentially any and all of ExxonMobil's communications and documents related to the subject of climate change, including all documents related to research that ExxonMobil conducted or funded, over the past 40 years.[47] For example, one of the CID's 38 document requests demands all documents "concerning Exxon's development, planning, implementation, review, and analysis of research efforts to study $CO_2$ emissions . . . and the effects of these emissions on the Climate."[48]

The CID's more targeted requests are in some instances more troubling than its extraordinary breadth.  The CID evinces a particular interest in ExxonMobil's communications

---

[44]  *Id.* at App. 141.
[45]  Ex. P at 155.
[46]  *Id.*
[47]  *See* Ex. B at App. 23-51 (Request Nos. 1-4).
[48]  *Id.* at App. 34 (Request No. 1).

with organizations perceived to be on one side of the climate change debate.[49] The CID requests

all documents and communications regarding climate change sent to or received from 12 named

organizations, all of which have been identified by the media as opposing certain policies in

favor of addressing climate change or as disputing the science in support of climate change.[50]

The CID's remarkably broad scope is particularly striking when contrasted with (1) the

limitations period of the statute under investigation, and (2) the dearth of any relevant

relationship between ExxonMobil and Massachusetts. The CID purports to investigate whether

ExxonMobil committed consumer or securities fraud by misrepresenting to the public its

understanding regarding the risks of climate change. The limitations period of the relevant

statute is four years.[51] During that limitations period, however, ExxonMobil has not sold fossil

fuel derived products to consumers in Massachusetts.[52] Nor has it marketed or offered any

security for sale to the general public in Massachusetts.[53] Massachusetts courts therefore cannot

even exercise personal jurisdiction over ExxonMobil in connection with the purported offenses

under investigation.

During the four-year limitations period ExxonMobil has, however, publicly and

repeatedly acknowledged that climate change presents significant risks that could affect its

business.[54] For example, in its 2006 10-K, ExxonMobil stated that the "risks of global climate

change" "have been, and may in the future" continue to impact its operations.[55] ExxonMobil's

---

[49]  *See id.* at App. 35 (Request No. 5).
[50]  *See, e.g.*, Ex. JJ at App. 306-08.
[51]  *Infra* Section I.B.2. Mass. Gen. Law ch. 93A, § 2.
[52]  Ex. HH at App. 295. Any service station that sells fossil fuel derived products under an "Exxon" or "Mobil" banner is owned and operated independently.
[53]  During the limitations period, ExxonMobil has sold short-term, fixed-rate notes in Massachusetts, in specially exempted commercial paper transactions. *See* Mass. Gen. Laws ch. 110A, § 402(a)(10); *see also* 15 U. S. C. § 77c(a)(3). These notes, which mature in 270 days or less, were sold to institutional investors, not individual customers.
[54]  *See* Ex. S at App. 183; Ex. T at App. 193.
[55]  Ex. U at App. 202-03.

forthright and public recognition of the risks associated with climate change long predates the limitations period and independently forecloses the possibility of securities or consumer fraud.

ExxonMobil's deadline to object to the CID is June 16, 2016. While ExxonMobil submits that Massachusetts courts are without personal jurisdiction to entertain an enforcement action, it nevertheless intends to appear specially in Massachusetts to file a protective motion in Massachusetts state court for the sole purpose of preserving its rights in that forum.

**LEGAL STANDARD**

A federal court should grant a motion for preliminary injunction where the plaintiff demonstrates: (1) a substantial likelihood of prevailing on the merits; (2) a substantial threat that it will suffer an irreparable injury unless the motion is granted; (3) that the threatened injury outweighs any potential harm to the enjoined party; and (4) that granting the preliminary injunction will not disserve the public interest. *Tex. Med. Providers Performing Abortion Servs.* v. *Lakey*, 667 F.3d 570, 574 (5th Cir. 2012). ExxonMobil's application satisfies each of these requirements and should be granted.

**ARGUMENT**

**I.      ExxonMobil Has a Substantial Likelihood of Prevailing on the Merits.**

ExxonMobil must demonstrate a substantial likelihood of success on only one of its claims to satisfy the first prong of its burden. For the reasons that follow, any of the four independent claims pressed in this action meets that requirement.

**A.      The CID Violates ExxonMobil's First Amendment Rights.**

The CID is a direct and deliberate assault on ExxonMobil's First Amendment right to participate in the public debate over climate-change policy. The Attorney General has violated ExxonMobil's right to participate in that debate in two ways. First, as her comments at the press conference made clear, the Attorney General has chosen to regulate ExxonMobil's speech

because she disagrees with ExxonMobil's perceived views about how the United States should respond to climate change. Second, the CID impermissibly intrudes on ExxonMobil's protected political speech.

### 1.  The CID Constitutes Impermissible Viewpoint Discrimination.

#### (a)  Applicable Law

The First Amendment prohibits states from prescribing "what shall be orthodox in politics." *W. Va. Bd. of Educ.* v. *Barnette*, 319 U.S. 624, 642 (1943). For that reason, states may not regulate speech because of the "opinion or perspective of the speaker." *Rosenberger* v. *Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). Otherwise, states would be free to "drive certain ideas or viewpoints from the marketplace." *Simon & Schuster, Inc.* v. *Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116 (1991). Courts therefore review such viewpoint discrimination—state action that regulates speech on the basis of the speaker's opinion—more strictly than any other First Amendment violation. *See Reed* v. *Town of Gilbert*, 135 S. Ct. 2218, 2223 (2015). Although most infringements on speech are subject to a balancing test, the First Amendment flatly forbids the government from engaging in viewpoint discrimination. *See, e.g.*, *Pleasant Grove City, Utah* v. *Summum*, 555 U.S. 460, 469 (2009).

To determine whether a regulation of speech is viewpoint-based, courts ask "whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward* v. *Rock Against Racism*, 491 U.S. 781, 791 (1989). When making that assessment, courts may consider a wide range of sources, including the relevant officials' own statements. *See, e.g.*, *Ridley* v. *Mass. Bay Transp. Auth.*, 390 F.3d 65, 87 (1st Cir. 2004).

#### (b)  Discussion

The Attorney General's candid recitation of the reasons for her investigation at the press conference establishes that the CID constitutes viewpoint discrimination. From start to finish,

the Attorney General and the other speakers at the press conference faulted ExxonMobil for exercising its right to engage in the national debate about how the United States should respond to climate change. For example, former Vice President Gore accused ExxonMobil of "trying to convince people that renewable energy is not a viable option," and of using "political and lobbying efforts to put taxes on solar panels and jigger with the laws . . . to slow down this renewable revolution."[56]

What Al Gore condemns as efforts to "jigger with the laws," the First Amendment calls "speech." Although the Attorney General couched the reasons for her investigation in slightly different terms, her stated justifications were nevertheless thoroughly and impermissibly tethered to ExxonMobil's alleged opposition to the Attorney General's preferred policy responses to climate change.

Attorney General Healey's statements should be read in the context of the press conference as a whole. Attorney General Schneiderman explained that the Green 20 had joined together "for a very simple reason": to respond to "what's happening to the planet" and stop the "morally vacant forces that are trying to block every step by the federal government to take meaningful action" related to climate change.[57] The purpose of the press conference was to "send[] a message" that the attorneys general were prepared to step into the "battle" over climate change "with an unprecedented level of commitment and coordination."[58] Attorney General Healey similarly announced that she had a "moral obligation" to move the country toward a "clean energy future" and alleviate the threat to "the very existence of our planet." As part of her campaign "to address climate change and to work for a better future," she explained that she was taking "quick, aggressive action" to "hold[] accountable those who have needed to be held

---

[56] Ex. A at App. 10.
[57] *Id.* at App. 3.
[58] *Id.* at App. 5.

accountable for far too long."[59] Statements like these, which expressly link state action to the speaker's viewpoint, are direct evidence of viewpoint discrimination. *Ridley*, 390 F.3d at 88-89.

The CID's demands confirm these impermissible motives. The CID targets organizations that hold dissenting views about climate change that differ from those of the Green 20. The CID demands that ExxonMobil produce its communications with 12 organizations—every one of which has been identified by the media as questioning the climate change policies favored by the Attorney General and her allies or as disputing the science in support of climate change. Where, as here, the government targets speakers because of their views on policy, it engages in impermissible viewpoint discrimination. The content of the CID, joined with the statements made by the Attorney General and her allies, cannot be reconciled with the First Amendment.

### 2. The CID Cannot Survive the Demanding Test Applicable to Subpoenas that Burden First Amendment Rights.

#### (a) Applicable Law

A subpoena "that may infringe on First Amendment rights" must pass a two-part test. *In re Grand Jury Investigation of Possible Violation of 18 U.S.C. § 1461 et seq.*, 706 F. Supp. 2d 11, 18 (D.D.C. 2009). The government must show (1) that it has a "compelling interest" in obtaining the materials it seeks, and (2) that there is a "sufficient nexus" between its interest and the information sought. *Id.* Foremost among the categories of speech protected by the First Amendment is political speech. Speech addressing "governmental affairs" and "the manner in which government is operated or should be operated" is well-recognized as political speech entitled to particularly vigilant protection under the First Amendment. *See Mills* v. *Alabama*, 384 U.S. 214, 218-19 (1966). "[T]his no less true because the speech comes from a corporation rather than an individual." *First Nat'l Bank of Boston* v. *Bellotti*, 435 U.S. 765, 777 (1978).

---

[59] *Id.* at App. 13-14.

### (b) Discussion

The CID violates the First Amendment for a second and independently sufficient reason: It cannot survive the rigorous test that courts apply to subpoenas that demand materials protected by the First Amendment. The CID requires ExxonMobil to produce documents bearing on its participation in the long-running and still-unresolved national debate about what policy approach the United States should take in response to the risks of climate change. ExxonMobil's research and related communications regarding climate change are an indispensable part of its informed participation in the ongoing national debate. Such documents thus fall comfortably within the protections of the First Amendment. Indeed, speech of the type demanded by the CID, which concerns "public affairs," "is the essence of self-government." *Garrison* v. *Louisiana*, 379 U.S. 64, 74–75 (1964). The Attorney General therefore must show that the CID's demands are substantially related to a compelling interest.

The Attorney General can identify no compelling interest that justifies the CID. The only interest the Attorney General and the other attorneys general discussed at the press conference was their collective desire to combat climate change by identifying and suppressing the speech of fossil fuel companies. *See supra* Section I.A.1. The Attorney General's desire to advance her political position by silencing dissenting views cannot qualify as a compelling interest under settled Supreme Court precedent. "[G]overnment has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Brown* v. *Entm't Merchs. Ass'n*, 564 U.S. 786, 790-91 (2011).

Even if the Attorney General could identify a compelling state interest, the CID's demands are not substantially related to advancing any such interest. *See Louisiana ex rel. Gremillion* v. *NAACP*, 366 U.S. 293, 296 (1961). Because her CID intrudes on protected speech, the Attorney General must show "a substantial relation between the information sought and a

subject of overriding and compelling state interest." *Gibson v. Fla. Legis. Investigation Comm.*, 372 U.S. 539, 546 (1963). If the "substantial relation" requirement means anything, it means that the CID is overbroad. The CID purports to investigate possible violations of a statute that has a four-year limitations period.[60] In the service of that investigation, the CID demands every document related to climate change that ExxonMobil has produced or received, and all the research it has funded, over the last 40 years. Requests that stretch more than three decades beyond the limitations period cannot possibly qualify as substantially related to any legitimate investigation. *Cf. id.* at 554. The Attorney General cannot show that the CID's exceedingly broad demands are related to any compelling interest, as required by the First Amendment.

**B.     The CID Is a Burdensome and Baseless Fishing Expedition that Violates the Fourth Amendment.**

The CID purports to authorize a fishing expedition into four decades' worth of records from a company with nearly 80,000 employees, despite a marked absence of any basis for suspecting that ExxonMobil violated the law under investigation. The scope of the CID is far too broad, and the burden it imposes is unreasonable.

The CID violates the Fourth Amendment in two ways. First, the Fourth Amendment forbids the government from imposing an unreasonable burden on the recipient of a subpoena. Subpoenas therefore must be restrained and specific. *See See v. City of Seattle*, 387 U.S. 541, 544 (1967). And that is particularly true where the materials sought may be protected by the First Amendment. *Zurcher v. Stanford Daily*, 436 U.S. 547, 564 (1978). But there is nothing restrained or specific about the CID.

Second, the Fourth Amendment does not permit the government to rifle through all of ExxonMobil's papers on climate change, "relevant or irrelevant, in the hope that something will

---

[60]     *Infra* Section I.B.2. Mass. Gen. Law ch. 93A, § 2; Mass. Gen. Law. ch. 260, § 5A.

turn up." *Fed. Trade Comm'n* v. *Am. Tobacco Co.*, 264 U.S. 298, 306 (1924). Instead, the investigation must follow from a legitimate suspicion that a crime has been committed. *See id.* Where, as here, there is no plausible suggestion that the recipient of a subpoena actually violated the law, a court should enjoin its enforcement. *See Major League Baseball* v. *Crist*, 331 F.3d 1177, 1187-88 (11th Cir. 2003).

### 1. The CID Imposes an Unreasonable Burden on ExxonMobil.

The CID's document requests are breathtakingly burdensome. When the government demands information from a private party through a subpoena, the Fourth Amendment requires that the subpoena be "limited in scope, relevant in purpose, and specific in directive so that compliance will not be unreasonably burdensome." *City of Seattle*, 387 U.S. at 544. If the materials sought to be seized may be protected by the First Amendment, then the Court must apply these requirements with "scrupulous exactitude." *Zurcher*, 436 U.S. at 564.

The CID cannot withstand the examination *Zurcher* requires. The CID contains 38 sweeping demands that span a 40-year period.[61] It requires ExxonMobil to produce virtually every document it has ever sent or received that in any way pertains to climate change.[62] Given the breadth of the requests and the 40-year date range, it would be difficult to overstate the costs ExxonMobil likely would incur in trying to comply with the CID. A reasonable estimate suggests that the requests embrace millions of pages, and ExxonMobil likely would need to spend millions of dollars to comply with the CID's demands.[63] Even if one puts aside the breadth of the requests, the date range alone renders the CID unreasonable. It runs decades longer than periods that have been held to be unreasonable in analogous contexts. *See, e.g.*, *In re Grand Jury Proceedings*, 707 F. Supp. 1207, 1218 (D. Haw. 1989) (eleven years); *In re Grand*

---

[61] Ex. B at App. 23-51 (Request Nos. 1-38).
[62] *See id.*
[63] Declaration of Justin Anderson at vii-ix.

*Jury Proceedings Witness Bardier*, 486 F. Supp. 1203, 1214 (D. Nev. 1980) (six years). The CID does not withstand a routine application of Fourth Amendment principles, let alone the rigorous examination required where the materials are protected by the First Amendment. *See Zurcher*, 436 U.S. at 564.

### 2. The CID Is a Baseless Fishing Expedition.

#### (a) Applicable Law

To qualify as a "reasonable" exercise of governmental authority under the Fourth Amendment, the CID must have been issued pursuant to a legitimate suspicion that the law has been violated. *See Am. Tobacco Co.*, 264 U.S. at 306. That means the government may not "direct fishing expeditions into private papers on the possibility that they may disclose evidence of crime." *Id.* Courts therefore examine subpoenas to determine whether the burden they impose is justified by any legitimate possibility that the law has been violated. When it is not, courts enjoin the enforcement of the subpoena. *See Crist*, 331 F.3d at 1187-88.

#### (b) Discussion

The CID is a baseless fishing expedition. It does not even attempt to limit the scope of its inquiry to documents that might be relevant to a plausible violation of the law. To the contrary, the CID's sweeping demands reveal the pretextual character of the Attorney General's investigation. As discussed in Section I.A, *supra*, the Attorney General's statements at the press conference confirm her true motive: to suppress speech, not enforce the law. That conclusion also follows from the dubious bases for the investigation.

ExxonMobil could not have committed the offenses that the CID purports to investigate, because—both before and throughout the limitations periods—ExxonMobil forthrightly and publicly disclosed the risks associated with climate change. The CID supposedly investigates whether ExxonMobil committed consumer or securities fraud by misrepresenting to the public its

understanding regarding the risks of climate change. The limitations period is four years.[64]
Since long before 2012, however, ExxonMobil has publicly recognized the need for action
regarding climate change and the potential risks that climate change poses to its business. Since
2002, ExxonMobil has supported the Global Climate and Energy Project at Stanford University,
which has a mission of "conduct[ing] fundamental research on technologies that will permit the
development of global energy systems with significantly lower greenhouse gas emissions."[65]
ExxonMobil's *2006 Corporate Citizenship Report* recognized that "the risk to society and
ecosystems from rising greenhouse gas emissions could prove to be significant."[66] Despite
noting that "[c]limate remains an extraordinarily complex area of scientific study," it reasoned
that "strategies that address the risk need to be developed and implemented."[67] Moreover, for at
least the past ten years, ExxonMobil has discussed the risks associated with climate change in its
public Securities and Exchange Commission filings.[68] In its 2006 10-K, ExxonMobil stated that
the "risks of global climate change" "have been, and may in the future" continue to impact its
operations.[69] Similarly, in its 2009 10-K, ExxonMobil noted that the "risk of climate change"
and "pending greenhouse gas regulations" may increase its "compliance costs."[70] ExxonMobil's
forthright and public recognition of the risks associated with climate change thus predate the
limitations period by years, and foreclose the possibility that it committed securities or consumer
fraud under the theory articulated by the Attorney General.

That ExxonMobil could not have violated the law also follows from an examination of
the activities the CID purports to investigate. The Attorney General's investigation supposedly

---

[64] *Infra* Section I.B.2. Mass. Gen. Law ch. 93A, § 2, M.G.L. ch. 260, § 5A.
[65] Ex. DD at App. 253-54.
[66] Ex. T at 193.
[67] *Id.*
[68] *See, e.g.,* Ex. U at 199-203; Ex. V at 206-12.
[69] Ex. U at 202-03.
[70] Ex. V at 211.

concerns possible violations of Mass. Gen. Law ch. 93A, § 2, which prohibits "unfair or deceptive acts or practices" in "trade or commerce." The CID says that the Attorney General is investigating ExxonMobil's "marketing and/or sale of energy and other fossil fuel derived products" to consumers in the Commonwealth," and its "marketing and/or sale of securities . . . to investors in the Commonwealth."[71]

It is inconceivable that ExxonMobil deceived Massachusetts consumers or investors during the limitations period. At no point during the past five years has ExxonMobil (i) sold fossil fuel derived products to consumers in Massachusetts, or (ii) owned or operated a single retail store or gas station in the Commonwealth.[72] And, ExxonMobil has not sold any form of equity to the general public in Massachusetts in the past five years, nor has it sold debt to the general public in the Commonwealth in the last decade.[73] The materials sought by the CID thus cannot be relevant to any possible violation of the statute. In fact, because ExxonMobil has not engaged in the activities purportedly under investigation in Massachusetts during the limitations period, it has no "suit-related" contacts with Massachusetts and is not subject to the personal jurisdiction of Massachusetts courts. *See Walden* v. *Fiore*, 134 S. Ct. 1115, 1121-23 (2014). The CID is therefore precisely the type of fishing expedition that the Fourth Amendment forbids.

### C. The Attorney General Cannot Serve as the Disinterested Prosecutor that Due Process Requires.

The Attorney General's improper statements at the press conference establish that she cannot serve as a disinterested prosecutor. Her comments evinced personal bias against ExxonMobil, improper motives in launching her investigations, and prejudgment of ExxonMobil's liability.

---

[71] Ex. B at App. 23.
[72] Ex. HH at App. 296.
[73] Ex. GG at App. 292-93. This is subject to the one exception discussed above—*i.e.*, short-term, fixed-rate notes, which ExxonMobil has sold to institutional purchasers in the Commonwealth. *See supra* n.52.

### 1.    Applicable Law

Due process guarantees ExxonMobil a prosecutor who will set aside his or her own interest—financial, political, or otherwise—in favor of a single interest: "that justice shall be done." *Berger* v. *United States*, 295 U.S. 78, 88 (1935). That requirement bars a prosecutor from "injecting a personal interest . . . into the enforcement process." *Marshall* v. *Jerrico, Inc.*, 446 U.S. 238, 249-50 (1980). It also prohibits a prosecutor from pursuing a case when he or she is "influenced by improper motives." *Young* v. *U.S. ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 807 (1987). These fundamental safeguards "help[] to guarantee that life, liberty, or property will not be taken on the basis of an erroneous or distorted conception of the facts or the law." *Marshall*, 446 U.S. at 242. They similarly "preserve[] both the appearance and reality of fairness, generating the feeling, so important to a popular government, that justice has been done." *Id.* (citation and internal quotation marks omitted).

These principles require prosecutors to abide by "standards of prosecutorial ethics," including their obligation to "respect the presumption of innocence" and "refrain[] from speaking in public about pending and impending cases except in very limited circumstances." *United States* v. *Bowen*, 799 F.3d 336, 353-54 (5th Cir. 2015). Prosecutors violate these requirements when they make "[i]nflammatory and biased" comments about ongoing matters." *Id.* at 358.

### 2.    Discussion

The Attorney General cannot serve as a disinterested prosecutor in her investigation of ExxonMobil because her statements at the press conference create "an appearance of impropriety" that "undermine[s] [the public] confidence" in her investigation. *U.S. ex rel. S.E.C.* v. *Carter*, 907 F.2d 484, 488 (5th Cir. 1990). As explained above, her statements revealed that her investigation improperly aims to suppress dissenting views about climate change and the proper policy responses to it, not to investigate and enforce potential violations of law. *Supra*

Section I.A. The Attorney General also expressed a personal bias against ExxonMobil and a premature judgment regarding the findings of her investigation.

The Attorney General claimed that "in [her] view," she had a "moral obligation" to combat climate change because "[n]othing is more important."[74] And weeks before even serving the CID, the Attorney General announced the results of her investigation: "We can all see today the troubling disconnect between what Exxon knew . . . and what the company and industry chose to share with investors and with the American public."[75]

Such statements falsely and misleadingly prejudge ExxonMobil's liability, and they have no place in a government investigation. *See Bowen*, 799 F.3d at 354. Statements of this kind—in conjunction with the Attorney General's desire to suppress ExxonMobil's political speech—confirm that the Attorney General cannot conduct her investigation in an even-handed manner, as required by due process. *See Wright* v. *United States*, 732 F.2d 1048, 1056 (2d Cir. 1984) (A prosecutor "is not disinterested if he has . . . an axe to grind against the defendant."). The Attorney General's investigation therefore violates due process.

### D. The CID Regulates Interstate Commerce, in Violation of the Dormant Commerce Clause.

The CID violates the Dormant Commerce Clause because it overwhelmingly regulates speech that occurs outside of Massachusetts.

#### 1. Applicable Law

The Commerce Clause grants Congress the exclusive power to regulate commerce among the states. *See* U.S. Const. art. I, § 8, cl. 3. Because Congress alone may regulate interstate commerce, states cannot "regulat[e] commerce occurring wholly outside that State's borders." *Healy* v. *Beer Inst., Inc.*, 491 U.S. 324, 332 (1989). A state burdens the flow of interstate

---

[74] Ex. A at App. 13.
[75] *Id.*

commerce and violates the Dormant Commerce Clause when its action has the "practical effect of controlling conduct outside of the state." *Pharm. Research Mfrs. of Am.* v. *Concannon*, 249 F.3d 66, 79 (1st Cir. 2001). The key question is "whether the practical effect of the regulation is to control conduct beyond the boundaries of the State." *Healy*, 491 U.S. at 336.

Although many Dormant Commerce Clause cases concern the regulation of out-of-state conduct, the same principles apply when the state seeks to regulate out-of-state speech. For example, in *American Booksellers Foundation* v. *Dean*, the Second Circuit considered whether a Vermont statute that prohibited the distribution of sexually explicit materials to minors over the internet violated the Dormant Commerce Clause. 342 F.3d 96, 99 (2d Cir. 2003). Recognizing that "it is difficult, if not impossible, for a state to regulate internet activities without projecting its legislation into other States," the Second Circuit held that the Vermont statute violated the Dormant Commerce Clause because "the rest of the nation [wa]s forced to comply with [Vermont's] regulation or risk prosecution." *Id.* at 103-04 (alteration omitted).

### 2. Discussion

The Attorney General has improperly used her law enforcement authority to regulate ExxonMobil's out-of-state speech. The CID regulates ExxonMobil's speech outside of Massachusetts, because it requests documents and communications that ExxonMobil made or created exclusively in other states and not in Massachusetts.

The CID demands materials relating to ExxonMobil's public statements and SEC filings. But ExxonMobil maintains its principal offices and all of its central operations in Texas, and these communications were made outside of Massachusetts.[76] The CID likewise demands documents related to ExxonMobil's research into climate change and to various speeches made by ExxonMobil executives regarding climate change. But again, those materials have no

---

[76] Ex. B at App. 38-40 (Request Nos. 15-16, 19, 22).

connection to Massachusetts.[77] The CID also requests ExxonMobil's communications with 12 organizations.[78] Only one of these organizations has an office in Massachusetts. The Attorney General is hard pressed to identify any document category that has a relevant connection to Massachusetts.

In light of the CID's almost exclusive focus on out-of-state speech, it should come as no surprise that the practical effect of the CID is to burden primarily out-of-state activity. Requiring ExxonMobil to produce the sought-after materials—which in no way relate to Massachusetts— effectively regulates speech that occurred wholly outside of Massachusetts, in violation of the Dormant Commerce Clause.

## II.    ExxonMobil Faces a Substantial Threat of Irreparable Injury.

To establish that it faces a substantial threat of irreparable injury, a party "need show only a significant threat of injury from the impending action, that the injury is imminent, and that money damages would not fully repair the harm." *Humana, Inc.* v. *Jacobson*, 804 F.2d 1390, 1394 (5th Cir. 1986). "A violation of constitutional rights constitutes irreparable harm." *Cohen* v. *Coahoma Cnty.*, 805 F. Supp. 398, 406 (N.D. Miss. 1992); *see Palmer ex rel. Palmer* v. *Waxahachie Indep. Sch. Dist.*, 579 F.3d 502, 506 (5th Cir. 2009).

As described in Section I.A, the CID violates ExxonMobil's First Amendment rights. And that is not the only impending deprivation of constitutional rights that ExxonMobil faces. Unless the injunction is granted, ExxonMobil will have two choices: (1) it can comply with the CID, which violates its First, Fourth, and Fourteenth Amendment rights and the Dormant Commerce Clause for the reasons described above, or (2) it can risk an enforcement action—and perhaps a prosecution—that is traceable to unconstitutional motives, which will subject it to

---

[77]    Ex. B at App. 23-51 (Request Nos. 1-4, 14, 17, 22; Request Nos. 8-12, 32).
[78]    Ex. B at App. 35 (Request No. 5).

precisely the same constitutional harms.  Under these circumstances, if ExxonMobil has shown

that it is likely to prevail on the merits, then it also faces an impending irreparable harm.

**III.    The Threatened Injury to ExxonMobil Outweighs any Potential Harm to the Attorney General, and an Injunction Would Serve the Public Interest.**

The constitutional injuries ExxonMobil faces far outweigh any harm that would follow

from the issuance of the injunction.  Enjoining the enforcement of this CID will not frustrate the

Attorney General's ability to enforce the law through lawful investigations.    Because

ExxonMobil's constitutional rights are at stake, enjoining the enforcement of the CID necessarily

would serve the public interest in protecting the exercise of those rights. *Opulent Life Church* v.

*City of Holly Springs*, 697 F.3d 279, 298 (5th Cir. 2012); *White* v. *Baker*, 696 F. Supp. 2d 1289,

1313 (N.D. Ga. 2010).

## CONCLUSION

The Attorney General and the Green 20 are entitled to their view that the world should

cease relying on fossil fuels.  They can campaign on that view, they can support other candidates

for public office who share that view, and they can use the considerable platforms provided by

their offices to urge their constituents to adopt that view.  The Attorney General's office gives

her no license, however, to compel by coercive force that which she has not earned through the

only method of achieving political change that comports with our political system: persuasion.

Our Constitution "eschew[s] silence coerced by law—the argument of force in its worst

form." *New York Times Co.* v. *Sullivan*, 376 U.S. 254, 270 (1964) (internal quotation marks

omitted).  Instead, the American system "presupposes that right conclusions are more likely to be

gathered out of a multitude of tongues, than through any kind of authoritative selection." *Id.*

Because the CID breaks faith with this basic ingredient of the American bargain, the Attorney

General should not be permitted to enforce it.

Dated:  June 15, 2016

Respectfully submitted,

EXXON MOBIL CORPORATION
Patrick J. Conlon
(*pro hac vice* pending)
State Bar No. 24054300
Daniel E. Bolia
State Bar No. 24064919
daniel.e.bolia@exxonmobil.com
1301 Fannin Street
Houston, TX 77002
(832) 624-6336


Theodore V. Wells, Jr.
(*pro hac vice* pending)
twells@paulweiss.com
Michele Hirshman
(*pro hac vice* pending)
Daniel J. Toal
(*pro hac vice* pending)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON, LLP
1285 Avenue of the Americas
New York, NY  10019-6064
(212) 373-3000
Fax: (212) 757-3990

Justin Anderson
(*pro hac vice* pending)
janderson@paulweiss.com
2001 K Street, NW
Washington, D.C.  20006-1047
(202) 223-7300
Fax: (202) 223-7420


*Counsel for Exxon Mobil Corporation*

Ralph H. Duggins
State Bar No. 06183700
rduggins@canteyhanger.com
Philip A. Vickers
State Bar No. 24051699
pvickers@canteyhanger.com
Alix D. Allison
State Bar. No. 24086261
aallison@canteyhanger.com
CANTEY HANGER LLP
600 West 6th Street, Suite 300
Fort Worth, TX 76102
(817) 877-2800
Fax: (817) 877-2807


Nina Cortell
State Bar No. 04844500
nina.cortell@haynesboone.com
HAYNES & BOONE, LLP
2323 Victory Avenue
Suite 700
Dallas, TX 75219
(214) 651-5579
Fax: (214) 200-0411

## CERTIFICATE OF SERVICE

I hereby certify that on June 15, 2016, a copy of the foregoing instrument was served on the following party via **certified mail, return receipt requested,** in accordance with the Federal Rules of Civil Procedure:

Maura Healey
Office Massachusetts Attorney General's Office
One Ashburton Place
Boston, MA 02108-1518

Philip A. Vickers