ORIGINAL

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED
JUN 15 2016
12:46 pm
CLERK, U.S. DISTRICT COURT
By ____________
Deputy

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| EXXON MOBIL CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>MAURA TRACY HEALEY, Attorney General of Massachusetts, in her official capacity,<br><br>Defendant. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CIVIL ACTION NO. 4:16-CV-469-A |

**APPENDIX IN SUPPORT OF PLAINTIFF EXXON MOBIL CORPORATION'S MOTION FOR PRELIMINARY INJUNCTION**


| Exhibit | Description | Page(s) |
|---|---|---|
| N/A | Declaration of Justin Anderson (June 14, 2016) | viii – xvi |
| A | Transcript of the AGs United for Clean Power Press Conference, held on March 29, 2016, which was prepared by counsel based on a video recording of the event. The video recording is available at http://www.ag.ny.gov/press-release/ag-schneiderman-former-vice-president-al-gore-and-coalition-attorneys-general-across | App.1 – App. 21 |
| B | Massachusetts Civil Investigative Demand | App. 22 – App. 51 |
| C | Press Release, New York State Office of the Attorney General, *A.G. Schneiderman, Former Vice President Al Gore and a Coalition of Attorneys General from Across the Country Announce Historic State-Based Effort to Combat Climate Change* (Mar. 29, 2016), http://www.ag.ny.gov/press-release/ag-schneiderman-former-vice-president-al-gore-and-coalition-attorneys-general-across | App. 52 – App. 55 |

| **Exhibit** | **Description** | **Page(s)** |
|---|---|---|
| D | Press Release, State of Alabama Office of the Attorney General, *State AG's Strange, Pruitt Condemn Attempts to Silence Those Who Disagree with President Obama's Energy Agenda* (Mar. 30, 2016), http://www.ago.state.al.us/News-800 | App. 56 – App. 57 |
| E | Press Release, *Attorney General Jeff Landry Slams Al Gore's Coalition*, State of Louisiana Office of the Attorney General (Mar. 30, 2016), https://www.ag.state.la.us/Article.aspx?articleID=2207& catID=2 | App. 58 – App. 59 |
| F | Michael Bastasch, *Kansas AG Takes on Al Gore's Alarmism – Won't Join Anti-Exxon 'Publicity Stunt,'* The Daily Caller (Apr. 4, 2016), http://dailycaller.com/2016/04/04/kansas-ag-takes-on-al-gores-alarmism-wont-join-ant-exxon-publicity-stunt | App. 60 – App.62 |
| G | Kyle Feldscher, *West Virginia AG 'Disappointed' in Probes of Exxon Mobil*, Wash. Examiner (Apr. 5, 2016), http://www.washingtonexaminer.com/west-virginia-ag-disappointed-in-probes-of-exxon-mobil/article/2587724 | App. 63 – App. 67 |
| H | Letter from Representative Lamar Smith, Congressman for the 21st District of Texas, et al. to Eric Schneiderman, Attorney General of New York (Mar. 18, 2016), *available at* https://science.house.gov/sites/republicans.science.house.gov/files/documents/05.18.16%20SST%20Letter%20to%20NY%20AG.pdf | App. 68 – App. 74 |
| I | E-mail from Wendy Morgan, Chief of Public Protection, Office of the Vermont Attorney General to Michael Meade, Director, Intergovernmental Affairs Bureau, Office of the New York Attorney General (Mar. 18, 2016, 6:06 PM), *available at* http://eelegal.org/wp-content/uploads/2016/04/Development-of-Agenda.pdf | App. 75 – App. 85 |
| J | *Peter Frumhoff*, Union of Concerned Scientists, http://www.ucsusa.org/about/staff/staff/peter-frumhoff.html#.VyT3oYSDFHw (last visited May 20, 2016, 12:22 PM) | App. 86 – App. 93 |

| Exhibit | Description | Page(s) |
|---|---|---|
| K | *Global Warming Solutions: Fight Misinformation*, Union of Concerned Scientists, http://www.ucsusa.org/our-work/global-warming/solutions/global-warming-solutions-fight-misinformation#.Vx-PC_krJpg (last visited May 20, 2016, 1:02 PM) | App. 94 – App. 107 |
| L | *Matthew F. Pawa*, Pawa Law Group, P.C., http://www.pawalaw.com/ attorneys/matthew-pawa (last visited May 20, 2016, 12:54 PM) | App. 108 – App. 110 |
| M | *Practice Areas*, Pawa Law Group, P.C., http://www.pawalaw.com/ practice-areas (last visited May 20, 2016, 12:29 PM) | App. 111 – App. 113 |
| N | Seth Shulman, Union of Concerned Scientists and Climate Accountability Institute, *Establishing Accountability for Climate Change Damages: Lessons from Tobacco Control* (October 2012), *available at* http://www.climateaccountability.org/pdf/ Climate%20Accountability%20Rpt%20Oct12 | App. 114 – App. 150 |
| O | Alana Goodman, *Memo Shows Secret Coordination Effort Against ExxonMobil by Climate Activists, Rockefeller Fund*, Wash. Free Beacon (Apr. 14, 2016, 5:00 PM), http://freebeacon.com/issues/ memo-shows-secret-coordination-effort-exxonmobil-climate-activists-rockefeller-fund | App. 151 – App. 153 |
| P | E-mail from Lemuel Srolovic, Bureau Chief, Environmental Protection Bureau, Office of the New York State Attorney General, to Matthew Pawa, President, Pawa Law Group, P.C. (Mar. 30, 2016, 9:01 PM), *available at* http://www.washingtonexaminer.com/ny-atty.-general-sought-to-keep-lawyers-role-in-climate-change-push-secret/article/2588874'custom_click=rss | App. 154 – App. 155 |

| Exhibit | Description | Page(s) |
|---|---|---|
| Q | E-mail from Peter Washburn, Policy Advisor, Environmental Protection Bureau of the New York Attorney General, to Lemuel Srolovic, Bureau Chief, Environmental Protection Bureau, Office of the New York State Attorney General; Scot Kline, Assistant Attorney General, Office of the Vermont Attorney General; and Wendy Morgan Chief of Public Protection, Office of the Vermont Attorney General (Mar. 25, 2016, 11:49 AM), *available at* http://eelegal.org/wp-content/uploads/2016/04/Questionnaire-responses.pdf | App. 156 – App. 163 |
| R | *About Us*, Cohen Milstein, http://www.cohenmilstein.com/about.php (last visited May 21, 2016) | App. 164 – App. 170 |
| S | Exxon Mobil Corp., *Corporate Citizenship in a Changing World* (2002) | App. 171 – App. 188 |
| T | Exxon Mobil Corp., *2006 Corporate Citizenship Report* (2007) | App. 189 – App. 196 |
| U | Exxon Mobil Corp., *Annual Report (Form 10-K)* (Feb. 28, 2007) | App. 197 – App. 203 |
| V | Exxon Mobil Corp., *Annual Report (Form 10-K)* (Feb. 26, 2010) | App. 204 – App. 212 |
| W | Plea in Intervention of the States of Texas and Alabama by Ken Paxton, Attorney General of Texas, and Luther Strange, Attorney General of Alabama (May 16, 2016), ECF No. 1 Ex. 27 | App. 213 – App. 220 |
| X | Press Release, *Attorney General Paxton Intervenes in First Amendment Case*, The Attorney General of Texas (May 16, 2016), https://texasattorneygeneral.gov/news/releases/attorney-general-paxton-intervenes-in-first-amendment-case | App. 221 – App. 224 |
| Y | Press Release, *Alabama Joins Intervention in Case to Protect First Amendment Right of Businesses from Government Threats of Criminal Prosecution*, State of Alabama Office of the Attorney General (May 16, 2016), http://www.ago.state.al.us/News-837 | App. 225 – App. 233 |

| Exhibit | Description | Page(s) |
|---|---|---|
| Z | Associated Press, *AG Won't Send Documents on Probe of Exxon Mobil*, N.Y. L.J. (June 3, 2016), *available at* http://www.newyorklawjournal.com/home/id=1202759197079/AG-Wont-Send-Documents-on-Probe-of-Exxon-Mobil?mcode=1202615069279&curindex=1&slreturn=20160503101116 | App. 234 – App. 236 |
| AA | Steven Mufson, *Environmental Groups Reject Rep. Lamar Smith's Request for Information on ExxonMobil Climate Case*, Wash. Post (June 1, 2013), https://www.washingtonpost.com/news/powerpost/wp/2016/06/01/environmental-groups-reject-rep-smiths-request-for-information-on-exxon-mobil-climate-case/ | App. 237 – App. 241 |
| BB | Letter from U.S. Senator Mike Lee of Utah, et al., to Loretta Lynch, U.S. Attorney General (May 25, 2016), *available at* http://www.cruz.senate.gov/files/documents/Letters/20160526_ClimateChangeLetter.pdf | App. 242 – App. 245 |
| CC | Justin Gillis & Clifford Krauss, *Exxon Mobil Investigated for Possible Climate Change Lies by New York Attorney General*, N.Y. Times (Nov. 5, 2015), http://www.nytimes.com/2015/11/06/science/exxon-mobil-under-investigation-in-new-york-over-climate-statements.html?_r=0 | App. 246 – App. 251 |
| DD | Stanford University Global Climate & Energy Project, *About Us*, https://gcep.stanford.edu/about/index.html (last visited Apr. 12, 2016) | App. 252 – App. 254 |
| EE | *Endangerment and Cause or Contribute Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act*, EPA, http://www3.epa.gov/climatechange/endangerment (last updated June 10, 2016) | App. 255 – App. 257 |
| FF | Jeremy Carl & David Fedor, Hoover Institution at Stanford University: Shultz-Stephenson Task Force on Energy Policy, *Revenue-Neutral Carbon Taxes in the Real World: Insights from British Columbia and Australia* (2012), *available at* http://media.hoover.org/sites/default/files/documents/CarlFedor_HooverETF2012_RevenueNeutralCarbonTaxesInBCandAUS.pdf | App. 258 – App. 290 |
| GG | Declaration of Robert Luettgen (June 14, 2016) | App. 291 – App. 293 |

| Exhibit | Description | Page(s) |
|---|---|---|
| HH | Declaration of Geoffrey Grant Doescher (June 10, 2016) | App. 294 – App. 296 |
| II | Press Release, Energy & Env't Legal Inst., *Emails Reveal Schneiderman, Other AG's Colluding with Al Gore and Greens to Investigate Climate Skeptics*, Energy & Environment Legal Institute (Apr. 15, 2016), *available at* http://eelegal.org/2016/04/15/release-emails-reveal-schneiderman-other-ags-colluding-with-al-gore-and-greens-to-investigate-climate-skeptics | App. 297 – App. 304 |
| JJ | Greenpeace, *ExxonMobil Climate Denial Funding 1998-2014*, ExxonSecrets.org, http://www.exxonsecrets.org/html/index.php (last visited June 11, 2016, 2:18 PM) | App. 305 – App. 308 |
| KK | Exxon Mobil Corp., *Annual Report (Form 10-K)* (Feb. 24, 2016) | App. 309 – App. 314 |
| LL | Union of Concerned Scientists, *Smoke, Mirrors, and Hot Air: How ExxonMobil Uses Big Tobacco's Tactics to Manufacture Uncertainty on Climate Science* (2007), *available at* http://www.ucsusa.org/sites/default/files/legacy/assets/documents/global_warming/exxon_report.pdf. | App. 315 – App. 325 |
| MM | E-mail from Michael Meade, Director, Intergovernmental Affairs Bureau, Office of the New York Attorney General, to Scot Kline, Assistant Attorney General, Office of the Vermont Attorney General, and Wendy Morgan, Chief of Public Protection, Office of the Vermont Attorney General (Mar. 22, 2016, 4:51 PM), *available at* http://eelegal.org/wp-content/uploads/2016/04/Gore-is-adding-star-power-and-words-to-avoid.pdf | App. 326 – App. 329 |
| NN | E-mail from Scot Kline, Assistant Attorney General, Office of the Vermont Attorney General, to Lemuel Srolovic, Bureau Chief, Environmental Protection Bureau, Office of the New York State Attorney General (Mar. 28, 2016, 9:08 AM), *available at* http://eelegal.org/wp-content/uploads/2016/04/Common-Interest-Agreement-and-discussion.pdf | App. 330 – App. 334 |
| OO | E-mail from Kenny Bruno to Matthew Pawa, President, Pawa Law Group, P.C. (January 5, 2016), *available at* http://freebeacon.com/wp-content/uploads/2016/04/scan0003.pdf | App. 335 – App. 336 |

Dated: June 15, 2016


EXXON MOBIL CORPORATION
Patrick J. Conlon
(patrick.j.conlon@exxonmobil.com)
State Bar No. 24054300
(*pro hac vice* pending)
Daniel E. Bolia
(daniel.e.bolia@exxonmobil.com)
State Bar No. 24064919
1301 Fannin Street
Houston, TX 77002
(832) 624-6336

Theodore V. Wells, Jr.
(*pro hac vice* pending)
Michele Hirshman
(*pro hac vice* pending)
Daniel J. Toal
(*pro hac vice* pending)
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
(212) 373-3000
Fax: (212) 757-3990

Justin Anderson
(*pro hac vice* pending)
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
2001 K Street, NW
Washington, D.C. 20006-1047
(202) 223-7300
Fax: (202) 223-7420

/s/ Philip Vickers

Ralph H. Duggins
(rduggins@canteyhanger.com)
State Bar No. 06183700
Philip A. Vickers
(pvickers@canteyhanger.com)
State Bar No. 24051699
Alix D. Allison
(aallison@canteyhanger.com)
State Bar. No. 24086261
CANTEY HANGER LLP
600 W. 6th St. #300
Fort Worth, TX 76102
(817) 877-2800
Fax: (817) 877-2807

Nina Cortell
(nina.cortell@haynesboone.com)
State Bar No. 04844500
HAYNES & BOONE, LLP
2323 Victory Avenue
Suite 700
Dallas, TX 75219
(214) 651-5579
Fax: (214) 200-0411


*Counsel for Exxon Mobil Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that on June 15, 2016, a copy of the foregoing instrument was served on the following party via **certified mail, return receipt requested,** in accordance with the Federal Rules of Civil Procedure:

Maura Healey
Office Massachusetts Attorney General's Office
One Ashburton Place
Boston, MA 02108-1518

Philip A. Vickers

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| EXXON MOBIL CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>MAURA TRACY HEALEY, Attorney General of Massachusetts, in her official capacity,<br><br>Defendant. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CIVIL ACTION NO. __________ |

**DECLARATION OF JUSTIN ANDERSON**

I, Justin Anderson, declare as follows:

1. My name is Justin Anderson. I have a pending application to practice law *pro hac vice* in the U.S. District Court for the Northern District of Texas and am a counsel with the law firm of Paul, Weiss, Rifkind, Wharton & Garrison LLP. I am one of the attorneys representing Exxon Mobil Corporation ("ExxonMobil") in this matter. I am over 18 years of age and am fully competent in all respects to make this Declaration. I have personal knowledge of the facts stated herein, based on my experience or my consultation with others, or they are known to me in my capacity as counsel for ExxonMobil, and each of them is true and correct.

2. I submit this declaration in support of Plaintiff Exxon Mobil Corporation's Complaint.

3. To comply with the civil investigative demand issued by Massachusetts Attorney General Maura Healey on April 19, 2016, ExxonMobil would need to collect, review, and produce millions (and potentially tens of millions) of pages of documents.

4. Based on my experience and my consultation with others, responding to document requests as broad as the ones in the civil investigative demand costs millions of dollars.

5. Attached to this declaration as Exhibit A is a true and correct transcript of the AGs United for Clean Power Press Conference, held on March 29, 2016, which was prepared by counsel based on a video recording of the event. The video recording is available at http://www.ag.ny.gov/press-release/ag-schneiderman-former-vice-president-al-gore-and-coalition-attorneys-general-across.

6. Attached to this declaration as Exhibit B is a true and correct copy of the Civil Investigative Demand served on Exxon Mobil Corporation by the Massachusetts Attorney General's Office.

7. Attached to this declaration as Exhibit C is a true and correct copy of a press release by the New York Attorney General's Office, dated March 29, 2016, obtained from http://www.ag.ny.gov/press-release/ag-schneiderman-former-vice-president-al-gore-and-coalition-attorneys-general-across.

8. Attached to this declaration as Exhibit D is a true and correct copy of a press release by the Alabama Attorney General's Office, dated March 30, 2016, obtained from http://www.ago.state.al.us/News-800.

9. Attached to this declaration as Exhibit E is a true and correct copy of a press release by the Louisiana Attorney General's Office, dated March 30, 2016, obtained from https://www.ag.state.la.us/Article.aspx?articleID=2207&catID=2.

10. Attached to this declaration as Exhibit F is a true and correct copy of an article by Michael Bastasch published in the *Daily Caller* on April 4, 2016, obtained from http://dailycaller.com/2016/04/04/kansas-ag-takes-on-al-gores-alarmism-wont-join-ant-exxon-publicity-stunt.

11. Attached to this declaration as Exhibit G is a true and correct copy of an article by Kyle Feldscher published in the *Washington Examiner* on April 5, 2016, obtained from http://www.washingtonexaminer.com/west-virginia-ag-disappointed-in-probes-of-exxon-mobil/article/2587724.

12. Attached to this declaration as Exhibit H is a true and correct copy of a letter from Representative Lamar Smith to Eric Schneiderman, dated March 18, 2016, obtained from https://science.house.gov/sites/republicans.science.house.gov/files/documents/05. 18.16%20SST%20Letter%20to%20NY%20AG.pdf.

13. Attached to this declaration as Exhibit I is a true and correct copy of an e-mail from Wendy Morgan to Michael Meade, dated March 18, 2016, obtained from http://eelegal.org/wp-content/uploads/2016/04/Development-of-Agenda.pdf.

14. Attached to this declaration as Exhibit J is a true and correct copy of the Union for Concerned Scientists's profile of Peter Frumhoff, obtained from http://www.ucsusa.org/about/staff/staff/peter-frumhoff.html#.VyT3oYSDFHw on May 20, 2016.

15. Attached to this declaration as Exhibit K is a true and correct copy of an article published by the Union for Concerned Scientists, obtained from http://www.ucsusa.org/our-work/global-warming/solutions/global-warming-solutions-fight-misinformation#.Vx-PC_krJpg on May 20, 2016.

16. Attached to this declaration as Exhibit L is a true and correct copy of the Pawa Law Group's profile of Matthew F. Pawa, obtained from http://www.pawalaw.com/attorneys/matthew-pawa on May 20, 2016.

17. Attached to this declaration as Exhibit M is a true and correct copy of the Pawa Law Group's description of its practice areas, obtained from http://www.pawalaw.com/practice-areas on May 20, 2016.

18. Attached to this declaration as Exhibit N is a true and correct copy of a report by Seth Shulman, dated October 2012, obtained from http://www.climateaccountability.org/pdf/Climate%20Accountability%20Rpt%20Oct12.

19. Attached to this declaration as Exhibit O is a true and correct copy of an article by Alana Goodman published in the *Washington Free Beacon* on April 14, 2016, obtained from http://freebeacon.com/issues/memo-shows-secret-coordination-effort-exxonmobil-climate-activists-rockefeller-fund.

20. Attached to this declaration as Exhibit P is a true and correct copy of an e-mail from Lemuel Srolovic to Matthew Pawa, dated March 30, 2016, obtained from http://www.washingtonexaminer.com/ny-atty.-general-sought-to-keep-lawyers-role-in-climate-change-push-secret/article/2588874'custom_click=rss.

21. Attached to this declaration as Exhibit Q is a true and correct copy of an e-mail from Peter Washburn to Lemuel Srolovic, et al., dated March 25, 2016, obtained from http://eelegal.org/wp-content/uploads/2016/04/Questionnaire-responses.pdf.

22. Attached to this declaration as Exhibit R is a true and correct copy of Cohen Milstein Sellers & Toll's "About Us" webpage, obtained from http://www.cohenmilstein.com/about.php on May 21, 2016.

23. Attached to this declaration as Exhibit S is a true and correct excerpt of Exxon Mobil Corporation's *Corporate Citizenship in a Changing World* report, dated 2002, obtained from ExxonMobil's files.

24. Attached to this declaration as Exhibit T is a true and correct excerpt of Exxon Mobil Corporation's *2006 Corporate Citizenship Report*, dated 2007, obtained from http://www.socialfunds.com/csr/reports/Exxon_Mobil_2006_Corporate_Citizenship_Report.pdf.

25. Attached to this declaration as Exhibit U is a true and correct excerpt of Exxon Mobil Corporation's *Annual Report (Form 10-K)*, dated February 28, 2007.

26. Attached to this declaration as Exhibit V is a true and correct excerpt of Exxon Mobil Corporation's *Annual Report (Form 10-K)*, dated February 26, 2010.

27. Attached to this declaration as Exhibit W is a true and correct copy of the plea in intervention filed in Exxon Mobil Corporation's action against the Virgin Islands Attorney General by the attorneys general of Texas and Alabama, obtained from pacer.gov.

28. Attached to this declaration as Exhibit X is a true and correct copy of a press release published by the Texas Attorney General's Office, dated May 16, 2016, obtained from https://texasattorneygeneral.gov/news/releases/attorney-general-paxton-intervenes-in-first-amendment-case.

29. Attached to this declaration as Exhibit Y is a true and correct copy of a press release published by the Alabama Attorney General's Office, dated May 16, 2016, obtained from http://www.ago.state.al.us/News-837.

30. Attached to this declaration as Exhibit Z is a true and correct copy of an article by the Associated Press published in the *New York Law Journal* on June 3, 2016, obtained from http://www.newyorklawjournal.com/home/id=1202759197079/AG-Wont-Send-Documents-on-Probe-of-Exxon-Mobil?mcode=1202615069279&curindex=1&slreturn=20160503101116.

31. Attached to this declaration as Exhibit AA is a true and correct copy of an article by Steven Mufson published in the *Washington Post* on June 1, 2013, obtained from https://www.washingtonpost.com/news/powerpost/wp/2016/06/01/environmental-groups-reject-rep-smiths-request-for-information-on-exxon-mobil-climate-case/.

32. Attached to this declaration as Exhibit BB is a true and correct copy of a letter from U.S. Senator Mike Lee to U.S. Attorney General Loretta Lynch, dated May 25, 2016, obtained from http://www.cruz.senate.gov/files/documents/Letters/20160526_ClimateChangeLetter.pdf.

33. Attached to this declaration as Exhibit CC is a true and correct copy of an article by Justin Gillis and Clifford Krauss published in the *New York Times* on November 5, 2015, obtained from http://www.nytimes.com/2015/11/06/science/exxon-mobil-under-investigation-in-new-york-over-climate-statements.html?_r=0.

34. Attached to this declaration as Exhibit DD is a true and correct copy of Stanford University's Global Climate & Energy Project's "About Us" webpage, obtained from https://gcep.stanford.edu/about/index.html.

35. Attached to this declaration as Exhibit EE is a true and correct copy of the Environmental Protection Agency's greenhouse gas "endangerment finding," obtained from http://www3.epa.gov/climatechange/endangerment on June 10, 2016.

36. Attached to this declaration as Exhibit FF is a true and correct copy of a report by Jeremy Carl and David Fedor, dated 2012, obtained from http://media.hoover.org/sites/default/files/documents/CarlFedor_HooverETF2012_RevenueNeutralCarbonTaxesInBCandAUS.pdf.

37. Attached to this declaration as Exhibit GG is a true and correct copy of the declaration signed by Robert Luettgen on June 14, 2016.

38. Attached to this declaration as Exhibit HH is a true and correct copy of the declaration signed by Geoffrey Grant Doescher on June 10, 2016.

39. Attached to this declaration as Exhibit II is a true and correct copy of a press release by the Energy and Environment Legal Institute, dated April 15, 2016, obtained from http://eelegal.org/2016/04/15/release-emails-reveal-schneiderman-other-ags-colluding-with-al-gore-and-greens-to-investigate-climate-skeptics.

40. Attached to this declaration as Exhibit JJ is a true and correct copy of a list of so-called climate "deniers" gathered by Greenpeace, obtained from http://www.exxonsecrets.org/html/index.php.

41. Attached to this declaration as Exhibit KK is a true and correct excerpt of Exxon Mobil Corporation's *Annual Report (Form 10-K)*, dated February 24, 2016.

42. Attached to this declaration as Exhibit LL is a true and correct excerpt of a report published by the Union of Concerned Scientists, dated 2007, obtained from http://www.ucsusa.org/sites/default/files/legacy/assets/documents/global_warming/exxon_report.pdf.

43. Attached to this declaration as Exhibit MM is a true and correct copy of an e-mail from Michael Meade to Scot Kline and Wendy Morgan, dated March 22, 2016, obtained from http://eelegal.org/wp-content/uploads/2016/04/Gore-is-adding-star-power-and-words-to-avoid.pdf.

44. Attached to this declaration as Exhibit NN is a true and correct copy of an e-mail from Scot Kline to Lemuel Srolovic, dated March 28, 2016, obtained from http://eelegal.org/wp-content/uploads/2016/04/Common-Interest-Agreement-and-discussion.pdf.

45. Attached to this declaration as Exhibit OO is a true and correct copy an email from Kenny Bruno to Matthew Pawa, et al., dated January 5, 2016, obtained from http://freebeacon.com/wp-content/uploads/2016/04/scan0003.pdf.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 14, 2016.

Justin Anderson
(janderson@paulweiss.com)
(*pro hac vice* pending)
Paul, Weiss, Rifkind, Wharton & Garrison LLP
2001 K Street, NW
Washington, DC 20006-1047
(202) 223-7321
Fax: (202) 204-7393

# Exhibit A

# AGs United For Clean Power Press Conference*

**March 29, 2016: 11:35 am – 12:32 pm**

**AG Schneiderman:** Thank you, good morning. I'm New York's Attorney General, Eric Schneiderman. I thank you for joining us here today for what we believe and hope will mark a significant milestone in our collective efforts to deal with the problem of climate change and put our heads together and put our offices together to try and take the most coordinated approach yet undertaken by states to deal with this most pressing issue of our time. I want to thank my co-convener of the conference, Vermont Attorney General, William Sorrel, who has been helping in joining us here and been instrumental in making today's events possible, and my fellow attorneys general for making the trip to New York for this announcement. Many of them had been working for years on different aspects of this problem to try and preserve our planet and reduce the carbon emissions that threaten all of the people we represent. And I'm very proud to be here today with Attorney General George Jepsen of Connecticut, Attorney General Brian Frosh of Maryland, Attorney General Maura Healey of Massachusetts, Attorney General Mark Herring of Virginia, and Attorney General Claude Walker of the U.S. Virgin Islands.

We also have staff representing other attorneys general from across the country, including: Attorney General Kamala Harris of California, Matt Denn of Delaware, Karl Racine of the District of Columbia, Lisa Madigan of Illinois, Tom Miller of Iowa, Janet Mills of Maine, Lori Swanson of Minnesota, Hector Balderas of New Mexico, Ellen Rosenblum of Oregon, Peter Kilmartin of Rhode Island and Bob Ferguson of Washington.

And finally, I want to extend my sincere thanks to Vice President Al Gore for joining us. It has been almost ten years since he galvanized the world's attention on climate change with his documentary *An Inconvenient Truth*.

And, I think it's fair to say that no one in American public life either during or beyond their time in elective office has done more to elevate the debate of our climate change or to expand global awareness about the urgency of the need for collective action on climate change than Vice President Gore. So it's truly an honor to have you here with us today.

* The following transcript of the AGs United For Clean Power Press Conference, held on March 29, 2016, was prepared by counsel based on a video recording of the event, which is available at http://www.ag.ny.gov/press-release/ag-schneiderman-former-vice-president-al-gore-and-coalition-attorneys-general-across.

# AGs United For Clean Power Press Conference

**March 29, 2016: 11:35 am – 12:32 pm**

So we've gathered here today for a conference – the first of its kind conference of attorneys general dedicated to coming up with creative ways to enforce laws being flouted by the fossil fuel industry and their allies in their short-sighted efforts to put profits above the interests of the American people and the integrity of our financial markets. This conference reflects our commitment to work together in what is really an unprecedented multi-state effort in the area of climate change. Now, we have worked together on many matters before and I am pleased to announce that many of the folks represented here were on the Amicus Brief we submitted to the United States Supreme Court in the *Friedrichs* v. *California Teacher Association* case. We just got the ruling that there was a four-four split so that the American labor movement survives to fight another day. And thanks, thanks to all for that effort and collaboration. It shows what we can do if we work together. And today we are here spending a day to ensure that this most important issue facing all of us, the future of our planet, is addressed by a collective of states working as creatively, collaboratively and aggressively as possible.

The group here was really formed when some of us came together to defend the EPA's Clean Power Plan, the new rules on greenhouse gases. And today also marks the day that our coalition is filing our brief in the Court of Appeals for the District of Columbia. In that important matter we were defending the EPA's rules. There is a coalition of other states on the other side trying to strike down the rules, but the group that started out in that matter together was 18 states and the District of Columbia. We call ourselves The Green 19, but now that Attorney General Walker of the Virgin Islands has joined us our rhyme scheme is blown. We can't be called The Green 19, so now we're The Green 20. We'll come up with a better name at some point.

But, ladies and gentlemen, we are here for a very simple reason. We have heard the scientists. We know what's happening to the planet. There is no dispute but there is confusion, and confusion sowed by those with an interest in profiting from the confusion and creating misperceptions in the eyes of the American public that really need to be cleared up. The U.S. Defense Department, no radical agency, recently called climate change an urgent and growing threat to our national security. We know that last month, February, was the furthest above normal for any month in history since 1880 when they started keeping meteorological records. The

facts are evident. This is not a problem ten years or twenty years in the future. [There are] people in New York who saw what happened with the additional storm surge with Super Storm Sandy. We know the water level in New York Harbor is almost a foot higher than it was. The New York State Department of Environmental Conservation, not some radical agency, predicts that if we continue at this pace, we'll have another 1.5 feet of water in New York Harbor. It'll go up by that much in 2050. So today, in the face of the gridlock in Washington, we are assembling a group of state actors to send the message that we are prepared to step into this breach. And one thing we hope all reasonable people can agree on is that every fossil fuel company has a responsibility to be honest with its investors and with the public about the financial and market risks posed by climate change. These are cornerstones of our securities and consumer protection laws.

My office reached a settlement last year based on the enforcement of New York securities laws with Peabody Energy. And they agreed to rewrite their financials because they had been misleading investors and the public about the threat to their own business plan and about the fact that they had very detailed analysis telling them how the price of coal would be going down in the face of actions taken by governments around the world. But they were hiding it from their investors. So they agreed to revise all of their filings with the SEC. And the same week we announced that, we announced that we had served a subpoena on ExxonMobil pursuing that and other theories relating to consumer and securities fraud. So we know, because of what's already out there in the public, that there are companies using the best climate science. They are using the best climate models so that when they spend shareholder dollars to raise their oil rigs, which they are doing, they know how fast the sea level is rising. Then they are drilling in places in the Arctic where they couldn't drill 20 years ago because of the ice sheets. They know how fast the ice sheets are receding. And yet they have told the public for years that there were no "competent models," was the specific term used by an Exxon executive not so long ago, no competent models to project climate patterns, including those in the Arctic. And we know that they paid millions of dollars to support organizations that put out propaganda denying that we can predict or measure the effects of fossil fuel on our climate, or even denying that climate change was happening.

**AGs United For Clean Power Press Conference**
**March 29, 2016: 11:35 am – 12:32 pm**

There have been those who have raised the question: aren't you interfering with people's First Amendment rights? The First Amendment, ladies and gentlemen, does not give you the right to commit fraud. And we are law enforcement officers, all of us do work, every attorney general does work on fraud cases. And we are pursuing this as we would any other fraud matter. You have to tell the truth. You can't make misrepresentations of the kinds we've seen here.

And the scope of the problem we're facing, the size of the corporate entities and their alliances and trade associations and other groups is massive and it requires a multi-state effort. So I am very honored that my colleagues are here today assembling with us. We know that in Washington there are good people who want to do the right thing on climate change but everyone from President Obama on down is under a relentless assault from well-funded, highly aggressive and morally vacant forces that are trying to block every step by the federal government to take meaningful action. So today, we're sending a message that, at least some of us – actually a lot of us – in state government are prepared to step into this battle with an unprecedented level of commitment and coordination.

And now I want to turn it over to my great colleague, the co-convener of this conference, Vermont Attorney General William Sorrel.

**AG Sorrel:** I am pleased that the small state of Vermont joins with the big state of New York and are working together to make this gathering today a reality. Truth is that states, large and small, have critical roles to play in addressing environmental quality issues. General Schneiderman has mentioned our filing today in the D.C. Circuit on the Clean Power Plan case. Going back some time, many of the states represented here joined with the federal government suing American Electric Power Company, the company operating several coal-fired electric plants in the Midwest and largely responsible for our acid rain and other air quality issues in the eastern part of the United States, ultimately resulting in what I believe to date is the largest settlement in an environmental case in our country's history. With help from a number of these states, we successfully litigated Vermont's adoption of the so-called California standard for auto emissions in federal court in Vermont, now the standard in the country. And right down to the present day, virtually all of the

states represented today are involved in looking at the alleged actions by Volkswagen and the issues relating to emissions from tens of thousands of their diesel automobiles.

But today we're talking about climate change which I don't think there's any doubt, at least in our ranks, is the environmental issue of our time. And in order for us to effectively address this issue, it's going to take literally millions of decisions and actions by countries, by states, by communities and by individuals. And, just very briefly, Vermont is stepping up and doing its part. Our legislature has set goals of 75% reduction – looking from a 1990 base line – a 75% reduction in greenhouse gas emissions by 2050. Similarly, our electric utilities have a goal of 75% use of renewable energy sources by 2032. So, we've been doing our part. Our presence here today is to pledge to continue to do our part. I'm mindful of the fact that I'm between you and the real rock star on this issue, and so I'm going to turn it back to General Schneiderman to introduce the next speaker.

**AG Schneiderman:** Thank you. Thank you. I'm not really a rock star.

[Laughter]

Thank you Bill. It's always a pleasure to have someone here from a state whose U.S. senator is from Brooklyn.

[Laughter]

And doing pretty well for himself. So, Vice President Gore has a very busy schedule. He has been traveling internationally, raising the alarm but also training climate change activists. He rearranged his schedule so he could be here with us to day to meet with my colleagues and I. And there is no one who has done more for this cause, and it is a great pleasure to have him standing shoulder to shoulder with us as we embark on this new round in what we hope will be the beginning of the end of our addiction to fossil fuel and our degradation of the planet. Vice President Al Gore.

**VP Gore:** Thank you very much, Eric. Thank you. Thank you very much.

[Applause]

Thank you very much, Attorney General Schneiderman. It really and truly is an honor for me to join you and your colleagues here,

Bill Sorrel of Vermont, Maura Healey of Massachusetts, Brian Frosh of Maryland, Mark Herring of Virginia, George Jepsen of Connecticut and Claude Walker from the U.S. Virgin Islands, and the ten (let's see 1, 2, 3, 4, 5) how many other – ten other states . . . eleven other state attorneys general offices that were represented in the meetings that took place earlier, prior to this press conference.

I really believe that years from now this convening by Attorney General Eric Schneiderman and his colleagues here today may well be looked back upon as a real turning point in the effort to hold to account those commercial interests that have been – according to the best available evidence – deceiving the American people, communicating in a fraudulent way, both about the reality of the climate crisis and the dangers it poses to all of us. And committing fraud in their communications about the viability of renewable energy and efficiency and energy storage that together are posing this great competitive challenge to the long reliance on carbon-based fuels. So, I congratulate you, Attorney General, and all of you, and to those attorneys general who were so impressively represented in the meetings here. This is really, really important.

I am a fan of what President Obama has been doing, particularly in his second term on the climate crisis. But it's important to recognize that in the federal system, the Congress has been sharply constraining the ability of the executive branch to fully perform its obligations under [the] Constitution to protect the American people against the kind of fraud that the evidence suggests is being committed by several of the fossil fuel companies, electric utilities, burning coal, and the like. So what these attorneys general are doing is exceptionally important. I remember very well – and I'm not going to dwell on this analogy – but I remember very well from my days in the House and Senate and the White House the long struggle against the fraudulent activities of the tobacco companies trying to keep Americans addicted to the deadly habit of smoking cigarettes and committing fraud to try to constantly hook each new generation of children to replenish their stock of customers who were dying off from smoking-related diseases. And it was a combined effort of the executive branch, and I'm proud that the Clinton-Gore administration played a role in that, but it was a combined effort in which the state attorneys general played the crucial role in securing an historic victory for public health. From the time the tobacco companies were first found out, as evidenced by the historic attorney generals' report of 1964, it

took 40 years for them to be held to account under the law. We do not have 40 years to continue suffering the consequences of the fraud allegedly being committed by the fossil fuel companies where climate change is concerned.

In brief, there are only three questions left to be answered about the climate crisis. The first one is: Must we change, do we really have to change? We rely on fossil fuels for more than 80% of all the energy our world uses. In burning it we've reduced poverty and raised standards of living and built this elaborate global civilization, and it looks like it'll be hard to change. So naturally, people wonder: Do we really have to change? The scientific community has been all but unanimous for a long time now. But now mother nature and the laws of physics – harder to ignore than scientists – are making it abundantly clear that we have to change. We're putting 110 million tons of man-made heat trapping global warming pollution into the thin shell of atmosphere surrounding our planet every day, as if it's an open sewer. And the cumulative amount of that man-made global warming pollution now traps as much extra heat energy in the earth's system as would be released by 400,000 Hiroshima-class atomic bombs exploding every 24 hours on the surface of our planet.

It's a big planet, but that's a lot of energy. And it is <u>the</u> reason why temperatures are breaking records almost every year now. 2015 was the hottest year measured since instruments had been used to measure temperature. 2014 was the second hottest. <u>14</u> of the 15 hottest have been in the last 15 years. As the Attorney General mentioned, February continues the trend by breaking all previous records – the hottest in 1,632 months ever measured. Last December 29th, the same unnatural global warming fuel storm system that created record floods in the Midwest went on up to the Arctic and on December 29th, smack in the middle of the polar winter night at the North Pole, temperatures were driven up <u>50 degrees</u> above the freezing point. So the North Pole started thawing in the middle of the winter night. Yesterday the announcement came that it's the smallest winter extent of ice ever measured in the Arctic.

Ninety-three percent of the extra heat goes into the oceans of the world, and that has consequences. When Super Storm Sandy headed across the Atlantic toward this city, it crossed areas of the Atlantic that were nine degrees Fahrenheit warmer than normal

and that's what made that storm so devastating. The sea level had already come up because of the ice melting, principally off Greenland and Antarctica. And as the Attorney General mentioned, that's a process now accelerating. But these ocean-based storms are breaking records now. I just came from the Philippines where Super Typhoon Haiyon created 4 million homeless people when it crossed much warmer waters of the Pacific. By the way, it was a long plane flight to get here and I happened to get, just before we took off, the 200-page brief that you all filed in support of the Clean Power Plan. Really excellent work. Footnotes took up a lot of those 200 pages so I'm not claiming to [have] read all 200 of them.

The same extra heat in the oceans is disrupting the water cycle. We all learned in school that the water vapor comes off the oceans and falls as rain or snow over the land and then rushes back to the ocean. That natural life-giving process is being massively disrupted because the warmer oceans put a lot more water vapor up there. And when storm conditions present themselves they, these storms will reach out thousands of kilometers to funnel all that extra humidity and water vapor into these massive record-breaking downpours. And occasionally it creates a snowpocalypse or snowmaggedon but most often, record-breaking floods. We've had seven once-in-a-thousand-year floods in the last ten years in the U.S. Just last week in Louisiana and Arkansas, two feet of rain in four days coming again with what they call the Maya Express off the oceans. And the same extra heat that's creating these record-breaking floods also pull the soil moisture out of the land and create these longer and deeper droughts all around the world on every continent.

Every night on the news now it's like a nature hike through the Book of Revelation. And we're seeing tropical diseases moving to higher latitudes – the Zika virus. Of course the transportation revolution has a lot to do with the spread of Zika and Dengue Fever and Chikungunya and diseases I've never heard of when I was growing up and maybe, probably most of you never did either. But now, they're moving and taking root in the United States. Puerto Rico is part of the United States, by the way – not a state, but part of our nation. Fifty percent of the people in Puerto Rico are estimated to get the Zika virus this year. By next year, eighty percent. When people who are part of the U.S. territory, when women are advised not to get pregnant, that's something new that

ought to capture our attention. And in large areas of Central America and South America, women are advised now not to get pregnant for two years until they try to get this brand new viral disease under control.

The list of the consequences continues, and I'm not going to go through it all, but the answer to that first question: "Do we have to change?" is clearly now to any reasonable thinking person: "yes, we have to change." Now the second question is: "Can we change?" And for quite a few years, I will confess to you that, when I answered that question yes, it was based on the projections of scientists and technologists who said, just wait. We're seeing these exponential curves just begin, solar is going to win, wind power is going to get way cheaper, batteries are going to have their day, we're going to see much better efficiency. Well now we're seeing these exponential curves really shoot up dramatically. Almost 75% of all the new investment in the U.S. in new generating capacity last year was in solar and wind – more than half worldwide. We're seeing coal companies go bankrupt on a regular basis now. Australia is the biggest coal exporter in the world. They've just, just the analysis there, they're not going to build any more coal plants because solar and wind are so cheap. And we're seeing this happen all around the world. But, there is an effort in the U.S. to slow this down and to bring it to a halt because part of the group that, again according to the best available evidence, has been committing fraud in trying to convince people that the climate crisis is not real, are now trying to convince people that renewable energy is not a viable option. And, worse than that, they're using their combined political and lobbying efforts to put taxes on solar panels and jigger with the laws to require that installers have to know the serial number of every single part that they're using to put on a rooftop of somebody's house, and a whole series of other phony requirements, unneeded requirements, that are simply for the purpose of trying to slow down this renewable revolution. In the opinion of many who have looked at this pattern of misbehavior and what certainly looks like fraud, they are violating the law. If the Congress would actually work – our democracy's been hacked, and that's another story, not the subject of this press conference – but if the Congress really would allow the executive branch of the federal government to work, then maybe this would be taken care of at the federal level. But these brave men and women, who are the attorneys general of the states represented in this historic coalition, are doing their job and – just

as many of them did in the tobacco example – they are now giving us real hope that the answer to that third question: "Will we change?" is going to be "yes." Because those who are using unfair and illegal means to try to prevent the change are likely now, finally, at long last, to be held to account. And that will remove the last barriers to allow the American people to move forward and to redeem the promise of our president and our country in the historic meeting in Paris last December where the United States led the global coalition to form the first global agreement that is truly comprehensive. If the United States were to falter and stop leading the way, then there would be no other leader for the global effort to solve this crisis. By taking the action these attorneys general are taking today, it is the best, most hopeful step I can remember in a long time – that we will make the changes that are necessary.

So, I'll conclude my part in this by, once again, saying congratulations to these public servants for the historic step they are taking today. And on behalf of many people, who I think would say it's alright for me to speak for them, I'd like to say thank you.

**AG Schneiderman**: Thank you very much, and now my other colleagues are going to say a few words. For whatever reason, I've gotten into the habit, since we always seem to do this, we do this in alphabetical order by state, which I learned when I first became an AG but I guess we'll stick with it. Connecticut Attorney General George Jepsen who was our partner in the *Friedrichs* case and stood with me when we announced that we were filing in that case. We've done a lot of good work together. Attorney General Jepsen.

**AG Jepsen:** I'd like to thank Eric and Bill for their leadership on this important issue and in convening this conference and to recognize the man who has done more to make global warming an international issue than anybody on the entire planet – Vice President Al Gore. In the backdrop, in the backdrop of a very dysfunctional Congress, state attorneys general, frequently on a bipartisan, basis have shown that we can stand up and take action where others have not. The Vice President referenced the tobacco litigation, which was before my time but hugely important in setting the tone and the structures by which we do work together. Since becoming attorney general in 2011, we've taken on the big banks and their mortgage servicing issues, a $25 billion settlement. We've taken on Wall Street's Standard & Poor's for mislabeling mortgage-backed securities – as

a 20-state coalition – mislabeling mortgage-backed securities as AAA when in fact they were junk. Working together on data privacy issues, and now it's time that we stand up once again and take on what is the most important issue of our generation. We owe it to our children, our children's children, to step up and do the right thing, to work together and I'm committed to it. Thank you.

**AG Schneiderman**: Thank you. And now a relatively new colleague but someone who has brought incredible energy to this fight and who we look forward to working with on this and other matters for a long time to come. Maryland Attorney General Brian Frosh.

**AG Frosh**: Well, first thank you again to General Schneiderman and General Sorrel for putting together this group and it's an honor to be with you, Mr. Vice President. Thank you so much for your leadership. I'm afraid we may have reached that point in the press conference where everything that needs to be said has been said, but everyone who needs to say it hasn't said it yet.

[Laughter]

So, I will try to be brief. Climate change is an existential threat to everybody on the planet. Maryland is exceptionally vulnerable to it. The Chesapeake Bay bisects our state. It defines us geographically, culturally, historically. We have as much tidal shoreline as states as large as California. We have islands in the Chesapeake Bay that are disappearing. We have our capital, Annapolis, which is also the nuisance flood capital of the United States. It's under water way, way, way too often. It's extraordinarily important that we address the problem of climate change. I'm grateful to General Sorrel and General Schneiderman for putting together this coalition of the willing. I'm proud to be a part of it in addressing and supporting the President's Clean Power Plan. What we want from ExxonMobil and Peabody and ALEC is very simple. We want them to tell the truth. We want them to tell the truth so that we can get down to the business of stopping climate change and of healing the world. I think that as attorneys general, as the Vice President said, we have a unique ability to help bring that about and I'm very glad to be part of it.

**AG Schneiderman**: Thank you. And, another great colleague, who has done extraordinary work before and since becoming attorney general working with our office on incredibly important civil rights issues,

financial fraud issues, Massachusetts Attorney General Maura Healey.

**AG Healey**: Thank you very much General Schneiderman. Thank you General Schneiderman and General Sorrel for your leadership on this issue. It's an honor for me to be able to stand here today with you, with our colleagues and certainly with the Vice President who, today, I think, put most eloquently just how important this is, this commitment that we make. Thank you for your leadership. Thank you for your continuing education. Thank you for your inspiration and your affirmation.

You know, as attorneys general, we have a lot on our plates: addressing the epidemics of opiate abuse, gun violence, protecting the economic security and well-being of families across this country; all of these issues are so important. But make no mistake about it, in my view, there's nothing we need to worry about more than climate change. It's incredibly serious when you think about the human and the economic consequences and indeed the fact that this threatens the very existence of our planet. Nothing is more important. Not only must we act, we have a moral obligation to act. That is why we are here today.

The science – we do believe in science; we're lawyers, we believe in facts, we believe in information, and as was said, this is about facts and information and transparency. We know from the science and we know from experience the very real consequences of our failure to address this issue. Climate change is and has been for many years a matter of extreme urgency, but, unfortunately, it is only recently that this problem has begun to be met with equally urgent action. Part of the problem has been one of public perception, and it appears, certainly, that certain companies, certain industries, may not have told the whole story, leading many to doubt whether climate change is real and to misunderstand and misapprehend the catastrophic nature of its impacts. Fossil fuel companies that deceived investors and consumers about the dangers of climate change should be, must be, held accountable. That's why I, too, have joined in investigating the practices of ExxonMobil. We can all see today the troubling disconnect between what Exxon knew, what industry folks knew, and what the company and industry chose to share with investors and with the American public.

**AGs United For Clean Power Press Conference**
**March 29, 2016: 11:35 am – 12:32 pm**

We are here before you, all committed to combating climate change and to holding accountable those who have misled the public. The states represented here today have long been working hard to sound the alarm, to put smart policies in place, to speed our transition to a clean energy future, and to stop power plants from emitting millions of tons of dangerous global warming pollution into our air. I will tell you, in Massachusetts that's been a very good thing. Our economy has grown while we've reduced greenhouse gas emissions and boosted clean power and efficiency. We're home to a state with an $11 billion clean energy industry that employs nearly 100,000 people. Last year clean energy accounted for 15% of New England's power production. Our energy efficiency programs have delivered $12.5 billion in benefits since 2008 and are expected to provide another $8 billion over the next three years. For the past five years, Massachusetts has also been ranked number one in the country for energy efficiency. So we know what's possible. We know what progress looks like. But none of us can do it alone. That's why we're here today. We have much work to do, but when we act and we act together, we know we can accomplish much. By quick, aggressive action, educating the public, holding accountable those who have needed to be held accountable for far too long, I know we will do what we need to do to address climate change and to work for a better future. So, I thank AG Schneiderman for gathering us here today and for my fellow attorneys general in their continued effort in this important fight. Thank you.

**AG Schneiderman**: Thank you. And now another great colleague who speaks as eloquently as anyone I've heard about what's happening to his state, and a true hero of standing up in a place where maybe it's not quite as politically easy as it is to do it in Manhattan but someone who is a true aggressive progressive and a great attorney general, Mark Herring from Virginia.

**AG Herring**: Thank you, Eric. Good afternoon. In Virginia, climate change isn't some theoretical issue. It's real and we are already dealing with its consequences. Hampton Roads, which is a coastal region in Virginia, is our second most populated region, our second biggest economy and the country's second most vulnerable area as sea levels rise. The area has the tenth most valuable assets in the world threatened by sea level rise. In the last 85 years the relative sea level in Hampton Roads has risen 14 inches – that's well over a foot – in just the last century.

**AGs United For Clean Power Press Conference**
**March 29, 2016: 11:35 am – 12:32 pm**

Some projections say that we can expect an additional two to five feet of relative sea level rise by the end of this century – and that would literally change the face of our state. It would cripple our economy and it could threaten our national security as Norfolk Naval, the world's largest naval base, is impacted. Nuisance flooding that has increased in frequency will become the norm. They call it blue sky flooding. Storm surges from tropical systems will threaten more homes, businesses and residents. And even away from the coast, Virginians are expected to feel the impact of climate change as severe weather becomes more dangerous and frequent. Just a few weeks ago, we had a highly unusual February outbreak of tornadoes in the Commonwealth that was very damaging and unfortunately deadly.

Farming and forestry is our number one industry in Virginia. It's a $70 billion industry in Virginia that supports around 400,000 jobs and it's going to get more difficult and expensive. And, the Commonwealth of Virginia local governments and the navy are already spending millions to build more resilient infrastructure, with millions and millions more on the horizon. To replace just one pier at Norfolk Naval is about $35 to $40 million, and there are 14 piers, so that would be around a half billion right there.

As a Commonwealth and a nation, we can't put our heads in the sand. We must act and that is what today is about. I am proud to have Virginia included in this first of its kind coalition which recognizes the reality and the pressing threat of man-made climate change and sea level rise. This group is already standing together to defend the Clean Power Plan – an ambitious and achievable plan – to enjoy the health, economic and environmental benefits of cleaner air and cleaner energy. But there may be other opportunities and that's why I have come all the way from Virginia. I am looking forward to exploring ideas and opportunities, to partner and collaborate, if there are enforcement actions we need to be taking, if there are legal cases we need to be involved in, if there are statutory or regulatory barriers to growing our clean energy sectors and, ultimately, I want to work together with my colleagues here and back in Virginia to help combat climate change and to shape a more sustainable future.

And for any folks who would say the climate change is some sort of made-up global conspiracy, that we're wasting our time, then

come to Hampton Roads. Come to Norfolk and take a look for yourselves. Mayor Fraim would love to have you.

**AG Schneiderman**: Thank you. And our closer, another great colleague who has traveled far but comes with tremendous energy to this cause and is an inspiration to us all, U.S. Virgin Islands Attorney General Claude Walker.

**AG Walker**: Thank you. Thank you, General Schneiderman, Vice President Gore. One of my heroes, I must say. Thank you. I've come far to New York to be a part of this because in the Virgin Islands and Puerto Rico, we experience the effects of global warming. We see an increase in coral bleaching, we have seaweeds, proliferation of seaweeds in the water, all due to global warming. We have tourism as our main industry, and one of the concerns that we have is that tourists will begin to see this as an issue and not visit our shores. But also, residents of the Virgin Islands are starting to make decisions about whether to live in the Virgin Islands – people who have lived there for generations, their families have lived there for generations. We have a hurricane season that starts in June and it goes until November. And it's incredibly destructive to have to go through hurricanes, tropical storms annually. So people make a decision: Do I want to put up with this, with the power lines coming down, buildings being toppled, having to rebuild annually? The strengths of the storms have increased over the years. Tropical storms now transform into hurricanes. When initially they were viewed as tropical storms but as they get close to the land, the strength increases. So we're starting to see people make decisions about whether to stay in a particular place, whether to move to higher ground – which is what some have said – as you experience flooding, as you experience these strong storms. So we have a strong stake in this, in making sure that we address this issue.

We have launched an investigation into a company that we believe must provide us with information about what they knew about climate change and when they knew it. And we'll make our decision about what action to take. But, to us, it's not an environmental issue as much as it is about survival, as Vice President Gore has stated. We try as attorneys general to build a community, a safe community for all. But what good is that if annually everything is destroyed and people begin to say: Why am I living here?

So we're here today to support this cause and we'll continue. It could be David and Goliath, the Virgin Islands against a huge corporation, but we will not stop until we get to the bottom of this and make it clear to our residents as well as the American people that we have to do something transformational. We cannot continue to rely on fossil fuel. Vice President Gore has made that clear. We have to look at renewable energy. That's the only solution. And it's troubling that as the polar caps melt, you have companies that are looking at that as an opportunity to go and drill, to go and get more oil. Why? How selfish can you be? Your product is destroying this earth and your strategy is, let's get to the polar caps first so we can get more oil to do what? To destroy the planet further? And we have documents showing that. So this is very troubling to us and we will continue our fight. Thank you.

**AG Schneiderman**: Thank you and Eric. And I do want to note, scripture reports David was not alone in fact, Brother Walker. Eric and Matt will take on-topic questions.

**Moderator**: Please just say your name and publication.

**Press Person**: John [inaudible] with *The New York Times*. I count two people who have actually said that they're launching new investigations. I'm wondering if we could go through the list and see who's actually in and who is not in yet.

**AG Schneiderman**: Well, I know that prior to today, it was, and not every investigation gets announced at the outset as you know, but it had already been announced that New York and California had begun investigations with those stories. I think Maura just indicated a Massachusetts investigation and the Virgin Islands has, and we're meeting with our colleagues to go over a variety of things. And the meeting goes on into the afternoon. So, I am not sure exactly where everyone is. Different states have – it's very important to understand – different states have different statutes, different jurisdictions. Some can proceed under consumer protection law, some securities fraud laws, there are other issues related to defending taxpayers and pension funds. So there are a variety of theories that we're talking about and collaborating and to the degree to which we can cooperate, we share a common interest, and we will. But, one problem for journalists with investigations is, part of doing an investigation is you usually don't talk a lot about what you're doing after you start it or even as you're preparing to start it.

## AGs United For Clean Power Press Conference

**March 29, 2016: 11:35 am – 12:32 pm**

**Press Person:** Shawn McCoy with *Inside Sources*. A *Bloomberg Review* editorial noted that the Exxon investigation is preposterous and a dangerous affirmation of power. *The New York Times* has pointed out that Exxon has published research that lines up with mainstream climatology and therefore there's not a comparison to Big Tobacco. So is this a publicity stunt? Is the investigation a publicity stunt?

**AG Schneiderman:** No. It's certainly not a publicity stunt. I think the charges that have been thrown around – look, we know for many decades that there has been an effort to influence reporting in the media and public perception about this. It should come as no surprise to anyone that that effort will only accelerate and become more aggressive as public opinion shifts further in the direction of people understanding the imminent threat of climate change and other government actors, like the folks represented here step up to the challenge. The specific reaction to our particular subpoena was that the public reports that had come out, Exxon said were cherry picked documents and took things out of context. We believe they should welcome our investigation because, unlike journalists, we will get every document and we will be able to put them in context. So I'm sure that they'll be pleased that we're going to get everything out there and see what they knew, when they knew it, what they said and what they might have said.

**Press Person:** David [inaudible] with *The Nation.* Question for General Schneiderman. What do you hope to accomplish with your Exxon investigation? I'm thinking with reference to Peabody where really there was some disclosure requirements but it didn't do a great deal of [inaudible]. Is there a higher bar for Exxon? What are the milestones that you hope to achieve after that investigation?

**AG Schneiderman:** It's too early to say. We started the investigation. We received a lot of documents already. We're reviewing them. We're not pre-judging anything, but the situation with oil companies and coal companies is somewhat different because the coal companies right now are, the market is already judging the coal industry very harshly. Coal companies, including Peabody, are teetering on the brink. The evidence that we advanced and what was specifically disclosed about Peabody were pretty clear cut examples of misrepresentations made in violation with the Securities and Exchange Commission, made to investors. It's too early to say what we're going to find with Exxon but we intend to work as

aggressively as possible, but also as carefully as possible. We're very aware of the fact that everything we do here is going to be subject to attack by folks who have a huge financial interest in discrediting us. So we're going to be aggressive and creative but we are also going to be as careful and meticulous and deliberate as we can.

**VP Gore**: Could I respond to the last couple of questions just briefly. And in doing so, I'd like to give credit to the journalistic community and single out the Pulitzer Prize winning team at *InsideClimate News*, also the *Los Angeles Times* and the student-led project at Columbia School of Journalism under Steve Coll. And the facts that were publicly presented during, in those series of articles that I have mentioned, are extremely troubling, and where Exxon Mobil in particular is concerned. The evidence appears to indicate that, going back decades, the company had information that it used for the charting of its plan to explore and drill in the Arctic, used for other business purposes information that largely was consistent with what the mainstream scientific community had collected and analyzed. And yes, for a brief period of time, it did publish some of the science it collected, but then a change came, according to these investigations. And they began to make public statements that were directly contrary to what their own scientists were telling them. Secondly, where the analogy to the tobacco industry is concerned, they began giving grants – according to the evidence collected – to groups that specialize in climate denial, groups that put out information purposely designed to confuse the public into believing that the climate crisis was not real. And according to what I've heard from the preliminary inquiries that some of these attorneys general have made, the same may be true of information that they have put out concerning the viability of competitors in the renewable energy space. So, I do think the analogy may well hold up rather precisely to the tobacco industry. Indeed, the evidence indicates that, that I've seen and that these journalists have collected, including the distinguished historian of science at Harvard, Naomi Oreskes wrote the book *The Merchants of Doubt* with her co-author, that they hired several of the very same public relations agents that had perfected this fraudulent and deceitful craft working for the tobacco companies. And so as someone who has followed the legislative, the journalistic work very carefully, I think the analogy does hold up.

## AGs United For Clean Power Press Conference
**March 29, 2016: 11:35 am – 12:32 pm**

**Press Person:** [inaudible] with *InsideClimate News*. Along the lines of talking about that analogy: from a legal framework, can you talk about a comparison, similarities and differences between this potential case and that of Big Tobacco?

**AG Schneiderman:** Well, again, we're at the early stages of the case. We are not pre-judging the evidence. We've seen some things that have been published by you and others, but it is our obligation to take a look at the underlying documentation and to get at all the evidence, and we do that in the context of an investigation where we will not be talking about every document we uncover. It's going to take some time, but that's another reason why working together collectively is so important. And we are here today because we are all committed to pursuing what you might call an all-levers approach. Every state has different laws, different statutes, different ways of going about this. The bottom line is simple. Climate change is real, it is a threat to all the people we represent. If there are companies, whether they are utilities or they are fossil fuel companies, committing fraud in an effort to maximize their short-term profits at the expense of the people we represent, we want to find out about it. We want to expose it, and we want to pursue them to the fullest extent of the law.

**Moderator:** Last one.

**Press Person:** Storms, floods will arise they are all going to continue to destroy property and the taxpayers . . .

**Moderator:** What's your name and . . .

**Press Person:** Oh, sorry. Matthew Horowitz from *Vice*. Taxpayers are going to have to pay for these damages from our national flood insurance claims. So if fossil fuel companies are proven to have committed fraud, will they be held financially responsible for any sorts of damages?

**AG Schneiderman:** Again, it's early to say but certainly financial damages are one important aspect of this but, and it is tremendously important and taxpayers – it's been discussed by my colleagues – we're already paying billions and billions of dollars to deal with the consequences of climate change and that will be one aspect of – early foreseeing, it's far too early to say. But, this is not a situation where financial damages alone can deal with the problem. We have to change conduct, and as the Vice President indicated, other

places in the world are moving more rapidly towards renewables. There is an effort to slow that process down in the United States. We have to get back on that path if we're going to save the planet and that's ultimately what we're here for.

**Moderator**: We're out of time, unfortunately. Thank you all for coming.

# Exhibit B



THE COMMONWEALTH OF MASSACHUSETTS
OFFICE OF THE ATTORNEY GENERAL
ONE ASHBURTON PLACE
BOSTON, MASSACHUSETTS 02108

MAURA HEALEY
ATTORNEY GENERAL

TEL: (617) 727-2200
www.mass.gov/ago

**CIVIL INVESTIGATIVE DEMAND**

*BY HAND DELIVERY*

Demand No.: 2016-EPD-36

Date Issued: April 19, 2016

Issued To: Exxon Mobil Corporation
c/o Corporation Service Company, its Registered Agent
84 State Street
Boston, Massachusetts 02109

This Civil Investigative Demand ("CID") is issued to Exxon Mobil Corporation ("Exxon" or "You") pursuant to Massachusetts General Laws c. 93A, § 6, as part of a pending investigation concerning potential violations of M.G.L. c. 93A, § 2, and the regulations promulgated thereunder arising both from (1) the marketing and/or sale of energy and other fossil fuel derived products to consumers in the Commonwealth of Massachusetts (the "Commonwealth"); and (2) the marketing and/or sale of securities, as defined in M.G.L. c. 110A. § 401(k), to investors in the Commonwealth, including, without limitation, fixed- and floating rate-notes, bonds, and common stock, sold or offered to be sold in the Commonwealth.

This CID requires You to produce the documents identified in Schedule A below, pursuant to M.G.L. c. 93A, § 6(1). The Documents identified in Schedule A must be produced by May 19, 2016, by delivering them to:

I. Andrew Goldberg
Assistant Attorney General
Office of the Attorney General
One Ashburton Place
Boston, MA 02108

The documents shall be accompanied by an affidavit in the form attached hereto. AAG Goldberg and such other employees, agents, consultants, and experts of the Office of the Attorney General as needed in its discretion, shall review Your affidavit and the documents produced in conjunction with our investigation.

This CID also requires You to appear and give testimony under oath through Your authorized custodian of records that the documents You produce in response to this CID represent all of the documents called for in this CID; that You have not withheld any documents responsive to this CID; and that all of the documents You produce were records made in good faith and kept in the regular course of Your business, and it was the regular course of Your business to make and keep such records. This testimony will be taken on June 10, 2016, beginning at 9:30 a.m. at the Boston Office of the Attorney General, 100 Cambridge Street, 10th Floor, Boston, Massachusetts. The testimony will be taken by AAG Goldberg or an appropriate designee, before an officer duly authorized to administer oaths by the law of the Commonwealth, and shall proceed, day to day, until the taking of testimony is completed. The witness has the right to be accompanied by an attorney. Rule 30(c) of the Massachusetts Rules of Civil Procedure shall apply. Your attendance and testimony are necessary to conduct this investigation.

This CID also requires You to appear and give testimony under oath through one or more of Your officers, directors or managing agents, or other persons most knowledgeable concerning the subject matter areas enumerated in Schedule B, below. This testimony will be taken on June 24, 2016, beginning at 9:30 a.m. at the Boston Office of the Attorney General, 100 Cambridge Street, 10th Floor, Boston, Massachusetts. The testimony will be taken by AAG Goldberg or an appropriate designee, before an officer duly authorized to administer oaths by the law of the Commonwealth, and shall proceed, day to day, until the taking of testimony is completed. The witness has the right to be accompanied by an attorney. Rule 30(c) of the Massachusetts Rules of Civil Procedure shall apply. Your attendance and testimony are necessary to conduct this investigation.

Under G.L. c. 93A, § 6(7), You may make a motion prior to the production date specified in this notice, or within twenty-one days after this notice has been served, whichever period is shorter, in the appropriate court of law to modify or set aside this CID for good cause shown.

If the production of the documents required by this CID would be, in whole or in part, unduly burdensome, or if You require clarification of any request, please contact AAG Goldberg promptly at the phone number below.

Finally, please note that under G.L. c. 93A, §7, obstruction of this investigation, including the alteration or destruction of any responsive document after receipt of

this CID, is subject to a fine of up to five thousand dollars ($5,000.00). A copy of that provision is reprinted at Schedule C.

Issued at Boston, Massachusetts, this 19th day of April, 2016.

COMMONWEALTH OF MASSACHUSETTS

MAURA HEALEY
ATTORNEY GENERAL

By: ______________________

I. Andrew Goldberg
Assistant Attorney General
Office of the Attorney General
One Ashburton Place
Boston, MA 02108
Tel. (617) 727-2200

## SCHEDULE A

### A. General Definitions and Rules of Construction

1. "Advertisement" means a commercial message made orally or in any newspaper, magazine, leaflet, flyer, or catalog; on radio, television, or public address system; electronically, including by email, social media, and blog post; or made in person, in direct mail literature or other printed material, or on any interior or exterior sign or display, in any window display, in any point of transaction literature, but not including on any product label, which is delivered or made available to a customer or prospective customer in any manner whatsoever.

2. "All" means each and every.

3. "Any" means any and all.

4. "And" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the CID all information or Documents that might otherwise be construed to be outside of its scope.

5. "Communication" means any conversation, discussion, letter, email, memorandum, meeting, note or other transmittal of information or message, whether transmitted in writing, orally, electronically or by any other means, and shall include any Document that abstracts, digests, transcribes, records or reflects any of the foregoing. Except where otherwise stated, a request for "Communications" means a request for all such Communications.

6. "Concerning" means, directly or indirectly, in whole or in part, relating to, referring to, describing, evidencing or constituting.

7. "Custodian" means any Person or Entity that, as of the date of this CID, maintained, possessed, or otherwise kept or controlled such Document.

8. "Document" is used herein in the broadest sense of the term and means all records and other tangible media of expression of whatever nature however and wherever created, produced or stored (manually, mechanically, electronically or otherwise), including without limitation all versions whether draft or final, all annotated or nonconforming or other copies, electronic mail ("e-mail"), instant messages, text messages, personal digital assistant or other wireless device messages, voicemail, calendars, date books, appointment books, diaries, books, papers, files, notes, confirmations, accounts statements, correspondence, memoranda, reports, records, journals, registers, analyses, plans, manuals, policies, telegrams, faxes, telexes, wires, telephone logs, telephone messages, message slips, minutes, notes or records or transcriptions of conversations or

Communications or meetings, tape recordings, videotapes, disks, and other electronic media, microfilm, microfiche, storage devices, press releases, contracts, agreements, notices and summaries. Any non-identical version of a Document constitutes a separate Document within this definition, including without limitation drafts or copies bearing any notation, edit, comment, marginalia, underscoring, highlighting, marking, or any other alteration of any kind resulting in any difference between two or more otherwise identical Documents. In the case of Documents bearing any notation or other marking made by highlighting ink, the term Document means the original version bearing the highlighting ink, which original must be produced as opposed to any copy thereof. Except where otherwise stated, a request for "Documents" means a request for all such Documents.

9. "Entity" means without limitation any corporation, company, limited liability company or corporation, partnership, limited partnership, association, or other firm or similar body, or any unit, division, agency, department, or similar subdivision thereof.

10. "Identify" or "Identity," as applied to any Document means the provision in writing of information sufficiently particular to enable the Attorney General to request the Document's production through CID or otherwise, including but not limited to: (a) Document type (letter, memo, etc.); (b) Document subject matter; (c) Document date; and (d) Document author(s), addressee(s) and recipient(s). In lieu of identifying a Document, the Attorney General will accept production of the Document, together with designation of the Document's Custodian, and identification of each Person You believe to have received a copy of the Document.

11. "Identify" or "Identity," as applied to any Entity, means the provision in writing of such Entity's legal name, any d/b/a, former, or other names, any parent, subsidiary, officers, employees, or agents thereof, and any address(es) and any telephone number(s) thereof.

12. "Identify" or "Identity," as applied to any natural person, means and includes the provision in writing of the natural person's name, title(s), any aliases, place(s) of employment, telephone number(s), e-mail address(es), mailing addresses and physical address(es).

13. "Person" means any natural person, or any Entity.

14. "Refer" means embody, refer or relate, in any manner, to the subject of the document demand.

15. "Refer or Relate to" means to make a statement about, embody, discuss, describe, reflect, identify, deal with, consist of, establish, comprise, list, or in any way pertain, in whole or in part, to the subject of the document demand.

16. "Sent" or "received" as used herein means, in addition to their usual meanings, the transmittal or reception of a Document by physical, electronic or other delivery, whether by direct or indirect means.

17. "CID" means this subpoena and any schedules, appendices, or attachments thereto.

18. The use of the singular form of any word used herein shall include the plural and vice versa. The use of any tense of any verb includes all other tenses of the verb.

19. The references to Communications, Custodians, Documents, Persons, and Entities in this CID encompass all such relevant ones worldwide.

**B. Particular Definitions**

1. "Exxon," "You," or "Your," means Exxon Mobil Corporation, and any present or former parents, subsidiaries, affiliates, directors, officers, partners, employees, agents, representatives, attorneys or other Persons acting on its behalf, and including predecessors or successors or any affiliates of the foregoing.

2. "Exxon Products and Services" means products and services, including without limitation petroleum and natural gas energy products and related services, offered to and/or sold by Exxon to consumers in Massachusetts.
3. "Carbon Dioxide" or "$CO_2$" means the naturally occurring chemical compound composed of a carbon atom covalently double bonded to two oxygen atoms that is fixed by photosynthesis into organic matter.

4. "Climate" means the statistical description in terms of the mean and variability of relevant quantities, such as surface variables, including, without limitation, temperature, precipitation, and wind, on Earth over a period of time ranging from months to thousands or millions of years. Climate is the state, including a statistical description, of the Climate System. *See* Intergovernmental Panel on Climate Change (IPCC), 2012: Glossary of terms. In: Managing the Risks of Extreme Events and Disasters to Advance Climate Change Adaptation [Field, C.B., V. Barros, T.F. Stocker, D. Qin, D.J. Dokken, K.L. Ebi, M.D. Mastrandrea, K.J. Mach, G.-K. Plattner, S.K. Allen, M. Tignor, and P.M. Midgley (eds.)]. A Special Report of Working Groups I and II of the IPCC. Cambridge University Press, Cambridge, UK, and New York, NY, USA (the "IPCC Glossary"), p. 557.

5. "Climate Change" means a change in the state of Earth's Climate that can be identified (e.g., by using statistical tests) by changes in the mean and/or the variability of its properties and that persists for an extended period, typically decades or longer. *See* IPCC Glossary, p. 557.

6. "Climate Model" means a numerical representation of the Climate System based on the physical, chemical, and biological properties of its components, their interactions, and feedback processes, and that accounts for all or some of its known properties. Climate models are applied as a research tool to study and simulate the climate, and for operational purposes, including monthly, seasonal, interannual, and longer-term climate predictions. *See* IPCC Glossary, p. 557.

7. "Climate Risk" means the risk that variables in the Climate System reach values that adversely affect natural and human systems and regions, including those that relate to extreme values of the climate variables such as high wind speed, high river water and sea level stages (flood), and low water stages (drought). These include, without limitation, such risks to ecosystems, human health, geopolitical stability, infrastructure, facilities, businesses, asset value, revenues, and profits, as well as the business risks associated with public policies and market changes that arise from efforts to mitigate or adapt to Climate Change.

8. "Climate Science" means the study of the Climate on Earth.
9. "Climate System" means the dynamics and interactions on Earth of five major components: atmosphere, hydrosphere, cryosphere, land surface, and biosphere. *See* IPCC Glossary, p. 557.

10. "Global Warming" means the gradual increase, observed or projected, in Earth's global surface temperature, as one of the consequences of radiative forcing caused by anthropogenic emissions.

11. "Greenhouse Gas" means a gaseous constituent of Earth's atmosphere, both natural and anthropogenic, that absorbs and emits radiation at specific wavelengths within the spectrum of infrared radiation emitted by the Earth's surface, the atmosphere, and clouds. Water vapor ($H_2O$), carbon dioxide ($CO_2$), nitrous oxide ($N_2O$), methane ($CH_4$), chlorofluorocarbons (CFCs), and ozone ($O_3$) are the primary Greenhouse Gases in the Earth's atmosphere. *See* IPCC Glossary, p. 560.

12. "Greenhouse Gas Emissions" means the exiting to the atmosphere of Greenhouse Gas.

13. "Methane" or "$CH_4$" means the chemical compound composed of one atom of carbon and four atoms of hydrogen. Methane is the main component of natural gas.

14. "Radiative Forcing Effect" means the influence a factor has in altering the balance of incoming and outgoing energy in the Earth-atmosphere system and is an index of the importance of the factor as a potential climate change mechanism.

15. "Security" has the same meaning as defined in M.G.L. c. 110A, § 401(k), and includes, without limitation, any fixed- and floating rate-notes, bonds, and common stock, available to investors for purchase by Massachusetts residents.

16. "Sustainable Development" means development that meets the needs of the present without compromising the ability of future generations to meet their own needs. *See* IPCC Glossary, p. 564.

17. "Sustainability Reporting" means the practice of measuring, disclosing and being accountable to internal and external stakeholders for organizational performance towards the goals of Sustainable Development.

18. "Acton Institute for the Study of Religion and Liberty" or "Acton Institute" means the nonprofit organization by that name. Acton Institute is located in Grand Rapids, Michigan.

19. "American Enterprise Institute for Public Policy Research" or "AEI" means the nonprofit public policy organization by that name. AEI is based in Washington, D.C.

20. "Americans for Prosperity" means the nonprofit advocacy group by that name. Americans for Prosperity is based in Arlington, Virginia.

21. "American Legislative Exchange Council" or "ALEC" means the nonprofit organization by that name consisting of state legislator and private sector members. ALEC is based in in Arlington, Virginia.

22. "American Petroleum Institute" or "API" means the oil and gas industry trade association by that name. API is based in Washington, D.C.

23. "Beacon Hill Institute at Suffolk University" means the research arm of the Department of Economics at Suffolk University in Boston, Massachusetts, by that name.

24. "Center for Industrial Progress" or "CIP" means the for profit organization by that name. CIP is located in Laguna Hills, California.

25. "Competitive Enterprise Institute" or "CEI" means the nonprofit public policy organization by that name. CEI is based in Washington, D.C.

26. "George C. Marshall Institute" means the nonprofit public policy organization by that name. George C. Marshall Institute is based in Arlington, Virginia.

27. "The Heartland Institute" means the nonprofit public policy organization by that name. The Heartland Institute is based in Arlington Heights, Illinois.

28. "The Heritage Foundation" means the nonprofit public policy organization by that name. The Heritage Foundation is based in Washington, D.C.

29. "Mercatus Center at George Mason University" means the university-based nonprofit public policy organization by that name. Mercatus Center at George Mason University is based in Arlington, Virginia.

**C. Instructions**

1. Preservation of Relevant Documents and Information; Spoliation. You are reminded of your obligations under law to preserve Documents and information relevant or potentially relevant to this CID from destruction or loss, and of the consequences of, and penalties available for, spoliation of evidence. No agreement, written or otherwise, purporting to modify, limit or otherwise vary the terms of this CID, shall be construed in any way to narrow, qualify, eliminate or otherwise diminish your aforementioned preservation obligations. Nor shall you act, in reliance upon any such agreement or otherwise, in any manner inconsistent with your preservation obligations under law. No agreement purporting to modify, limit or otherwise vary your preservation obligations under law shall be construed as in any way narrowing, qualifying, eliminating or otherwise diminishing such aforementioned preservation obligations, nor shall you act in reliance upon any such agreement, unless an Assistant Attorney General confirms or acknowledges such agreement in writing, or makes such agreement a matter of record in open court.

2. Possession, Custody, and Control. The CID calls for all responsive Documents or information in your possession, custody or control. This includes, without limitation, Documents or information possessed or held by any of your officers, directors, employees, agents, representatives, divisions, affiliates, subsidiaries or Persons from whom you could request Documents or information. If Documents or information responsive to a request in this CID are in your control, but not in your possession or custody, you shall promptly Identify the Person with possession or custody.

3. Documents No Longer in Your Possession. If any Document requested herein was formerly in your possession, custody or control but is no longer available, or no longer exists, you shall submit a statement in writing under oath that: (a) describes

in detail the nature of such Document and its contents; (b) Identifies the Person(s) who prepared such Document and its contents; (c) Identifies all Persons who have seen or had possession of such Document; (d) specifies the date(s) on which such Document was prepared, transmitted or received; (e) specifies the date(s) on which such Document became unavailable; (f) specifies the reason why such Document is unavailable, including without limitation whether it was misplaced, lost, destroyed or transferred; and if such Document has been destroyed or transferred, the conditions of and reasons for such destruction or transfer and the Identity of the Person(s) requesting and performing such destruction or transfer; and (g) Identifies all Persons with knowledge of any portion of the contents of the Document.

4. No Documents Responsive to CID Requests. If there are no Documents responsive to any particular CID request, you shall so state in writing under oath in the Affidavit of Compliance attached hereto, identifying the paragraph number(s) of the CID request concerned.

5. Format of Production. You shall produce Documents, Communications, and information responsive to this CID in electronic format that meets the specifications set out in Schedule D.

6. Existing Organization of Documents to be Preserved. Regardless of whether a production is in electronic or paper format, each Document shall be produced in the same form, sequence, organization or other order or layout in which it was maintained before production, including but not limited to production of any Document or other material indicating filing or other organization. Such production shall include without limitation any file folder, file jacket, cover or similar organizational material, as well as any folder bearing any title or legend that contains no Document. Documents that are physically attached to each other in your files shall be accompanied by a notation or information sufficient to indicate clearly such physical attachment.

7. Document Numbering. All Documents responsive to this CID, regardless of whether produced or withheld on ground of privilege or other legal doctrine, and regardless of whether production is in electronic or paper format, shall be numbered in the lower right corner of each page of such Document, without disrupting or altering the form, sequence, organization or other order or layout in which such Documents were maintained before production. Such number shall comprise a prefix containing the producing Person's name or an abbreviation thereof, followed by a unique, sequential, identifying document control number.

8. Privilege Placeholders. For each Document withheld from production on ground of privilege or other legal doctrine, regardless of whether a production is electronic or in hard copy, you shall insert one or more placeholder page(s) in the

production bearing the same document control number(s) borne by the Document withheld, in the sequential place(s) originally occupied by the Document before it was removed from the production.

9. Privilege. If You withhold or redact any Document responsive to this CID of privilege or other legal doctrine, you shall submit with the Documents produced a statement in writing under oath, stating: (a) the document control number(s) of the Document withheld or redacted; (b) the type of Document; (c) the date of the Document; (d) the author(s) and recipient(s) of the Document; (e) the general subject matter of the Document; and (f) the legal ground for withholding or redacting the Document. If the legal ground for withholding or redacting the Document is attorney-client privilege, you shall indicate the name of the attorney(s) whose legal advice is sought or provided in the Document.

10. Your Production Instructions to be Produced. You shall produce a copy of all written or otherwise recorded instructions prepared by you concerning the steps taken to respond to this CID. For any unrecorded instructions given, you shall provide a written statement under oath from the Person(s) who gave such instructions that details the specific content of the instructions and any Person(s) to whom the instructions were given.

11. Cover Letter. Accompanying any production(s) made pursuant to this CID, You shall include a cover letter that shall at a minimum provide an index containing the following: (a) a description of the type and content of each Document produced therewith; (b) the paragraph number(s) of the CID request to which each such Document is responsive; (c) the Identity of the Custodian(s) of each such Document; and (d) the document control number(s) of each such Document.

12. Affidavit of Compliance. A copy of the Affidavit of Compliance provided herewith shall be completed and executed by all natural persons supervising or participating in compliance with this CID, and you shall submit such executed Affidavit(s) of Compliance with Your response to this CID.

13. Identification of Persons Preparing Production. In a schedule attached to the Affidavit of Compliance provided herewith, you shall Identify the natural person(s) who prepared or assembled any productions or responses to this CID. You shall further Identify the natural person(s) under whose personal supervision the preparation and assembly of productions and responses to this CID occurred. You shall further Identify all other natural person(s) able competently to testify: (a) that such productions and responses are complete and correct to the best of such person's knowledge and belief; and (b) that any Documents produced are authentic, genuine and what they purport to be.