IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| EXXON MOBIL CORPORATION, | § § § | |
| Plaintiff, | § § | |
| v. | § § | No. 4:16-CV-469-K |
| MAURA TRACY HEALEY, Attorney General of Massachusetts, in her official capacity, | § § § § | |
| Defendant. | § § | |

**EXXON MOBIL CORPORATION'S MEMORANDUM OF LAW IN SUPPORT OF ITS
MOTION FOR LEAVE TO FILE A FIRST AMENDED COMPLAINT**

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ..................................................................................................... ii

BACKGROUND ............................................................................................................................1

ARGUMENT ...................................................................................................................................7

I.      Applicable Law ....................................................................................................................7

II.     Discussion ............................................................................................................................8

      A.      The Requested Amendment Will Not Prejudice Attorney General Healey. ...........8

      B.      The Requested Amendment Was Not Unduly Delayed. ........................................8

      C.      The Amendment Is Not Sought in Bad Faith, with a Dilatory Motive, or to Cure Deficiencies in Prior Amendments. .................................................................8

      D.      The Proposed Amendment Is Not Futile. ...............................................................9

CONCLUSION ...............................................................................................................................10

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Barbour* v. *City of Forney*,
　2015 WL 4094005 (N.D. Tex. June 17, 2015) ...................................................................8, 9

*Lyn-Lea Travel Corp.* v. *Am. Airlines, Inc.*,
　283 F.3d 282 (5th Cir. 2002) ...................................................................................................7

*Mary Kay, Inc.* v. *Dunlap*,
　No. 3:12-CV-0029-D, 2012 WL 3283475 (N.D. Tex. Aug. 13, 2012) ...................................8

*Mayeaux* v. *La. Health Serv. & Indem. Co.*,
　376 F.3d 420 (5th Cir. 2004) ...................................................................................................7

*Pub. Health Equip. & Supply Co.* v. *Clarke Mosquito Control Prods., Inc.*,
　410 F. App'x 738 (5th Cir. 2010) .............................................................................................9

*SGIC Strategic Glob. Inv. Capital, Inc.* v. *Burger King Eur. GMBH*,
　No. 15-10942, 2016 WL 5888386 (5th Cir. Oct. 10, 2016) .................................................8, 9

*Smith* v. *EMC Corp.*,
　393 F.3d 590 (5th Cir. 2004) ...................................................................................................8

### OTHER AUTHORITIES

Fed. R. Civ. P. 15(a) ..........................................................................................................1, 7, 9

Fed. R. Civ. P. 20...................................................................................................................10

*Modernization of Oil & Gas Reporting*, SEC Release No. 78, File No. S7-15-08,
　2008 WL 5423153, at *66 (Dec. 31, 2008) .............................................................................5

Pursuant to Federal Rule of Civil Procedure 15(a), Plaintiff Exxon Mobil Corporation ("ExxonMobil" or the "Company") respectfully submits this memorandum of law in support of its motion for leave to file and serve the Proposed First Amended Complaint, which would (i) join the Attorney General of New York as a defendant and (ii) add new claims for federal preemption and for conspiracy to deprive ExxonMobil of its constitutional rights.

## BACKGROUND

In November 2015, New York Attorney General Eric Schneiderman issued a sweeping subpoena to ExxonMobil (the "Subpoena") that demanded the production of essentially every document in the Company's possession concerning global warming or climate change for a period of nearly 40 years.  Prop. First Am. Compl. ¶¶ 20, 61-68.[1]  The Subpoena was directed at ExxonMobil's historic research on climate change, as well as ExxonMobil's interactions with groups that the Attorney General perceived as opposing his preferred policy responses to climate change.  *Id.* ¶¶ 61-68.

Within a week of issuing the Subpoena, Attorney General Schneiderman publicly announced the investigative theory he was pursuing.  He appeared on a *PBS NewsHour* segment, entitled "Has Exxon Mobil misled the public about its climate change research?"  *Id.* ¶ 22.  During that appearance, the Attorney General explained that the focus of his investigation was ExxonMobil's purported decision to "shift[] [its] point of view" and "change[] tactics" on climate change after "being at the leadership of doing good scientific work" on the issue "[i]n the 1980s."  *Id.*  Attorney General Schneiderman said his probe extended to ExxonMobil's "funding [of] organizations."  *Id.*  Renewable energy was another focus of the investigation.  The Attorney

---

[1]   "Prop. First Am. Compl." refers to the First Amended Complaint that ExxonMobil proposes to file if this motion is granted.  A copy of the Proposed First Amended Complaint is attached to this brief as Exhibit A, and a copy of the Proposed Appendix in support of the First Amended Complaint is attached as Exhibit B.

General said he was "concerned about" ExxonMobil's purported "overestimating the costs of switching to renewable energy." *Id.* ¶ 23.

Less than a month later, the Attorney General reminded the public of the theory driving his investigation.  At an event sponsored by *Politico* in New York, the Attorney General said that ExxonMobil appeared to be "doing very good work in the 1980s on climate research" but that its "corporate strategy seemed to shift" later.  *Id.* ¶ 25.  The Attorney General likewise reiterated that his investigation pertained to alleged "aggressive climate deniers," claiming that the Company had funded organizations that he considered "deniers."  *Id.*

Despite the Subpoena's sprawling scope and the politically charged context, the Company expected that the New York Attorney General's Office would conduct a fair and impartial investigation.   Based on that expectation, and in conformity with the Attorney General's investigative focus, ExxonMobil began producing documents related to its historical research on climate change.  *Id.* ¶¶ 26, 74.

As the investigation unfolded, events further suggested that Attorney General Schneiderman's inquiry had more to do with politics than law enforcement.  On March 29, 2016, the Attorney General convened a press conference—which featured former Vice President and climate activist Al Gore as the keynote speaker—with a group of like-minded state attorneys general, including Massachusetts Attorney General Maura Healey.  *Id.* ¶¶ 27-39.  They called themselves the "Green 20."  *Id.* ¶¶ 27.  At the conference, the Attorney General pledged that the coalition would "deal with the problem of climate change" by using law enforcement powers "creatively" and "aggressively" to force ExxonMobil and other energy companies to support the coalition's preferred policy responses to climate change.  *Id.* ¶¶ 2, 28.  Three weeks later, ExxonMobil received a civil investigative demand from Attorney General Healey that, like the

Subpoena, demanded four decades of climate change records and expressly targeted ExxonMobil's communications with organizations that have been labeled as "climate deniers." *Id.* ¶¶ 10, 69-73.

In the following months, additional evidence of the investigations' true purpose—to suppress speech with which the Green 20 disagrees—continued to come to light. Pursuant to a Vermont Freedom of Information Act request, one member of the Green 20 was obliged to disclose emails revealing that the group held closed-door meetings with climate activists and private attorneys in advance of the press conference. *Id.* ¶¶ 40-51. Members of the coalition recognized that the involvement of those individuals—who have a long and well-documented history of seeking to use law-enforcement tools to "delegitimize" ExxonMobil, *id.* ¶¶ 4-6, 42-49—could expose the special interests behind their investigations. *Id.* ¶ 50. So, when the private attorney asked Attorney General Schneiderman's office what he should tell a reporter if asked about his involvement, the Chief of the Environmental Protection Bureau asked him not to confirm his attendance at the conference. *Id.* ¶¶ 7, 50.

Public records requests also have revealed that the Green 20 executed an agreement, which was designed to shield the group's communications from public disclosure. *Id.* ¶ 52. According to the agreement, the Green 20 shared two goals, neither of which relates to any legitimate law-enforcement objective: "limit[ing] climate change" and "ensuring the dissemination of accurate information about climate change." *Id.* The agreement bound the parties not to disclose any information about the Green 20's meetings surrounding the press conference or any other "information" shared by the Green 20 after the agreement was executed. *Id.* ¶ 53.

Recent events have fully unmasked the pretextual nature of the Green 20's investigations, revealed the improper bias and unconstitutional objectives animating them, and confirmed that Attorney General Schneiderman has no intention of fairly evaluating ExxonMobil's substantial

production of documents. *Id.* ¶¶ 74-76.  Less than a month ago, and well after ExxonMobil commenced this action, the Attorney General's spokesman stated that the Company's "historic climate change research" was no longer "the focus of this investigation." *Id.* ¶¶ 74.  Rather than close his investigation, Attorney General Schneiderman shifted focus.  He directed ExxonMobil to produce documents concerning its estimation of oil and gas reserves. *Id.* ¶ 76.  As explained in a lengthy interview published in *The New York Times*, the Attorney General intends to examine whether ExxonMobil has overstated its reserves and failed to record impairments of its assets by not accounting for what he believes will be future "global efforts to address climate change," which might require ExxonMobil "to leave enormous amounts of oil reserves in the ground." *Id.* ¶ 75.

This sharp investigative shift shows that the Attorney General is simply searching for a legal theory that will justify his efforts to use legal tools to pressure ExxonMobil to alter its position on matters of public concern. *Id.* ¶ 76.  Attorney General Schneiderman's new theory of securities fraud has nothing to do with the prior focus of his investigation on ExxonMobil's historic climate change research. *Id.* ¶ 75.  And without offering—or possessing—any supporting evidence whatsoever, the Attorney General inappropriately opined to *The New York Times* that there "may be massive securities fraud" at ExxonMobil based on its estimation of its oil and gas reserves and valuation of its assets. *Id.*

Attorney General Schneiderman's decision to investigate ExxonMobil's reserves and the impairment of ExxonMobil's assets is particularly egregious because it cannot be reconciled with rules and regulations imposed by the Securities and Exchange Commission ("SEC"), which govern the estimation of proved reserves and the process for analyzing possible impairment of assets. *Id.* ¶ 77.  Those regulations prohibit companies like ExxonMobil from considering the impact of future regulations when estimating reserves. *Id.* ¶ 78.  To the contrary, they require ExxonMobil

4

to calculate its proved reserves in light of "*existing* economic conditions, operating methods, and *government regulations*." *Modernization of Oil & Gas Reporting*, SEC Release No. 78, File No. S7-15-08, 2008 WL 5423153, at *66 (Dec. 31, 2008) (emphasis added). The SEC adopted that definition of proved reserves as part of its efforts to provide investors with a "comprehensive understanding of oil and gas reserves, which should help investors evaluate the relative value of oil and gas companies." *Id.* at *1. The SEC's definition of proved oil and gas reserves thus reflects its reasoned judgment about how best to supply investors with information about the relative value of oil and gas companies, as well as its balancing of competing priorities, such as the agency's desire for comprehensive disclosures, that are not unduly burdensome, and which investors can easily compare. Prop. First Am. Compl. ¶ 78.

Similarly, Attorney General Schneiderman seeks to impose liability on ExxonMobil for not adopting his assumptions about the financial impact of possible, but unknown, future regulations concerning carbon emissions when considering whether to record impairments of its assets. *Id.* ¶ 79. However, the accounting standards promulgated by the Financial Accounting Standards Board, which the SEC has endorsed as authoritative, require ExxonMobil to "incorporate [its] own assumptions" about future events—not the assumptions of Attorney General Schneiderman—when assessing whether its assets are impaired. *Id.*

The theory that the Attorney General has promoted to media outlets requires that ExxonMobil adopt his assumptions about the likelihood of possible future climate change regulations and then incorporate those assumptions into its estimation of proved reserves and its determination of whether an asset has been impaired. *Id.* ¶ 79. But that theory of "massive securities fraud" cannot be reconciled with SEC rules and regulations. *Id.* The SEC requires ExxonMobil to ignore Attorney General Schneiderman's assumptions about future regulations

5

when estimating reserves and holds ExxonMobil responsible for applying its own assumptions—not those dictated by a state attorney general—when conducting its impairment analyses. *Id.*

In papers filed in this Court in August, Attorney General Healey disclosed that she is also investigating ExxonMobil's estimation of reserves and impairment of assets in light of the possibility of future climate change regulations. *Id.* ¶ 80. The decision to embrace this theory speaks volumes about the pretextual nature of the investigations being conducted by Attorneys General Schneiderman and Healey. To read the relevant SEC rules is to understand why ExxonMobil may not account for future climate change regulations when calculating its proved reserves. And to read the applicable accounting standards is to understand why it is impermissible for the Attorneys General to impose their assumptions about the financial impact of possible future climate change regulations on companies that are required to develop their own independent assumptions. The Attorneys Generals' claims that they are conducting a bona fide investigation premised on ExxonMobil's supposed failure to account for the Attorneys Generals' expectations regarding the financial impact of future regulations thus cannot be taken seriously. Their true objective is clear: to fish indiscriminately through ExxonMobil's records with the hope of finding some violation of some law that one of them might be empowered to enforce, or otherwise to harass ExxonMobil into endorsing the Green 20's policy views regarding how the United States should respond to climate change. *Id.*

The desire of Attorneys General Schneiderman and Healey to impose liability on ExxonMobil for complying with SEC disclosure requirements, and the accounting methodologies incorporated in them, would create a direct conflict with federal law. *Id.* ¶ 81. Even if the New York or Massachusetts Attorneys General were seeking only to layer additional disclosure requirements beyond those imposed by the SEC, this would frustrate, and pose an obstacle to,

Congress's and the SEC's efforts to create a uniform market for securities and to provide consistent

metrics by which investors can measure oil and gas companies on a relative basis.  *Id.*

This recent and transparent encroachment on an area of federal regulation has dispelled

any hope or expectation that the New York Attorney General would engage in a legitimate and

unbiased investigation, and has further demonstrated why Attorney General Healey's attempted

fishing expedition must be enjoined.   In light of the recent developments described above, the

Green 20's campaign has been revealed as a conspiracy—carried out by means of Attorney

General Schneiderman's subpoena and Attorney General Healey's civil investigative demand—to

deprive ExxonMobil of its constitutional rights.   These developments have compelled ExxonMobil

to join the New York Attorney General as a defendant in this action, to assert two additional ground

for relief—federal preemption and conspiracy—and thus to file this motion.

## ARGUMENT

### I.       Applicable Law

A court should "freely give leave" to amend a complaint "when justice so requires."  Fed.

R. Civ. P. 15(a)(2).  Rule 15's permissive language "evinces a bias in favor of granting leave to

amend."  *Lyn-Lea Travel Corp.* v. *Am. Airlines, Inc.*, 283 F.3d 282, 286 (5th Cir. 2002).  This

Circuit therefore applies a strong presumption that a motion to amend should be granted.  *E.g.*,

*Mayeaux* v. *La. Health Serv. & Indem. Co.*, 376 F.3d 420, 426 (5th Cir. 2004).  To overcome that

presumption, an opposing party must identify a "substantial reason" that justifies denying leave to

amend.  *Barbour* v. *City of Forney*, 2015 WL 4094005, at *3 (N.D. Tex. June 17, 2015).  When

analyzing if such a reason exists, courts examine whether (1) the amendment will result in

prejudice to the opposing party, (2) the amendment has been unduly delayed, (3) the amendment

has been sought in bad faith or with a dilatory motive, (4) the moving party repeatedly failed to

cure deficiencies in previous amendments, and (5) the amendment would be futile.  *SGIC Strategic*

*Glob. Inv. Capital, Inc.* v. *Burger King Eur. GMBH*, No. 15-10942, 2016 WL 5888386, at *4 (5th Cir. Oct. 10, 2016).  For the reasons that follow, none of these exceptions applies here.

## II.    Discussion

### A.    The Requested Amendment Will Not Prejudice Attorney General Healey.

An amendment is unduly prejudicial only if it would require the defendant to reopen discovery and prepare a new defense for a claim that was not previously before the court.  *Smith* v. *EMC Corp.*, 393 F.3d 590, 596 (5th Cir. 2004).  Merits discovery has not even begun in this action, let alone concluded.  Attorney General Healey therefore will not be prejudiced by the requested amendment.  *See id.*

### B.    The Requested Amendment Was Not Unduly Delayed.

For substantially the same reasons, ExxonMobil has not unduly delayed its proposed amendment.  Courts find undue delay only where a party attempts to amend its complaint at an advanced stage of the proceedings—for example, after trial.  *See id.* at 595.  Courts routinely reject timeliness arguments opposing amendments that are proposed early in the proceedings, including during merits discovery.  *See, e.g.*, *Mary Kay, Inc.* v. *Dunlap*, No. 3:12-CV-0029-D, 2012 WL 3283475, at *2 (N.D. Tex. Aug. 13, 2012).  Because merits discovery has not yet commenced, the amendment is timely.  *See id.*

### C.    The Amendment Is Not Sought in Bad Faith, with a Dilatory Motive, or to Cure Deficiencies in Prior Amendments.

Where a party seeks leave to amend its complaint for the first time, and before any court-ordered deadline, the bad faith or dilatory motive exception does not apply.  *Pub. Health Equip. & Supply Co.* v. *Clarke Mosquito Control Prods., Inc.*, 410 F. App'x 738, 740 (5th Cir. 2010).  This is ExxonMobil's first proposed amendment, and its filing precedes any court-imposed deadline.  The bad faith or dilatory motive exception thus provides no basis for denying

8

ExxonMobil's motion. *See id.* Because this is ExxonMobil's first attempt to amend its complaint, the fourth possible exception—whether the moving party has repeatedly failed to cure deficiencies in prior amendments—also is inapplicable. *See SGIC Strategic Global Inv. Capital, Inc.*, 2016 WL 58888386, at *4.

### D.     The Proposed Amendment Is Not Futile.

ExxonMobil's proposed amendment, which contains detailed claims grounded in well-recognized legal principles and supported by specific facts, is not futile. Courts rarely indulge an opposing party's attempt to "preempt an analysis of a new cause of action in the context of a dispositive motion by denying leave in the Rule 15(a) context on the basis of futility." *Barbour*, 2015 WL 4094005, at *4. Courts therefore deny requested amendments as futile only if (1) the amended complaint simply repeats prior, insufficient allegations, or (2) the new claims so obviously fail as a matter of law that they are not merely insufficiently pleaded but in fact "cannot be stated." *Id.*

ExxonMobil's detailed allegations easily clear that low threshold. Attorney General Healey's motion to dismiss did not—and could not—challenge the sufficiency of ExxonMobil's allegations. ECF No. 60 at 1. Indeed, the Court has taken under advisement ExxonMobil's motion for a preliminary injunction, which further develops the factual bases for its claims. Any motion to dismiss by Attorney General Schneiderman would have to grapple with similarly detailed allegations of wrongdoing. In fact, ExxonMobil's complaint recites a host of allegations that apply only to the New York Attorney General, because he made a series of improper, extrajudicial statements regarding his investigation of ExxonMobil. Prop. First Am. Compl. ¶¶ 20-26, 74-75.[2]

---

[2]     Joinder of Attorney General Schneiderman is proper under Federal Rule of Civil Procedure 20. ExxonMobil's claims raise questions of law and fact common to both Attorney General Schneiderman and Attorney General Healey. Fed. R. Civ. P. 20(a)(2)(B). Indeed, all of ExxonMobil's claims are brought against both Attorneys

ExxonMobil's new causes of action concerning preemption and conspiracy are similarly well pleaded. The merit of the preemption claim is apparent from the face of the applicable federal regulations and accounting rules, which plainly contradict the investigative theories of both Attorney General Schneiderman and Attorney General Healey. *See id.* ¶¶ 77-81. The plausibility of ExxonMobil's civil conspiracy claim similarly is apparent: As ExxonMobil has pleaded in detail, Attorneys General Schneiderman and Healey have agreed with each other and others to deprive ExxonMobil of its constitutional rights. *Id.* ¶ 106. In furtherance of that illegal objective, the Attorneys General have issued the Subpoena and the civil investigative demand and have entered into the common interest agreement. *Id.* ¶ 107. Far from being futile, ExxonMobil's proposed amendment thus includes claims that are at least as plausible as those which Attorney General Healey did not even attempt to challenge as insufficient.

## **CONCLUSION**

For the foregoing reasons, ExxonMobil respectfully requests that the Court grant it leave to file the Proposed First Amended Complaint.[3]

---

General, and common questions of fact concerning the press conference and common interest agreement, among others, will arise as to both Attorneys General.

[3] A proposed order grating this relief has been prepared for the Court's consideration and is attached to this brief as Exhibit C.

Dated:  October 17, 2016


EXXON MOBIL CORPORATION

By:  /s/ Patrick J. Conlon                          
Patrick J. Conlon
*pro hac vice*
State Bar No. 24054300
patrick.j.conlon@exxonmobil.com
Daniel E. Bolia
State Bar No. 24064919
daniel.e.bolia@exxonmobil.com
1301 Fannin Street
Houston, TX 77002
(832) 624-6336

/s/ Nina Cortell                                    
Nina Cortell
State Bar No. 04844500
nina.cortell@haynesboone.com
HAYNES & BOONE, LLP
2323 Victory Avenue
Suite 700
Dallas, TX 75219
(214) 651-5579
Fax: (214) 200-0411


/s/ Theodore V. Wells, Jr.                          
Theodore V. Wells, Jr.
*pro hac vice*
twells@paulweiss.com
Michele Hirshman
*pro hac vice*
mhirshman@paulweiss.com
Daniel J. Toal
*pro hac vice*
dtoal@paulweiss.com
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON, LLP
1285 Avenue of the Americas
New York, NY 10019-6064
(212) 373-3000
Fax: (212) 757-3990

Justin Anderson
*pro hac vice*
janderson@paulweiss.com
2001 K Street, NW
Washington, D.C. 20006-1047
(202) 223-7300
Fax: (202) 223-7420

*Counsel for Exxon Mobil Corporation*

/s/ Ralph H. Duggins                                
Ralph H. Duggins
State Bar No. 06183700
rduggins@canteyhanger.com
Philip A. Vickers
State Bar No. 24051699
pvickers@canteyhanger.com
Alix D. Allison
State Bar. No. 24086261
aallison@canteyhanger.com
CANTEY HANGER LLP
600 West 6th Street, Suite 300
Fort Worth, TX 76102
(817) 877-2800
Fax: (817) 877-2807

## CERTIFICATE OF SERVICE

I hereby certify that on October 17, 2016, a copy of the foregoing instrument was served on the following party via the Court's CM/ECF system in accordance with the Federal Rules of Civil Procedure:

Maura Healey
Massachusetts Attorney General's Office
One Ashburton Place
Boston, MA 02108-1518
Phone: (617) 727-2200

/s/ Ralph H. Duggins
Ralph H. Duggins

12