# Exhibit S

APP. 175





# PRACTICE AREAS



## Environmental Litigation

Our environmental law practice handles major cases with national and even international significance. We are most well known for our role in launching global warming litigation.

**READ ON**



## Personal Injuries

We represent injured persons in a wide variety of cases for recovery of substantial monetary damages against wrongdoers. We currently represent child victims of instant soup spills. We brought personal injury cases arising from the prescription drugs Seroquel and Zyprexa on behalf of numerous individuals and,

**APP. 176**

terms for our clients.

**READ ON**



The Pawa Law Group, P.C. is a litigation and trial firm. Our firm offers significant experience representing governments, large and small businesses, environmental and conservation groups, citizens, property owners, non-profit organizations and injured persons. We handle individual cases and class actions. We have litigated cases in virtually all courts in Massachusetts and the District of Columbia and in numerous courts throughout the country.

**TALK TO US TODAY!**

1280 Centre Street
Suite 230
Newton Centre, MA 02459

P: (617) 641-9550
F: (617) 641-9551

© 2016 Pawa Law Group, P.C. Disclaimer Website by tWP

**APP. 177**

# Exhibit T



Corporate Citizenship Report

**Ex⌘onMobil**
Energy lives here™

2015

APP. 179

3   Chairman's letter

4   About ExxonMobil

5   Global operations

6   Powering the world's progress

7   The *Outlook for Energy*

8   Sustainability

9   Engaging with stakeholders

10   External Citizenship Advisory Panel

12   ExxonMobil's key sustainability issues and challenges




**15**

**Case Study:**

ExxonMobil's *Operations Integrity Management System*



**18**

## Safety, health and the workplace

- Safety
- Emergency preparedness and response
- Workplace security
- Health and wellness
- Workforce



**29**

## Managing climate change risks

- Engaging on climate change policy
- Developing future technology
- Mitigating greenhouse gas emissions in our operations
- Developing solutions that reduce greenhouse gas emissions for customers

**42**

**Case Study:**

ExxonMobil's research and development initiatives



**45**

## Environmental performance

- Environmental management
- Biodiversity and ecosystem services
- Water management
- Spill performance
- Air emissions
- Environmental compliance
- Rehabilitation and decommissioning



**56**

**Case Study:**

Technological innovations in Arctic wildlife protection



**59**

## Community and social impact

- Respecting human rights
- Managing community engagement
- Strategic community investments



**71**

**Case Study:**

New country entry in Guyana for the Upstream business





**74**

## Local development and supply chain management

- Local economic growth and development
- Supply chain management

**81**

## Corporate governance

- Ethics and integrity
- Board of directors
- Shareholder relations

88   About this report

89   Materiality

90   Performance data

93   IPIECA/GRI content index

94   Assurance statement



In December 2015, students at the Federal Housing Estate Primary School in Lagos, Nigeria, learn about malaria prevention and proper bed net use through Grassroot Soccer's community-based program. To learn more about this program, see page 69.

  

Web    Video    Throughout the report, additional content is available by clicking the icons shown on the left.



# Managing climate change risks

**Harold Johnson, lab technician at our Products Technology Center in Paulsboro, New Jersey, examines a motor oil sample.** Since 2000, ExxonMobil has spent approximately $7 billion to develop lower-emission energy solutions.

Society continues to face the dual challenge of meeting energy demand to support the economic growth needed for improved living standards, while simultaneously addressing the risks posed by rising greenhouse gas emissions and climate change. While future temperature changes and the associated impacts are difficult to accurately predict, we believe the risks of climate change are real and warrant thoughtful action.

ExxonMobil supports advancement of the scientific understanding of climate change and is committed to providing affordable energy to support human progress while advancing effective solutions to address the risks of climate change. Our climate change risk management strategy includes four components: engaging on climate change policy, developing future technology, mitigating greenhouse gas emissions in our operations and developing solutions that reduce greenhouse gas emissions for our customers.

## Engaging on climate change policy

Climate change is a global issue that requires the collaboration of governments, companies, consumers and other stakeholders to create global solutions. We believe countries need to work together to craft policies aimed at mitigating greenhouse gas emissions that recognize the priorities and needs of both developed and developing countries. We engage stakeholders directly and with trade associations around the world to encourage sound policy solutions for addressing these risks.

### Attributes of sound climate policy

ExxonMobil believes the long-term objective of effective policy is to reduce the risks posed by climate change at minimum societal cost, in balance with other societal priorities such as poverty eradication, education, health, security and affordable energy.

We fundamentally believe that free markets, innovation and technology are essential to addressing the risks of climate change. Success in developing and deploying impactful technologies will highly depend on governments creating a

policy landscape that enables innovation and competition. Policies need to be clear and guard against duplicative, overlapping and conflicting regulations, which send mixed signals to the market and impose unnecessary costs on consumers. We believe that effective policies are those that:

• Promote global participation;

• Let market prices drive the selection of solutions;

• Ensure a uniform and predictable cost of greenhouse gas emissions across the economy;

• Minimize complexity and administrative costs;

• Maximize transparency; and

• Provide flexibility for future adjustments to react to developments in climate science and the economic impacts of climate policies.

Policies based on these principles minimize overall costs to society and allow markets to help determine the most effective and commercially viable solutions.

Given the wide range of societal priorities and limited global resources, all policies, including climate change policy, must be as economically efficient as possible. ExxonMobil believes that market-based systems that impose a uniform, economy-wide cost on greenhouse gas emissions are more economically efficient policy options than mandates or standards. This is because market-based policies more effectively drive consumer behavior and technology innovation, while mandates and standards eliminate consumer choice and can perpetuate ineffective technologies.

Since 2009, ExxonMobil has held the view that a properly designed, revenue-neutral carbon tax is a more effective market-based option than a cap-and-trade approach. A carbon tax is more transparent, can be implemented in existing tax infrastructure, avoids the complexity of creating and regulating carbon markets where none exist and reduces greenhouse gas emissions price volatility, thus delivering a clearer, more consistent long-term market price signal.

Only through a sound global policy framework will the power of markets and innovation enable society to find cost-effective solutions to address the risks of climate change, while at the same time continuing to address the many other challenges the world faces.

### Engaging stakeholders

Managing the risks of climate change will require increased innovation and collaboration. Therefore, ExxonMobil engages a variety of stakeholders — including policymakers, investors, consumers, non-governmental organizations (NGOs), academics and the public — on climate change issues of direct relevance to the company.

## Up Close: Attributes of sound market-based policy

While market-based systems may have different designs and regional applications, we believe effective systems are those that promote global participation and are characterized as follows:

• Apply to all greenhouse gas emissions across the economy;

• Provide a uniform price for all greenhouse gas emissions;

• Apply the costs of greenhouse gas emissions to the parties most able and likely to alter behavior in response to a price signal;

• Prevent shifting of greenhouse gas emissions to unregulated jurisdictions;

• Provide for linkages with other market-based systems outside the regulated jurisdiction;

• Return revenue generated from the system back to the economy in an equitable fashion that encourages economic growth and limits regressive income effects; and

• Provide for accurate and cost-effective greenhouse gas emissions measurement, verification and reporting.

# Up Close:
# Outcomes from COP 21

In December 2015, parties to the United Nations (UN) Framework Convention on Climate Change convened in Paris for the 21st Conference of the Parties (COP 21). COP 21 resulted in a global agreement which, for the first time, commits all parties to undertake action on climate change and report on related progress. Key commitments of the agreement include:

• "Each party shall prepare, communicate and maintain successive nationally determined contributions that it intends to achieve."

• "Each party shall communicate nationally determined contributions every five years."

• "Each party shall regularly provide ... a national inventory report of anthropogenic emissions by sources and removals by sinks of greenhouse gases" and "information necessary to track progress made in implementing and achieving its nationally determined contribution."

**Paris France**

Participants at the 21st Conference of the Parties in Paris, December 2015.

ExxonMobil believes that these commitments are a positive step in achieving global participation to address climate change risks.

For many years, ExxonMobil's *Outlook for Energy* has taken into account the potential for climate policies to become increasingly stringent over time and impose rising costs on energy-related carbon dioxide emissions. Preliminary analyses of the aggregation of intended nationally determined contributions, which were submitted by governments as part

of the COP 21 process, indicate a greenhouse gas emissions trajectory similar to that anticipated in our *Outlook*.

ExxonMobil continues to support and contribute to efforts to reduce greenhouse gas emissions. We believe the risks of climate change are real and warrant thoughtful action. Meeting the climate change challenge will require action from all parts of society, including governments, civil society and the private sector. We believe it is possible to address climate risks while also meeting growing global energy demand and supporting economic development.

---

ExxonMobil actively advocates for responsible policies that would be effective in addressing the risks of climate change. When we encounter proposals, we offer informed data and policy analysis and engage in thoughtful debate. We have had hundreds of meetings with policymakers in the United States, the European Union and Canada to share our views on carbon pricing policy. We will continue to meet with policymakers and other stakeholders to discuss effective approaches to reduce greenhouse gas emissions. For additional information on ExxonMobil's approach to political advocacy and contributions, see page 86.

Our chairman and members of the management committee have primary responsibility for — and are actively engaged in — managing climate change risks. The board of directors receives annual in-depth briefings that cover updates on public policy, scientific and technical research, and company positions and actions related to climate change.

To drive improvement, our merit-driven employee development and compensation systems integrate performance in environmental areas, including emissions and energy efficiency.

In order to ensure that our corporate communications accurately reflect our internal policy positions, we employ a corporate-wide global climate change and greenhouse gas issue management team. As issues arise at the local, state, national and regional levels, our global team of experts evaluate and develop a company position on the issue. ExxonMobil employees also hold key leadership positions, including board of director positions, with many trade associations that engage on climate change issues, including the American Petroleum Institute (API), the International Association of Oil and Gas Producers (IOGP) and IPIECA, the global oil and gas industry association for environmental and social issues.

We believe an effective policy response to climate change requires a thorough understanding of the climate system. Our scientists have been involved in climate change research and related policy analysis for more than 30 years. This has resulted in hundreds of publicly available documents on climate-related topics, including more than 50 peer-reviewed publications.

While our long-standing and continuous involvement with climate science research, often conducted in collaboration with governmental bodies and leading universities, has advanced the company's understanding of the climate system, ExxonMobil is committed to continued engagement with the climate science community in an effort to further develop the science. ExxonMobil contributes to a wide range of academic and other organizations that research and promote dialogue on addressing climate change risks.

 Peer-reviewed articles on climate research



We engage with IPIECA on a number of issues, including climate change risks. Rick Mire, environment, regulatory and socioeconomic manager, has represented ExxonMobil at IPIECA for more than a decade and has served as chair since 2012.

## Up Close:
## ExxonMobil and the IPCC

For more than 25 years, the IPCC has provided periodic assessments of climate change, including information on the causes and impacts as well as potential response strategies. Experts from ExxonMobil have participated in the IPCC since its inception. In October 2014, the IPCC completed its Fifth Assessment Report, which offers an update of materials related to climate science, including the socioeconomic aspects of climate change and its implications for sustainable development. Our scientists contributed to the IPCC Fifth Assessment Report in lead author, review editor and reviewer roles.

The Fifth Assessment reports high confidence in the scientific certainty of many aspects of climate change, including that atmospheric greenhouse gas concentrations are rising in response to emission, the earth's temperature has warmed over the last century and that the risks associated with climate change will increase with the magnitude of atmospheric greenhouse gas concentration and temperature increases. The assessment notes that the ability to forecast the magnitude and pattern of future climate change remains less certain and confidence declines when moving from a global to local scale.

While the current scientific understanding of climate change leaves some unanswered questions, it is clear that the risks are real and warrant thoughtful action. ExxonMobil employs a risk management strategy and continually strives to improve our understanding of the impacts of climate change. As part of our *Outlook for Energy* analysis, we project an energy-related carbon dioxide ($CO_2$) emissions profile through 2040. This can be compared with the energy-related $CO_2$ emissions profiles from various scenarios outlined by the IPCC. When we do this, our *Outlook* emissions profile approximates the IPCC's intermediate Representative Concentration Pathways 4.5 emissions profile in shape, but is slightly under it in magnitude.

 IPCC's Fifth Assessment Report

Experts from our organization have participated in the UN Intergovernmental Panel on Climate Change (IPCC) since its inception. Most recently, our scientists contributed to the IPCC Fifth Assessment Report in lead author, review editor and reviewer roles. For additional information on the IPCC's Fifth Assessment Report, see the adjacent Up Close. Our scientists also participated in the work of the U.S. National Academy of Sciences, including its work to review the third U.S. National Climate Assessment Report and provide advice to the U.S. Global Change Research Program.

### Engaging industry
ExxonMobil recognizes the growing interest in climate change risks and understands that stakeholders seek a better understanding of the positions of the oil and gas industry, as well as how individual companies approach the management of climate change risks within their own businesses.

IPIECA was established in 1974 at the request of the United Nations Environmental Program. As an active IPIECA member, ExxonMobil engaged with member companies in advance of the December 2015 COP 21 meeting in Paris in order to help develop a common industry position on global efforts to address and mitigate climate change risks. That work culminated in The Paris Puzzle — a publication on the challenges and responses needed to address the risks of climate change.

 IPIECA Paris Puzzle

Recognizing the desire of stakeholders for more accessible and clear information, in 2015 we also took a key role collaborating with IPIECA and its member companies to create a voluntary reporting framework for oil and gas companies to publish their climate change risk management approach in a simple, straightforward and transparent manner. The resulting framework, which IPIECA will pilot during 2016, covers a wide range of climate-related issues and provides a consistent reporting methodology for the oil and gas industry. This framework should enable interested stakeholders to understand an individual company's views on the issues central to addressing climate change risks.

 IPIECA Climate Change Reporting Framework

# Developing future technology

## ExxonMobil's approach to developing future technology

| Expand access to energy | Mitigate emissions | Promote science for sound policy | Improve efficiency | Increase supply |
|---|---|---|---|---|
| • Hydrocarbon and renewable energy systems<br><br>• Emerging power generation technologies | • Methane emissions reduction<br><br>• Advanced carbon capture and sequestration | • Climate science, economics and policy<br><br>• Resilience and preparedness | • Internal combustion engine efficiency<br><br>• Light-weighting and packaging reduction | • Natural gas to products<br><br>• Advanced biofuels, including algae |

As society transitions to lower greenhouse gas emission energy solutions, technological advancements that change the way we produce and use energy will be instrumental in providing the global economy with the energy it needs while reducing greenhouse gas emissions. Recognizing the limitations associated with most existing low greenhouse gas emissions energy technologies, particularly in delivering the necessary economy and scale, we are conducting fundamental research to develop low greenhouse gas emission energy solutions that have the potential to be economically feasible without subsidies, standards or mandates. ExxonMobil is pioneering scientific research to discover innovative approaches to enhance existing and develop next-generation energy sources.

ExxonMobil's Emerging Technologies program brings together executives, scientists and engineers from across ExxonMobil's businesses to identify and evaluate technology research opportunities with a long-term strategic focus. The Emerging Technologies team seeks to understand a wide range of technology options and how they may impact the global energy system in the near term and as far as 50 years into the future. Our evaluation extends well beyond our base business and near-term focus. If a technology could have a material effect on the future of energy, we insist on knowing about it and understanding the related science. Understanding the fundamental science serves as a basis for our broader research efforts and may lead to further technology development aimed at practical application, such as our work on biofuels. Additionally, this awareness informs our internal analysis of the global energy landscape as reflected and encapsulated in our annual *Outlook for Energy*.

 *The Outlook for Energy: A View to 2040*

At the center of our research is ExxonMobil's Corporate Strategic Research laboratory, a fundamental research institution with approximately 150 Ph.D. scientists and engineers focused on addressing the company's long-range science needs. The laboratory's scientists are internationally recognized experts in their field. Our research portfolio, as illustrated in the graphic above, includes a broad array of programs, including biofuels, carbon capture and sequestration, alternative energy and climate science.

*"ExxonMobil is a leader in its commitment to fundamental science and has a constancy of purpose when looking at emerging energy technologies. As part of our commitment, we continue to widen our research aperture through collaborations with academics and other third parties to better enable us to identify potential breakthroughs in lower-emission technologies."*

 **Vijay Swarup**
Vice president, research and development

In addition to in-house research, the Corporate Strategic Research laboratory conducts strategic research with leading universities around the world. For example, in 2014, ExxonMobil signed an agreement to join the Massachusetts Institute of Technology Energy Initiative, a collaboration aimed at working to advance and explore the future of energy. ExxonMobil was also a founding member of the Global Climate and Energy Project at Stanford University, which seeks to develop fundamental, game-changing scientific breakthroughs that could lead to lower greenhouse gas emissions and a less carbon-intensive global energy system. Other university collaborations cover a wide range of scientific topics, from understanding the impacts of black carbon and aerosols at the University of California, Riverside to the fundamentals of biomass pyrolysis used to make biofuels at Iowa State University.

### Advanced biofuels

ExxonMobil funds a broad portfolio of biofuels research programs including ongoing efforts to develop algae-based biofuels, as well as programs for converting non-food based feedstocks, such as whole cellulosic biomass, algae-based feedstocks and cellulose-derived sugars, into advanced biofuels. We believe that additional fundamental technology improvements and scientific breakthroughs are still necessary in both biomass optimization and the processing of biomass into fuels. Specifically, scientific breakthroughs are needed to ensure that advanced biofuels can be scaled up economically and produced with the desired environmental benefit of lower life cycle greenhouse gas emissions.

# Up Close:
## Advanced biofuels partnership with Michigan State University

ExxonMobil is a leader in funding and conducting research on advanced biofuels. In 2015, ExxonMobil and Michigan State University (MSU) launched a partnership to advance biofuel research by developing the basic science required to progress algae-based fuels and bio-products.

Research has shown that algae photosynthesis can be highly efficient under optimal conditions in the laboratory but that this efficiency drops under realistic growth conditions. The partnership seeks to understand why some strains of algae are more efficient than others by using advanced technologies to study the photosynthetic processes of many cultures under different conditions.

The objective is to eventually process algae bio-oils in ExxonMobil refineries to supplement crude oil as the raw material to manufacture gasoline, diesel, aviation fuels and marine fuels. We are also researching potential applications for chemicals and lubricants.

Algae biofuel research and development is a long-term endeavor that could take decades to commercialize at scale. In this partnership, we are working to build on our significant progress since beginning this work in 2009.

"Nature has provided us with a great potential for improvement, and there are many strains of algae that have adapted to work in different environments. We want to determine how they do this and which genes are responsible. Then, we can potentially combine traits to make strains that are more efficient under harsh conditions."

**David Kramer**
Photosynthesis and bioenergetics professor, MSU-Department of Energy Plant and Research Laboratory

Our advanced biofuels research includes joint research collaborations with Synthetic Genomics Inc., Renewable Energy Group, the Colorado School of Mines, Michigan State University, Iowa State University, Northwestern University and the University of Wisconsin. For additional information on biofuel initiatives in 2015, see the adjacent Up Close.

 Energy investment in advanced biofuels

### Carbon capture and sequestration
Carbon capture and sequestration (CCS) is the process by which $CO_2$ gas that would otherwise be released into the atmosphere is captured, compressed and injected into underground geologic formations for permanent storage. With a working interest in approximately one-third of the world's total CCS capacity, ExxonMobil is a leader in one of the most important next-generation low-carbon technologies. In 2015, we captured 6.9 million metric tons of $CO_2$ for sequestration.

ExxonMobil believes the greatest opportunity for future large-scale deployment of CCS will be in the natural gas-fired power generation sector. While CCS technology can be applied to coal-fired power generation, the cost to capture $CO_2$ is about twice that of natural gas power generation. In addition, because coal-fired power generation creates about twice as much $CO_2$ per unit of electricity generated, the geological storage space required to sequester the $CO_2$ produced from coal-fired generation is about twice that associated with gas-fired generation.

ExxonMobil is conducting proprietary, fundamental research to develop breakthrough carbon capture technologies that have the potential to be economically feasible without government subsidies, standards or mandates.

### Environmental life cycle assessments
Every product has the potential to impact the environment. These impacts can be associated with use of the product itself, the manufacturing process or the acquisition of raw materials used to make the product. As a result, a holistic estimate of a product's environmental impact should reflect its entire life cycle.



Our LaBarge gas plant in Wyoming contributes to the total carbon dioxide ExxonMobil captures for sequestration each year.

To help direct our research efforts, we use in-house experts and tools to conduct environmental life cycle assessments of emerging products and activities. In doing so, we are able to assess which technologies have the potential to deliver the game-changing results that will be needed to transition the energy system to lower-emissions solutions.

ExxonMobil researchers also collaborate with researchers at national laboratories and universities around the globe to advance the science of life cycle assessments. In recent years, we have developed new approaches for quantifying environmental impacts associated with energy systems, and published our findings in prestigious peer-reviewed journals. Peer-review and collaboration with external scientists enhance dialogue with the academic research community and bring external expertise and perspective to ExxonMobil life cycle assessments, supporting sound science both within the company and in the greater scientific community.

# Mitigating greenhouse gas emissions in our operations

As we seek to increase production of oil and natural gas to meet growing global energy demand, we are committed to continuing to take actions to mitigate greenhouse gas emissions within our operations.

ExxonMobil has a robust set of processes designed to improve efficiency, reduce emissions and contribute to effective long-term solutions to manage climate change risks. These processes include, where appropriate, setting tailored objectives at the business, site and equipment levels, and then stewarding progress toward meeting those objectives. Based on decades of experience, ExxonMobil believes this rigorous bottom-up approach is a more effective and meaningful way to drive efficiency improvement and greenhouse gas emissions reduction than simply setting high-level corporate targets. We also believe that continuing to use this approach will yield further improvements in all sectors of our business.

In the near term, we are working to increase energy efficiency while reducing flaring, venting and fugitive emissions in our operations. In the medium term, we are deploying proven technologies such as cogeneration and carbon capture and sequestration where technically and economically feasible. Longer term, we are conducting and supporting research to develop breakthrough, game-changing technologies. Since 2000, ExxonMobil has spent approximately $7 billion to develop lower-emission energy solutions.

In 2015, ExxonMobil's net equity greenhouse gas emissions were 122 million $CO_2$-equivalent metric tons. Relative to our 2014 performance, our 2015 emissions decreased by approximately 1 million $CO_2$-equivalent metric tons. This decrease was primarily driven by energy efficiency improvement and asset divestment.

 2015 CDP (Carbon Disclosure Project) response

## Greenhouse gas emissions (net)[1]

Net equity, $CO_2$-equivalent emissions
Millions of metric tons



| Year | |
|------|------|
| 2006 | 139 |
| 2007 | 135 |
| 2008 | 126 |
| 2009 | 123 |
| 2010 | 126 |
| 2011 | 128 |
| 2012 | 126 |
| 2013 | 127 |
| 2014 | 123 |
| 2015 | 122 |

● Upstream   ● Downstream   ● Chemical

*In 2015, ExxonMobil's net equity greenhouse gas emissions were 122 million $CO_2$-equivalent metric tons. Relative to our 2014 performance, our 2015 emissions decreased by approximately 1 million $CO_2$-equivalent metric tons.*

[1] Our calculations are based on the guidance provided in API's Compendium of Greenhouse Gas Emission Estimation Methodologies for the Oil and Gas Industry and IPIECA's Petroleum Industry Guidelines for Reporting Greenhouse Gas Emissions.

## Greenhouse gas emissions (normalized)

Net equity, $CO_2$-equivalent emissions
Metric tons per 100 metric tons of throughput or production



● Upstream   ● Downstream   ● Chemical

*Through our commitment to energy efficiency, application of structured processes and continued use of a bottom-up approach, we continue to yield industry-leading results. For example, normalized greenhouse gas emissions from our Downstream business totaled 18.9 metric tons per 100 metric tons of throughput or production in 2015. This represents an improvement of 13 percent compared with our 2006 performance.*

## Greenhouse gas emissions avoided from ExxonMobil actions[2]

Net equity, $CO_2$-equivalent emissions
Millions of metric tons



| Year | |
|------|------|
| 2006 | 2.3 |
| 2007 | 4.5 |
| 2008 | 6.9 |
| 2009 | 9.1 |
| 2010 | 11.8 |
| 2011 | 13.6 |
| 2012 | 15.5 |
| 2013 | 17.9 |
| 2014 | 19.7 |
| 2015 | 20.5 |

● Energy efficiency and cogeneration   ● Flare/vent reduction

*In 2015, greenhouse gas emissions avoided from ExxonMobil actions were 20.5 million metric tons, cumulative since 2006. This represents an additional reduction of 0.8 million metric tons compared with our 2014 performance.*

[2] Cumulative since 2006.

# Emissions reduction

 

## >$3.8 Billion

invested since 2000 at our Upstream facilities around the world on emission reduction efforts, including energy efficiency and flare mitigation

## >$400 Million

invested over the past 15 years at our refining facilities around the world to reduce greenhouse gas emissions



## >$2 Billion

in support of Upstream and Downstream cogeneration facilities since 2001 to more efficiently produce electricity and reduce greenhouse gas emissions

## >$200 Million

in capital expenditures at global Chemical facilities since 2004 to reduce greenhouse gas emissions

## Energy efficiency

In 2015, energy used in our operations totaled 1.7 billion gigajoules. Energy consumed in our operations generates more than 80 percent of our direct greenhouse gas emissions and is one of our largest operating costs. As such, we have focused on energy efficiency for several decades. Since 2000, we have used our Global Energy Management System in the Downstream and Chemical businesses, and our Production Operations Energy Management System in our Upstream businesses to identify and act on energy savings opportunities.

Through our commitment to energy efficiency, application of structured processes and continued use of a bottom-up approach, we continue to yield industry-leading results. For example, in the 2010, 2012 and 2014 Refining Industry Surveys,[3] ExxonMobil's global refining operations achieved first quartile energy efficiency performance.

## Flaring

In 2015, flaring volume from our combined Upstream, Downstream and Chemical operations totaled 5.3 million metric tons. This represents an increase of 0.8 million metric tons compared with our 2014 performance.

The increase in flaring in 2015 was primarily due to operations in Angola, where a third-party-operated liquefied natural gas (LNG) plant was not operating. These increases were partially offset by flaring reductions resulting from the completion of commissioning work at our Papua New Guinea LNG plant and operational improvements at the Usan production field in Nigeria.

ExxonMobil is a charter member of the *Global Gas Flaring Reduction Partnership*. In addition, we put in place our own parameters, the *Upstream Flaring and Venting Reduction Environmental Standard for Projects*, in 2005. Accordingly, our goal is to responsibly avoid routine flaring in new Upstream projects and reduce "legacy" flaring in our existing operations.

## Hydrocarbon flaring

### Millions of metric tons



| Year | Value |
|------|-------|
| 2006 | 8.2 |
| 2007 | 8.0 |
| 2008 | 5.7 |
| 2009 | 4.4 |
| 2010 | 3.6 |
| 2011 | 4.1 |
| 2012 | 3.6 |
| 2013 | 3.7 |
| 2014 | 4.5 |
| 2015 | 5.3 |

● Upstream   ● Downstream   ● Chemical

*In 2015, flaring volume from our combined Upstream, Downstream and Chemical operations totaled 5.3 million metric tons. This represents an increase of 0.8 million metric tons compared with our 2014 performance.*

For example, our joint venture operations in Qatar have recently begun using a jetty boil-off gas (JBOG) recovery facility to recover the natural gas that was previously flared during LNG vessel loading at the marine berths located at the Ras Laffan Port. Approximately 1 percent of the LNG loaded onto the ships evaporates due to the difference in temperature between the LNG and the ship tank. The JBOG recovery facility collects the boil-off gas and returns it to the LNG plants to be used as fuel or converted back into LNG. During one year of operation, the JBOG facility has recovered more than 500,000 metric tons of gas and reduced LNG vessel loading-related flaring by around 90 percent.

[3]The Solomon Survey provides a global benchmarking assessment of the refining industry and is conducted every two years.



Paula Byrum inspects equipment at our XTO Energy operations site near Herbert Springs, Arkansas.

# Up Close:
# Mitigating methane emissions at XTO Energy

XTO Energy manages methane emissions as a matter of safety and environmental responsibility. Responsible methane containment practices are applied during drilling, completion and production operations to minimize methane emissions. We manage emissions through a mix of voluntary and regulatory actions, such as implementing leak detection and repair programs, reducing oil and gas completion emissions and targeting replacement of high-bleed pneumatics with lower-emitting devices.

After drilling and completion of a new well, our workers prepare the production equipment for decades of operation. A key part of these preparations is to ensure that the natural gas product is contained by the production equipment. We utilize optical gas imaging cameras to locate equipment leaks that would otherwise be invisible, which allows us to detect leaks and make repairs. This attention to detail is important to promote safety and environmental performance.

There is a growing interest within the scientific and policy communities on human-related methane emissions. In the United States, we are working with federal and state governments and within industry to ensure that regulations aimed at reducing emissions of methane and volatile organic compounds sufficiently support long-term operations, achieve emission reduction objectives and provide flexibility for technology.

We continue to seek greater understanding of the magnitude and characteristics of oil and gas industry-related methane emissions. XTO Energy participated in studies conducted by the University of Texas and Environmental Defense Fund which quantified the methane leakage rate in the United States from Upstream gas production activities at 0.4 percent of the total gas produced. The results of this study helped validate Environmental Protection Agency estimates. We are active in ongoing methane research including participating in a methane measurement reconciliation study with the Department of Energy's National Renewable Energy Laboratory to close the knowledge gap between methane measured at ground sources and methane measured from the air. We are also working with Stanford University on its new Natural Gas Initiative, which will focus on methane measurement and monitoring technologies.

## Venting and fugitive emissions

Our venting and fugitive emissions in 2015 totaled 6 million $CO_2$-equivalent metric tons, which is essentially flat relative to our 2014 performance. While venting and fugitive emissions, most of which are methane, represent approximately 5 percent of our direct greenhouse gas emissions, we recognize the importance of reducing these emissions. We continue to look for cost-effective ways to reduce methane and other hydrocarbon emissions in our operations, such as replacing high-bleed pneumatic devices with lower-emission technology and conducting green well completions in targeted Upstream operations. For more information on how XTO Energy manages methane emissions, see the adjacent Up Close.

## Cogeneration

Cogeneration technology captures heat generated from the production of electricity for use in production, refining and chemical processing operations. Due to its inherent energy efficiency, the use of cogeneration leads to reduced greenhouse gas emissions. Our cogeneration facilities alone enable the avoidance of approximately 6 million metric tons per year of greenhouse gas emissions.

We have interests in approximately 5,500 megawatts of cogeneration capacity in more than 100 installations at more than 30 locations around the world. This capacity is equivalent to the annual energy needed to power 2.5 million U.S. homes. Over the past decade, we have added more than 1,000 megawatts of cogeneration capacity and continue to develop additional investment opportunities.

For example, ExxonMobil began the construction of a new 84-megawatt cogeneration facility at our Singapore refinery's Jurong site. When this facility is completed in 2017, ExxonMobil will have more than 440 megawatts of cogeneration capacity in Singapore, enabling our integrated refining and petrochemical complex to meet all its power needs.



The Kizomba B platform located offshore Angola.

**Energy-related $CO_2$ emissions**

Billion metric tons

- Rest of world
- Key growth
- India
- China
- OECD32[4]

[4]The Organization for Economic Cooperation and Development. Refer to the Organization for Economic Cooperation and Development website (*oecd.org*) for a listing of its members.

# Up Close:
# Managing the business risks of climate change

By 2040, the world's population is projected to reach 9 billion — up from about 7.2 billion today — and global GDP will have more than doubled. As a result, we see global energy demand rising by about 25 percent from 2014 to 2040. In order to meet this demand, we believe all economic energy sources, including our existing hydrocarbon reserves, will be needed. We also believe that the transition of the global energy system to lower-emissions sources will take many decades due to its enormous scale, capital intensity and complexity. As such, we believe that none of our proven hydrocarbon reserves are, or will become, stranded.

*Energy and carbon — managing the risks*

ExxonMobil's long-range annual forecast, *The Outlook for Energy*, examines energy supply and demand trends for approximately 100 countries, 15 demand sectors and 20 different energy types. The *Outlook* forms the foundation for the company's business strategies and helps guide our investment decisions. In response to projected increases in global fuel and electricity demand, our 2016 *Outlook* estimates that global energy-related $CO_2$ emissions will peak around 2030 and then begin to decline. A host of trends contribute to this downturn — including slowing population growth, maturing economies and a shift to cleaner fuels like natural gas and renewables — some voluntary and some the result of policy.

ExxonMobil addresses the potential for future climate change policy, including the potential for restrictions on emissions, by estimating a proxy cost of carbon. This cost, which in some geographies may approach $80 per ton by 2040, has been included in our *Outlook* for several years. This approach seeks to reflect potential policies governments may employ related to the exploration, development, production, transportation or use of carbon-based fuels. We believe our view on the

potential for future policy action is realistic and by no means represents a "business-as-usual" case. We require all of our business lines to include, where appropriate, an estimate of greenhouse gas-related emissions costs in their economics when seeking funding for capital investments.

We evaluate potential investments and projects using a wide range of economic conditions and commodity prices. We apply prudent and substantial margins in our planning assumptions to help ensure competitive returns over a wide range of market conditions. We also financially stress test our investment opportunities, which provides an added margin against uncertainties, such as those related to technology development, costs, geopolitics, availability of required materials, services and labor. Stress testing further enables us to consider a wide range of market environments in our planning and investment process.

# Exhibit U


# Retire in the U.K
Free Report for people considering Retiring in the United Kindgom Go to internationalliving.com






FREE DUFFEL BAG
Annual Membership for only $30    Join NRA

      

# Memo Shows Secret Coordination Effort Against ExxonMobil by Climate Activists, Rockefeller Fund

**Several states have launched investigations into the company**

 SHARE     TWEET     EMAIL

BY: Alana Goodman    Follow @alanagoodman

*April 14, 2016 5:00 pm*

A small coalition of prominent climate change activists and political operatives huddled on Jan. 8 for a closed-door meeting at the Rockefeller Family Fund in Manhattan. Their agenda: taking down oil giant ExxonMobil through a coordinated campaign of legal action, divestment efforts, and political pressure.

The meeting—which included top offcials at GreenPeace, the Working Families Party, and the

**APP. 192**

Case 4:16-cv-00469-K   Document 76-7   Filed 10/17/16   Page 19 of 49   PageID 2589



      

Rockefeller Family Fund—took place as climate change groups have pushed for a federal criminal probe of ExxonMobil's environmental impact, similar to the 1990s racketeering case against Big Tobacco.

A copy of the meeting's agenda, obtained by the *Washington Free Beacon*, provides a rare glimpse inside the anti-ExxonMobil crusade, which has already spurred investigations into the oil giant by Democratic attorneys general in several states.

ADVERTISING

According to the memo, the coalition's goals are to "delegitimize [ExxonMobil] as a political actor," "force offcials to disassociate themselves from Exxon," and "drive divestment from Exxon." The memo also proposed "creating scandal" by using lawsuits and state prosecutors to obtain internal documents from ExxonMobil through judicial discovery.

The secret meeting was frst reported by the *Wall Street Journal* on Wednesday, but the group's agenda was not posted in full until now.

**APP. 193**

The agenda referred to a December meeting with Bruno, where it described emailing their "press list of a small group of around a dozen attendees, including Naomi Ages at GreenPeace; Dan Cantor, executive director of the New York Working Families Party; Jamie Henn, co-founder at 350.org; and Rob Weissman, president at Public Citizen.

According to the agenda, the meeting would be opened by Lee Wasserman, director of the Rockefeller Family Fund. The organization funds many environmental groups and hosted the meeting at its Manhattan offce.

"If you are receiving this message then we believe you are attending the meeting this coming Friday Jan 8 regarding Exxon," wrote Bruno. "The meeting will take place at: Rockefeller Family Fund."

The email included a "DRAFT Agenda" for "Exxon: Revelations & Opportunities."

Under a section headlined "goals," the agenda listed: "To establish in the public's mind that Exxon is a corrupt institution"; "To delegitimize them as a political actor; and "To drive Exxon & climate into center of 2016 election."

The agenda also outlined "the main avenues for legal actions & related campaigns," including state attorneys general, the Department of Justice, international litigation, and tort lawsuits.

"Which of these has the best prospects for successful action? For getting discovery? For creating scandal?" said the memo.

The Rockefeller Family Fund did not immediately return request for comment.

California announced an investigation into ExxonMobil's statements on climate change in January, shortly after the meeting took place.

Several other states attorneys general, including New York's Eric Schneiderman and Massachusetts' Maura Healey, have also launched investigations into whether ExxonMobil broke the law by allegedly covering up internal conclusions on climate change and misleading investors.

ExxonMobil fled court papers on W ednesday challenging another investigation by the U.S. Virgin Island's attorney general's offce, the *Wall Street Journal* reported.

In the fling, the oil company denounced the "chilling ef fect of this inquiry, which discriminates based on viewpoint to target one side of an ongoing policy debate" and "strikes at protected speech at the core of the First Amendment."

This entry was posted in Issues and tagged Climate Change. Bookmark the permalink.



 **Alana Goodman**    Email | Full Bio | RSS

Alana Goodman is a staff writer for the Washington Free Beacon. Prior to joining the Beacon, she was assistant online editor at Commentary. She has written for the Weekly Standard, the New York Post and the Washington Examiner. Goodman graduated from the University of Massachusetts in 2010, and lives in Washington, D.C. Her Twitter handle is @alanagoodman. Her email address is goodman@freebeacon.com.

**APP. 194**

# Exhibit V

## CLIMATE CHANGE COALITION COMMON INTEREST AGREEMENT

This Common Interest Agreement ("Agreement") is entered into by the undersigned Attorneys General of the States, Commonwealths, and Territories (the "Parties") who are interested in advancing their common legal interests in limiting climate change and ensuring the dissemination of accurate information about climate change. The Parties mutually agree:

1.      Common Legal Interests.  The Parties share common legal interests with respect to the following topics: (i) potentially taking legal actions to compel or defend federal measures to limit greenhouse gas emissions, (ii) potentially conducting investigations of representations made by companies to investors, consumers and the public regarding fossil fuels, renewable energy and climate change, (iii) potentially conducting investigations of possible illegal conduct to limit or delay the implementation and deployment of renewable energy technology, (iv) potentially taking legal action to obtain compliance with federal and state laws governing the construction and operation of fossil fuel and renewable energy infrastructure, or (v) contemplating undertaking one or more of these legal actions, including litigation ("Matters of Common Interest").

2.      Shared Information.  It is in the Parties' individual and common interests to share documents, mental impressions, strategies, and other information regarding the Matters of Common Interest and any related investigations and litigation ("Shared Information").  Shared Information shall include (1) information shared in organizing a meeting of the Parties on March 29, 2016, (2) information shared at and after the March 29 meeting, pursuant to an oral common interest agreement into which the Parties entered at the meeting and renewed on April 12, 2016, and (3) information shared after the execution of this Agreement.

3.      Legends on Documents.  To avoid misunderstandings or inadvertent disclosure, all documents exchanged pursuant to this Agreement should bear the legend "Confidential – Protected by Common Interest Privilege" or words to that effect.  However, the inadvertent failure to include such a legend shall not waive any privilege or protection available under this Agreement or otherwise.  In addition, any Party may, where appropriate, also label documents exchanged pursuant to this Agreement with other appropriate legends, such as, for example, "Attorney-Client Privileged" or "Attorney Work Product."  Oral communications among the Parties shall be deemed confidential and protected under this Agreement when discussing Matters of Common Interest.

4.      Non-Waiver of Privileges.  The exchange of Shared Information among Parties— including among Parties' staff and outside advisors—does not diminish in any way the privileged and confidential nature of such information. The Parties retain all applicable privileges and claims to confidentiality, including the attorney client privilege, work product privilege, common interest privilege, law enforcement privilege, deliberative process privilege and exemptions from disclosure under any public records laws that may be asserted to protect against disclosure of Shared Information to non-Parties (hereinafter collectively referred to as "Privileges").

**APP. 196**

5.      Nondisclosure.  Shared Information shall only be disclosed to: (i) Parties; (ii) employees or agents of the Parties, including experts or expert witnesses; (iii) government officials involved with the enforcement of antitrust, environmental, consumer protection, or securities laws who have agreed in writing to abide by the confidentiality restrictions of this Agreement; (iv) criminal enforcement authorities; (v) other persons, provided that all Parties consent in advance; and (vi) other persons as provided in paragraph 6.  A Party who provides Shared Information may also impose additional conditions on the disclosure of that Shared Information. Nothing in this Agreement prevents a Party from using the Shared Information for law enforcement purposes, criminal or civil, including presentation at pre-trial and trial-related proceedings, to the extent that such presentation does not (i) conflict with other agreements that the Party has entered into, (ii) interfere with the preservation of the Privileges, or (iii) conflict with court orders and applicable law.

6.      Notice of Potential Disclosure.  The Parties agree and acknowledge that each Party is subject to applicable freedom of information or public records laws, and nothing in this Agreement is intended to alter or limit the disclosure requirements of such laws. If any Shared Information is demanded under a freedom of information or public records law or is subject to any form of compulsory process in any proceeding ("Request"), the Party receiving the Request shall: (i) immediately notify all other Parties (or their designees) in writing; (ii) cooperate with any Party in the course of responding to the Request; and (iii) refuse to disclose any Shared Information unless required by law.

7.      Inadvertent Disclosure.  If a Party discloses Shared Information to a person not entitled to receive such information under this Agreement, the disclosure shall be deemed to be inadvertent and unintentional and shall not be construed as a waiver of any Party's right under law or this Agreement. Any Party may seek additional relief as may be authorized by law.

8.      Independently Obtained Information.  Provided that no disclosure is made of Shared Information obtained pursuant to this Agreement, nothing in this Agreement shall preclude a Party from (a) pursuing independently any subject matter, including subjects reflected in Shared Information obtained by or subject to this Agreement or (b) using or disclosing any information, documents, investigations, or any other materials independently obtained or developed by such Party.

9.      Related Litigation.  The Parties continue to be bound by this Agreement in any litigation or other proceeding that arises out of the Matters of Common Interest.

10.     Parties to the Agreement.  This Agreement may be executed in counterparts. All potential Parties must sign for their participation to become effective.

11.     Withdrawal.  A Party may withdraw from this Agreement upon thirty days written notice to all other Parties.  Withdrawal shall not terminate, or relieve the withdrawing Party of any obligation under this Agreement regarding Shared Information received by the withdrawing Party before the effective date of the withdrawal.

12.     Modification.  This writing is the complete Agreement between the Parties, and any modifications must be approved in writing by all Parties.

**APP. 197**

Dated:  _May 18_ , 2016

_Michele Van Gelderen_

Michele Van Gelderen
Supervising Deputy Attorney General
Consumer Law Section
Office of Attorney General Kamala D. Harris
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
Tel. (213) 897-2000

**APP. 198**

Dated: _May 3_ , 2016

_____

Matthew I. Levine
Assistant Attorney General
Office of the Attorney General
55 Elm Street
P.O. Box 120
Hartford, CT 06106

4

**APP. 199**

Dated: _May 2_____, 2016

Elizabeth Wilkins
Senior Counsel to the Attorney General*
Office of the Attorney General for the District of
Columbia
441 4th Street N.W. Suite 1100S
Washington, D.C. 20001
 (202) 724-5568
elizabeth.wilkins@dc.gov

*Admitted to practice only in Maryland.  Practicing in the
District of Columbia under the direct supervision of Natalie O.
Ludaway, a member of the D.C. Bar pursuant to D.C. Court of
Appeals Rule 49(c).

APP. 200

Dated: _May 2_ , 2016

James P. Gignac
Environmental and Energy Counsel
Illinois Attorney General's Office
69 W. Washington St., 18th Floor
Chicago, IL  60602
(312) 814-0660
jgignac@atg.state.il.us

Dated: April 29, 2016

CHRISTOPHE COURCHESNE
Assistant Attorney General
Chief, Environmental Protection Division
One Ashburton Place
Boston, MA 02108
christophe.courchesne@state.ma.us

APP. 202

Dated: _____, 2016

_____
Joshua N. Auerbach
Assistant Attorney General
200 Saint Paul Place
Baltimore, Maryland 21202
(410) 576-6311
jauerbach@oag.state.md.us

APP. 203

Dated:  _May 5_____ , 2016

_(signature)_

Gerald D. Reid
Assistant Attorney General
Chief, Natural Resources Division
Maine Office of the Attorney General
(207) 626-8545
jerry.reid@maine.gov

**APP. 204**

Signature: _Karen D. Olson_ Date: _5/16/16_

Karen D. Olson
Deputy Attorney General
Minnesota Attorney General's Office
445 Minnesota Street, Suite 900
St. Paul, MN  55101
(651) 757-1370
karen.olson@ag.state.mn.us

APP. 205

Dated: _April 29_ , 2016

JOSEPH A. FOSTER, ATTORNEY GENERAL
K. Allen Brooks, Senior Assistant Attorney General
33 Capitol Street
Concord, NH 03301
(603) 271-3679
allen.brooks@doj.nh.gov

**APP. 206**

Dated: _Mary 6_, 2016

Tania Maestas
Deputy Attorney General Civil Affairs
Office of the New Mexico Attorney General
PO Drawer 1508
Santa Fe, NM 87504

**APP. 207**

Dated: May 2, 2016

Monica Wagner
Deputy Chief
Environmental Protection Bureau
Office of the Attorney General of New York
120 Broadway, 26th floor
New York, NY 10271
212-416-6351

**APP. 208**

Dated: _April 29_ , 2016

Paul Garrahan
Attorney-in-Charge | Natural Resources Section |
General Counsel Division
Oregon Department of Justice
1162 Court St. NE, Salem, OR 97301-4096
971.673.1943 (Tue, Thu, Fri) (Portland)
503.947.4593 (Mon, Wed) (Salem)
503.929.7553 (Mobile)

APP. 209

Dated: April 28, 2016

Gregory S. Schultz
Special Assistant Attorney General
Rhode Island Department of Attorney General
150 South Main Street Providence, RI 02903
Tel.: (401) 274-4400, Ext. 2400

15

Dated: May 9, 2016

*Rhodes B. Ritenour* 5/9/16

Rhodes B. Ritenour
Deputy Attorney General
Civil Litigation Division
Office of the Attorney General
900 East Main Street
Richmond, VA 23219
Office: (804) 786-6731
E-mail: RRitenour@oag.state.va.us

*John W. Daniel* 5/9/16

John W. Daniel
Deputy Attorney General
Commerce, Environmental, and Technology
Division
Office of the Attorney General
900 East Main Street
Richmond, VA 23219
Office: (804) 786-6053
E-mail: JDaniel@oag.state.va.us

16

**APP. 211**

Dated: May 10th, 2016

Renee A. Gumbs, Esq.
Deputy Attorney General
Department of Justice
34-38 Kronprindsens Gade
GERS Complex, 2nd flr.
St. Thomas, VI 00802
(340) 774-5666. ext. 101
(340) 776-3494 (Fax)
Renee.gumbs@doj.vi.gov

**APP. 212**

Dated: _April 29_, 2016

*Nicholas F. Persampieri*
Nicholas F. Persampieri
Assistant Attorney General
Office of the Attorney General
109 State Street
Montpelier, VT 05609-1001
(802)-828-6902
nick.persampieri@vermont.gov

18

**APP. 213**

Dated: _MAY 1_____, 2016

_[signature]_

Laura J. Watson
Senior Assistant Attorney General
Washington State Office of the Attorney General
(360)-586-6743
Laura.watson@atg.wa.gov

APP. 214

# Exhibit W

NEWS RELEASE

# Luther Strange

Alabama Attorney General



FOR IMMEDIATE RELEASE
May 16, 2016

For More Information, contact:
Mike Lewis     (334) 353-2199
Joy Patterson  (334) 242-7491
Page 1 of 1

### ALABAMA JOINS INTERVENTION IN CASE TO PROTECT FIRST AMENDMENT RIGHT OF BUSINESSES FROM GOVERNMENT THREATS OF CRIMINAL PROSECUTION

(MONTGOMERY) – Attorney General Luther Strange announced that Alabama has joined Texas in requesting that a Texas judge rule against an unconstitutional investigation conducted by the Attorney General of the Virgin Islands against ExxonMobil for its views on climate change.

"The fundamental right of freedom of speech is under assault by an Attorney General pursuing an agenda against a business that doesn't share his views on the environment," said Attorney General Strange. "The Attorney General of the Virgin Islands, an American Territory, is abusing the power of his government office to punish and intimidate a company for its climate change views which run counter to that of his own.

"This is more than just a free speech case. It is a battle over whether a government official has a right to launch a criminal investigation against anyone who doesn't share his radical views," Attorney General Strange added. "In this case an attorney general has subpoenaed ExxonMobil to provide some 40 years' worth of records so that it can conduct a witch hunt against the company for its views on the environment. This is a very disturbing trend that must be stopped and I am pleased to join with Texas Attorney General Ken Paxton in filing an intervention plea in support of the First Amendment."

The intervention plea was filed Monday in the case of *ExxonMobil Corporation v. Claude Earl Walker, Attorney General of the United States Virgin Islands*.

*A copy of the intervention plea is attached.*

--30--



501 Washington Avenue • Montgomery, AL 36104 • (334) 242-7300
www.ago.state.al.us

**APP. 216**

NO. 017-284890-16

| | | |
|---|---|---|
| EXXON MOBIL CORPORATION | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | |
| | § | |
| CLAUDE EARL WALKER, Attorney | § | |
| General of the United States Virgin | § | TARRANT COUNTY, TEXAS |
| Islands, in his official capacity, | § | |
| COHEN MILSTEIN SELLERS & | § | |
| TOLL, PLLC, in its official capacity | § | |
| as designee, and LINDA SINGER, in | § | |
| her official capacity as designee, | § | |
| | § | |
| *Defendants*. | § | 17TH JUDICIAL DISTRICT |

## PLEA IN INTERVENTION OF THE
## STATES OF TEXAS AND ALABAMA

The States of Texas and Alabama intervene under Rule 60 of the Texas

Rules of Civil Procedure to protect the due process rights of their residents.

**I.    Background.**

At a recent gathering on climate change in New York City, Claude Earl

Walker, Attorney General of the United States Virgin Islands, announced an

investigation by his office ("Investigation") into a company whose product he

claims "is destroying this earth." Pl. Compl. Ex. B at 16. A week earlier,

ExxonMobil Corporation, a New Jersey corporation with principal offices in

Texas, was served with a subpoena seeking documents responsive to alleged

violations of the penal code of the Virgin Islands. *Id*. at ¶ 20, Ex. A at 1. Though

General Walker signed the subpoena, it arrived in an envelope postmarked in

Washington, D.C, with a return address for Cohen Milstein, a law firm that

**APP. 217**

describes itself as a "pioneer in plaintiff class action lawsuits" and "the most effective law firm in the United States for lawsuits with a strong social and political component." *Id.* at ¶¶ 4, 20. ExxonMobil now seeks to quash the subpoena in Texas state court, asserting, *inter alia*, that the Investigation violates the First Amendment and that the participation of Cohen Milstein, allegedly on a contingency fee basis, is an unconstitutional delegation of prosecutorial power. *See generally id.*

The intervenors are States whose sovereign power and investigative and prosecutorial authority are implicated by the issues and tactics raised herein. General Walker's Investigation appears to be driven by ideology, and not law, as demonstrated not only by his collusion with Cohen Milstein, but also by his request for almost four decades worth of material from a company with no business operations, employees, or assets in the Virgin Islands. *Id.* at ¶ 7. And it is disconcerting that the apparent pilot of the discovery expedition is a private law firm that could take home a percentage of penalties (if assessed) available only to government prosecutors. We agree with ExxonMobil that serious jurisdictional concerns exist, but to protect the fundamental right of impartiality in criminal and quasi-criminal investigations, we intervene.

## II.  Standard for Intervention.

Rule of Civil Procedure 60 provides that "[a]ny party may intervene by filing a pleading, subject to being stricken out by the court for sufficient cause on the motion of any party." TEX. R. CIV. P. 60. "Rule 60 . . . provides . . . that

any party may intervene" in litigation in which they have a sufficient interest. *Mendez v. Brewer*, 626 S.W.2d 498, 499 (Tex. 1982). "A party has a justiciable interest in a lawsuit, and thus a right to intervene, when his interests will be affected by the litigation." *Jabri v. Alsayyed*, 145 S.W.3d 660, 672 (Tex. App.— Houston [14th Dist.] 2004, no pet.) (citing *Law Offices of Windle Turley v. Ghiasinejad*, 109 S.W.3d 68, 71 (Tex. App.—Fort Worth 2003, no pet.)). And an intervenor is not required to secure a court's permission to intervene in a cause of action or prove that it has standing. *Guar. Fed. Sav. Bank v. Horseshoe Operating Co.*, 793 S.W.2d 652, 657 (Tex. 1990).

There is no pre-judgment deadline for intervention. *Tex. Mut. Ins. Co. v. Ledbetter*, 251 S.W.3d 31, 36 (Tex. 2008). Texas courts recognize an "expansive" intervention doctrine in which a plea in intervention is untimely only if it is "filed after judgment." *State v. Naylor*, 466 S.W.3d 783, 788 (Tex. 2015) (quoting *First Alief Bank v. White*, 682 S.W.2d 251, 252 (Tex. 1984)). There is no final judgment in this case, thus making the States' intervention timely.

## III.   Intervenors Have an Interest in Ensuring Constitutional Safeguards for Prosecutions of its Residents.

The alleged use of contingency fees in this case raises serious due process considerations that the intervenors have an interest in protecting.

To begin, government attorneys have a constitutional duty to act impartially in the execution of their office. The Supreme Court has explained that attorneys who represent the public do not represent an ordinary party in litigation, but "a sovereignty whose obligation to govern impartially is as

compelling as its obligation to govern at all." *Berger v. United States*, 295 U.S. 78, 88, (1935).

Contingency fee arrangements cut against the duty of impartiality by giving the attorney that represents the government a financial stake in the outcome. Thus, the use of contingency fees is highly suspect in criminal cases and, more generally, when fundamental rights are at stake. *State v. Lead Indus., Ass'n, Inc.*, 951 A.2d 428, 476 n. 48 (R.I. 2008) (doubting that contingent fees would ever be appropriate in a criminal case); *Int'l Paper Co. v. Harris Cty.*, 445 S.W.3d 379, 393 (Tex. App.—Houston [1st Dist.] 2013, no pet.) (contingency fees are impermissible in cases implicating fundamental rights).

Here, the Investigation appears to be a punitive enforcement action, as all of the statutes that ExxonMobil purportedly violated are found in the criminal code of the Virgin Islands. 14 V.I.C. §§ 551, 605, 834. In addition, ExxonMobil asserts a First Amendment interest to be free from viewpoint discrimination. Intervenors, in sum, have a strong interest in ensuring that contingency fee arrangements are not used in criminal and quasi criminal cases where a multitude of fundamental rights, including speech, lie in the balance.

## IV.  Conclusion and Prayer for Relief.

The States identified herein, Texas and Alabama, by and through this intervention, request notice and appearance, and the opportunity to defend the rule of law before this Court.

Respectfully submitted,

| | |
|---|---|
| LUTHER STRANGE<br>Attorney General of Alabama<br>501 Washington Ave.<br>Montgomery, Alabama 36104 | KEN PAXTON<br>Attorney General of Texas<br><br>JEFFREY C. MATEER<br>First Assistant Attorney General<br><br>BRANTLEY STARR<br>Deputy Attorney General for Legal<br>  Counsel<br><br>AUSTIN R. NIMOCKS<br>Associate Deputy Attorney General for<br>  Special Litigation<br><br><u>/s/ Austin R. Nimocks</u><br>AUSTIN R. NIMOCKS<br>Texas Bar No. 24002695<br><br>Special Litigation Division<br>P.O. Box 12548, Mail Code 001<br>Austin, Texas 78711-2548<br><br>*ATTORNEYS FOR INTERVENORS* |

**APP. 221**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing pleading has been served on the following counsel of record on this 16th day of May, 2016, in accordance with Rule 21a of the Texas Rules of Civil Procedure, electronically through the electronic filing manager:

Patrick J. Conlon
patrick.j.conlon@exxonmobil.com
Daniel E. Bolia
daniel.e.bolia@exxonmobil.com
1301 Fannin Street
Houston, TX 77002

Theodore V. Wells, Jr.
twells@paulweiss.com
Michele Hirshman
mhirshman@paulweiss.com
Daniel J. Toal
dtoal@paulweiss.com
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON, LLP
1285 Avenue of the Americas
New York, NY 10019-6064

Justin Anderson
janderson@paulweiss.com
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON, LLP
2001 K Street, NW
Washington, D.C. 20006-1047

Ralph H. Duggins
rduggins@canteyhanger.com
Philip A. Vickers
pvickers@canteyhanger.com
Alix D. Allison
aallison@canteyhanger.com
CANTEY HANGER LLP
600 W. 6th St. #300
Fort Worth, TX 76102

**APP. 222**

Nina Cortell
nina.cortell@haynesboone.com
HAYNES & BOONE, LLP
301 Commerce Street
Suite 2600
Fort Worth, TX 76102

*Counsel for Exxon Mobil Corporation*

Cohen Milstein Sellers & Toll PLLC
lsinger@cohenmilstein.com
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, D.C. 20005

Linda Singer, Esq.
lsinger@cohenmilstein.com
Cohen Milstein Sellers & Toll PLLC
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, D.C. 20005

Claude Earl Walker, Esq.
claude.walker@doj.vi.gov
Attorney General
3438 Kronprindsens Gade
GERS Complex, 2nd Floor
St. Thomas, U.S. Virgin Islands 00802

/s/ Austin R. Nimocks
Austin R. Nimocks
Associate Deputy Attorney General for
Special Litigation

**APP. 223**