# Exhibit X

NEWS ADVISORY

# Luther Strange

Alabama Attorney General



FOR IMMEDIATE RELEASE
March 30, 2016

For More Information, contact:
Mike Lewis      (334) 353-2199
Joy Patterson   (334) 242-7491
Page 1 of 1

## STATE AG's STRANGE, PRUITT CONDEMN ATTEMPTS TO SILENCE THOSE WHO DISAGREE WITH PRESIDENT OBAMA'S ENERGY AGENDA

(MONTGOMERY) – Alabama Attorney General Luther Strange and Oklahoma Attorney General Scott Pruitt released the following statement Wednesday:

"Yesterday, Al Gore, New York Attorney General Eric Schneiderman, and a small handful of other East Coast State Attorneys General announced what they called an "unprecedented coalition" that "vows to defend climate change progress made under President Obama and to push the next President for even more aggressive action" by seeking to criminally investigate energy companies for disputing the science behind global warming.

"We won't be joining this effort, and we want to explain why. Reasonable minds can disagree about the science behind global warming, and disagree they do. This scientific and political debate is healthy, and it should be encouraged. It should not be silenced with threats of criminal prosecution by those who believe that their position is the only correct one and that all dissenting voices must therefore be intimidated and coerced into silence. It is inappropriate for State Attorneys General to use the power of their office to attempt to silence core political speech on one of the major policy debates of our time.

"We are proud to be a part of a different coalition, one driven by respect for the rule of law, rather than by ambition to use the law to silence voices with which we disagree. Our coalition of 29 states is leading the fight to challenge the legality of President Obama's plan to kill off fossil fuels – his so-called "Clean Power Plan." The 29 states and state Attorneys General who are part of this effort respect our proper role, which is not to pick winners and losers in the energy sector nor to silence those who disagree with us, but rather to ensure that the EPA is acting consistent with the power granted to it by Congress and to fulfill our statutory duties to ensure that the consumers in our states have access to reliable, affordable energy. In fulfilling these duties, the 29 states and their Attorney Generals understand that all sources of energy should be considered – not just those that we may prefer for one policy reason or another – so that we give ourselves the best possible chance to achieve our goal of energy independence, with reliable and affordable energy available at the lowest possible cost to our citizens."

--30--



501 Washington Avenue • Montgomery, AL 36104 • (334) 242-7300

www.ago.alabama.gov



**APP. 225**

# Exhibit Y



OFFICE OF THE ATTORNEY GENERAL
*State of Louisiana*

JEFF LANDRY

**RECENT NEWS**

3/30/2016 11:47:00 AM

## Attorney General Jeff Landry Slams Al Gore's Coalition

BATON ROUGE, LA – Louisiana Attorney General issued the following statement after yesterday's press conference by former Vice President Al Gore and those state Attorneys General supportive of the EPA's power plant regulation halted last month by the United States Supreme Court:

"While I was not surprised to see these Attorneys General announce their intention to continue working in support of the unlawful and misguided Clean Power Plan – I was disturbed by their parallel announcement to 'use all tools at [their] disposal to fight for Climate Progress,' including the unfettered investigation of individual coal, oil, and natural gas companies' past or current climate opinions, views, or research. It is one thing to use the legal system to pursue public policy outcomes; but it is quite another to use prosecutorial weapons to intimidate critics, silence free speech, or chill the robust exchange of ideas.

We have seen powerful forces at work nationally targeting, most recently and visibly, our nation's coal industry. It is now abundantly clear that the crosshairs have shifted to our country's oil and natural gas industries.

In contrast to yesterday's news conference by 16 state Attorneys General from largely non-oil and gas producing states, Louisiana stands with more than 29 states and state agencies who remain in steadfast opposition to the EPA's Clean Power Plan. I will continue to work my fellow Attorneys General from across the country to ensure Louisiana workers, job creators, and consumers are not burdened by the EPA's overreach or threatened by this new and disturbing development of unleashing the prosecutorial arsenal to quell dissent on such an important issue of public debate."



# Exhibit Z

# Congress of the United States
## House of Representatives
COMMITTEE ON SCIENCE, SPACE, AND TECHNOLOGY

2321 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515–6301

(202) 225–6371
www.science.house.gov

May 18, 2016

The Honorable Eric Schneiderman
Attorney General of New York
Office of the Attorney General
The Capitol
Albany, NY 12224-0341

Dear Mr. Attorney General,

The Committee on Science, Space, and Technology is conducting oversight of a coordinated attempt to deprive companies, nonprofit organizations, and scientists of their First Amendment rights and ability to fund and conduct scientific research free from intimidation and threats of prosecution. On March 29, 2016, you and other state attorneys general – the self-proclaimed "Green 20" – announced that you were cooperating on an unprecedented effort against those who have questioned the causes, magnitude, or best ways to address climate change.[1] The Committee is concerned that these efforts to silence speech are based on political theater rather than legal or scientific arguments, and that they run counter to an attorney general's duty to serve "as the guardian of the legal rights of the citizens" and to "assert, protect, and defend the rights of the people."[2] These legal actions may even amount to an abuse of prosecutorial discretion. To assist in the Committee's oversight of this matter, I am writing to request information related to your office's role in this investigation.

### The 2012 Workshop to Explore Legal Avenues to Demonize the Fossil Fuel Industry

According to media reports, efforts to instigate an investigation such as the one announced by the Green 20 on March 29 date back to at least 2012 and are the result of a "four-year, coordinated strategy by environmental organizations and trial attorneys."[3] In June 2012, the Climate Accountability Institute (CAI) and the Union of Concerned Scientists (UCS) convened a "Workshop on Climate Accountability, Public Opinion, and Legal Strategies" in La

---

[1] Video Press Conference with Eric Schneiderman, Attorney General, N.Y. State (Mar. 29, 2016); John Schwartz, *Exxon Mobil Climate Change Inquiry in New York Gains Allies,* N.Y. TIMES, Mar. 29, 2016, *available at* http://www.nytimes.com/2016/03/30/science/new-york-climate-change-inquiry-into-exxon-adds-prosecutors.html?_r=2.
[2] Bureaus of Attorney General, New York, May 12, 2016, *available at http://www.ag.ny.gov/bureaus*; Office of the Attorney General, U.S. Virgin Islands, Dept. of Justice, May 12 ,2016, *available at* http://usvidoj.codemeta.com/DivisionContent_1.php?divId=84.
[3] Phil McKenna, *Activists Step Up Long-Running Campaign to Hold Oil Industry Accountable for Climate Damages* Inside Climate News, Apr. 27, 2016, *available at* http://insideclimatenews.org/news/26042016/environmental-activists-campaign-exxon-climate-change-investigation-attorney-general-schneiderman.

**APP. 229**

The Honorable Eric Schneiderman
May 18, 2016
Page 2

Jolla, California.[4]  The workshop's attendees included UCS Director of Science and Policy Peter
Frumhoff and activist trial attorney Matthew Pawa, founder of the Global Warming Legal Action
Project.[5]

       The goal of the 2012 workshop was to develop a "strategy to fight industry in the courts,"
as well as to find ways to address what workshop attendees believed to be a "network of public
relations firms and nonprofit 'front groups' that have been actively sowing disinformation about
global warming for years."[6]  According to the workshop's report, a necessary component of their
strategy was to bring "internal industry documents to light."[7]  Workshop attendees then
proceeded to identify ways to procure documents that they admittedly did not know existed (e.g.,
"many participants suggested that incriminating documents **may** exist):"[8]

> Having attested to the importance of seeking internal documents … lawyers at the
> workshop emphasized that there are many effective avenues for gaining access to
> such documents. First, lawsuits are not the only way to win the release of
> documents … **State attorneys general can also subpoena documents, raising
> the possibility that a single sympathetic state attorney general might have
> substantial success in bringing key internal documents to light.** In addition,
> lawyers at the workshop noted that even grand juries convened by a district
> attorney could result in significant document discovery.[9]

The strategy decided upon by workshop participants appears clear:  to act under the color of law
to persuade attorneys general to use their prosecutorial powers to stifle scientific discourse,
intimidate private entities and individuals, and deprive them of their First Amendment rights and
freedoms.

**The 2016 Rockefeller Family Fund Meeting and the Attempt to Conceal Collusion between
Your Office and Extremist Environmental Groups and Trial Lawyers**

       In January 2016, nearly four years later, a group of environmental activists, including
2012 workshop participant Matthew Pawa, as well as representatives from groups such as

---

[4] Establishing Accountability for Climate Change Damages: Lessons from Tobacco Control, Climate Accountability
Institute, and Union of Concerned Scientists, Oct. 2012, *available at*
http://www.climateaccountability.org/pdf/Climate%20Accountability%20Rpt%20Oct12.pdf.
[5] *Id.*
[6] Phil McKenna, *Activists Step Up Long-Running Campaign to Hold Oil Industry Accountable for Climate
Damages,* Inside Climate News, Apr. 27, 2016, *available at*
http://insideclimatenews.org/news/26042016/environmental-activists-campaign-exxon-climate-change-
investigation-attorney-general-schneiderman; Establishing Accountability for Climate Change Damages: Lessons
from Tobacco Control, Climate Accountability Institute, and Union of Concerned Scientists, Oct. 2012, *available at*
http://www.climateaccountability.org/pdf/Climate%20Accountability%20Rpt%20Oct12.pdf.
[7] Establishing Accountability for Climate Change Damages: Lessons from Tobacco Control, Climate Accountability
Institute, and Union of Concerned Scientists, Oct. 2012, *available at*
http://www.climateaccountability.org/pdf/Climate%20Accountability%20Rpt%20Oct12.pdf.
[8] *Id.* [emphasis added]
[9] *Id.* [emphasis added]

The Honorable Eric Schneiderman
May 18, 2016
Page 3

350.org and Greenpeace, met at the Manhattan offices of the Rockefeller Family Fund.[10]  The meeting was held to develop a strategy "to establish in [the] public's mind that Exxon is a corrupt institution that has pushed humanity (and all creation) toward climate chaos and grave harm," and "[t]o drive Exxon & climate into [the] center of [the] 2016 election cycle."[11]  According to media reports, the meeting also included a discussion of state attorneys general, the Department of Justice, and "the main avenues for legal actions & related campaigns."[12]  Specifically, meeting attendees were to focus on determining "the best prospects for successful action? For getting discovery? For creating scandal?"[13]

     Finally, on March 29, 2016, in the hours before you and other members of the Green 20, joined by former Vice President Al Gore, held your widely-publicized press conference announcing your cooperation on investigations against those who question the causes, magnitude, or best ways to address climate change, members of your group were briefed by 2012 workshop attendees Matthew Pawa of the Global Warming Legal Action Project and UCS's Peter Frumhoff.  It has since come to light that your office willfully concealed the fact that this briefing took place.  According to emails discovered and posted online by a watchdog group, on March 30, Matthew Pawa wrote to an attorney in your office stating that a *Wall Street Journal* reporter wanted to talk with Pawa about the pre-conference briefing. Pawa asked an attorney in your office, "What should I say if she asks if I attended?"[14]  Your attorney replied, "My ask is if you speak to the reporter, to not confirm that you attended or otherwise discuss the event."[15]

     In the weeks since the March 29 press conference, legal actions against those who question climate change orthodoxy by members of the Green 20 have rapidly expanded to include subpoenas for documents, communications, and research that would capture the work of more than 100 academic institutions, scientists, and nonprofit organizations.  According to press reports, most of those targeted were identified from lists published on an environmental activist organization's website.[16]

---

[10] Amy Harder, Devlin Barret, and Bradley Olson, *Exxon Fires Back at Climate-Change Probe,* WALL ST. J., Apr. 13, 2016, *available at* http://www.wsj.com/articles/exxon-fires-back-at-climate-change-probe-1460574535?cb=logged0.4458549134086849.

[11] *Id.*

[12] Alana Goodman, *Memo Shows Secret Coordination Effort Against ExxonMobil by Climate Activists, Rockefeller Fund,* Wash. Free Beacon, Apr. 14, 2016, *available at http://freebeacon.com/issues/memo-shows-secret-coordination-effort-exxonmobil-climate-activists-rockefeller-fund.*

[13] *Id.*

[14] Valerie Richardson, *Democratic AGs, Climate Change Groups Collude on Prosecuting Dissenters, Emails Show,* WASH. TIMES, Apr. 17, 2016, *available at* http://www.washingtontimes.com/news/2016/apr/17/democratic-ags-climate-change-groups-colluded-on-p/?page=all.

[15] *Id.*

[16] Valerie Richardson, *Exxon Climate Change Dissent Subpoena Sweeps Up More than 100 U.S. Institutions,* WASH. TIMES, May 3, 2016, *available at* http://m.washingtontimes.com/news/2016/may/3/virgin-islands-ag-subpoenas-exxon-communications/.

The Honorable Eric Schneiderman
May 18, 2016
Page 4

**The Committee's Request for Transparency**

This sequence of events – from the 2012 workshop to develop strategies to enlist the help of attorneys general to secure documents, to the 2016 subpoenas issued by you and other members of the Green 20 – raises serious questions about the impartiality and independence of current investigations by the attorneys general. Your office – funded with taxpayer dollars – is using legal actions and investigative tactics taken in close coordination with certain special interest groups and trial attorneys may rise to the level of an abuse of prosecutorial discretion. Further, such actions call into question the integrity of your office.

To assist the Committee in its oversight of a coordinated attempt to attack the First Amendment rights of American citizens and their ability to fund and conduct scientific research free from intimidation and threats of prosecution, we request the following documents and information as soon as possible, but by no later than noon on May 30, 2016.  Please provide the requested information for the time frame from January 1, 2012, to the present:

1. All documents and communications between or among employees of the Office of the Attorney General of New York and any officer or employee of the Climate Accountability Institute, the Union of Concerned Scientists, Greenpeace, 350.org, the Rockefeller Brothers Fund, the Rockefeller Family Fund, the Global Warming Legal Action Project, the Pawa Law Group, and the Climate Reality Project, referring or relating to your office's investigation, *subpoenas duces tecum*, or potential prosecution of companies, nonprofit organizations, scientists, or other individuals related to the issue of climate change.

2. All documents and communications between or among employees of the Office of the Attorney General of New York and any other state attorney general office referring or relating to your office's investigation, *subpoenas duces tecum*, or potential prosecution of companies, nonprofit organizations, scientists, or other individuals related to the issue of climate change.

3. All documents and communications between or among employees of the Office of the Attorney General of New York and any official or employee of the U.S. Department of Justice, U.S. Environmental Protection Agency, or the Executive Office of the U.S. President referring or relating to your office's investigation, *subpoenas duces tecum*, or potential prosecution of companies, nonprofit organizations, scientists, or other individuals related to the issue of climate change.

The Committee on Science, Space, and Technology has jurisdiction over environmental and scientific programs and "shall review and study on a continuing basis laws, programs, and Government activities" as set forth in House Rule X.

When producing documents to the Committee, please deliver production sets to the Majority Staff in Room 2321 of the Rayburn House Office Building and the Minority Staff in Room 394 of the Ford House Office Building.  The Committee prefers, if possible, to receive all

The Honorable Eric Schneiderman
May 18, 2016
Page 5

documents in electronic format.  An attachment provides information regarding producing documents to the Committee.

If you have any questions about this request, please contact Committee Staff at 202-225-6371.  Thank you for your attention to this matter.

Sincerely,

Rep. Lamar Smith
Chairman

Rep. F. James Sensenbrenner, Jr.
Member of Congress

Rep. Randy Neugebauer
Member of Congress

Rep. Bill Posey
Member of Congress

Rep. Randy Weber
Chairman
Subcommittee on Energy

Rep. Frank D. Lucas
Vice Chairman

Rep. Dana Rohrabacher
Member of Congress

Rep. Mo Brooks
Member of Congress

Rep. Jim Bridenstine
Chairman
Subcommittee on Environment

Rep. John Moolenaar
Member of Congress

**APP. 233**

The Honorable Eric Schneiderman
May 18, 2016
Page 6

Rep. Brian Babin
Chairman
Subcommittee on Space

Rep. Barry Loudermilk
Chairman
Subcommittee on Oversight

Rep. Ralph Lee Abraham
Member of Congress

cc:    The Honorable Eddie Bernice Johnson, Ranking Member, Committee on Science, Space,
       and Technology

Enclosure

# Exhibit AA



STATE OF NEW YORK
OFFICE OF THE ATTORNEY GENERAL
120 BROADWAY
NEW YORK, NY 10271

ERIC T. SCHNEIDERMAN
ATTORNEY GENERAL

LESLIE B. DUBECK
COUNSEL

May 26, 2016

The Honorable Lamar Smith
Chairman
House Committee on Science, Space, and Technology
2321 Rayburn House Office Building
Washington, D.C. 20515

Dear Chairman Smith:

I write in response to the May 18, 2016 letter (the "Letter") signed by you and several other Republican members of the House Committee on Science, Space, and Technology (the "Committee") requesting that my office provide various documents and communications referring or relating to law enforcement and investigative activities of the Office of the Attorney General of New York ("NYOAG") concerning climate change.

NYOAG has a long, very proud history of aggressively protecting investors and consumers from corporate fraud. The matter that appears to be the focus of your attention is our ongoing investigation into whether ExxonMobil Corporation violated New York's securities, business and consumer fraud laws by making false or misleading statements to investors and consumers relating to climate change driven risks and their impact on Exxon's business. This investigation comes on the heels of an investigation NYOAG concluded last year into Peabody Energy Corporation, then the largest publicly traded coal company in the world, which found that Peabody made false and misleading statements to the public and investors regarding financial risks associated with climate change and the effects of potential regulatory responses on the market for coal.[1]

For the reasons set forth below, the NYOAG respectfully declines to provide the materials requested by the Letter. The Letter is premised on a series of incorrect statements and assumptions regarding the actions of the NYOAG and raises serious constitutional concerns,

---

[1] Under the agreement concluding the NYOAG investigation, Peabody committed to revising its disclosures to investors regarding the company's financial risks related to climate change. Assurance of Discontinuance at pp. 9-10, *In the Matter of Investigation by Eric T. Schneiderman, Attorney General of the State of New York, of Peabody Energy Corporation*, Assurance No. 15-242 (Nov. 8, 2015), http://ag.ny.gov/pdfs/Peabody-Energy-Assurance-signed.pdf.

The Honorable Lamar Smith
May 26, 2016
Page 2 of 3

including the lack of congressional jurisdiction over state law enforcement activities and the Committee's intrusion into sovereign state actions protected by the 10th Amendment to the U.S. Constitution.

First, the Letter makes unfounded claims about the NYOAG's motives. Our investigation seeks to ensure that investors and consumers were and are provided with complete and accurate information that is indispensable to the just and effective functioning of our free market. There is no basis for your suggestion that the NYOAG has been engaged in a "coordinated attempt to deprive companies, nonprofit organizations, and scientists of their First Amendment rights and ability to fund and conduct scientific research free from intimidation and threats of prosecution." As I am sure you are aware, "the First Amendment does not shield fraud." *Illinois v. Telemarketing Associates, Inc.,* 538 U.S. 600, 612 (2003) (allowing fraud claim and rejecting argument that fraudulent charitable solicitations are protected by the First Amendment); *People v. Coalition Against Breast Cancer, Inc.*, 22 N.Y.S.3d 562, 565 (2d Dep't 2015) (same); *United States v. Philip Morris USA, Inc.*, 566 F.3d 1095, 1123 (D.C. Cir. 2009) (holding that false and misleading statements about the health effects and addictiveness of smoking cigarettes were not protected by the First Amendment); *SEC v. Pirate Investor LLC*, 580 F.3d 233, 255 (2009) ("Punishing fraud, whether it be common law fraud or securities fraud, simply does not violate the First Amendment.").

Second, Congress does not have jurisdiction to demand documents and communications from a state law enforcement official regarding the exercise of a State's sovereign police powers, such as the NYOAG's investigation of ExxonMobil. Congress' powers are limited by the 10th Amendment to those granted by the U.S. Constitution, and its investigative jurisdiction is derived from and limited by its power to legislate concerning federal matters. *See, e.g.*, *Barenblatt v. United States*, 360 U.S. 109, 111-12 (1959); *Kilbourn v. Thompson*, 103 U.S. 168, 195-96 (1880). Thus, Congress' oversight authority does not extend to investigations by a state Attorney General. *See, e.g.*, *Watkins v. United States*, 354 U.S. 178, 187 (1957) ("The power of the Congress to conduct investigations . . . comprehends probes into departments of the Federal Government . . . .").

Investigations and other law enforcement actions by a state Attorney General for potential violations of state law, as here, involve the exercise of police powers reserved to the States under the 10th Amendment, and are not the appropriate subject of federal legislation, oversight or interference. *See, e.g.*, *New York v. United States*, 505 U.S. 144, 162 (1992) ("[T]he Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress' instructions.") Our federal system contemplates a crucial role for state law enforcement. *See* The Federalist No. 45 at 357 (James Madison) (Robert Scigliano ed., 2010) (the powers delegated "to the federal government are few and defined. . . . The powers reserved to the several states will extend to all objects which, in the ordinary course of affairs, concern the lives, liberties, and property of the people, and the internal order, improvement, and prosperity of the state").

The Honorable Lamar Smith
May 26, 2016
Page 3 of 3

Third, we are not aware of any precedent supporting a Congressional investigation or oversight of a state Attorney General, as contemplated by the Letter. Indeed, absent an explicit authorization, a committee's investigative power is narrowly construed to avoid serious constitutional concerns, such as the state sovereignty issues that are implicated here. *See Tobin v. United States*, 306 F.2d 270, 275 (D.C. Cir.), *cert denied*, 371 U.S. 902 (1962) (overturning contempt conviction involving House Judiciary Subcommittee subpoena of Port of New York Authority records pursuant to "expansive investigation of an interstate compact agency" by Congress that had "never before [been] attempted"). The Letter does not identify any congressional authorization to engage in this inquiry; nor could it, given the constitutional principles discussed above. Under House Rule X, cited in the Letter, Congress has authorized the Committee on Science, Space, and Technology, to "review and study on a continuing basis laws, programs, and Government activities relating to nonmilitary research and development." Rule X(3)(k). Congress has not delegated this committee with any oversight authority concerning the investigations of state attorneys general regarding violations of state securities, consumer or business laws, nor could it. Moreover, throughout the Rules of the House of Representatives, context demands that "Government" with a capital "G" be understood as a proper noun to describe a specific government—the Federal Government—and not *all* governments. *See, e.g.*, Rule X(4)(c)(1)(B) (Committee on Oversight and Government Reform shall "evaluate the effects of laws enacted to reorganize the legislative and executive branches of the Government"). *See also* Gov't Printing Office Style Manual, Rule 3.19. The governments of the several states are distinct entities from the entity that is the Government of the United States. *United States v. Cruikshank*, 92 U.S. 542, 549 (1876) ("We have in our political system a government of the United States and a government of each of the several States. Each one of these governments is distinct from the others . . . .").

We trust that you and the other signatory Committee members appreciate the importance of our federal system, state law enforcement activities, and the critical need to maintain their integrity and independence from federal interference.

Sincerely,

Leslie B. Dubeck
Counsel

cc:   Honorable Eddie Bernice Johnson
      Ranking Member, Committee on Science, Space, and Technology

      Majority Staff, Committee on Science, Space, and Technology
      Rayburn House Office Building, Room 2321

      Minority Staff, Committee on Science, Space, and Technology
      Ford House Office Building, Room 394

# Exhibit BB



 (http://www.facebook.com/SciSpaceTechCmt) 

(//twitter.com/HouseScience)  (http://www.youtube.com/channel/UCtoUE3dJ-

mLUo5dwGs7hXOw)  (newsletter-subscribe)  (/rss.xml)

# Smith Subpoenas MA, NY Attorneys General, Environmental Groups

Jul 13, 2016  | Press Release

WASHINGTON – Science, Space, and Technology Committee Chairman Lamar Smith (R-Texas) today issued subpoenas to New York Attorney General Eric Schneiderman, Massachusetts Attorney General Maura Healey, and eight environmental organizations to obtain documents related to coordinated efforts to deprive companies, nonprofit organizations, scientists and scholars of their First Amendment rights.

**Chairman Lamar Smith (R-Texas):** "The attorneys general have appointed themselves to decide what is valid and what is invalid regarding climate change. The attorneys general are pursuing a political agenda at the expense of scientists' right to free speech.

"The Committee has a responsibility to protect First Amendment rights of companies, academic institutions, scientists, and nonprofit organizations. That is why the Committee is obligated to ask for information from the attorneys general and others.

"Unfortunately, the attorneys general have refused to give the committee the information to which it is entitled. What are they hiding? And why?"

**Energy Subcommittee Chairman Randy Weber (R-Texas):** "Since when did it become a crime to express or hold an opinion?  The difference of opinions is what makes our country so strong and unique. It's this freedom without censorship or restraint that helped build our country. However, this posse of attorneys general believe that those whose opinion, or scientific research, conflicts with the alleged consensus view on climate change should be the subject of investigation and prosecution by government officials - talk about a chilling effect on free speech."

**Space Subcommittee Chairman Brian Babin (R-Texas):** "Since March, these attorneys general have attempted to use questionable legal tactics to force the production of documents and communications from a broad group of scientists, companies, and non-profit organizations.  These actions are an attempt to chill the scientific research of those who do not support the attorneys' general and environmental groups' political positions.

"These actions amount to a political attack rather than a serious inquiry based on the law.  Today's action by the Science Committee and Chairman Smith sustains the commitment to protect the First Amendment rights of the individuals and groups targeted by the attorneys general and environmental activists."

**Rep. Darin LaHood (R-Ill.):** "Instead of pursuing real threats to America, these attorneys general are going down a path of partisan politics and attacking people who disagree with their conclusions about climate change.  The administration has attempted to avoid all debate on climate change by circumventing Congress and signing international agreements without the consent of the Senate, and it now appears that Democratic attorneys general are following the president's lead.

"If the debate on climate change is settled, the environmental activists and state attorneys general should have no problem convincing the American public with their own evidence and arguments.  Why go to such great lengths to squash differing opinions and anyone who questions their conclusions? These individuals, scientists, and organizations have the right to conduct research, form their own opinions, and voice those opinions."

**Rep. Warren Davidson (R-Ohio):** "Instead of upholding the constitution, protecting citizens, and putting real criminal behind bars, these attorneys general are using taxpayer dollars to manufacture charges to send a political message.  This demonstrates a clear deviation from the legal duties of an attorney general and the possible abuse of discretionary judgement. It is not the job of the attorneys general to decide what science should be conducted, and their actions indicate their intent is to silence certain voices."

Chairman Smith followed up the subpoenas with a press conference (https://www.facebook.com/SciSpaceTechCmt/) on Capitol Hill this afternoon.

On July 8, Chairman Smith sent letters (/news/press-releases/committee-ramps-investigation-threatens-use-compulsory-process-against-members) to the individuals and organizations subpoenaed today reiterating his May 18 (/news/press-releases/committee-scrutinizes-motive-green-20) and June 20 (/news/press-releases/committee-stands-firm-investigation-green-20) requests for documents and communications, setting a deadline for those documents as July 13 (today) at 12:00 p.m., and threatening the use of compulsory process pending their compliance with the requests. The attorneys general and environmental groups have refused to comply with the committee's investigation at every step.

114th Congress

# Exhibit CC

THE ATTORNEY GENERAL OF TEXAS

# KEN PAXTON

## Attorney General Paxton Intervenes in First Amendment Case

*Monday, May 16, 2016 – Ft.Worth*



Attorney General Ken Paxton on Monday joined Alabama in asking a state judge to put an end to a ridiculous investigation launched against ExxonMobil by Claude Earl Walker, Attorney General of the U.S. Virgin Islands. Walker, working with a Washington, D.C.-based private law firm, issued a subpoena for more than four decades' worth of Exxon records, alleging the company has engaged in racketeering due to its stated position on climate change, in a clear contradiction to the First Amendment to the U.S. Constitution.

 "This case is about abusing the power of the subpoena to force Exxon to turn over many decades' worth of records, so an attorney general with an agenda can pore over them in hopes of finding something incriminating," said Attorney General Ken Paxton. "It's a fishing expedition of the worst kind, and represents an effort to punish

Exxon for daring to hold an opinion on climate change that differs from that of radical environmentalists."

 The First Amendment ensures that all people are free to hold opinions and promote them in public debate. This action by the Virgin Islands' AG could effectively set a precedent that anyone can be criminally investigated because of their stated opinions. ExxonMobil, which employs thousands in Texas, faces high court costs if the investigation goes forward.

 This version updates with the correct brief:

https://www.texasattorneygeneral.gov/files/epress/files/2016/2016-05-16_exxon_states_intervention.pdf

AG Ken Paxton Speaks About Exxon Being Targeted for Climate Change Beliefs

1

Related News

AG Paxton Files Lawsuit to Halt Illegal Buck-a-Bag Fee in Brownsville

Victoria Child Support Office Moves to New Location

# Exhibit DD



# United States Senate

## WASHINGTON, DC 20510

May 25, 2016

The Honorable Loretta Lynch
Attorney General
United States Department of Justice
Washington, D.C. 20530

Re:   **DOJ's investigation into private entities' views on climate change**

Dear Attorney General Lynch:

We write today to demand that the Department of Justice (DOJ) immediately cease its ongoing use of law enforcement resources to stifle private debate on one of the most controversial public issues of our time—climate change.

This past March, during a DOJ oversight hearing before the Senate Judiciary Committee, one of our colleagues from the other side of the aisle lamented that, "[u]nder President Obama, the Department of Justice has done nothing so far about the climate denial scheme." To our astonishment, you responded as follows:

> This matter has been discussed. We have received information about it and have referred it to the FBI to consider whether or not it meets the criteria for what we could take action on.

We also understand that, in 2015, the Department was asked by a "coalition of environmentalists and lawmakers"[1] to investigate whether the past decisions of a private sector company to adopt and publicly disclose certain views on climate issues, and to refrain from adopting and publicly disclosing others, may have violated the Racketeer Influenced and Corrupt Organizations Act and related laws.

Statements from a March 29, 2016, press conference held by Democrat Attorneys General from New York, Connecticut, Maryland, Massachusetts, and Virginia, along with staff from the Democrat Attorney General's offices in California, Delaware, the District of Columbia, Illinois, Iowa, Maine, Minnesota, New Mexico, Oregon, Rhode Island, and Washington (the "State Attorneys General") make clear that similar investigations are ongoing. The Attorney

---

[1] Valerie Richardson, *Democratic AGs, climate change groups colluded on prosecuting dissenters, emails show.* http://www.washingtontimes.com/news/2016/apr/17/democratic-ags-climate-change-groups-colluded-on-p/ (April 17, 2016).

General of the United States Virgin Islands also issued a subpoena seeking from over 100 private parties, including universities, scientists and nonprofit organizations, decades worth of documents, communications, emails, op-eds, speeches, advertisements, letters to the editor, research, reports, studies and memoranda of any kind—including drafts—that refer to climate change, greenhouse gases, carbon tax, or climate science.[2]

These actions provide disturbing confirmation that government officials at all levels are threatening to wield the sword of law enforcement to silence debate on climate change.[3] As you well know, initiating criminal prosecution for a private entity's opinions on climate change is a blatant violation of the First Amendment and an abuse of power that rises to the level of prosecutorial misconduct.[4] Using such a prosecution to issue intrusive demands targeting individuals who represent the parts of civil society that are most dependent on free inquiry and debate is something categorically different. As the U.S. Court of Appeals for the Sixth Circuit reminded the Justice Department just weeks ago, "no citizen—Republican or Democrat, socialist or libertarian—should be targeted or even have to fear being targeted"[5] on the basis of ideological disagreement with the government.

We encourage you to consider the following statement from Alabama Attorney General Luther Strange and Oklahoma Attorney General Scott Pruitt, issued in response to the announcement of the investigation by the previously referenced State Attorneys General, as you consider your path forward:

> [Scientific and political debate] should not be silenced with threats of criminal prosecution by those who believe that their position is the only correct one and that all dissenting voices must therefore be intimidated and coerced into silence. It is inappropriate for State Attorneys General to use the power of their office to attempt to silence core political speech on one of the major policy debates of our time.[6]

In light of the above, please confirm within 14 days that the Department (1) has terminated all investigations or inquiries arising from any private individual or entity's views on climate change and (2) will not initiate in the future any such investigations or inquiries. In addition, we ask that you explain what steps you are taking as the federal official charged with protecting the civil rights of American citizens to prevent state law enforcement officers from unconstitutionally harassing private entities or individuals simply for disagreeing with the prevailing climate change orthodoxy.

We expect your prompt attention to this matter. If you have any questions, please contact Senator Mike Lee's Judiciary Committee staff at (202) 224-2791.

---

[2] Valerie Richardson, *Exxon climate change dissent subpoena sweeps up more than 100 U.S. institutions*. http://www.washingtontimes.com/news/2016/may/3/virgin-islands-ag-subpoenas-exxon-communications/ (May 3, 2016).

[3] Megan McArdle, *Subpoenaed Into Silence on Global Warming*, http://www.bloombergview.com/articles/2016-04-08/subpoenaed-into-silence-on-global-warming (April 8, 2016).

[4] 18 U.S.C. § 530B; *ABA Model Rule 3.1*.

[5] *United States v. NorCal Tea Party Patriots*, No. 15-3793, slip op. at *1 (6th Cir., Mar. 22, 2016).

[6] Richardson, *supra*, at note 1.

Very truly yours,

Senator Mike Lee

Senator Ted Cruz

Senator Jeff Sessions

Senator David Perdue

Senator David Vitter

**APP. 249**

# Exhibit EE



STATE OF NEW YORK
OFFICE OF THE ATTORNEY GENERAL

### SUBPOENA FOR PRODUCTION OF DOCUMENTS
### THE PEOPLE OF THE STATE OF NEW YORK

TO:   **S. Jack Balagia, Jr.**
      **Vice-President and General Counsel**
      **Exxon Mobil Corporation**
      **Corporate Headquarters**
      **5959 Las Colinas Boulevard**
      **Irving, Texas 75039-2298**

**WE HEREBY COMMAND YOU**, pursuant to New York State Executive Law Section 63(12) and Section 2302(a) of the New York State Civil Practice Law and Rules, to deliver and turn over to Eric T. Schneiderman, the Attorney General of the State of New York, or a designated Assistant Attorney General, on the **4th day of December, 2015** by 10:00 a.m., or any agreed upon adjourned date or time, at the at the offices of the New York State Office of the Attorney General, 120 Broadway, 26th Floor, New York, New York 10271, all documents and information requested in the attached Schedule in accordance with the instructions and definitions contained therein in connection with an investigation to determine whether an action or proceeding should be instituted with respect to repeated fraud or illegality as set forth in the New York State Executive Law Article 5, Section 63(12), violations of the deceptive acts and practices law as set forth in New York State General Business Law Article 22-A, potential fraudulent practices in respect to stocks, bonds and other securities as set forth in New York State General Business Law Article 23-A, and any related violations, or any matter which the Attorney General deems pertinent thereto.

**PLEASE TAKE NOTICE** that under the provisions of Article 23 of the New York State Civil Practice Laws and Rules, you are bound by this subpoena to produce the documents requested on the date specified and any adjourned date.  Pursuant to New York State Civil Practice Laws and Rules Section 2308(b)(1), your failure to do so subjects you to, in addition to any other lawful punishment, costs, penalties and damages sustained by the State of New York State as a result of your failure to so comply.

**PLEASE TAKE NOTICE** that the Attorney General deems the information and documents requested by this Subpoena to be relevant and material to an investigation and inquiry undertaken in the public interest.

**APP. 251**

**WITNESS, Honorable Eric T. Schneiderman,** Attorney General of the State of New York, this 4th day of November, 2015.

By: _____

Lemuel M. Srolovic
Kevin G. W. Olson
Mandy DeRoche

Office of the Attorney General
Environmental Protection Bureau

120 Broadway, 26th Floor
New York, New York 10271
(212) 416-8448 (telephone)
(212) 416-6007 (facsimile)

APP. 252

## SCHEDULE 1

### A.   General Definitions and Rules of Construction

1.   "All" means each and every.

2.   "Any" means any and all.

3.   "And" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the Subpoena all information or Documents that might otherwise be construed to be outside of its scope.

4.   "Communication" means any conversation, discussion, letter, email, memorandum, meeting, note or other transmittal of information or message, whether transmitted in writing, orally, electronically or by any other means, and shall include any Document that abstracts, digests, transcribes, records or reflects any of the foregoing.  Except where otherwise stated, a request for "Communications" means a request for all such Communications.

5.   "Concerning" means, directly or indirectly, in whole or in part, relating to, referring to, describing, evidencing or constituting.

6.   "Custodian" means any Person or Entity that, as of the date of this Subpoena, maintained, possessed, or otherwise kept or controlled such Document.

7.   "Document" is used herein in the broadest sense of the term and means all records and other tangible media of expression of whatever nature however and wherever created, produced or stored (manually, mechanically, electronically or otherwise), including without limitation all versions whether draft or final, all annotated or nonconforming or other copies, electronic mail ("e-mail"), instant messages, text messages, Blackberry or other wireless device messages, voicemail, calendars, date books, appointment books, diaries, books, papers, files, notes, confirmations, accounts statements, correspondence, memoranda, reports, records, journals, registers, analyses, plans, manuals, policies, telegrams, faxes, telexes, wires, telephone logs, telephone messages, message slips, minutes, notes or records or transcriptions of conversations or Communications or meetings, tape recordings, videotapes, disks, and other electronic media, microfilm, microfiche, storage devices, press releases, contracts, agreements, notices and summaries. Any non-identical version of a Document constitutes a separate Document within this definition, including without limitation drafts or copies bearing any notation, edit, comment, marginalia, underscoring, highlighting, marking, or any other alteration of any kind resulting in any difference between two or more otherwise identical Documents.  In the case of Documents bearing any notation or other marking made by highlighting ink, the term Document means the original version bearing the highlighting ink, which original must be produced as opposed to any copy thereof.  Except where otherwise stated, a request for "Documents" means a request for all such Documents.

APP. 253

8.   "Entity" means without limitation any corporation, company, limited liability company or corporation, partnership, limited partnership, association, or other firm or similar body, or any unit, division, agency, department, or similar subdivision thereof.

9.   "Identify" or "Identity," as applied to any Document means the provision in writing of information sufficiently particular to enable the Attorney General to request the Document's production through subpoena or otherwise, including but not limited to: (a) Document type (letter, memo, etc.); (b) Document subject matter; (c) Document date; and (d) Document author(s), addressee(s) and recipient(s).  In lieu of identifying a Document, the Attorney General will accept production of the Document, together with designation of the Document's Custodian, and identification of each Person You believe to have received a copy of the Document.

10.  "Identify" or "Identity," as applied to any Entity, means the provision in writing of such Entity's legal name, any d/b/a, former, or other names, any parent, subsidiary, officers, employees, or agents thereof, and any address(es) and any telephone number(s) thereof.

11.  "Identify" or "Identity," as applied to any natural person, means and includes the provision in writing of the natural person's name, title(s), any aliases, place(s) of employment, telephone number(s), e-mail address(es), mailing addresses and physical address(es).

12.  "Person" means any natural person, or any Entity.

13.  "Sent" or "received" as used herein means, in addition to their usual meanings, the transmittal or reception of a Document by physical, electronic or other delivery, whether by direct or indirect means.

14.  "Subpoena" means this subpoena and any schedules, appendices, or attachments thereto.

15.  The use of the singular form of any word used herein shall include the plural and vice versa.  The use of any tense of any verb includes all other tenses of the verb.

16.  The references to Communications, Custodians, Documents, Persons, and Entities in this Subpoena encompass all such relevant ones worldwide.

## B.    Particular Definitions

1.   "You" or "Your" means ExxonMobil Corporation, ExxonMobil Oil Corporation, any present or former parents, subsidiaries, affiliates, directors, officers, partners, employees, agents, representatives, attorneys or other Persons acting on its behalf, and including predecessors or successors or any affiliates of the foregoing.

2.   "Climate Change" means global warming, Climate Change, the greenhouse effect, a change in global average temperatures, sea level rise, increased concentrations of carbon dioxide and other Greenhouse Gases and/or any other potential effect on the earth's physical and biological systems as a result of anthropogenic emissions of carbon dioxide

**APP. 254**

and other Greenhouse Gases, in any way the concept is described by or to You.

3.      "Fossil Fuel" or "Fossil Fuels" means all energy sources formed from fossilized remains of dead organisms, including oil, gas, bitumen and natural gas, but excluding coal. For purposes of this subpoena, the definition includes also fossil fuels blended with biofuels, such as corn ethanol blends of gasoline. The definition excludes renewable sources of energy production, such as hydroelectric, geothermal, solar, tidal, wind, and wood.

4.      "Greenhouse Gases" or "GHGs" meanscarbon dioxide, methane, nitrous oxide, hydroflurocarbons, perfluorocarbons and sulfur hexafloride.

5.       "Renewable Energy" means renewable sources of energy production, such as hydroelectric, geothermal, solar, tidal, wind, and wood.

## C.      Instructions

1.      Preservation of Relevant Documents and Information; Spoliation.  You are reminded of your obligations under law to preserve Documents and information relevant or potentially relevant to this Subpoena from destruction or loss, and of the consequences of, and penalties available for, spoliation of evidence.  No agreement, written or otherwise, purporting to modify, limit or otherwise vary the terms of this Subpoena, shall be construed in any way to narrow, qualify, eliminate or otherwise diminish your aforementioned preservation obligations.  Nor shall you act, in reliance upon any such agreement or otherwise, in any manner inconsistent with your preservation obligations under law.  No agreement purporting to modify, limit or otherwise vary your preservation obligations under law shall be construed as in any way narrowing, qualifying, eliminating or otherwise diminishing such aforementioned preservation obligations, nor shall you act in reliance upon any such agreement, unless an Assistant Attorney General confirms or acknowledges such agreement in writing, or makes such agreement a matter of record in open court.

2.      Possession, Custody, and Control.  The Subpoena calls for all responsive Documents or information in your possession, custody or control.  This includes, without limitation, Documents or information possessed or held by any of your officers, directors, employees, agents, representatives, divisions, affiliates, subsidiaries or Persons from whom you could request Documents or information.  If Documents or information responsive to a request in this Subpoena are in your control, but not in your possession or custody, you shall promptly Identify the Person with possession or custody.

3.      Documents No Longer in Your Possession.  If any Document requested herein was formerly in your possession, custody or control but is no longer available, or no longer exists, you shall submit a statement in writing under oath that:  (a) describes in detail the nature of such Document and its contents; (b) Identifies the Person(s) who prepared such Document and its contents; (c) Identifies all Persons who have seen or had possession of such Document; (d) specifies the date(s) on which such Document was prepared, transmitted or received; (e) specifies the date(s) on which such Document became unavailable; (f) specifies the reason why such Document is unavailable, including

APP. 255

without limitation whether it was misplaced, lost, destroyed or transferred; and if such Document has been destroyed or transferred, the conditions of and reasons for such destruction or transfer and the Identity of the Person(s) requesting and performing such destruction or transfer; and (g) Identifies all Persons with knowledge of any portion of the contents of the Document.

4.    No Documents Responsive to Subpoena Requests.  If there are no Documents responsive to any particular Subpoena request, you shall so state in writing under oath in the Affidavit of Compliance attached hereto, identifying the paragraph number(s) of the Subpoena request concerned.

5.    Format of Production.  You shall produce Documents, Communications, and information responsive to this Subpoena in electronic format that meets the specifications set out in Attachments 1 and 2.

6.    Existing Organization of Documents to be Preserved.  Regardless of whether a production is in electronic or paper format, each Document shall be produced in the same form, sequence, organization or other order or layout in which it was maintained before production, including but not limited to production of any Document or other material indicating filing or other organization.  Such production shall include without limitation any file folder, file jacket, cover or similar organizational material, as well as any folder bearing any title or legend that contains no Document.  Documents that are physically attached to each other in your files shall be accompanied by a notation or information sufficient to indicate clearly such physical attachment.

7.    Document Numbering.  All Documents responsive to this Subpoena, regardless of whether produced or withheld on ground of privilege or other legal doctrine, and regardless of whether production is in electronic or paper format, shall be numbered in the lower right corner of each page of such Document, without disrupting or altering the form, sequence, organization or other order or layout in which such Documents were maintained before production.  Such number shall comprise a prefix containing the producing Person's name or an abbreviation thereof, followed by a unique, sequential, identifying document control number.

8.    Privilege Placeholders.  For each Document withheld from production on ground of privilege or other legal doctrine, regardless of whether a production is electronic or in hard copy, you shall insert one or more placeholder page(s) in the production bearing the same document control number(s) borne by the Document withheld, in the sequential place(s) originally occupied by the Document before it was removed from the production.

9.    Privilege.  If You withhold or redact any Document responsive to this Subpoena on ground of privilege or other legal doctrine, you shall submit with the Documents produced a statement in writing under oath, stating:  (a) the document control number(s) of the Document withheld or redacted; (b) the type of Document; (c) the date of the Document; (d) the author(s) and recipient(s) of the Document; (e) the general subject matter of the Document; and (f) the legal ground for withholding or redacting the Document.  If the legal ground for withholding or redacting the Document is attorney-

**APP. 256**

client privilege, you shall indicate the name of the attorney(s) whose legal advice is sought or provided in the Document.

10. <u>Your Production Instructions to be Produced.</u>  You shall produce a copy of all written or otherwise recorded instructions prepared by you concerning the steps taken to respond to this Subpoena.  For any unrecorded instructions given, you shall provide a written statement under oath from the Person(s) who gave such instructions that details the specific content of the instructions and any Person(s) to whom the instructions were given.

11. <u>Cover Letter.</u>  Accompanying any production(s) made pursuant to this Subpoena, You shall include a cover letter that shall at a minimum provide an index containing the following:  (a) a description of the type and content of each Document produced therewith; (b) the paragraph number(s) of the Subpoena request to which each such Document is responsive; (c) the Identity of the Custodian(s) of each such Document; and (d) the document control number(s) of each such Document.

12. <u>Affidavit of Compliance.</u>  A copy of the Affidavit of Compliance provided herewith shall be completed and executed by all natural persons supervising or participating in compliance with this Subpoena, and you shall submit such executed Affidavit(s) of Compliance with Your response to this Subpoena.

13. <u>Identification of Persons Preparing Production.</u>  In a schedule attached to the Affidavit of Compliance provided herewith, you shall Identify the natural person(s) who prepared or assembled any productions or responses to this Subpoena.  You shall further Identify the natural person(s) under whose personal supervision the preparation and assembly of productions and responses to this Subpoena occurred.  You shall further Identify all other natural person(s) able competently to testify:  (a) that such productions and responses are complete and correct to the best of such person's knowledge and belief; and (b) that any Documents produced are authentic, genuine and what they purport to be.

14. <u>Continuing Obligation to Produce.</u>  This Subpoena imposes a continuing obligation to produce the Documents and information requested.  Documents located, and information learned or acquired, at any time after your response is due shall be promptly produced at the place specified in this Subpoena.

15. <u>No Oral Modifications.</u>  No agreement purporting to modify, limit or otherwise vary this Subpoena shall be valid or binding, and you shall not act in reliance upon any such agreement, unless an Assistant Attorney General confirms or acknowledges such agreement in writing, or makes such agreement a matter of record in open court.

16. <u>Time Period.</u>  The term "Time Period 1" as used in this Subpoena shall be from January 1, 2005 through the date of the production.  The term "Time Period 2" shall be from January 1, 1977 through the date of the production.

APP. 257

## D.    Documents to be Produced

1. All Documents and Communications, within Time Period 2, Concerning any research, analysis, assessment, evaluation, modeling or other consideration performed by You, on Your behalf, or with funding provided by You Concerning the causes of Climate Change.

2. All Documents and Communications, within Time Period 2, Concerning any research, analysis, assessment, evaluation, modeling (including the competency or accuracy of such models) or other consideration performed by You, on Your behalf, or with funding provided by You, Concerning the impacts of Climate Change, including but not limited to on air, water and land temperatures, sea-level rise, ocean acidification, extreme weather events, arctic ice, permafrost and shipping channels, precipitation, flooding, water supplies, desertification, agricultural and food supplies, built environments, migration, and security concerns, including the timing of such impacts.

3. All Documents and Communications, within Time Period 2, Concerning the integration of Climate Change-related issues (including but not limited to (a) future demand for Fossil Fuels, (b) future emissions of Greenhouse Gases from Fossil Fuel extraction, production and use, (c) future demand for Renewable Energy, (d) future emissions of Greenhouse Gases from Renewable Energy extraction, production and use, (e) Greenhouse Gas emissions reduction goals, (f) the physical risks and opportunities of Climate Change, and (g) impact on Fossil Fuel reserves into Your business decisions, including but not limited to financial projections and analyses, operations projections and analyses, and strategic planning performed by You, on Your behalf, or with funding provided by You.

4. All Documents and Communications, within Time Period 1, Concerning whether and how You disclose the impacts of Climate Change (including but not limited to regulatory risks and opportunities, physical risks and opportunities, Greenhouse Gas emissions and management, indirect risks and opportunities, International Energy Agency scenarios for energy consumption, and other carbon scenarios) in Your filings with the U.S. Securities and Exchange Commission and in Your public-facing and investor-facing reports including but not limited to Your *Outlook For Energy* reports, Your *Energy Trends, Greenhouse Gas Emissions, and Alternative Energy* reports, and Your *Energy and Carbon - Managing the Risks* Report.

5. All Documents and Communications, within Time Period 1, presented to Your board of directors Concerning Climate Change

6. All Documents and Communications Concerning Climate Change, within Time Period 1, prepared by or for trade associations or industry groups, or exchanged between You and trade associations or industry groups, or sent from or to trade associations or industry groups, including but not limited to the: (i) American Petroleum Institute; (ii) Petroleum Industry Environmental Conservation Association; (IPIECA); (iii) US Oil & Gas Association; (iv) Petroleum Marketers Association of America; and (v) Empire State Petroleum Association.

**APP. 258**

7.    All Documents and Communications, within Time Period 1, related to Your support or funding for organizations relating to communications or research of Climate Change, including decisions to cease funding or supporting such organizations.

8.    All Documents and Communications, within Time Period 1, created, recommended, sent, and/or distributed by You, on Your behalf, or with funding provided by You, Concerning marketing, advertising, and/or communication about Climate Change including but not limited to (a) policies, procedures, practices, memoranda and similar instructive or informational materials; (b) marketing or communication strategies or plans, (c) flyers, promotional materials, and informational materials; (d) scripts, Frequently Asked Questions, Q&As, and/or other guidance documents; (e) slide presentations, power points or videos; (f) written or printed notes from or video or audio recordings of speeches, seminars or conferences; (g) all Communications with and presentations to investors; and/or (h) press releases.

9.    All Documents and Communications, within Time Period 1, that are exemplars of all advertisements, flyers, promotional materials, and informational materials of any type, (including but not limited to web-postings, blog-postings, social media-postings, print advertisements, radio and television advertisements, brochures, posters, billboards, flyers and disclosures) used, published, or distributed by You, on Your behalf, or with funding provided by You, Concerning Climate Change including but not limited to (a) a copy of each print advertisement placed in New York State; (b) a DVD format copy of each television advertisement that ran in New York State; (c) an audio recording of each radio advertisement that ran in New York State and the audio portion of each internet advertisement; and (d) a printout, screenshot or copy of each advertisement, information, or communication provided via the internet, email, Facebook, Twitter, You Tube, or other electronic communications system.

10.    All Documents and Communications, within Time Period 1, substantiating or refuting the claims made in the materials identified in response to Demand Nos. 4, 8 and 9.

11.    All Documents and Communications sufficient to identify any New York State consumer who has complained to You, or to any state, county or municipal consumer protection agency located in New York State, Concerning Your actions with respect to Climate Change; and for each New York State consumer identified: (i) each complaint or request made by or on behalf of a consumer, (ii) all correspondence between the consumer, his or her representative, and You, (iii) recordings and notes of all conversations between the consumer and You, and (iv) the resolution of each complaint, if any.

**APP. 259**

<u>APPENDIX 1</u>

**Electronic Document Production Specifications**

Unless otherwise specified and agreed to by the Office of Attorney General, all responsive documents must be produced in LexisNexis® Concordance® format in accordance with the following instructions.  Any questions regarding electronic document production should be directed to the Assistant Attorney General whose telephone number appears on the subpoena.

1.    <u>Concordance Production Components</u>.  A Concordance production consists of the following component files, which must be produced in accordance with the specifications set forth below in Section 7.

   A.    *Metadata Load File.*  A delimited text file that lists in columnar format the required metadata for each produced document.

   B.    *Extracted or OCR Text Files.*  Document-level extracted text for each produced document or document-level optical character recognition ("OCR") text where extracted text is not available.

   C.    *Single-Page Image Files.*  Individual petrified page images of the produced documents in tagged image format ("TIF"), with page-level Bates number endorsements.

   D.    *Opticon Load File.*  A delimited text file that lists the single-page TIF files for each produced document and defines (i) the relative location of the TIF files on the production media and (ii) each document break.

   E.    *Native Files.*  Native format versions of non-printable or non–print friendly produced documents.

2.    <u>Production Folder Structure</u>.  The production must be organized according to the following standard folder structure:
   - data\ (contains production load files)
   - images\ (contains single-page TIF files, with subfolder organization) \0001, \0002, \0003…
   - native files\ (contains native files, with subfolder organization) \0001, \0002, \0003…
   - text\ (contains text files, with subfolder organization) \0001, \0002, \0003…

3.    <u>De-Duplication</u>.  You must perform global de-duplication of stand-alone documents and email families against any prior productions pursuant to this or previously related subpoenas.

4.    <u>Paper or Scanned Documents</u>.  Documents that exist only in paper format must be scanned to single-page TIF files and OCR'd.  The resulting electronic files should be

**APP. 260**

pursued in Concordance format pursuant to these instructions. You must contact the Assistant Attorney General whose telephone number appears on the subpoena to discuss (i) any documents that cannot be scanned, and (ii) how information for scanned documents should be represented in the metadata load file.

5.  Structured Data. Before producing structured data, including but not limited to relational databases, transactional data, and xml pages, you must first speak to the Assistant Attorney General whose telephone number appears on the subpoena. Spreadsheets are not considered structured data.

6.  Media and Encryption. All documents must be produced on CD, DVD, or hard-drive media. All production media must be encrypted with a strong password, which must be delivered independently from the production media.

7.  Production File Requirements.

    A.  *Metadata Load File*
        - Required file format:
            o  ASCII or UTF-8
            o  Windows formatted CR + LF end of line characters, including full CR + LF on last record in file.
            o  .dat file extension
            o  Field delimiter: (ASCII decimal character 20)
            o  Text Qualifier: þ (ASCII decimal character 254). Date and pure numeric value fields do not require qualifiers.
            o  Multiple value field delimiter: ; (ASCII decimal character 59)
        - The first line of the metadata load file must list all included fields. All required fields are listed in Attachment 2.
        - Fields with no values must be represented by empty columns maintaining delimiters and qualifiers.
        - *Note:* All documents must have page-level Bates numbering (except documents produced only in native format, which must be assigned a document-level Bates number). The metadata load file must list the beginning and ending Bates numbers (BEGDOC and ENDDOC) for each document. For document families, including but not limited to emails and attachments, compound documents, and uncompressed file containers, the metadata load file must also list the Bates range of the entire document family (ATTACHRANGE), beginning with the first Bates number (BEGDOC) of the "parent" document and ending with the last Bates number (ENDDOC) assigned to the last "child" in the document family.
        - Date and Time metadata must be provided in separate columns.
        - Accepted date formats:
            o  mm/dd/yyyy
            o  yyyy/mm/dd
            o  yyyymmdd
        - Accepted time formats:
            o  hh:mm:ss (if not in 24-hour format, you must indicate am/pm)

11

**APP. 261**

        o  hh:mm:ss:mmm

B.    ***Extracted or OCR Text Files***
- You must produce individual document-level text files containing the full extracted text for each produced document.
- When extracted text is not available (for instance, for image-only documents) you must provide individual document-level text files containing the document's full OCR text.
- The filename for each text file must match the document's beginning Bates number (BEGDOC) listed in the metadata load file.
- Text files must be divided into subfolders containing no more than 500 to 1000 files.

C.    ***Single-Page Image Files (Petrified Page Images)***
- Where possible, all produced documents must be converted into single-page tagged image format ("TIF") files.  See Section 7.E below for instructions on producing native versions of documents you are unable to convert.
- Image documents that exist only in non-TIF formats must be converted into TIF files.  The original image format must be produced as a native file as described in Section 7.E below.
- For documents produced only in native format, you must provide a TIF placeholder that states "Document produced only in native format."
- Each single-page TIF file must be endorsed with a unique Bates number.
- The filename for each single-page TIF file must match the unique page-level Bates number (or document-level Bates number for documents produced only in native format).
- Required image file format:
  - CCITT Group 4 compression
  - 2-Bit black and white
  - 300 dpi
  - Either .tif or .tiff file extension.
- TIF files must be divided into subfolders containing no more than 500 to 1000 files.  Where possible documents should not span multiple subfolders.

D.    ***Opticon Load File***
- Required file format:
  - ASCII
  - Windows formatted CR + LF end of line characters
  - Field delimiter: , (ASCII decimal character 44)
  - No Text Qualifier
  - .opt file extension
- The comma-delimited Opticon load file must contain the following seven fields (as indicated below, values for certain fields may be left blank):
  - ALIAS or IMAGEKEY – the unique Bates number assigned to each page of the production.
  - VOLUME – this value is optional and may be left blank.

**APP. 262**

- o RELATIVE PATH – the filepath to each single-page image file on the production media.
- o DOCUMENT BREAK – defines the first page of a document.  The only possible values for this field are "Y" or blank.
- o FOLDER BREAK – defines the first page of a folder.  The only possible values for this field are "Y" or blank.
- o BOX BREAK – defines the first page of a box.  The only possible values for this field are "Y" or blank.
- o PAGE COUNT – this value is optional and may be left blank.
- *Example*:
  ABC00001,,IMAGES\0001\ABC00001.tif,Y,,,2
  ABC00002,,IMAGES\0001\ABC00002.tif,,,,
  ABC00003,,IMAGES\0002\ABC00003.tif,Y,,,1
  ABC00004,,IMAGES\0002\ABC00004.tif,Y,,,1

E.  *Native Files*

- Non-printable or non–print friendly documents (including but not limited to spreadsheets, audio files, video files and documents for which color has significance to document fidelity) must be produced in their native format.
- The filename of each native file must match the document's beginning Bates number (BEGDOC) in the metadata load file and retain the original file extension.
- For documents produced only in native format, you must assign a single document-level Bates number and provide an image file placeholder that states "Document produced only in native format."
- The relative paths to all native files on the production media must be listed in the NATIVEFILE field of the metadata load file.
- Native files that are password-protected must be decrypted prior to conversion and produced in decrypted form.  In cases where this cannot be achieved the document's password must be listed in the metadata load file.  The password should be placed in the COMMENTS field with the format Password: <PASSWORD>.
- You may be required to supply a software license for proprietary documents produced only in native format.

**APP. 263**

## APPENDIX 2

### Required Fields for Metadata Load File

| FIELD NAME | FIELD DESCRIPTION | FIELD VALUE EXAMPLE[1] |
|---|---|---|
| DOCID | Unique document reference (can be used for de-duplication). | ABC0001 or ###.######.### |
| BEGDOC | Bates number assigned to the first page of the document. | ABC0001 |
| ENDDOC | Bates number assigned to the last page of the document. | ABC0002 |
| BEGATTACH | Bates number assigned to the first page of the parent document in a document family (*i.e.*, should be the same as BEGDOC of the parent document, or PARENTDOC). | ABC0001 |
| ENDATTACH | Bates number assigned to the last page of the last child document in a family (*i.e.*, should be the same as ENDDOC of the last child document). | ABC0008 |
| ATTACHRANGE | Bates range of entire document family. | ABC0001 - ABC0008 |
| PARENTDOC | BEGDOC of parent document. | ABC0001 |
| CHILDDOCS | List of BEGDOCs of all child documents, delimited by ";" when field has multiple values. | ABC0002; ABC0003; ABC0004… |
| COMMENTS | Additional document comments, such as passwords for encrypted files. | |
| NATIVEFILE | Relative file path of the native file on the production media. | .\Native_File\Folder\...\BEGDOC.ext |
| SOURCE | For scanned paper records this should be a description of the physical location of the original paper record.  For loose electronic files this should be the name of the file server or workstation where the files were gathered. | Company Name, Department Name, Location, Box Number… |
| CUSTODIAN | Owner of the document or file. | Firstname Lastname, Lastname, Firstname, User Name; Company Name, Department Name… |
| FROM | Sender of the email. | Firstname Lastname < FLastname @domain > |

[1] Examples represent possible values and not required format unless the field format is specified in Attachment 1.

**APP. 264**

| FIELD NAME | FIELD DESCRIPTION | FIELD VALUE EXAMPLE[1] |
|---|---|---|
| TO | All to: members or recipients, delimited by ";" when field has multiple values. | Firstname Lastname < FLastname @domain >; Firstname Lastname < FLastname @domain >; … |
| CC | All cc: members, delimited by ";" when field has multiple values. | Firstname Lastname < FLastname @domain >; Firstname Lastname < FLastname @domain >; … |
| BCC | All bcc: members, delimited by ";" when field has multiple values | Firstname Lastname < FLastname @domain >; Firstname Lastname < FLastname @domain >; … |
| SUBJECT | Subject line of the email. | |
| DATERCVD | Date that an email was received. | mm/dd/yyyy, yyyy/mm/dd, or yyyymmdd |
| TIMERCVD | Time that an email was received. | hh:mm:ss AM/PM or hh:mm:ss |
| DATESENT | Date that an email was sent. | mm/dd/yyyy, yyyy/mm/dd, or yyyymmdd |
| TIMESENT | Time that an email was sent. | hh:mm:ss AM/PM or hh:mm:ss |
| CALBEGDATE | Date that a meeting begins. | mm/dd/yyyy, yyyy/mm/dd, or yyyymmdd |
| CALBEGTIME | Time that a meeting begins. | hh:mm:ss AM/PM or hh:mm:ss |
| CALENDDATE | Date that a meeting ends. | mm/dd/yyyy, yyyy/mm/dd, or yyyymmdd |
| CALENDTIME | Time that a meeting ends. | hh:mm:ss AM/PM or hh:mm:ss |
| CALENDARDUR | Duration of a meeting in hours. | 0.75, 1.5… |
| ATTACHMENTS | List of filenames of all attachments, delimited by ";" when field has multiple values. | AttachmentFileName.; AttachmentFileName.docx; AttachmentFileName.pdf;… |
| NUMATTACH | Number of attachments. | 1, 2, 3, 4…. |
| RECORDTYPE | General type of record. | IMAGE; LOOSE E-MAIL; E-MAIL; E-DOC; IMAGE ATTACHMENT; LOOSE E-MAIL ATTACHMENT; E-MAIL ATTACHMENT; E-DOC ATTACHMENT |
| FOLDERLOC | Original folder path of the produced document. | Drive:\Folder\...\...\ |
| FILENAME | Original filename of the produced document. | Filename.ext |
| DOCEXT | Original file extension. | html, xls, pdf |

**APP. 265**

| FIELD NAME | FIELD DESCRIPTION | FIELD VALUE EXAMPLE[1] |
|---|---|---|
| DOCTYPE | Name of the program that created the produced document. | Adobe Acrobat, Microsoft Word, Microsoft Excel,  Corel WordPerfect… |
| TITLE | Document title (if entered). | |
| AUTHOR | Name of the document author. | Firstname Lastname; Lastname, First Name; FLastname |
| REVISION | Number of revisions to a document. | 18 |
| DATECREATED | Date that a document was created. | mm/dd/yyyy, yyyy/mm/dd, or yyyymmdd |
| TIMECREATED | Time that a document was created. | hh:mm:ss AM/PM or hh:mm:ss |
| DATEMOD | Date that a document was last modified. | mm/dd/yyyy, yyyy/mm/dd, or yyyymmdd |
| TIMEMOD | Time that a document was last modified. | hh:mm:ss AM/PM or hh:mm:ss |
| FILESIZE | Original file size in bytes. | 128, 512, 1024… |
| PGCOUNT | Number of pages per document. | 1, 2, 10, 100… |
| IMPORTANCE | Email priority level if set. | Low, Normal, High |
| TIFFSTATUS | Generated by the Law Pre-discovery production tool (leave blank if inapplicable). | Y, C, E, W, N, P |
| DUPSTATUS | Generated by the Law Pre-discovery production tool (leave blank if inapplicable). | P |
| MD5HASH | MD5 hash value computed from native file (a/k/a file fingerprint). | BC1C5CA6C1945179FEE144F25F 51087B |
| SHA1HASH | SHA1 hash value | B68F4F57223CA7DA3584BAD7E CF111B8044F8631 |
| MSGINDEX | Email message ID | |

**APP. 266**

## AFFIDAVIT OF COMPLIANCE WITH SUBPOENA

State of _____ }

County of _____ }

    I, _____, being duly sworn, state as follows:

1.    I am employed by _____ in the position of _____;

2.    The enclosed production of documents and responses to the Subpoena of the Attorney General of the State of New York, dated November 4, 2015 (the "Subpoena") were prepared and assembled under my personal supervision;

3.    I made or caused to be made a diligent, complete and comprehensive search for all Documents and information requested by the Subpoena, in full accordance with the instructions and definitions set forth in the Subpoena;

4.    The enclosed production of documents and responses to the Subpoena are complete and correct to the best of my knowledge and belief;

5.    No Documents or information responsive to the Subpoena have been withheld from this production and response, other than responsive Documents or information withheld on the basis of a legal privilege or doctrine;

6.    All responsive Documents or information withheld on the basis of a legal privilege or doctrine have been identified on a privilege log composed and produced in accordance with the instructions in the Subpoena;

7.    The Documents contained in these productions and responses to the Subpoena are authentic, genuine and what they purport to be;

8.    Attached is a true and accurate record of all persons who prepared and assembled any productions and responses to the Subpoena, all persons under whose personal supervision the preparation and assembly of productions and responses to the Subpoena occurred, and all persons able competently to testify:  (a) that such productions and responses are complete and correct to the best of such person's knowledge and belief; and (b) that any Documents produced are authentic, genuine and what they purport to be; and

9.    Attached is a true and accurate statement of those requests under the Subpoena as to which no responsive Documents were located in the course of the aforementioned search.

_____    _____

Signature of Affiant    Date

_____

Printed Name of Affiant

**APP. 267**

**********

Subscribed and sworn to before me
this 4th day of December 2015.

_____
Notary Public

My commission expires:

_____

**APP. 268**

# Exhibit FF

10/7/2016   Stanford University - The Global Climate and Energy Project - energy research, climate change, global climate, global warming, greenhouse emissions, ...

Case 4:16-cv-00469-K   Document 76-8   Filed 10/17/16   Page 47 of 55   PageID 2666



STANFORD UNIVERSITY
# GLOBAL CLIMATE & ENERGY PROJECT

About Us

The Global Climate and Energy Project (GCEP) at Stanford University seeks new solutions to one of the grand challenges of this century: supplying energy to meet the changing needs of a growing world population in a way that protects the environment.

GCEP's mission is to conduct fundamental research on technologies that will permit the development of global energy systems with significantly lower greenhouse gas emissions.

The GCEP sponsors include private companies with experience and expertise in key energy sectors. In December 2002, four sponsors – ExxonMobil, GE, Schlumberger, and Toyota – helped launch GCEP at Stanford University with plans to invest $225 million over a decade or more. DuPont and Bank of America joined the GCEP partnership in 2011 and 2013, respectively, bringing new perspectives and insights about the global energy challenge.

GCEP develops and manages a portfolio of innovative energy research programs that could lead to technologies that are efficient, environmentally benign, and cost-effective when deployed on a large scale. We currently have a number of exciting research projects taking place across disciplines throughout the Stanford campus and are collaborating with leading institutions around the world.

Objectives:
We believe that no single technology is likely to meet the energy challenges of the future on its own. It is essential that GCEP explore a range of technologies across a spectrum of globally significant energy resources and uses.

As a result, our primary objective is to build a diverse portfolio of research on technologies that will reduce greenhouse gas emissions, if successful in the marketplace.

Among GCEP's specific goals:

1. Identify promising research opportunities for low-emissions, high-efficiency energy technologies.

2. Identify barriers to the large-scale application of these new technologies.

3. Conduct fundamental research into technologies that will help to overcome these barriers and provide the basis for large-scale applications.

4. Share research results with a wide audience, including the science and engineering community, media, business, governments, and potential end-users.

HOME  |  RESEARCH  |  EVENTS  |  NEWS  |  TECHNICAL LIBRARY  |  ABOUT  |  TERMS OF USE  |
SITE MAP  |

© Copyright 2015-16 Stanford University: Global Climate and Energy Project (GCEP)

**Restricted Use of Materials from GCEP Site**: User may download materials from GCEP site only for User's own personal, non-commercial use. User may not otherwise copy, reproduce, retransmit, distribute,

Case 4:16-cv-00469-K   Document 76-8   Filed 10/17/16   Page 48 of 55   PageID 2667

publish, commercially exploit or otherwise transfer any material without obtaining prior GCEP or author approval.

APP. 271

# Exhibit GG



| Company: | EXXON MOBIL CORP |
|---|---|
| Document: | 10-K • 2/28/2007 |
| Section: | Entire Document |
| File Number: | 001-02256 |
| Pages: | 118 |

11/9/2015 1:58:12 PM

**Table of Contents**

**Index to Financial Statements**

2006

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

# FORM 10-K

☒ ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF
THE SECURITIES EXCHANGE ACT OF 1934
For the fiscal year ended December 31, 2006

or

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF
THE SECURITIES EXCHANGE ACT OF 1934
For the transition period from to
Commission File Number 1-2256

# EXXON MOBIL CORPORATION
(Exact name of registrant as specified in its charter)

| NEW JERSEY | 13-5409005 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification Number) |

5959 LAS COLINAS BOULEVARD, IRVING, TEXAS 75039-2298
(Address of principal executive offices) (Zip Code)

(972) 444-1000
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| **Common Stock, without par value (5,693,398,774 shares outstanding at January 31, 2007)** | **New York Stock Exchange** |
| **Registered securities guaranteed by Registrant:** | |
| **SeaRiver Maritime Financial Holdings, Inc.** | |
| **Twenty-Five Year Debt Securities due October 1, 2011** | **New York Stock Exchange** |

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ✔ No

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes  No ✔

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ✔ No

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ✔ Accelerated filer  Non-accelerated filer

Indicate by check mark whether the registrant is a shell company (as defined by Rule 12b-2 of the Act). Yes  No ✔

The aggregate market value of the voting stock held by non-affiliates of the registrant on June 30, 2006, the last business day of the registrant's most recently completed second fiscal quarter, based on the closing price on that date of $61.35 on the New York Stock Exchange composite tape, was in excess of $364 billion.

**Documents Incorporated by Reference:**
**Proxy Statement for the 2007 Annual Meeting of Shareholders (Part III)**

Table of Contents

Index to Financial Statements

**EXXON MOBIL CORPORATION**
**FORM 10-K**
**FOR THE FISCAL YEAR ENDED DECEMBER 31, 2006**

**TABLE OF CONTENTS**

| | | Page Number |
|---|---|---|
| **PART I** | | |
| Item 1. | Business | 1 |
| Item 1A. | Risk Factors | 2 |
| Item 1B. | Unresolved Staff Comments | 4 |
| Item 2. | Properties | 4 |
| Item 3. | Legal Proceedings | 20 |
| Item 4. | Submission of Matters to a Vote of Security Holders | 21 |
| | Executive Officers of the Registrant [pursuant to Instruction 3 to Regulation S-K, Item 401(b)] | 22 |
| **PART II** | | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 23 |
| Item 6. | Selected Financial Data | 24 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 24 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 24 |
| Item 8. | Financial Statements and Supplementary Data | 24 |
| Item 9. | Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | 25 |
| Item 9A. | Controls and Procedures | 25 |
| Item 9B. | Other Information | 25 |
| **PART III** | | |
| Item 10. | Directors, Executive Officers and Corporate Governance | 26 |
| Item 11. | Executive Compensation | 26 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 26 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 27 |
| Item 14. | Principal Accounting Fees and Services | 27 |
| **PART IV** | | |
| Item 15. | Exhibits, Financial Statement Schedules | 27 |
| | Financial Section | 29 |
| | Signatures | 94 |
| | Index to Exhibits | 96 |
| | Exhibit 12 — Computation of Ratio of Earnings to Fixed Charges | |
| | Exhibits 31 and 32 — Certifications | |

Table of Contents

Index to Financial Statements

PART I

Item 1. *Business.*

Exxon Mobil Corporation, formerly named Exxon Corporation, was incorporated in the State of New Jersey in 1882. On November 30, 1999, Mobil Corporation became a wholly-owned subsidiary of Exxon Corporation, and Exxon changed its name to Exxon Mobil Corporation.

Divisions and affiliated companies of ExxonMobil operate or market products in the United States and most other countries of the world. Their principal business is energy, involving exploration for, and production of, crude oil and natural gas, manufacture of petroleum products and transportation and sale of crude oil, natural gas and petroleum products. ExxonMobil is a major manufacturer and marketer of commodity petrochemicals, including olefins, aromatics, polyethylene and polypropylene plastics and a wide variety of specialty products. ExxonMobil also has interests in electric power generation facilities. Affiliates of ExxonMobil conduct extensive research programs in support of these businesses.

Exxon Mobil Corporation has several divisions and hundreds of affiliates, many with names that include *ExxonMobil, Exxon, Esso* or *Mobil*. For convenience and simplicity, in this report the terms *ExxonMobil, Exxon, Esso* and *Mobil*, as well as terms like *Corporation, Company, our, we* and *its*, are sometimes used as abbreviated references to specific affiliates or groups of affiliates. The precise meaning depends on the context in question.

Throughout ExxonMobil's businesses, new and ongoing measures are taken to prevent and minimize the impact of our operations on air, water and ground. These include a significant investment in refining infrastructure and technology to manufacture clean fuels as well as projects to reduce nitrogen oxide and sulfur oxide emissions and expenditures for asset retirement obligations. ExxonMobil's 2006 worldwide environmental expenditures for all such preventative and remediation steps, including ExxonMobil's share of equity company expenditures, were about $3.2 billion, of which $1.1 billion were capital expenditures and $2.1 billion were included in expenses. The total cost for such activities is expected to remain in this range in 2007 and 2008 (with capital expenditures approximately 40 percent of the total).

Operating data and industry segment information for the Corporation are contained in the Financial Section of this report under the following: "Quarterly Information", "Note 17: Disclosures about Segments and Related Information" and "Operating Summary". Information on oil and gas reserves is contained in the "Oil and Gas Reserves" part of the "Supplemental Information on Oil and Gas Exploration and Production Activities" portion of the Financial Section of this report. Information on Company-sponsored research and development activities is contained in "Note 3: Miscellaneous Financial Information" of the Financial Section of this report.

The number of regular employees was 82.1 thousand, 83.7 thousand and 85.9 thousand at years ended 2006, 2005 and 2004, respectively. Regular employees are defined as active executive, management, professional, technical and wage employees who work full time or part time for the Corporation and are covered by the Corporation's benefit plans and programs. Regular employees do not include employees of the company-operated retail sites (CORS). The number of CORS employees was 24.3 thousand, 22.4 thousand and 19.3 thousand at years ended 2006, 2005 and 2004, respectively.

ExxonMobil maintains a website at www.exxonmobil.com. Our annual report on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K and any amendments to those reports filed or furnished pursuant to Section 13(a) of the Securities Exchange Act of 1934 are made available through our website as soon as reasonably practical after we electronically file or furnish the reports to the Securities and Exchange Commission. Also available on the Corporation's website are the Company's

1

**APP. 276**

Table of Contents

Index to Financial Statements

Corporate Governance Guidelines and Code of Ethics and Business Conduct, as well as the charters of the audit, compensation and nominating committees of the Board of Directors. All of these documents are available in print without charge to shareholders who request them. Information on our website is not incorporated into this report.

**Item 1A.**      *Risk Factors.*

ExxonMobil's financial and operating results are subject to a number of factors, many of which are not within the Company's control. These factors include the following:

*Industry and Economic Factors:* The oil and gas business is fundamentally a commodity business. This means the operations and earnings of the Corporation and its affiliates throughout the world may be significantly affected by changes in oil, gas and petrochemical prices and by changes in margins on gasoline and other refined products. Oil, gas, petrochemical and product prices and margins in turn depend on local, regional and global events or conditions that affect supply and demand for the relevant commodity. These events or conditions are generally not predictable and include, among other things:

- general economic growth rates and the occurrence of economic recessions;

- the development of new supply sources;

- adherence by countries to OPEC quotas;

- supply disruptions;

- weather, including seasonal patterns that affect regional energy demand (such as the demand for heating oil or gas in winter) as well as severe weather events (such as hurricanes) that can disrupt supplies or interrupt the operation of ExxonMobil facilities;

- technological advances, including advances in exploration, production, refining and petrochemical manufacturing technology and advances in technology relating to energy usage;

- changes in demographics, including population growth rates and consumer preferences; and

- the competitiveness of alternative hydrocarbon or other energy sources.

Under certain market conditions, factors that have a positive impact on one segment of our business may have a negative impact on another segment and vice versa.

*Competitive Factors:* The energy and petrochemical industries are highly competitive. There is competition within the industries and also with other industries in supplying the energy, fuel and chemical needs of both industrial and individual consumers. The Corporation competes with other firms in the sale or purchase of needed goods and services in many national and international markets and employs all methods of competition which are lawful and appropriate for such purposes.

A key component of the Corporation's competitive position, particularly given the commodity-based nature of many of its businesses, is ExxonMobil's ability to manage expenses successfully. This requires continuous management focus on reducing unit costs and improving efficiency including through technology improvements, cost control, productivity enhancements and regular reappraisal of our asset portfolio as described elsewhere in this report.

*Political and Legal Factors:* The operations and earnings of the Corporation and its affiliates throughout the world have been, and may in the future be, affected from time to time in varying degree by political and legal factors including:

- political instability or lack of well-established and reliable legal systems in areas where the Corporation operates;

2

**APP. 277**

Table of Contents

Index to Financial Statements

- other political developments and laws and regulations, such as expropriation or forced divestiture of assets, unilateral cancellation or modification of contract terms, and de-regulation of certain energy markets;

- laws and regulations related to environmental or energy security matters, including those addressing alternative energy sources and the risks of global climate change;

- restrictions on exploration, production, imports and exports;

- restrictions on the Corporation's ability to do business with certain countries, or to engage in certain areas of business within a country;

- price controls;

- tax or royalty increases, including retroactive claims;

- war or other international conflicts; and

- civil unrest.

Both the likelihood of these occurrences and their overall effect upon the Corporation vary greatly from country to country and are not predictable. A key component of the Corporation's strategy for managing political risk is geographic diversification of the Corporation's assets and operations.

*Project Factors:* In addition to some of the factors cited above, ExxonMobil's results depend upon the Corporation's ability to develop and operate major projects and facilities as planned. The Corporation's results will therefore be affected by events or conditions that impact the advancement, operation, cost or results of such projects or facilities, including:

- the outcome of negotiations with co-venturers, governments, suppliers, customers or others (including, for example, our ability to negotiate favorable long-term contracts with customers, or the development of reliable spot markets, that may be necessary to support the development of particular production projects);

- reservoir performance and natural field decline;

- changes in operating conditions and costs, including costs of third party equipment or services such as drilling rigs and shipping;

- security concerns or acts of terrorism that threaten or disrupt the safe operation of company facilities; and

- the occurrence of unforeseen technical difficulties (including technical problems that may delay start-up or interrupt production from an Upstream project or that may lead to unexpected downtime of refineries or petrochemical plants).

See section 1 of Item 2 of this report for a discussion of additional factors affecting future capacity growth and the timing and ultimate recovery of reserves.

*Market Risk Factors:* See the "Market Risks, Inflation and Other Uncertainties" portion of the Financial Section of this report for discussion of the impact of market risks, inflation and other uncertainties.

Projections, estimates and descriptions of ExxonMobil's plans and objectives included or incorporated in Items 1, 2, 7 and 7A of this report are forward-looking statements. Actual future results, including project completion dates, production rates, capital expenditures, costs and business plans could differ materially due to, among other things, the factors discussed above and elsewhere in this report.

3

**APP. 278**