# Exhibit HH

APP. 279

**2015**

## UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

### FORM 10-K

☑ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF
THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2015

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF
THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from to

Commission File Number 1-2256

# EXXON MOBIL CORPORATION
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **NEW JERSEY** | **13-5409005** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification Number) |

**5959 LAS COLINAS BOULEVARD, IRVING, TEXAS 75039-2298**
(Address of principal executive offices) (Zip Code)

**(972) 444-1000**
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| Common Stock, without par value (4,152,756,609 shares outstanding at January 31, 2016) | New York Stock Exchange |

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☑ No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☑ No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☑ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☑

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer," and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☑ Accelerated filer ☐

Non-accelerated filer ☐ Smaller reporting company ☐

Indicate by check mark whether the registrant is a shell company (as defined by Rule 12b-2 of the Act). Yes ☐ No ☑

The aggregate market value of the voting stock held by non-affiliates of the registrant on June 30, 2015, the last business day of the registrant's most recently completed second fiscal quarter, based on the closing price on that date of $83.20 on the New York Stock Exchange composite tape, was in excess of $346 billion.

**Documents Incorporated by Reference: Proxy Statement for the 2016 Annual Meeting of Shareholders (Part III)**

**EXXON MOBIL CORPORATION**
**FORM 10-K**
**FOR THE FISCAL YEAR ENDED DECEMBER 31, 2015**

**TABLE OF CONTENTS**

**PART I**

Item 1.       Business

Item 1A.      Risk Factors

Item 1B.      Unresolved Staff Comments

Item 2.       Properties

Item 3.       Legal Proceedings

Item 4.       Mine Safety Disclosures

Executive Officers of the Registrant [pursuant to Instruction 3 to Regulation S-K, Item 401(b)]

**PART II**

Item 5.       Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities

Item 6.       Selected Financial Data

Item 7.       Management's Discussion and Analysis of Financial Condition and Results of Operations

Item 7A.      Quantitative and Qualitative Disclosures About Market Risk

Item 8.       Financial Statements and Supplementary Data

Item 9.       Changes in and Disagreements With Accountants on Accounting and Financial Disclosure

Item 9A.      Controls and Procedures

Item 9B.      Other Information

**PART III**

Item 10.      Directors, Executive Officers and Corporate Governance

Item 11.      Executive Compensation

Item 12.      Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters

Item 13.      Certain Relationships and Related Transactions, and Director Independence

Item 14.      Principal Accounting Fees and Services

**PART IV**

Item 15.      Exhibits, Financial Statement Schedules

Financial Section

Signatures

Index to Exhibits

Exhibit 12 - Computation of Ratio of Earnings to Fixed Charges

Exhibits 31 and 32 - Certifications

## PART I

### ITEM 1. BUSINESS

Exxon Mobil Corporation was incorporated in the State of New Jersey in 1882. Divisions and affiliated companies of ExxonMobil operate or market products in the United States and most other countries of the world. Their principal business is energy, involving exploration for, and production of, crude oil and natural gas, manufacture of petroleum products and transportation and sale of crude oil, natural gas and petroleum products. ExxonMobil is a major manufacturer and marketer of commodity petrochemicals, including olefins, aromatics, polyethylene and polypropylene plastics and a wide variety of specialty products. Affiliates of ExxonMobil conduct extensive research programs in support of these businesses.

Exxon Mobil Corporation has several divisions and hundreds of affiliates, many with names that include *ExxonMobil, Exxon, Esso, Mobil* or *XTO*. For convenience and simplicity, in this report the terms *ExxonMobil, Exxon, Esso, Mobil* and *XTO*, as well as terms like *Corporation, Company, our, we* and *its*, are sometimes used as abbreviated references to specific affiliates or groups of affiliates. The precise meaning depends on the context in question.

Throughout ExxonMobil's businesses, new and ongoing measures are taken to prevent and minimize the impact of our operations on air, water and ground. These include a significant investment in refining infrastructure and technology to manufacture clean fuels, as well as projects to monitor and reduce nitrogen oxide, sulfur oxide and greenhouse gas emissions, and expenditures for asset retirement obligations. Using definitions and guidelines established by the American Petroleum Institute, ExxonMobil's 2015 worldwide environmental expenditures for all such preventative and remediation steps, including ExxonMobil's share of equity company expenditures, were $5.6 billion, of which $3.8 billion were included in expenses with the remainder in capital expenditures. The total cost for such activities is expected to decrease to approximately $5 billion in 2016 and 2017, mainly reflecting lower project activity in Canada. Capital expenditures are expected to account for approximately 30 percent of the total.

The energy and petrochemical industries are highly competitive. There is competition within the industries and also with other industries in supplying the energy, fuel and chemical needs of both industrial and individual consumers. The Corporation competes with other firms in the sale or purchase of needed goods and services in many national and international markets and employs all methods of competition which are lawful and appropriate for such purposes.

Operating data and industry segment information for the Corporation are contained in the Financial Section of this report under the following: "Quarterly Information", "Note 18: Disclosures about Segments and Related Information" and "Operating Summary". Information on oil and gas reserves is contained in the "Oil and Gas Reserves" part of the "Supplemental Information on Oil and Gas Exploration and Production Activities" portion of the Financial Section of this report.

ExxonMobil has a long-standing commitment to the development of proprietary technology. We have a wide array of research programs designed to meet the needs identified in each of our business segments. Information on Company-sponsored research and development spending is contained in "Note 3: Miscellaneous Financial Information" of the Financial Section of this report. ExxonMobil held approximately 11 thousand active patents worldwide at the end of 2015. For technology licensed to third parties, revenues totaled approximately $158 million in 2015. Although technology is an important contributor to the overall operations and results of our Company, the profitability of each business segment is not dependent on any individual patent, trade secret, trademark, license, franchise or concession.

The number of regular employees was 73.5 thousand, 75.3 thousand, and 75.0 thousand at years ended 2015, 2014 and 2013, respectively. Regular employees are defined as active executive, management, professional, technical and wage employees who work full time or part time for the Corporation and are covered by the Corporation's benefit plans and programs. Regular employees do not include employees of the company-operated retail sites (CORS). The number of CORS employees was 2.1 thousand, 8.4 thousand, and 9.8 thousand at years ended 2015, 2014 and 2013, respectively. The decrease in CORS employees reflects the multi-year transition of the company-operated retail network in portions of Europe to a more capital-efficient Branded Wholesaler model.

Information concerning the source and availability of raw materials used in the Corporation's business, the extent of seasonality in the business, the possibility of renegotiation of profits or termination of contracts at the election of governments and risks attendant to foreign operations may be found in "Item 1A. Risk Factors" and "Item 2. Properties" in this report.

ExxonMobil maintains a website at exxonmobil.com. Our annual report on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K and any amendments to those reports filed or furnished pursuant to Section 13(a) of the Securities Exchange Act of 1934 are made available through our website as soon as reasonably practical after we electronically file or furnish the reports to the Securities and Exchange Commission. Also available on the Corporation's website are the Company's Corporate Governance Guidelines and Code of Ethics and Business Conduct, as well as the charters of the audit, compensation and nominating committees of the Board of Directors. Information on our website is not incorporated into this report.

1

**APP. 282**

## ITEM 1A. RISK FACTORS

ExxonMobil's financial and operating results are subject to a variety of risks inherent in the global oil, gas, and petrochemical businesses. Many of these risk factors are not within the Company's control and could adversely affect our business, our financial and operating results, or our financial condition. These risk factors include:

### Supply and Demand

The oil, gas, and petrochemical businesses are fundamentally commodity businesses. This means ExxonMobil's operations and earnings may be significantly affected by changes in oil, gas, and petrochemical prices and by changes in margins on refined products. Oil, gas, petrochemical, and product prices and margins in turn depend on local, regional, and global events or conditions that affect supply and demand for the relevant commodity. Any material decline in oil or natural gas prices could have a material adverse effect on certain of the Company's operations, especially in the Upstream segment, financial condition and proved reserves. On the other hand, a material increase in oil or natural gas prices could have a material adverse effect on certain of the Company's operations, especially in the Downstream and Chemical segments.

**Economic conditions.** The demand for energy and petrochemicals correlates closely with general economic growth rates. The occurrence of recessions or other periods of low or negative economic growth will typically have a direct adverse impact on our results. Other factors that affect general economic conditions in the world or in a major region, such as changes in population growth rates, periods of civil unrest, government austerity programs, or currency exchange rate fluctuations, can also impact the demand for energy and petrochemicals. Sovereign debt downgrades, defaults, inability to access debt markets due to credit or legal constraints, liquidity crises, the breakup or restructuring of fiscal, monetary, or political systems such as the European Union, and other events or conditions that impair the functioning of financial markets and institutions also pose risks to ExxonMobil, including risks to the safety of our financial assets and to the ability of our partners and customers to fulfill their commitments to ExxonMobil.

**Other demand-related factors.** Other factors that may affect the demand for oil, gas, and petrochemicals, and therefore impact our results, include technological improvements in energy efficiency; seasonal weather patterns, which affect the demand for energy associated with heating and cooling; increased competitiveness of alternative energy sources that have so far generally not been competitive with oil and gas without the benefit of government subsidies or mandates; and changes in technology or consumer preferences that alter fuel choices, such as toward alternative fueled or electric vehicles.

**Other supply-related factors.** Commodity prices and margins also vary depending on a number of factors affecting supply. For example, increased supply from the development of new oil and gas supply sources and technologies to enhance recovery from existing sources tend to reduce commodity prices to the extent such supply increases are not offset by commensurate growth in demand. Similarly, increases in industry refining or petrochemical manufacturing capacity tend to reduce margins on the affected products. World oil, gas, and petrochemical supply levels can also be affected by factors that reduce available supplies, such as adherence by member countries to OPEC production quotas and the occurrence of wars, hostile actions, natural disasters, disruptions in competitors' operations, or unexpected unavailability of distribution channels that may disrupt supplies. Technological change can also alter the relative costs for competitors to find, produce, and refine oil and gas and to manufacture petrochemicals.

**Other market factors.** ExxonMobil's business results are also exposed to potential negative impacts due to changes in interest rates, inflation, currency exchange rates, and other local or regional market conditions. We generally do not use financial instruments to hedge market exposures.

### Government and Political Factors

ExxonMobil's results can be adversely affected by political or regulatory developments affecting our operations.

**Access limitations.** A number of countries limit access to their oil and gas resources, or may place resources off-limits from development altogether. Restrictions on foreign investment in the oil and gas sector tend to increase in times of high commodity prices, when national governments may have less need of outside sources of private capital. Many countries also restrict the import or export of certain products based on point of origin.

**Restrictions on doing business.** ExxonMobil is subject to laws and sanctions imposed by the U.S. or by other jurisdictions where we do business that may prohibit ExxonMobil or certain of its affiliates from doing business in certain countries, or restricting the kind of business that may be conducted. Such restrictions may provide a competitive advantage to competitors who may not be subject to comparable restrictions.

**Lack of legal certainty.** Some countries in which we do business lack well-developed legal systems, or have not yet adopted clear regulatory frameworks for oil and gas development. Lack of legal certainty exposes our operations to increased risk of adverse or unpredictable actions by government officials, and also makes it more difficult for us to enforce our contracts. In some cases these risks can be partially offset by agreements to arbitrate disputes in an international forum, but the adequacy of this remedy may still depend on the local legal system to enforce an award.

2

**Regulatory and litigation risks.** Even in countries with well-developed legal systems where ExxonMobil does business, we remain exposed to changes in law (including changes that result from international treaties and accords) that could adversely affect our results, such as:

- increases in taxes or government royalty rates (including retroactive claims);
- price controls;
- changes in environmental regulations or other laws that increase our cost of compliance or reduce or delay available business opportunities (including changes in laws related to offshore drilling operations, water use, or hydraulic fracturing);
- adoption of regulations mandating the use of alternative fuels or uncompetitive fuel components;
- adoption of government payment transparency regulations that could require us to disclose competitively sensitive commercial information, or that could cause us to violate the non-disclosure laws of other countries; and
- government actions to cancel contracts, re-denominate the official currency, renounce or default on obligations, renegotiate terms unilaterally, or expropriate assets.

Legal remedies available to compensate us for expropriation or other takings may be inadequate.

We also may be adversely affected by the outcome of litigation, especially in countries such as the United States in which very large and unpredictable punitive damage awards may occur, or by government enforcement proceedings alleging non-compliance with applicable laws or regulations.

**Security concerns.** Successful operation of particular facilities or projects may be disrupted by civil unrest, acts of sabotage or terrorism, and other local security concerns. Such concerns may require us to incur greater costs for security or to shut down operations for a period of time.

**Climate change and greenhouse gas restrictions.** Due to concern over the risk of climate change, a number of countries have adopted, or are considering the adoption of, regulatory frameworks to reduce greenhouse gas emissions. These include adoption of cap and trade regimes, carbon taxes, restrictive permitting, increased efficiency standards, and incentives or mandates for renewable energy. These requirements could make our products more expensive, lengthen project implementation times, and reduce demand for hydrocarbons, as well as shift hydrocarbon demand toward relatively lower-carbon sources such as natural gas. Current and pending greenhouse gas regulations may also increase our compliance costs, such as for monitoring or sequestering emissions.

**Government sponsorship of alternative energy.** Many governments are providing tax advantages and other subsidies to support alternative energy sources or are mandating the use of specific fuels or technologies. Governments are also promoting research into new technologies to reduce the cost and increase the scalability of alternative energy sources. We are conducting our own research efforts into alternative energy, such as through sponsorship of the Global Climate and Energy Project at Stanford University and research into liquid products from algae and biomass that can be further converted to transportation fuels. Our future results may depend in part on the success of our research efforts and on our ability to adapt and apply the strengths of our current business model to providing the energy products of the future in a cost-competitive manner. See "Management Effectiveness" below.

## Management Effectiveness

In addition to external economic and political factors, our future business results also depend on our ability to manage successfully those factors that are at least in part within our control. The extent to which we manage these factors will impact our performance relative to competition. For projects in which we are not the operator, we depend on the management effectiveness of one or more co-venturers whom we do not control.

**Exploration and development program.** Our ability to maintain and grow our oil and gas production depends on the success of our exploration and development efforts. Among other factors, we must continuously improve our ability to identify the most promising resource prospects and apply our project management expertise to bring discovered resources on line as scheduled and within budget.

**Project management.** The success of ExxonMobil's Upstream, Downstream, and Chemical businesses depends on complex, long-term, capital intensive projects. These projects in turn require a high degree of project management expertise to maximize efficiency. Specific factors that can affect the performance of major projects include our ability to: negotiate successfully with joint venturers, partners, governments, suppliers, customers, or others; model and optimize reservoir performance; develop markets for project outputs, whether through long-term contracts or the development of effective spot markets; manage changes in operating conditions and costs, including costs of third party equipment or services such as drilling rigs and shipping; prevent, to the extent possible, and respond effectively to unforeseen technical difficulties that could delay project startup or cause unscheduled project downtime; and influence the performance of project operators where ExxonMobil does not perform that role.

**APP. 284**

# Exhibit II



# THE COMMONWEALTH OF MASSACHUSETTS
## OFFICE OF THE ATTORNEY GENERAL
### ONE ASHBURTON PLACE
### BOSTON, MASSACHUSETTS 02108

MAURA HEALEY
ATTORNEY GENERAL

TEL: (617) 727-2200
www.mass.gov/ago

## CIVIL INVESTIGATIVE DEMAND

*BY HAND DELIVERY*

Demand No.:  2016-EPD-36

Date Issued:  April 19, 2016

Issued To:  Exxon Mobil Corporation
c/o Corporation Service Company, its Registered Agent
84 State Street
Boston, Massachusetts 02109

This Civil Investigative Demand ("CID") is issued to Exxon Mobil Corporation ("Exxon" or "You") pursuant to Massachusetts General Laws c. 93A, § 6, as part of a pending investigation concerning potential violations of M.G.L. c. 93A, § 2, and the regulations promulgated thereunder arising both from (1) the marketing and/or sale of energy and other fossil fuel derived products to consumers in the Commonwealth of Massachusetts (the "Commonwealth"); and (2) the marketing and/or sale of securities, as defined in M.G.L. c. 110A, § 401(k), to investors in the Commonwealth, including, without limitation, fixed- and floating rate-notes, bonds, and common stock, sold or offered to be sold in the Commonwealth.

This CID requires You to produce the documents identified in Schedule A below, pursuant to M.G.L. c. 93A, § 6(1). The Documents identified in Schedule A must be produced by May 19, 2016, by delivering them to:

> I. Andrew Goldberg
> Assistant Attorney General
> Office of the Attorney General
> One Ashburton Place
> Boston, MA 02108

The documents shall be accompanied by an affidavit in the form attached hereto. AAG Goldberg and such other employees, agents, consultants, and experts of the Office of the Attorney General as needed in its discretion, shall review Your affidavit and the documents produced in conjunction with our investigation.



APP. 286

Demand No.: 2016-EPD-36
Date Issued: April 19, 2016
Issued To: Exxon Mobil Corporation

This CID also requires You to appear and give testimony under oath through Your authorized custodian of records that the documents You produce in response to this CID represent all of the documents called for in this CID; that You have not withheld any documents responsive to this CID; and that all of the documents You produce were records made in good faith and kept in the regular course of Your business, and it was the regular course of Your business to make and keep such records. This testimony will be taken on June 10, 2016, beginning at 9:30 a.m. at the Boston Office of the Attorney General, 100 Cambridge Street, 10th Floor, Boston, Massachusetts. The testimony will be taken by AAG Goldberg or an appropriate designee, before an officer duly authorized to administer oaths by the law of the Commonwealth, and shall proceed, day to day, until the taking of testimony is completed. The witness has the right to be accompanied by an attorney. Rule 30(c) of the Massachusetts Rules of Civil Procedure shall apply. Your attendance and testimony are necessary to conduct this investigation.

This CID also requires You to appear and give testimony under oath through one or more of Your officers, directors or managing agents, or other persons most knowledgeable concerning the subject matter areas enumerated in Schedule B, below. This testimony will be taken on June 24, 2016, beginning at 9:30 a.m. at the Boston Office of the Attorney General, 100 Cambridge Street, 10th Floor, Boston, Massachusetts. The testimony will be taken by AAG Goldberg or an appropriate designee, before an officer duly authorized to administer oaths by the law of the Commonwealth, and shall proceed, day to day, until the taking of testimony is completed. The witness has the right to be accompanied by an attorney. Rule 30(c) of the Massachusetts Rules of Civil Procedure shall apply. Your attendance and testimony are necessary to conduct this investigation.

Under G.L. c. 93A, § 6(7), You may make a motion prior to the production date specified in this notice, or within twenty-one days after this notice has been served, whichever period is shorter, in the appropriate court of law to modify or set aside this CID for good cause shown.

If the production of the documents required by this CID would be, in whole or in part, unduly burdensome, or if You require clarification of any request, please contact AAG Goldberg promptly at the phone number below.

Finally, please note that under G.L. c. 93A, §7, obstruction of this investigation, including the alteration or destruction of any responsive document after receipt of

Demand No.:  2016-EPD-36
Date Issued:  April 19, 2016
Issued To:  Exxon Mobil Corporation

this CID, is subject to a fine of up to five thousand dollars ($5,000.00). A copy of that
provision is reprinted at Schedule C.

Issued at Boston, Massachusetts, this 19th day of April, 2016.

> COMMONWEALTH OF
> MASSACHUSETTS
>
> MAURA HEALEY
> ATTORNEY GENERAL
>
> By:
>
> I. Andrew Goldberg
> Assistant Attorney General
> Office of the Attorney General
> One Ashburton Place
> Boston, MA 02108
> Tel. (617) 727-2200

APP. 288

Demand No.:  2016-EPD-36
Date Issued:  April 19, 2016
Issued To:  Exxon Mobil Corporation

## SCHEDULE A

### A. General Definitions and Rules of Construction

1. "Advertisement" means a commercial message made orally or in any newspaper, magazine, leaflet, flyer, or catalog; on radio, television, or public address system; electronically, including by email, social media, and blog post; or made in person, in direct mail literature or other printed material, or on any interior or exterior sign or display, in any window display, in any point of transaction literature, but not including on any product label, which is delivered or made available to a customer or prospective customer in any manner whatsoever.

2. "All" means each and every.

3. "Any" means any and all.

4. "And" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the CID all information or Documents that might otherwise be construed to be outside of its scope.

5. "Communication" means any conversation, discussion, letter, email, memorandum, meeting, note or other transmittal of information or message, whether transmitted in writing, orally, electronically or by any other means, and shall include any Document that abstracts, digests, transcribes, records or reflects any of the foregoing. Except where otherwise stated, a request for "Communications" means a request for all such Communications.

6. "Concerning" means, directly or indirectly, in whole or in part, relating to, referring to, describing, evidencing or constituting.

7. "Custodian" means any Person or Entity that, as of the date of this CID, maintained, possessed, or otherwise kept or controlled such Document.

8. "Document" is used herein in the broadest sense of the term and means all records and other tangible media of expression of whatever nature however and wherever created, produced or stored (manually, mechanically, electronically or otherwise), including without limitation all versions whether draft or final, all annotated or nonconforming or other copies, electronic mail ("e-mail"), instant messages, text messages, personal digital assistant or other wireless device messages, voicemail, calendars, date books, appointment books, diaries, books, papers, files, notes, confirmations, accounts statements, correspondence, memoranda, reports, records, journals, registers, analyses, plans, manuals, policies, telegrams, faxes, telexes, wires, telephone logs, telephone messages, message slips, minutes, notes or records or transcriptions of conversations or

Demand No.: 2016-EPD-36
Date Issued: April 19, 2016
Issued To:   Exxon Mobil Corporation

> Communications or meetings, tape recordings, videotapes, disks, and other
> electronic media, microfilm, microfiche, storage devices, press releases,
> contracts, agreements, notices and summaries. Any non-identical version of a
> Document constitutes a separate Document within this definition, including
> without limitation drafts or copies bearing any notation, edit, comment,
> marginalia, underscoring, highlighting, marking, or any other alteration of any
> kind resulting in any difference between two or more otherwise identical
> Documents. In the case of Documents bearing any notation or other marking
> made by highlighting ink, the term Document means the original version
> bearing the highlighting ink, which original must be produced as opposed to any
> copy thereof. Except where otherwise stated, a request for "Documents" means
> a request for all such Documents.

9. "Entity" means without limitation any corporation, company, limited liability
company or corporation, partnership, limited partnership, association, or other
firm or similar body, or any unit, division, agency, department, or similar
subdivision thereof.

10. "Identify" or "Identity," as applied to any Document means the provision in
writing of information sufficiently particular to enable the Attorney General to
request the Document's production through CID or otherwise, including but not
limited to: (a) Document type (letter, memo, etc.); (b) Document subject matter;
(c) Document date; and  (d) Document author(s), addressee(s) and recipient(s).
In lieu of identifying a Document, the Attorney General will accept production
of the Document, together with designation of the Document's Custodian, and
identification of each Person You believe to have received a copy of the
Document.

11. "Identify" or "Identity," as applied to any Entity, means the provision in writing
of such Entity's legal name, any d/b/a, former, or other names, any parent,
subsidiary, officers, employees, or agents thereof, and any address(es) and any
telephone number(s) thereof.

12. "Identify" or "Identity," as applied to any natural person, means and includes
the provision in writing of the natural person's name, title(s), any aliases,
place(s) of employment, telephone number(s), e-mail address(es), mailing
addresses and physical address(es).

13. "Person" means any natural person, or any Entity.

14. "Refer" means embody, refer or relate, in any manner, to the subject of the
document demand.

APP. 290

Demand No.: 2016-EPD-36
Date Issued: April 19, 2016
Issued To: Exxon Mobil Corporation

15. "Refer or Relate to" means to make a statement about, embody, discuss, describe, reflect, identify, deal with, consist of, establish, comprise, list, or in any way pertain, in whole or in part, to the subject of the document demand.

16. "Sent" or "received" as used herein means, in addition to their usual meanings, the transmittal or reception of a Document by physical, electronic or other delivery, whether by direct or indirect means.

17. "CID" means this subpoena and any schedules, appendices, or attachments thereto.

18. The use of the singular form of any word used herein shall include the plural and vice versa. The use of any tense of any verb includes all other tenses of the verb.

19. The references to Communications, Custodians, Documents, Persons, and Entities in this CID encompass all such relevant ones worldwide.

## B. Particular Definitions

1. "Exxon," "You," or "Your," means Exxon Mobil Corporation, and any present or former parents, subsidiaries, affiliates, directors, officers, partners, employees, agents, representatives, attorneys or other Persons acting on its behalf, and including predecessors or successors or any affiliates of the foregoing.

2. "Exxon Products and Services" means products and services, including without limitation petroleum and natural gas energy products and related services, offered to and/or sold by Exxon to consumers in Massachusetts.

3. "Carbon Dioxide" or "$CO_2$" means the naturally occurring chemical compound composed of a carbon atom covalently double bonded to two oxygen atoms that is fixed by photosynthesis into organic matter.

4. "Climate" means the statistical description in terms of the mean and variability of relevant quantities, such as surface variables, including, without limitation, temperature, precipitation, and wind, on Earth over a period of time ranging from months to thousands or millions of years. Climate is the state, including a statistical description, of the Climate System. *See* Intergovernmental Panel on Climate Change (IPCC), 2012: Glossary of terms. In: Managing the Risks of Extreme Events and Disasters to Advance Climate Change Adaptation [Field, C.B., V. Barros, T.F. Stocker, D. Qin, D.J. Dokken, K.L. Ebi, M.D. Mastrandrea, K.J. Mach, G.-K. Plattner, S.K. Allen, M. Tignor, and P.M. Midgley (eds.)]. A Special Report of Working Groups I and II of the IPCC. Cambridge University Press, Cambridge, UK, and New York, NY, USA (the "IPCC Glossary"), p. 557.

APP. 291

Demand No.: 2016-EPD-36
Date Issued: April 19, 2016
Issued To: Exxon Mobil Corporation

5. "Climate Change" means a change in the state of Earth's Climate that can be identified (e.g., by using statistical tests) by changes in the mean and/or the variability of its properties and that persists for an extended period, typically decades or longer. *See* IPCC Glossary, p. 557.

6. "Climate Model" means a numerical representation of the Climate System based on the physical, chemical, and biological properties of its components, their interactions, and feedback processes, and that accounts for all or some of its known properties. Climate models are applied as a research tool to study and simulate the climate, and for operational purposes, including monthly, seasonal, interannual, and longer-term climate predictions. *See* IPCC Glossary, p. 557.

7. "Climate Risk" means the risk that variables in the Climate System reach values that adversely affect natural and human systems and regions, including those that relate to extreme values of the climate variables such as high wind speed, high river water and sea level stages (flood), and low water stages (drought). These include, without limitation, such risks to ecosystems, human health, geopolitical stability, infrastructure, facilities, businesses, asset value, revenues, and profits, as well as the business risks associated with public policies and market changes that arise from efforts to mitigate or adapt to Climate Change.

8. "Climate Science" means the study of the Climate on Earth.
9. "Climate System" means the dynamics and interactions on Earth of five major components: atmosphere, hydrosphere, cryosphere, land surface, and biosphere. *See* IPCC Glossary, p. 557.

10. "Global Warming" means the gradual increase, observed or projected, in Earth's global surface temperature, as one of the consequences of radiative forcing caused by anthropogenic emissions.

11. "Greenhouse Gas" means a gaseous constituent of Earth's atmosphere, both natural and anthropogenic, that absorbs and emits radiation at specific wavelengths within the spectrum of infrared radiation emitted by the Earth's surface, the atmosphere, and clouds. Water vapor ($H_2O$), carbon dioxide ($CO_2$), nitrous oxide ($N_2O$), methane ($CH_4$), chlorofluorocarbons (CFCs), and ozone ($O_3$) are the primary Greenhouse Gases in the Earth's atmosphere. *See* IPCC Glossary, p. 560.

12. "Greenhouse Gas Emissions" means the exiting to the atmosphere of Greenhouse Gas.

13. "Methane" or "$CH_4$" means the chemical compound composed of one atom of carbon and four atoms of hydrogen. Methane is the main component of natural gas.

APP. 292

Demand No.: 2016-EPD-36
Date Issued: April 19, 2016
Issued To: Exxon Mobil Corporation

14. "Radiative Forcing Effect" means the influence a factor has in altering the balance of incoming and outgoing energy in the Earth-atmosphere system and is an index of the importance of the factor as a potential climate change mechanism.

15. "Security" has the same meaning as defined in M.G.L. c. 110A, § 401(k), and includes, without limitation, any fixed- and floating rate-notes, bonds, and common stock, available to investors for purchase by Massachusetts residents.

16. "Sustainable Development" means development that meets the needs of the present without compromising the ability of future generations to meet their own needs. *See* IPCC Glossary, p. 564.

17. "Sustainability Reporting" means the practice of measuring, disclosing and being accountable to internal and external stakeholders for organizational performance towards the goals of Sustainable Development.

18. "Acton Institute for the Study of Religion and Liberty" or "Acton Institute" means the nonprofit organization by that name. Acton Institute is located in Grand Rapids, Michigan.

19. "American Enterprise Institute for Public Policy Research" or "AEI" means the nonprofit public policy organization by that name. AEI is based in Washington, D.C.

20. "Americans for Prosperity" means the nonprofit advocacy group by that name. Americans for Prosperity is based in Arlington, Virginia.

21. "American Legislative Exchange Council" or "ALEC" means the nonprofit organization by that name consisting of state legislator and private sector members. ALEC is based in in Arlington, Virginia.

22. "American Petroleum Institute" or "API" means the oil and gas industry trade association by that name. API is based in Washington, D.C.

23. "Beacon Hill Institute at Suffolk University" means the research arm of the Department of Economics at Suffolk University in Boston, Massachusetts, by that name.

24. "Center for Industrial Progress" or "CIP" means the for profit organization by that name. CIP is located in Laguna Hills, California.

25. "Competitive Enterprise Institute" or "CEI" means the nonprofit public policy organization by that name. CEI is based in Washington, D.C.

Demand No.: 2016-EPD-36
Date Issued: April 19, 2016
Issued To: Exxon Mobil Corporation

26. "George C. Marshall Institute" means the nonprofit public policy organization by
that name. George C. Marshall Institute is based in Arlington, Virginia.

27. "The Heartland Institute" means the nonprofit public policy organization by that
name. The Heartland Institute is based in Arlington Heights, Illinois.

28. "The Heritage Foundation" means the nonprofit public policy organization by
that name. The Heritage Foundation is based in Washington, D.C.

29. "Mercatus Center at George Mason University" means the university-based
nonprofit public policy organization by that name. Mercatus Center at George
Mason University is based in Arlington, Virginia.

## C. Instructions

1. Preservation of Relevant Documents and Information; Spoliation. You are
reminded of your obligations under law to preserve Documents and information
relevant or potentially relevant to this CID from destruction or loss, and of the
consequences of, and penalties available for, spoliation of evidence. No
agreement, written or otherwise, purporting to modify, limit or otherwise vary the
terms of this CID, shall be construed in any way to narrow, qualify, eliminate or
otherwise diminish your aforementioned preservation obligations. Nor shall you
act, in reliance upon any such agreement or otherwise, in any manner inconsistent
with your preservation obligations under law. No agreement purporting to modify,
limit or otherwise vary your preservation obligations under law shall be construed
as in any way narrowing, qualifying, eliminating or otherwise diminishing such
aforementioned preservation obligations, nor shall you act in reliance upon any
such agreement, unless an Assistant Attorney General confirms or acknowledges
such agreement in writing, or makes such agreement a matter of record in open
court.

2. Possession, Custody, and Control. The CID calls for all responsive Documents or
information in your possession, custody or control. This includes, without
limitation, Documents or information possessed or held by any of your officers,
directors, employees, agents, representatives, divisions, affiliates, subsidiaries or
Persons from whom you could request Documents or information. If Documents
or information responsive to a request in this CID are in your control, but not in
your possession or custody, you shall promptly Identify the Person with
possession or custody.

3. Documents No Longer in Your Possession. If any Document requested herein was
formerly in your possession, custody or control but is no longer available, or no
longer exists, you shall submit a statement in writing under oath that: (a) describes

APP. 294

Demand No.: 2016-EPD-36
Date Issued: April 19, 2016
Issued To: Exxon Mobil Corporation

in detail the nature of such Document and its contents; (b) Identifies the Person(s) who prepared such Document and its contents; (c) Identifies all Persons who have seen or had possession of such Document; (d) specifies the date(s) on which such Document was prepared, transmitted or received; (e) specifies the date(s) on which such Document became unavailable; (f) specifies the reason why such Document is unavailable, including without limitation whether it was misplaced, lost, destroyed or transferred; and if such Document has been destroyed or transferred, the conditions of and reasons for such destruction or transfer and the Identity of the Person(s) requesting and performing such destruction or transfer; and (g) Identifies all Persons with knowledge of any portion of the contents of the Document.

4. No Documents Responsive to CID Requests. If there are no Documents responsive to any particular CID request, you shall so state in writing under oath in the Affidavit of Compliance attached hereto, identifying the paragraph number(s) of the CID request concerned.

5. Format of Production. You shall produce Documents, Communications, and information responsive to this CID in electronic format that meets the specifications set out in Schedule D.

6. Existing Organization of Documents to be Preserved. Regardless of whether a production is in electronic or paper format, each Document shall be produced in the same form, sequence, organization or other order or layout in which it was maintained before production, including but not limited to production of any Document or other material indicating filing or other organization. Such production shall include without limitation any file folder, file jacket, cover or similar organizational material, as well as any folder bearing any title or legend that contains no Document. Documents that are physically attached to each other in your files shall be accompanied by a notation or information sufficient to indicate clearly such physical attachment.

7. Document Numbering. All Documents responsive to this CID, regardless of whether produced or withheld on ground of privilege or other legal doctrine, and regardless of whether production is in electronic or paper format, shall be numbered in the lower right corner of each page of such Document, without disrupting or altering the form, sequence, organization or other order or layout in which such Documents were maintained before production. Such number shall comprise a prefix containing the producing Person's name or an abbreviation thereof, followed by a unique, sequential, identifying document control number.

8. Privilege Placeholders. For each Document withheld from production on ground of privilege or other legal doctrine, regardless of whether a production is electronic or in hard copy, you shall insert one or more placeholder page(s) in the

Demand No.: 2016-EPD-36
Date Issued: April 19, 2016
Issued To: Exxon Mobil Corporation

production bearing the same document control number(s) borne by the Document withheld, in the sequential place(s) originally occupied by the Document before it was removed from the production.

9. Privilege. If You withhold or redact any Document responsive to this CID of privilege or other legal doctrine, you shall submit with the Documents produced a statement in writing under oath, stating: (a) the document control number(s) of the Document withheld or redacted; (b) the type of Document; (c) the date of the Document; (d) the author(s) and recipient(s) of the Document; (e) the general subject matter of the Document; and (f) the legal ground for withholding or redacting the Document. If the legal ground for withholding or redacting the Document is attorney-client privilege, you shall indicate the name of the attorney(s) whose legal advice is sought or provided in the Document.

10. Your Production Instructions to be Produced. You shall produce a copy of all written or otherwise recorded instructions prepared by you concerning the steps taken to respond to this CID. For any unrecorded instructions given, you shall provide a written statement under oath from the Person(s) who gave such instructions that details the specific content of the instructions and any Person(s) to whom the instructions were given.

11. Cover Letter. Accompanying any production(s) made pursuant to this CID, You shall include a cover letter that shall at a minimum provide an index containing the following: (a) a description of the type and content of each Document produced therewith; (b) the paragraph number(s) of the CID request to which each such Document is responsive; (c) the Identity of the Custodian(s) of each such Document; and (d) the document control number(s) of each such Document.

12. Affidavit of Compliance. A copy of the Affidavit of Compliance provided herewith shall be completed and executed by all natural persons supervising or participating in compliance with this CID, and you shall submit such executed Affidavit(s) of Compliance with Your response to this CID.

13. Identification of Persons Preparing Production. In a schedule attached to the Affidavit of Compliance provided herewith, you shall Identify the natural person(s) who prepared or assembled any productions or responses to this CID. You shall further Identify the natural person(s) under whose personal supervision the preparation and assembly of productions and responses to this CID occurred. You shall further Identify all other natural person(s) able competently to testify: (a) that such productions and responses are complete and correct to the best of such person's knowledge and belief; and (b) that any Documents produced are authentic, genuine and what they purport to be.

11 of 25

Demand No.:  2016-EPD-36
Date Issued:  April 19, 2016
Issued To:  Exxon Mobil Corporation

14. Continuing Obligation to Produce. This CID imposes a continuing obligation to produce the Documents and information requested. Documents located, and information learned or acquired, at any time after your response is due shall be promptly produced at the place specified in this CID.

15. No Oral Modifications. No agreement purporting to modify, limit or otherwise vary this CID shall be valid or binding, and you shall not act in reliance upon any such agreement, unless an Assistant Attorney General confirms or acknowledges such agreement in writing, or makes such agreement a matter of record in open court.

16. Time Period. Except where otherwise stated, the time period covered by this CID shall be from April 1, 2010, through the date of the production.

D. **Documents to be Produced**

1. For the time period from January 1, 1976, through the date of this production, Documents and Communications concerning Exxon's development, planning, implementation, review, and analysis of research efforts to study $CO_2$ emissions (including, without limitation, from fossil fuel extraction, production, and use), and the effects of these emissions on the Climate, including, without limitation, efforts by Exxon to:

    (a) analyze the absorption rate of atmospheric $CO_2$ in the oceans by developing and using Climate Models;

    (b) measure atmospheric and oceanic $CO_2$ levels (including, without limitation, through work conducted on Exxon's *Esso Atlantic* tanker);

    (c) determine the source of the annual $CO_2$ increment that has been increasing over time since the Industrial Revolution by measuring changes in the isotopic ratios of carbon and the distribution of radon in the ocean; and/or

    (d) assess the financial costs and environmental consequences associated with the disposal of $CO_2$ and hydrogen sulfide gas from the development of offshore gas from the seabed of the South China Sea off Natuna Island, Indonesia.

2. For the time period from January 1, 1976, through the date of this production, Documents and Communications concerning papers prepared, and presentations given, by James F. Black, at times Scientific Advisor in the Products Research Division of Exxon Research and Engineering, author of, among others, the paper *The Greenhouse Effect*, produced in or around 1978.

APP. 297

Demand No.: 2016-EPD-36
Date Issued: April 19, 2016
Issued To: Exxon Mobil Corporation

3. For the time period from January 1, 1976, through the date of this production, Documents and Communications concerning the paper *CO₂ Greenhouse Effect A Technical Review*, dated April 1, 1982, prepared by the Coordination and Planning Division of Exxon Research and Engineering Company.

4. For the time period from January 1, 1976, through the date of this production, Documents and Communications concerning the paper *CO₂ Greenhouse and Climate Issues*, dated March 28, 1984, prepared by Henry Shaw, including all Documents:

   (a) forming the basis for Exxon's projection of a 1.3 to 3.1 degree Celsius average temperature rise by 2090 due to increasing $CO_2$ emissions and all Documents describing the basis for Exxon's conclusions that a 2 to 3 degree Celsius increase in global average temperature could:

      • Be "amplified to about 10 degrees C at the poles," which could cause "polar ice melting and a possible sea-level rise of 0.7 meter[sic] by 2080"
      • Cause redistribution of rainfall
      • Cause detrimental health effects
      • Cause population migration

   (b) forming the basis for Exxon's conclusion that society could "avoid the problem by sharply curtailing the use of fossil fuels."

5. Documents and Communications with any of Acton Institute, AEI, Americans for Prosperity, ALEC, API, Beacon Hill Institute at Suffolk University, CEI, CIP, George C. Marshall Institute, The Heartland Institute, The Heritage Foundation, and/or Mercatus Center at George Mason University, concerning Climate Change and/or Global Warming, Climate Risk, Climate Science, and/or communications regarding Climate Science by fossil fuel companies to the media and/or to investors or consumers, including Documents and Communications relating to the funding by Exxon of any of those organizations.

6. For the time period from September 1, 1997, through the date of this production, Documents and Communications concerning the API's draft *Global Climate Science Communications Plan* dated in or around 1998.

7. For the time period from January 1, 2007, through the date of this production, Documents and Communications concerning Exxon's awareness of, and/or response to, the Union of Concerned Scientists report *Smoke, Mirrors & Hot Air: How ExxonMobil Uses Big Tobacco's Tactics to Manufacture Uncertainty on Climate Science*, dated January 2007.

Demand No.: 2016-EPD-36
Date Issued: April 19, 2016
Issued To: Exxon Mobil Corporation

8. For the time period from April 1, 1997, through the date of this production, Documents and Communications concerning the decision making by Exxon in preparing, and substantiation of, the following statements in the remarks *Energy – key to growth and a better environment for Asia-Pacific nations*, by then Chairman Lee R. Raymond to the World Petroleum Congress, Beijing, People's Republic of China, 10/13/97 (the "Raymond WPC Statements"):

   • It is highly unlikely that the temperature in the middle of the next century will be significantly affected whether policies are enacted now or 20 years from now. (Raymond WPC Statements, p. 11)

   • Forecasts of future warming come from computer models that try to replicate Earth's past climate and predict the future. They are notoriously inaccurate. None can do it without significant overriding adjustments. (Raymond WPC Statements, p. 10)

   • Proponents of the agreements [that could result from the Kyoto Climate Change Conference in December 1997] say they are necessary because burning fossil fuels causes global warming. Many people – politicians and the public alike – believe that global warming is a rock-solid certainty. But it's not. (Raymond WPC Statements, p. 8)

   • To achieve this kind of reduction in carbon dioxide emissions most advocates are talking about, governments would have to resort to energy rationing administered by a vast international bureaucracy responsible to no one. (Raymond WPC Statements, p. 10)

   • We also have to keep in mind that most of the greenhouse effect comes from natural sources, especially water vapor. Less than a quarter is from carbon dioxide, and, of this, only four percent of the carbon dioxide entering the atmosphere is due to human activities – 96 percent comes from nature. (Raymond WPC Statements, p. 9)

9. Documents and Communications concerning Chairman Rex W. Tillerson's June 27, 2012, address to the Council on Foreign Relations, including those sufficient to document the factual basis for the following statements:

   • Efforts to address climate change should focus on engineering methods to adapt to shifting weather patterns and rising sea levels rather than trying to eliminate use of fossil fuels.

   • Humans have long adapted to change, and governments should create policies to cope with the Earth's rising temperatures.

14 of 25

**APP. 299**

Demand No.: 2016-EPD-36
Date Issued: April 19, 2016
Issued To: Exxon Mobil Corporation

- Changes to weather patterns that move crop production areas around –
  we'll adapt to that. It's an engineering problem and it has engineering
  solutions.

- Issues such as global poverty [are] more pressing than climate change, and
  billions of people without access to energy would benefit from oil and gas
  supplies.

10. Documents and Communications concerning Chairman Tillerson's statements
    regarding Climate Change and Global Warming, on or about May 30, 2013, to
    shareholders at an Exxon shareholder meeting in Dallas, Texas, including
    Chairman Tillerson's statement "What good is it to save the planet if humanity
    suffers?"

11. Documents and Communications concerning Chairman Tillerson's speech
    *Unleashing Innovation to Meet Our Energy and Environmental Needs*, presented
    to the 36th Annual Oil and Money Conference in London, England, 10/7/15 (the
    "2015 Oil and Money Conference Speech"), including Documents sufficient to
    demonstrate the factual basis for Chairman Tillerson's representation that
    Exxon's scientific research on Climate Change, begun in the 1970s, "led to work
    with the U.N.'s Intergovernmental Panel on Climate Change and collaboration
    with academic institutions and to reaching out to policymakers and others, who
    sought to advance scientific understanding and policy dialogue."

12. Documents and Communications concerning any public statement Chairman
    Tillerson has made about Climate Change or Global Warming from 2012 to
    present.

13. Documents and Communications concerning changes in the design, construction,
    or operation of any Exxon facility to address possible variations in sea level
    and/or other variables, such as temperature, precipitation, timing of sea ice
    formation, wind speed, and increased storm intensity, associated with Climate
    Change, including but not limited to:

    (a) adjustments to the height of Exxon's coastal and/or offshore drilling
        platforms; and

    (b) adjustments to any seasonal activity, including shipping and the movement
        of vehicles.

14. Documents and Communications concerning any research, analysis, assessment,
    evaluation, Climate Modeling or other consideration performed by Exxon, or with
    funding provided by Exxon, concerning the costs for $CO_2$ mitigation, including,

APP. 300

Demand No.: 2016-EPD-36
Date Issued: April 19, 2016
Issued To: Exxon Mobil Corporation

> without limitation, concerning the 2014 Exxon report to shareholders *Energy and Carbon – Managing the Risks* (the "2014 Managing the Risks Report").

15. Documents and Communications substantiating or refuting the following claims in the 2014 Managing the Risks Report:

   - [B]y 2030 for the 450ppm CO2 stabilization pathway, the average American household would face an added CO2 cost of almost \$2,350 per year for energy, amounting to about 5 percent of total before-tax median income. (p. 9)
   - These costs would need to escalate steeply over time, and be more than double the 2030 level by mid-century. (p. 9)
   - Further, in order to stabilize atmospheric GHG concentrations, these CO2 costs would have to be applied across both developed and undeveloped countries. (p. 9)
   - [W]e see world GDP growing at a rate that exceeds population growth through [the year 2040], almost tripling in size from what it was globally in 2000 [fn. omitted]. It is largely the poorest and least developed of the world's countries that benefit most from this anticipated growth. However, this level of GDP growth requires more accessible, reliable and affordable energy to fuel growth, and it is vulnerable populations who would suffer most should that growth be artificially constrained. (pp. 3 – 4)
   - [W]e anticipate renewables growing at the fastest pace among all sources through [the year 2040]. However, because they make a relatively small contribution compared to other energy sources, renewables will continue to comprise about 5 percent of the total energy mix by 2040. Factors limiting further penetration of renewables include scalability, geographic dispersion, intermittency (in the case of solar and wind), and cost relative to other sources. (p. 6)
   - In assessing the economic viability of proved reserves, we do not believe a scenario consistent with reducing GHG emissions by 80 percent by 2050, as suggested by the "low carbon scenario," lies within the "reasonably likely to occur" range of planning assumptions, since we consider the scenario highly unlikely. (p. 16)

16. Documents and Communications that formed the basis for the following statements in Exxon's January 26, 2016, press release on Exxon's 2016 Energy Outlook:

Case 4:16-cv-00469-K Document 76-9 Filed 10/17/16 Page 24 of 43 PageID 2698

Demand No.: 2016-EPD-36
Date Issued: April 19, 2016
Issued To: Exxon Mobil Corporation

- In 2040, oil and natural gas are expected to make up nearly 60 percent of global supplies, while nuclear and renewables will be approaching 25 percent. Oil will provide one third of the world's energy in 2040, remaining the No. 1 source of fuel, and natural gas will move into second place.

- ExxonMobil's analysis and those of independent agencies confirms our long-standing view that all viable energy sources will be needed to meet increasing demand.

- The Outlook projects that global energy-related carbon dioxide emissions will peak around 2030 and then start to decline. Emissions in OECD nations are projected to fall by about 20 percent from 2014 to 2040.

17. Documents and Communications concerning any research, study, and/or evaluation by Exxon and/or any other fossil fuel company regarding the Climate Change Radiative Forcing Effect of natural gas (Methane), and potential regulation of Methane as a Greenhouse Gas.

18. Documents and Communications concerning Exxon's internal consideration of public relations and marketing decisions for addressing consumer perceptions regarding Climate Change and Climate Risks in connection with Exxon's offering and selling Exxon Products and Services to consumers in Massachusetts.

19. Documents and Communications concerning the drafting and finalizing of text, including all existing drafts of such text, concerning Greenhouse Gas Emissions and the issue of Climate Change or Global Warming filed with the U.S. Securities and Exchange Commission (the "SEC") by Exxon, including, without limitation, Exxon's Notices of Meeting; Form 10-Ks; Form 10-Qs; Form 8-Ks; Prospectuses; Prospectus Supplements; and Free Will Prospectuses; and/or contained in any offering memoranda and offering circulars from filings with the SEC under Regulation D (17 CFR § 230.501, et seq.).

20. Documents and Communications concerning Exxon's consideration of public relations and marketing decisions for addressing investor perceptions regarding Climate Change, Climate Risk, and Exxon's future profitability in connection with Exxon's offering and selling Securities in Massachusetts.

21. Documents and Communications related to Exxon's efforts in 2015 and 2016 to address any shareholder resolutions related to Climate Change, Global Warming, and how efforts to reduce Greenhouse Gas Emissions will affect Exxon's ability to operate profitably.

22. For the time period from January 1, 2006, through the date of this production, Documents and Communications concerning Exxon's development of its program

17 of 25

**APP. 302**

Case 4:16-cv-00469-K Document 76-9 Filed 10/17/16 Page 25 of 43 PageID 2699

for Sustainability Reporting addressing Climate Change and Climate Risk,
including, without limitation, regarding Exxon's annual "Corporate Citizenship
Report" and Exxon's "Environmental Aspects Guide."

23. Documents and Communications concerning information exchange among Exxon
and other companies and/or industry groups representing energy companies,
regarding marketing of energy and/or fossil fuel products to consumers in light of
public perceptions regarding Climate Change and Climate Risk.

24. Exemplars of all advertisements, flyers, promotional materials, and informational
materials of any type, including but not limited to web-postings, blog-posts, social
media-postings, print ads (including ads on op-ed pages of newspapers), radio and
television advertisements, brochures, posters, billboards, flyers and disclosures
used by or for You, Your employees, agents, franchisees or independent
contractors to solicit or market Exxon Products and Services in Massachusetts,
including but not limited to:

   • A copy of each print advertisement placed in the Commonwealth;
   • A DVD format copy of each television advertisement that ran in the
     Commonwealth;
   • An audio recording of each radio advertisement and audio portion of each
     internet advertisement;
   • A copy of each direct mail advertisement, brochure, or other written
     promotional materials;
   • A printout, screenshot or copy of each advertisement, information, or
     communication provided via the internet, email, Facebook, Twitter, You
     Tube, or other electronic communications system; and/or
   • A copy of each point-of-sale promotional material used
     by You or on Your behalf.

25. Documents and Communications sufficient to show where each of the exemplars
in Demand No. 24 was placed and the intended or estimated consumers thereof,
including, where appropriate, the number of hits on each internet page and all
Commonwealth Internet Service Providers viewing same.

26. Documents and Communications substantiating the claims made in the
advertisements, flyers, promotional materials, and informational materials
identified in response to Demand Nos. 22 through 24.

27. Documents and Communications concerning Your evaluation or review of the
impact, success or effectiveness of each Document referenced in Demand Nos. 22
through 24, including but not limited to Documents discussing or referring in any
way to: (a) the effects of advertising campaigns or communications; (b) focus
groups; (c) copy tests; (d) consumer perception; (e) market research; (f) consumer

**APP. 303**

Demand No.: 2016-EPD-36
Date Issued: April 19, 2016
Issued To: Exxon Mobil Corporation

> research; and/or (g) other study or survey or the reactions, perceptions, beliefs, attitudes, wishes, needs, or understandings of potential consumers of Exxon Products and Services in light of public perceptions of Climate Change, Greenhouse Gas Emissions, and Climate Risk.

28. Documents sufficient to show Exxon's organizational structure and leadership over time, including but not limited to organizational charts, reflecting all Exxon Entities in any way involved in:

> (a) the marketing, advertisement, solicitation, promotion, and/or sale of Exxon Products and Services to consumers in the Commonwealth; and/or

> (b) the marketing, advertisement, solicitation, promotion, and/or sale to investors of Exxon Securities in the Commonwealth.

29. Documents and Communications sufficient to identify each agreement entered into on or after April 1, 2010, through the present, between and among Exxon and the Commonwealth of Massachusetts, its agencies, and/or its political subdivisions, for Exxon to provide Exxon Products and Services in Massachusetts.

30. Documents sufficient to identify all claims, lawsuits, court proceedings and/or administrative or other proceedings against You in any jurisdiction within the United States concerning Climate Change and relating to Your solicitation of consumers of Exxon Products and Services and/or relating to Your solicitation of consumers of Exxon Securities, including all pleadings and evidence in such proceedings and, if applicable, the resolution, disposition or settlement of any such matters.

31. Documents sufficient to identify and describe any discussion or consideration of disclosing in any materials filed with the SEC or provided to potential or existing investors (e.g., in prospectuses for debt offerings) information or opinions concerning the environmental impacts of Greenhouse Gas Emissions, including, without limitation, the risks associated with Climate Change, and Documents sufficient to identify all Persons involved in such consideration.

32. Transcripts of investor calls, conferences or presentations given by You at which any officer or director spoke concerning the environmental impacts of Greenhouse Gas Emissions, including, without limitation, the risks associated with Climate Change.

33. Documents and Communications concerning any subpoena or other demand for production of documents or for witness testimony issued to Exxon by the New

APP. 304

Demand No.: 2016-EPD-36
Date Issued: April 19, 2016
Issued To: Exxon Mobil Corporation

> York State Attorney General's Office concerning Climate Change and Your
> marketing of Exxon Products and Services and/or Exxon Securities, including,
> through the date of Your production in response to this CID, all Documents
> produced to the New York State Attorney General's Office pursuant to any such
> subpoena or demand.

34. Documents sufficient to Identify all other federal or state law enforcement or
    regulatory agencies that have issued subpoenas or are otherwise currently
    investigating You concerning Your marketing of Exxon Products and Services to
    consumers and/or of Exxon Securities to investors.

35. Documents sufficient to Identify any Massachusetts consumer who has
    complained to You, or to any Massachusetts state or local consumer protection
    agency, concerning Your actions with respect to Climate Change, and for each
    such consumer identified, documents sufficient to identify each such complaint;
    each correspondence between You and such consumer or such consumer's
    representative; any internal notes or recordings regarding such complaint; and the
    resolution, if any, of each such complaint.

36. Documents and communications that disclose Your document retention policies
    in effect between January 1, 1976 and the date of this production.

37. Documents sufficient to Identify Your officers, directors and/or managing agents,
    or other persons most knowledgeable concerning the subject matter areas
    enumerated in Schedule B, below.

38. Documents sufficient to identify all natural persons involved in the preparation of
    Your response to this CID.

**APP. 305**

Demand No.: 2016-EPD-36
Date Issued: April 19, 2016
Issued To: Exxon Mobil Corporation

## SCHEDULE B

Pursuant to the terms of this CID, you are commanded to produce one or more witnesses at the above-designated place and time, or any agreed-upon adjourned place and time, who is or are competent to testify as to the following subject matter areas:

1. Your compliance with Massachusetts General Law Chapter 93A, § 2, and the regulations promulgated thereunder concerning, the marketing, advertising, soliciting, promoting, and communicating or sale of: (1) Exxon Products and Services in the Commonwealth and/or to Massachusetts residents; and (2) Securities in the Commonwealth and/or to Massachusetts residents.

2. The marketing, advertising, soliciting, promoting, and communicating or sale of Exxon Products and Services in the Commonwealth and/or to Massachusetts residents, including their environmental impacts with respect to Greenhouse Gas Emission, Climate Change and/or Climate Risk.

3. The marketing, advertising, soliciting, promoting, and communicating or sale of Securities in the Commonwealth and/or to Massachusetts residents, including as to Exxon's disclosures of risks to its business related to Climate Change.

4. All topics covered in the demands above.

5. Your recordkeeping methods for the demands above, including what information is kept and how it is maintained.

6. Your compliance with this CID.

Demand No.: 2016-EPD-36
Date Issued: April 19, 2016
Issued To: Exxon Mobil Corporation

## SCHEDULE C

## CHAPTER 93A. REGULATION OF BUSINESS PRACTICES FOR CONSUMERS PROTECTION

### Chapter 93A: Section 7. Failure to appear or to comply with notice

Section 7. A person upon whom a notice is served pursuant to the provisions of section six shall comply with the terms thereof unless otherwise provided by the order of a court of the commonwealth. Any person who fails to appear, or with intent to avoid, evade, or prevent compliance, in whole or in part, with any civil investigation under this chapter, removes from any place, conceals, withholds, or destroys, mutilates, alters, or by any other means falsifies any documentary material in the possession, custody or control of any person subject to any such notice, or knowingly conceals any relevant information, shall be assessed a civil penalty of not more than five thousand dollars.

The attorney general may file in the superior court of the county in which such person resides or has his principal place of business, or of Suffolk county if such person is a nonresident or has no principal place of business in the commonwealth, and serve upon such person, in the same manner as provided in section six, a petition for an order of such court for the enforcement of this section and section six. Any disobedience of any final order entered under this section by any court shall be punished as a contempt thereof.

APP. 307

Demand No.: 2016-EPD-36
Date Issued: April 19, 2016
Issued To: Exxon Mobil Corporation

## SCHEDULE D

*See* attached "Office of the Attorney General - Data Delivery Specification."

APP. 308

Demand No.: 2016-EPD-36
Date Issued: April 19, 2016
Issued To: Exxon Mobil Corporation

## AFFIDAVIT OF COMPLIANCE WITH CIVIL INVESTIGATIVE DEMAND

State of

County of

I, _____ , being duly sworn, state as follows:

1. I am employed by _____ in the position of
   _____ ;

2. The enclosed production of documents and responses to Civil Investigative Demand 2016-EPD-36 of the Attorney General of the Commonwealth of Massachusetts, dated April 19, 2016 (the "CID") were prepared and assembled under my personal supervision;

3. I made or caused to be made a diligent, complete and comprehensive search for all Documents and information requested by the CID, in full accordance with the instructions and definitions set forth in the CID;

4. The enclosed production of documents and responses to the CID are complete and correct to the best of my knowledge and belief;

5. No Documents or information responsive to the CID have been withheld from this production and response, other than responsive Documents or information withheld on the basis of a legal privilege or doctrine;

6. All responsive Documents or information withheld on the basis of a legal privilege or doctrine have been identified on a privilege log composed and produced in accordance with the instructions in the CID;

7. The Documents contained in these productions and responses to the CID are authentic, genuine and what they purport to be;

8. Attached is a true and accurate record of all persons who prepared and assembled any productions and responses to the CID, all persons under whose personal supervision the preparation and assembly of productions and responses to the CID occurred, and all persons able competently to testify: (a) that such productions and responses are complete and correct to the best of such person's knowledge and belief; and (b) that any Documents produced are authentic, genuine and what they purport to be; and

9. Attached is a true and accurate statement of those requests under the CID as to

24 of 25

**APP. 309**

Demand No.: 2016-EPD-36
Date Issued: April 19, 2016
Issued To: Exxon Mobil Corporation

> which no responsive Documents were located in the course of the aforementioned search.

_____     _____
Signature of Affiant                        Date

_____
Printed Name of Affiant

Subscribed and sworn to before me

this ___ day of _____ 2016.

_____
Notary Public
My commission expires:

_____

APP. 310



## Office of the Attorney General - Data Delivery Specification
## ONE – Production Load File

I. **General**

1. Images produced to the Office of the Attorney General should be single page series IV TIFF images, 300 dpi or better quality. TIFFs may be Black & White or color.

2. Bates Numbers should be placed in the lower right hand corner unless to do so would obscure the underlying image. In such cases, the Bates number should be placed as near to that position as possible while preserving the underlying image. Bates numbers should contain no spaces, hyphens or underscores. Example: AG0000000001.

3. Spreadsheets and Powerpoint ESI should be produced as native ESI and name for the bates number associated with the first page of the item. If the item has a confidentiality designation, please *DO NOT* append it to the bates numbered file name. The designation should be stored in a field in the DAT.

4. For any ESI that exists in encrypted format or is password-protected, instructions on means for access should be provided with the production to the AGO. (For example, by supplying passwords.)

5. All records should include at least the following fields of created data:
   a. Beginning Bates Number (where TIFF Images are produced)
   b. Ending Bates Number
   c. Beginning Attachment Range
   d. Ending Attachment Range
   e. RemovedFrom: If records were globally deduplicated, this field should contain a concatenated list of all custodians or sources which originally held the item.
   f. MD5 Hash or other hash value
   g. Custodian / Source
   h. Original file path or folder structure
   i. FamilyID
   j. Path/Link to natives
   k. Path/Link to text files (*do not produce inline text in the dat file*)
   l. Redacted – Bit Character field (1 or 0 where 1=Yes and 0=No)
   m. Production date
   n. Volume name
   o. Confidentiality or other treatment stamps

6. Email should be produced with at least the following fields of metadata:
   a. TO
   b. FROM
   c. CC
   d. BCC
   e. Subject
   f. Path to text file (*do not produce inline text in the dat file*)

Rev. 09-24-2015

**APP. 311**

## Office of the Attorney General - Data Delivery Specification
## ONE – Production Load File

   g. Sent Date (dates and times must be stored in separate fields)
   h. Sent Time (dates and times must be stored in separate fields and without time zones)
   i. File extension (.txt, .msg, etc.)
   j. Attachment count.
7. eFiles should be produced with at least the following individual fields of metadata:
   a. Author
   b. CreateDate (dates and times must be stored in separate fields)
   c. CreateTime (dates and times must be stored in separate fields with no time zones or am/pm)
   d. LastModifiedDate (dates and times must be stored in separate fields)
   e. LastModifiedTime (dates and times must be stored in separate fields with no time zones or am/pm).
8. Deduplication (Removed From data field)
   a. If the producing entity wishes to deduplicate, exact hash value duplicates may be removed on a global basis if the producing entity provides a field of created data for each deduplicated item that provides a concatenated list of all custodians or other sources where the item was original located. This list should be provided in the RemovedFrom data field.
   b. Any other form of deduplication must be approved in advance by the Office of the Attorney General.

### II. File Types and Load File Requirements

#### a. File Types

Data: Text, images and native files should each be delivered as subfolders in a folder named "DATA". See screen shot "Example Production Deliverable."

* Images: Single page TIFF images delivered in a folder named "IMAGES."
* Text: Multipage text files (one text file per document), delivered in a folder named "TEXT."
* Natives: Delivered in a folder named 'NATIVES".

Load Files: Concordance format data load file and Opticon format image load file should be delivered in a folder named LOAD (at the same level as the folder DATA in the structure). See screen shot "Example Production Deliverable."

Rev. 09-24-2015

**APP. 312**

## Office of the Attorney General - Data Delivery Specification
## ONE – Production Load File

Example Production Deliverable
  VOL001
    DATA
      IMAGES
      NATIVES
      TEXT
    LOAD

b. **Fields to be Produced in ONE Data Load File – Concordance Format**

| Field Name | Description/Notes |
|---|---|
| BegBates | Starting Bates Number for document |
| EndBates | Ending Bates Number for document |
| BegAttach | Starting Bates Number of Parent document |
| EndAttach | Ending Bates Number of last attachment in family |
| FamilyID | Parent BegBates |
| Volume | Name of Volume or Load File |
| MD5Hash | |
| Custodian_Source | If the source is a human custodian, please provide the name: Last name, first name. If this results in duplicates, add numbers or middle initials Last name, first name, middle initial or # If the source is not a human custodian, please provide a unique name for the source. Ex: AcctgServer |
| FROM | Email |
| TO | Email |
| CC | Email |
| BCC | Email |
| Subject | Email |
| Sent Date | Email |
| Sent Time | Email |
| File Extension | |
| Attch Count | Email |
| Doc Type | Email, attachment |
| Original FilePath | Original location of the item at time of Preservation. |
| FileName | |
| CreateDate | Loose files or attachments. Date and Time must be in separate fields. |
| CreateTime | Loose files or attachments. Date and Time must be in separate fields and the Time field should not include Time Zone (EDT, EST etc) |
| LastModDate | Loose files or attachments (Date and Time must be in separate fields) |
| LastModTime | Loose files or attachments. Date and Time must be in separate fields and the Time field should not include Time Zone (EDT, EST, AM, PM etc) |
| Redacted | This is a Boolean/bit character field. Data value should be "0" or "1" where 0 = No and 1=Yes. |
| Confidentiality Designation | NOTE: Do not append the Confidentiality Designation to the native file name |
| RemovedFrom | Last name, first name with semi colon as separator<br>Lastname, firstname; nextlastname, nextfirstname etc. |

Page **3** of **4**

## Office of the Attorney General - Data Delivery Specification
## ONE – Production Load File

| | |
|---|---|
| Encrypted_pwp | This is a single character field. Data value should be "N" or "Y". (File is or is not encrypted/password protected) |
| EncryptKey_password | For those files where Encrypted_pwp is Y, provide password or encryption key information in this field. |
| ProdDate | MM\DD\YYYY |
| TextLink | path to the text files should begin with TEXT\ |
| NativeLink | path to the native files should begin with NATIVES\ |

The Data load file for ONE is the same as a Concordance load file, with the same field delimiters () and text qualifiers (þ). Here is a screen shot of part of a ONE load file with the fields identified above:

```
þBegBatesþ|þEndBatesþ|þBegAttachþ|þEndAttachþ|þFamilyIDþ|þVolumeþ|þMD5Hashþ|þCustodian_Sourceþ|þFROMþ|þTOþ|þCCþ|þBCCþ|þSubjectþ|þSent Dateþ|þSent Timeþ|þFile Extensionþ|þD
þAG000004507þ|þAG000004510þ|þAG000004507þ|þAG000004512þ|þAG000004507þ|þVOL001þ|þþ|þDoe, Johnþ|þjohndoe@someplace.comþ|þjdoe@somewhereelse.comþ|þtheboss@someplace.comþ|þpþ|þt
þAG000004511þ|þAG000004512þ|þAG000004507þ|þAG000004512þ|þAG000004507þ|þVOL001þ|þþ|þDoe, Johnþ|þjohndoe@someplace.comþ|þjdoe@somewhereelse.comþ|þtheboss@someplace.comþ|þpþ|þt
```

### c. **Fields required for an Images Load File – Opticon Format**

The Images load file for ONE is the same as an OPTICON load file. It contains these fields, although Folder Break and Box Break are often not used.

| Field Name | Description/Notes |
|---|---|
| Alias | Imagekey/Image link - Beginning bates or ctrl number for the document |
| Volume | Volume name or Load file name |
| Path | relative path to Images should begin with IMAGES\ and include the full file name and file extension (tif, jpg) |
| Document Break | Y denotes image marks the beginning of a document |
| Folder Break | N/A - leave blank |
| Box Break | N/A - leave blank |
| Pages | Number of Pages in document |

Here is a screen shot of an opticon load file format in a text editor with each field separated by a comma. Alias, Volume, Path, Document Break, Folder Break (blank), Box Break (blank), Pages.

```
AG000004507,VOL001,IMAGES\00\00\AG000004507.TIF,Y,,,4
AG000004508,VOL001,IMAGES\00\00\AG000004508.TIF,,,,
AG000004509,VOL001,IMAGES\00\00\AG000004509.TIF,,,,
AG000004510,VOL001,IMAGES\00\00\AG000004510.TIF,,,,
AG000004511,VOL001,IMAGES\01\00\AG000004511.TIF,Y,,,2
AG000004512,VOL001,IMAGES\01\00\AG000004512.TIF,,,,
```

**Technical questions regarding this specification should be addressed to:**
Diane E. Barry
AAG / eDiscovery Attorney
Office of the Attorney General
One Ashburton Place
Boston MA 02108
Diane.E.Barry@state.ma.us
(617) 963-2120

Page 4 of 4

**APP. 314**

# Exhibit JJ

APP. 315

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| EXXON MOBIL CORPORATION, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. _____ |
| | § | |
| MAURA TRACY HEALEY, Attorney | § | |
| General of Massachusetts, in her | § | |
| official capacity, | § | |
| | § | |
| Defendant. | § | |
| | § | |

## DECLARATION OF ROBERT A. LUETTGEN

I, Robert A. Luettgen, declare as follows:

1.      My name is Robert A. Luettgen. I am Assistant Corporate Secretary at Exxon Mobil Corporation and have held this position since 2010. I am over 18 years of age and am fully competent in all respects to make this Declaration. The facts stated in this declaration are true and correct and are based on personal knowledge that I have obtained in my capacity as an employee of Exxon Mobil Corporation and from inquiries I made before submitting this declaration.

2.      I submit this declaration in support of Plaintiff Exxon Mobil Corporation's Motion for a Preliminary Injunction.

3.      Exxon Mobil Corporation maintains its principal office and its central operations in Texas.

4.      Exxon Mobil Corporation holds its shareholder meetings in Texas.

5.      Exxon Mobil Corporation does not maintain any climate change research facilities or personnel in Massachusetts.

**APP. 316**

6.    In the past five years, Exxon Mobil Corporation has not marketed or sold any securities or debt to the general public in Massachusetts.

7.    In the past five years, Exxon Mobil Corporation has not issued any form of equity for sale to the general public in Massachusetts.

8.    Aside from commercial paper, Exxon Mobil Corporation's only sale of debt in the past decade has been to underwriters outside the Commonwealth, and Exxon Mobil Corporation did not market that debt to investors in Massachusetts.

9.    During the limitations period, ExxonMobil has sold short-term, fixed-rate notes, which mature in 270 days or less, to institutional investors in Massachusetts.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 14, 2016.

Robert A. Luettgen
Assistant Corporate Secretary
Exxon Mobil Corporation
5959 Las Colinas Blvd
Irving, Texas 75039

# Exhibit KK

APP. 318

# THE WALL STREET JOURNAL.

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit http://www.djreprints.com.

http://www.wsj.com/articles/new-york-ag-employs-powerful-law-in-exxon-probe-1474061881

BUSINESS

# New York AG Employs Powerful Law in Exxon Probe

New York's 1921 Martin Act grants prosecutors wide jurisdiction in securities investigations



*PHOTO: BLOOMBERG NEWS*

By CHRISTOPHER M. MATTHEWS

Sept. 16, 2016 5:38 p.m. ET

On first blush, New York Attorney General Eric Schneiderman's probe into Exxon Mobil Corp.'s accounting practices raises some questions. For instance, why is the top cop in New York investigating the Texas-based company's financial disclosures, a job more commonly handled by the federal Securities and Exchange Commission?

But Mr. Schneiderman has been knee deep in Exxon's internal forecasting for more than a year, using a powerful New York state fraud law to investigate the company's knowledge of the impact of climate change and how it could affect its future business.

**APP. 319**

The new probe into why Exxon hasn't written down the value of its assets two years into a crash in oil prices is an outgrowth of the climate change investigation, say people familiar with the matter, and yet another example of the wide jurisdiction of New York's Martin Act.

---

READ MORE

---

- Exxon's Accounting Practices Are Investigated
- Big Oil Companies Stay Shy Despite Upswing in Prices
- Exxon Seeking Injunction Against Climate-Change Investigation

Both probes have been examining whether Exxon, the world's largest publicly traded energy company, violated the 1921 law, under which prosecutors must prove a company misled or omitted material facts from investors while offering securities.

The law grants wide powers. It doesn't require prosecutors to prove there was criminal intent or even that there were victims of an alleged fraud, something other agencies, including the SEC, have to prove under federal securities law.

An Exxon spokesman declined to comment on the investigation but said the company didn't have any material impairment impacts in its financial results.

Similar investigations brought by at least five other state attorneys general have been hampered by aggressive moves by Exxon, which, for instance, has sought to quash subpoenas issued by Massachusetts and the U.S. Virgin Islands. But the company hasn't challenged Mr. Schneiderman's broad subpoenas for emails, financial records, internal forecasts and other documents, a nod to breadth of the Martin Act.

Still, some legal experts have questioned whether Mr. Schneiderman is overreaching with his use of the Martin Act.

"You'd think if there was an issue about marking down reserves or other misstatements, that would be the eminent province of the SEC," said James Fanto, a professor at Brooklyn Law School.

Since 2014, oil producers world-wide have been forced to recognize that wells they plan to drill in the future are worth $200 billion less than they once thought, and revisions have become a staple of oil industry earnings, helping to push losses to record levels. Exxon hasn't taken any write-downs—the only major U.S. oil producer not to do so—which has led some analysts to question its accounting practices.

APP. 320

Case 4:16-cv-00469-K   Document 76-9   Filed 10/17/16   Page 43 of 43   PageID 2717

"The Attorney General's office is conducting an investigation into potential business fraud, consumer fraud, and securities fraud," spokesman Eric Soufer said. "As the Attorney General has said, the company's financial disclosures—and not the accuracy of its historic climate change research—are the focus of this investigation."

Columbia Law School Professor Merritt B. Fox said the key issue for Mr. Schneiderman in either probe is whether the information Exxon allegedly withheld was, in fact, material in the eyes of the investing world.

"If they have evidence Exxon knew about the effects of climate change or falling prices on its assets and didn't disclose it to people outside, that has the possibility of being a material misstatement or omission," Professor Fox said.

But if the public could make investment decisions with other publicly available information, "it could be an issue," for Mr. Schneiderman, he said.

News of Mr. Schneiderman's new focus, reported by The Wall Street Journal on Friday, also comes amid pushback to the climate change investigations by conservative advocacy groups, lawmakers and state AGs.

The Energy & Environment Legal Institute, a conservative nonprofit, released emails last week from other AGs offices that were involved in a March press conference set up by Mr. Schneiderman to announce a coalition to combat climate change. The group, which obtained the emails through Freedom of Information requests, say they show skepticism by the other AG offices about the New York probe.

Meanwhile, a group of 11 Republican state attorneys general have filed motions to support Exxon's efforts in Massachusetts state court to challenge a subpoena sent to the company by Massachusetts Attorney General Maura Healey.

Write to Christopher M. Matthews at christopher.matthews@wsj.com

Copyright 2014 Dow Jones & Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

**APP. 321**