IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| EXXON MOBIL CORPORATION, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | No. 4:16-CV-469-K |
| | § | |
| MAURA TRACY HEALEY, Attorney | § | |
| General of Massachusetts, in her | § | |
| official capacity, | § | |
| | § | |
| Defendant. | § | |

**APPENDIX IN SUPPORT OF EXXON MOBIL CORPORATION'S
REPLY IN FURTHER SUPPORT OF ITS MOTION
<u>FOR LEAVE TO FILE A FIRST AMENDED COMPLAINT</u>**

| <u>Exhibit</u> | <u>Description</u> | <u>Page(s)</u> |
|---|---|---|
| N/A | Declaration of Justin Anderson (Nov. 9, 2016) | iv – v |
| A | Christopher M. Matthews, *New York AG Employs Powerful Law in Exxon Probe*, Wall St. J. (Sept. 16, 2016) | App. 1 – App. 4 |
| B | John Schwartz, *Exxon Mobil Fraud Inquiry Said to Focus More on Future than Past*, N.Y. Times (Aug. 19, 2016) | App. 5 – App. 8 |
| C | Letter from Michele Hirshman, Partner, Paul, Weiss, Rifkind, Wharton & Garrison LLP, to the Honorable Barry R. Ostrager, Justice, Supreme Court of the State of New York (Oct. 18, 2016) | App. 9 – App. 11 |

| **Exhibit** | **Description** | **Page(s)** |
|---|---|---|
| D | Email from Nora Ahmed, Associate, Paul, Weiss, Rifkind, Wharton & Garrison LLP, to John Oleske, Senior Enforcement Counsel, Office of the Attorney General of the State of New York; Katherine Milgram, Chief, Investor Protection Bureau, Office of the Attorney General of the State of New York; and Mandy DeRoche, Assistant Attorney General, Office of the Attorney General of the State of New York (Oct. 17, 2016, 1:45 PM) | App. 12 – App. 13 |
| E | Exxon Mobil Corp., *Annual Report (Form 10-K)* (Feb. 24, 2016) | App. 14 – App. 19 |

Dated:  Nov. 9, 2016

EXXON MOBIL CORPORATION
Patrick J. Conlon
(patrick.j.conlon@exxonmobil.com)
State Bar No. 24054300
(*pro hac vice*)
Daniel E. Bolia
(daniel.e.bolia@exxonmobil.com)
State Bar No. 24064919
1301 Fannin Street
Houston, TX 77002
(832) 624-6336

Theodore V. Wells, Jr.
(*pro hac vice*)
Michele Hirshman
(*pro hac vice*)
Daniel J. Toal
(*pro hac vice*)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY  10019-6064
(212) 373-3000
Fax: (212) 757-3990

Justin Anderson
(*pro hac vice*)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
2001 K Street, NW
Washington, D.C.  20006-1047
(202) 223-7300
Fax: (202) 223-7420

        /s/ Ralph H. Duggins
Ralph H. Duggins
(rduggins@canteyhanger.com)
State Bar No. 06183700
Philip A. Vickers
(pvickers@canteyhanger.com)
State Bar No. 24051699
Alix D. Allison
(aallison@canteyhanger.com)
State Bar. No. 24086261
CANTEY HANGER LLP
600 W. 6th St. #300
Fort Worth, TX 76102
(817) 877-2800
Fax: (817) 877-2807

Nina Cortell
(nina.cortell@haynesboone.com)
State Bar No. 04844500
HAYNES & BOONE, LLP
2323 Victory Avenue
Suite 700
Dallas, TX 75219
(214) 651-5579
Fax: (214) 200-0411

*Counsel for Exxon Mobil Corporation*

## CERTIFICATE OF SERVICE

This is to certify that on this 9th day of November 2016, a true and correct copy of the foregoing document was filed electronically via the CM/ECF system, which gave notice to all counsel of record pursuant to Local Rule 5.1(d).

/s/Ralph H. Duggins
RALPH H. DUGGINS

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| EXXON MOBIL CORPORATION, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:16-CV-469-K |
| | § | |
| MAURA TRACY HEALEY, Attorney | § | |
| General of Massachusetts, in her | § | |
| official capacity, | § | |
| | § | |
| Defendant. | § | |
| | § | |

## <u>DECLARATION OF JUSTIN ANDERSON</u>

I, Justin Anderson, declare as follows:

1.     My name is Justin Anderson.  I have been admitted to practice law *pro hac vice* in the U.S. District Court for the Northern District of Texas and am an attorney with the law firm Paul, Weiss, Rifkind, Wharton & Garrison LLP, counsel of record for Exxon Mobil Corporation ("ExxonMobil") in this matter.  I am at least 18 years of age and am fully competent in all respects to make this Declaration.  I have personal knowledge of the facts stated herein, based on my experience or my consultation with others, or they are known to me in my capacity as counsel for ExxonMobil, and each of them is true and correct.

2.     I submit this declaration in support of Exxon Mobil Corporation's Motion for Leave to File a First Amended Complaint.

3.     Attached to this declaration as Exhibit A is a copy of an article by Christopher M. Matthews, published in the *Wall Street Journal* on September 16, 2016, http://www.wsj.com/articles/new-york-ag-employs-powerful-law-in-exxon-probe-1474061881.

4.      Attached to this declaration as Exhibit B is a copy of an article by John Schwartz, published in the *New York Times* on August 19, 2016, http://www.nytimes.com/2016/08/20/science/exxon-mobil-fraud-inquiry-said-to-focus-more-on-future-than-past.html.

5.      Attached to this declaration as Exhibit C is a true and correct copy of letter from Michele Hirshman to Justice Barry R. Ostrager, sent on October 18, 2016.

6.      Attached to this declaration as Exhibit D is a true and correct copy of an email from Nora Ahmed to John Oleske, Katherine Milgram, and Mandy DeRoche, sent on October 17, 2016.

7.      Attached to this declaration as Exhibit E is an excerpt of Exxon Mobil Corporation's *Annual Report (Form 10-K)*, dated February 24, 2016.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 9, 2016.

Justin Anderson
(janderson@paulweiss.com)
*(pro hac vice)*
Paul, Weiss, Rifkind, Wharton &
     Garrison LLP
2001 K Street, NW
Washington DC 20006-1047
(202) 223-7321
Fax: (202) 204-7394

# Exhibit A

# THE WALL STREET JOURNAL.

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit http://www.djreprints.com.

http://www.wsj.com/articles/new-york-ag-employs-powerful-law-in-exxon-probe-1474061881

BUSINESS

# New York AG Employs Powerful Law in Exxon Probe

New York's 1921 Martin Act grants prosecutors wide jurisdiction in securities investigations



*PHOTO: BLOOMBERG NEWS*

By **CHRISTOPHER M. MATTHEWS**

Sept. 16, 2016 5:38 p.m. ET

On first blush, New York Attorney General Eric Schneiderman's probe into Exxon Mobil Corp.'s accounting practices raises some questions. For instance, why is the top cop in New York investigating the Texas-based company's financial disclosures, a job more commonly handled by the federal Securities and Exchange Commission?

But Mr. Schneiderman has been knee deep in Exxon's internal forecasting for more than a year, using a powerful New York state fraud law to investigate the company's knowledge of the impact of climate change and how it could affect its future business.

The new probe into why Exxon hasn't written down the value of its assets two years into a crash in oil prices is an outgrowth of the climate change investigation, say people familiar with the matter, and yet another example of the wide jurisdiction of New York's Martin Act.

**App. 002**

READ MORE

- Exxon's Accounting Practices Are Investigated
- Big Oil Companies Stay Shy Despite Upswing in Prices
- Exxon Seeking Injunction Against Climate-Change Investigation

Both probes have been examining whether Exxon, the world's largest publicly traded energy company, violated the 1921 law, under which prosecutors must prove a company misled or omitted material facts from investors while offering securities.

The law grants wide powers. It doesn't require prosecutors to prove there was criminal intent or even that there were victims of an alleged fraud, something other agencies, including the SEC, have to prove under federal securities law.

An Exxon spokesman declined to comment on the investigation but said the company didn't have any material impairment impacts in its financial results.

Similar investigations brought by at least five other state attorneys general have been hampered by aggressive moves by Exxon, which, for instance, has sought to quash subpoenas issued by Massachusetts and the U.S. Virgin Islands. But the company hasn't challenged Mr. Schneiderman's broad subpoenas for emails, financial records, internal forecasts and other documents, a nod to breadth of the Martin Act.

Still, some legal experts have questioned whether Mr. Schneiderman is overreaching with his use of the Martin Act.

"You'd think if there was an issue about marking down reserves or other misstatements, that would be the eminent province of the SEC," said James Fanto, a professor at Brooklyn Law School.

Since 2014, oil producers world-wide have been forced to recognize that wells they plan to drill in the future are worth $200 billion less than they once thought, and revisions have become a staple of oil industry earnings, helping to push losses to record levels. Exxon hasn't taken any write-downs—the only major U.S. oil producer not to do so— which has led some analysts to question its accounting practices.

"The Attorney General's office is conducting an investigation into potential business fraud, consumer fraud, and securities fraud," spokesman Eric Soufer said. "As the Attorney General has said, the company's financial disclosures—and not the accuracy of its historic climate change research—are the focus of this investigation."

Case 4:16-cv-00469-K   Document 97   Filed 11/09/16   Page 10 of 25   PageID 3331

Columbia Law School Professor Merritt B. Fox said the key issue for Mr. Schneiderman in either probe is whether the information Exxon allegedly withheld was, in fact, material in the eyes of the investing world.

"If they have evidence Exxon knew about the effects of climate change or falling prices on its assets and didn't disclose it to people outside, that has the possibility of being a material misstatement or omission," Professor Fox said.

But if the public could make investment decisions with other publicly available information, "it could be an issue," for Mr. Schneiderman, he said.

News of Mr. Schneiderman's new focus, reported by The Wall Street Journal on Friday, also comes amid pushback to the climate change investigations by conservative advocacy groups, lawmakers and state AGs.

The Energy & Environment Legal Institute, a conservative nonprofit, released emails last week from other AGs offices that were involved in a March press conference set up by Mr. Schneiderman to announce a coalition to combat climate change. The group, which obtained the emails through Freedom of Information requests, say they show skepticism by the other AG offices about the New York probe.

Meanwhile, a group of 11 Republican state attorneys general have filed motions to support Exxon's efforts in Massachusetts state court to challenge a subpoena sent to the company by Massachusetts Attorney General Maura Healey.

**Write to** Christopher M. Matthews at christopher.matthews@wsj.com

Copyright 2014 Dow Jones & Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

# Exhibit B

**The New York Times** | http://nyti.ms/2bs9dyJ

SCIENCE

# Exxon Mobil Fraud Inquiry Said to Focus More on Future Than Past

By JOHN SCHWARTZ   AUG. 19, 2016

For more than a year, much of the public scrutiny of Exxon Mobil was captured by the #Exxonknew hashtag — shorthand for revelations about decades-old research on climate change conducted by the company while it funded groups promoting doubt about climate science.

Articles about that research have energized protests against Exxon Mobil and the fossil fuel industry and had a role in initiating queries by at least five attorneys general, led by Eric T. Schneiderman of New York.

Early on, his office demanded extensive emails, financial records and other documents from the oil company, leaving many observers with the impression that a deeper look into the company's past was the focus of the investigation.

But in an extensive interview, Mr. Schneiderman said that his investigation was focused less on the distant past than on relatively recent statements by Exxon Mobil related to climate change and what it means for the company's future.

In other words, the question for Mr. Schneiderman is less what Exxon knew, and more what it predicts.

For example, he said, the investigation is scrutinizing a 2014 report by Exxon Mobil stating that global efforts to address climate change would not mean that it had to leave enormous amounts of oil reserves in the ground as so-called "stranded assets."

But many scientists have suggested that if the world were to burn even just a portion of the oil in the ground that the industry declares on its books, the planet would heat up to such dangerous levels that "there's no one left to burn the rest," Mr. Schneiderman said.

By that logic, the Exxon Mobil will have to leave much of its oil in the ground, which means the company's valuation of its reserves is off by a significant amount.

"If, collectively, the fossil fuel companies are overstating their assets by trillions of dollars, that's a big deal," Mr. Schneiderman said. And if the company's own internal research shows that Exxon Mobil knows better, he added, "there may be massive securities fraud here."

Alan Jeffers, a spokesman for Exxon, dismissed the idea that its forecast could be viewed as fraudulent.

"If it turns out to be wrong, that's not fraud, that's wrong," he said. "That's why we adjust our outlook every year, and that's why we issue the annual forecast publicly, so people can know the basis of our forecasting."

The company has said allegations that it secretly developed a definitive understanding of climate change before the rest of the world's scientists are "preposterous."

Mr. Schneiderman has praised reports from publications, including Inside Climate News and the Los Angeles Times, that detailed Exxon Mobil's past research.

And all indications were that his office planned to use its subpoena powers to unearth new documents that might show a disconnect between what the company was saying publicly and what it was saying privately about climate change over several decades.

In the interview, however, Mr. Schneiderman said his focus lay elsewhere. "The older stuff really is just important to establish knowledge and the framework and to look for inconsistencies."

He called his efforts a straightforward fraud investigation, like many that he and his predecessors have taken on in subjects as wide-ranging as the crash of mortgage-backed securities and Volkswagen's diesel engine deceptions.

Mr. Schneiderman also mentioned, as an example of questionable public statements by Exxon Mobil, **congressional testimony** in 2010 by its chief executive, Rex Tillerson, who said that while the company acknowledged that humans were affecting the climate through greenhouse gas emissions to some degree, it was not yet clear "to what extent and therefore what can you do about it."

Mr. Tillerson added, "There is not a model available today that is competent" for understanding the science and predicting the future.

Mr. Schneiderman disagrees, and cited the industry's own extensive climate research and the actions it has taken in response, including exploration in the melting Arctic and **raising the decks** of offshore oil platforms to compensate for rising sea level.

"These guys have the best science for their engineering purposes," he said. "We're confident they're not wasting shareholder dollars to do things that are inconsistent with the science they have internally."

Since November, when the investigation was **first revealed**, and as other state attorneys general announced their support, Mr. Schneiderman's intentions have been questioned and, he said, misconstrued.

Supporters of Exxon Mobil have accused him and his colleagues of using prosecutorial powers to pursue political ends and of trying to squelch the First Amendment rights of the company, its scientists and anyone who agrees with them.

Lamar Smith, a congressman from Texas and chairman of the House Committee on Science, Space and Technology, accused the attorneys general of "**pursuing a political agenda at the expense of scientists' rights to free speech**" and has issued **subpoenas** demanding internal documents from Mr. Schneiderman and another state attorney general, as well as eight groups that have supported the investigations.

Hans von Spakovsky, a conservative commentator, compared the investigation by the attorneys general to the **Spanish Inquisition**, and the Daily Caller asked whether Mr. Schneiderman had suggested "**jailing global warming skeptics**."

Mr. Schneiderman talks about such accusations with incredulity.

"This is an investigation," he said. "It is a civil fraud case. No one is being prosecuted — we're not out to silence dissenting views." He has said, however, that if criminal actions turn up in the evidence the state gathers, criminal charges could be filed.

When asked about the First Amendment implications of investigating Exxon's statements, he repeated a sentence he has uttered many times: "The First Amendment doesn't protect you for fraud."

He added, "Three-card monte operators can't say, 'Hey, I'm just exercising my First Amendment rights!'"

When asked about the focus of Mr. Schneiderman's investigation, Joel Seligman, an expert in securities law who is the president of the University of Rochester, said that "at some level, this is a plain-vanilla investigation — and there is no guarantee it will lead to a case."

Exxon Mobil has sued to block subpoenas from **Massachusetts** and the **United States Virgin Islands**, but the company has provided hundreds of thousands of pages of documents to New York.

If the investigation does turn up the kind of evidence that could lead to a civil case, it is still unclear whether New York or the other states might win, said David M. Uhlmann, a former top federal prosecutor of environmental crime and a professor at the University of Michigan law school.

Until governments impose the kind of regulations that will lead to concrete action to slow or reverse climate change, he said, "We're going to continue to drill for oil and frack for gas." In that case, he continued, Exxon may "utilize a significant portion of its reserves, which means it may not even be wrong when it states that it expects to utilize its reserves."

Even if Exxon is wrong in saying that it expects to be able to use all its reserves, "The question is whether they know that they are wrong and are therefore lying to investors," he added.

The investigation, Mr. Schneiderman said, mirrors an earlier inquiry into a coal giant, Peabody Energy. In 2013, he issued subpoenas for internal documents related to climate change, and found false statements to shareholders and the Securities and Exchange Commission. "Simple stuff like 'it's impossible to predict the effect of a carbon tax on the coal market,' and they paid a consultant a lot of money to predict the effect of a carbon market," he said.

Peabody **signed an agreement** pledging to **properly disclose the climate risk** to its business.

Mr. Schneiderman has also been accused of **conspiring** with environmental groups, but he said, "People bring information to us all the time. If it's got merit to it, we follow up on it."

Groups like the Union of Concerned Scientists have investigated the fossil fuel industry for years, he said, and so "it would be malpractice for us not to meet with people like this."

The industry's tactics come "straight out of the tobacco playbook," he said. "It's delay, and sowing doubt."

Mr. Schneiderman has refused to comply with the congressman's subpoena, stressing the importance of federalism — normally an argument used by conservatives against federal overreach.

When asked for comment, Kristina Baum, a spokeswoman for the Science committee, said that Mr. Smith was unavailable.

---

© 2016 The New York Times Company

# Exhibit C

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

1285 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10019-6064

TELEPHONE (212) 373-3000

LLOYD K. GARRISON    (1946-1991)
RANDOLPH E. PAUL     (1946-1956)
SIMON H. RIFKIND     (1950-1995)
LOUIS S. WEISS       (1927-1950)
JOHN F. WHARTON      (1927-1977)

WRITER'S DIRECT DIAL NUMBER

212-373-3747

WRITER'S DIRECT FACSIMILE

212-492-0747

WRITER'S DIRECT E-MAIL ADDRESS

mhirshman@paulweiss.com

UNIT 3601, OFFICE TOWER A, BEIJING FORTUNE PLAZA
NO. 7 DONGSANHUAN ZHONGLU
CHAOYANG DISTRICT
BEIJING 100020
PEOPLE'S REPUBLIC OF CHINA
TELEPHONE (86-10) 5828-6300

12TH FLOOR, HONG KONG CLUB BUILDING
3A CHATER ROAD, CENTRAL
HONG KONG
TELEPHONE (852) 2846-0300

ALDER CASTLE
10 NOBLE STREET
LONDON EC2V 7JU, U.K.
TELEPHONE (44 20) 7367 1600

FUKOKU SEIMEI BUILDING
2-2 UCHISAIWAICHO 2-CHOME
CHIYODA-KU, TOKYO 100-0011, JAPAN
TELEPHONE (81-3) 3597-8101

TORONTO-DOMINION CENTRE
77 KING STREET WEST, SUITE 3100
P.O. BOX 226
TORONTO, ONTARIO M5K 1J3
TELEPHONE (416) 504-0520

2001 K STREET, NW
WASHINGTON, DC 20006-1047
TELEPHONE (202) 223-7300

500 DELAWARE AVENUE, SUITE 200
POST OFFICE BOX 32
WILMINGTON, DE 19899-0032
TELEPHONE (302) 655-4410

October 18, 2016

By NYSCEF

The Honorable Barry R. Ostrager
Supreme Court of the State of New York
Commercial Division
60 Centre Street, Room 629
New York, NY 10007

Re:  In the Matter of the Application of the People of the State of
New York, by Eric T. Schneiderman, Index No. 451962/2016.

Dear Justice Ostrager:

We represent Respondent Exxon Mobil Corporation ("ExxonMobil") in connection with the above referenced matter.  We write in response to the letter sent to your Honor last night by the Office of the Attorney General of the State of New York (the "Attorney General").  As an initial matter, we wish to reiterate that ExxonMobil does not object to this Court's consideration of the Attorney General's application regarding the applicability of the accountant-client privilege.[1]

As the Attorney General notes in its letter, ExxonMobil recently filed a motion to amend its complaint to add the Attorney General as a defendant in his official capacity in a pending action in the United States District Court for the Northern District of Texas.  Surprisingly, the Attorney General asserts that ExxonMobil's effort to protect

---

[1]  See Resp.'s Memo. of Law in Opp. 1, Oct. 17, 2016, NYSCEF No. 18.

**App. 010**

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

The Honorable Barry R. Ostrager                                                               2

its rights with respect to the Attorney General's investigation is somehow an effort to "evade" this Court's jurisdiction over the Parties' dispute over the applicability of the accountant-client privilege.  The Attorney General is attempting to conflate two entirely separate proceedings.  The Texas action concerns the propriety of the Attorney General's investigation and whether the Attorney General has violated ExxonMobil's rights under the United States Constitution.  The Attorney General's Application is narrowly focused on the applicability of the accountant-client privilege to documents sought by the Attorney General pursuant to a subpoena issued to ExxonMobil's auditor, PricewaterhouseCoopers LLP ("PwC").

In its letter, the Attorney General also claims that ExxonMobil's opposition to the Attorney General's Application for an Order to Show Cause is an "attempt[] to slow the pace of these proceedings" and "evade" this Court's jurisdiction. Far from it.  ExxonMobil welcomes the opportunity to have this Court rule on the Attorney General's challenge to the possible assertion of the accountant-client privilege, and certainly has not attempted to "evade" this Court's jurisdiction, despite the Attorney General's unsupported assertion to the contrary.  ExxonMobil simply requests that the Attorney General follow the proper procedure.  As explained in its Memorandum of Law in Opposition to the Attorney General's Application, ExxonMobil does "not object to this Court's treatment of the Attorney General's filing as if it were a notice of petition—as it should have been filed—and the subsequent setting of a briefing schedule convenient to the parties to address the merits of the Attorney General's claims."[2]

Respectfully,

/s/ Michele Hirshman

Michele Hirshman

cc:

| Katherine Milgram, Esq. | Jocelyn Strauber, Esq. |
| John Oleske, Esq. | Patrick Conlon, Esq. |
| Mandy DeRoche, Esq. | Theodore V. Wells, Jr., Esq. |
| Jonathan Zweig, Esq. | Michelle Parikh, Esq. |
| David Meister, Esq. | Abel McDonnell, Esq. |

---

[2]    *Id.*

# Exhibit D

| | |
|---|---|
| **From:** | Ahmed, Nora |
| **Sent:** | Monday, October 17, 2016 1:45 PM |
| **To:** | 'john.oleske@ag.ny.gov'; 'katherine.milgram@ag.ny.gov'; 'Mandy DeRoche (Mandy.DeRoche@ag.ny.gov)' |
| **Cc:** | patrick.j.conlon@exxonmobil.com; Wells Jr., Theodore V; Hirshman, Michele; Toal, Daniel J; Anderson, Justin |
| **Subject:** | ExxonMobil |
| **Attachments:** | Brief ISO Mot to Amend.pdf; Mot to Amend.pdf; Proposed Amended Complaint.pdf |

Counsel,

Please find attached papers that were filed today in the United States District Court for the Northern District of Texas.

**Nora Ahmed** | Associate
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas | New York, NY 10019-6064
(212) 373-3986 (Direct Phone) | (212) 492-0986 (Direct Fax)
nahmed@paulweiss.com | www.paulweiss.com

**App. 013**

# Exhibit E

10-K 1 xom10k2015.htm FORM 10-K

**2015**

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, D.C. 20549**

**FORM 10-K**

☑ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF**
**THE SECURITIES EXCHANGE ACT OF 1934**
For the fiscal year ended December 31, 2015

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF**
**THE SECURITIES EXCHANGE ACT OF 1934**
For the transition period from          to

Commission File Number 1-2256

# EXXON MOBIL CORPORATION
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **NEW JERSEY** | **13-5409005** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification Number) |

**5959 LAS COLINAS BOULEVARD, IRVING, TEXAS 75039-2298**
(Address of principal executive offices) (Zip Code)

**(972) 444-1000**
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| **Common Stock, without par value (4,152,756,609 shares outstanding at January 31, 2016)** | **New York Stock Exchange** |

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☑   No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.   Yes ☐   No ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☑   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes ☑   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☑

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer," and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☑          Accelerated filer ☐

Non-accelerated filer ☐          Smaller reporting company ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).   Yes ☐   No ☑

The aggregate market value of the voting stock held by non-affiliates of the registrant on June 30, 2015, the last business day of the registrant's most recently completed second fiscal quarter, based on the closing price on that date of $83.20 on the New York Stock Exchange composite tape, was in excess of $346 billion.

**Documents Incorporated by Reference:  Proxy Statement for the 2016 Annual Meeting of Shareholders (Part III)**

**App. 015**

**ITEM 2.     PROPERTIES**

**Information with regard to oil and gas producing activities follows:**

**1. Disclosure of Reserves**

**A. Summary of Oil and Gas Reserves at Year-End 2015**

The table below summarizes the oil-equivalent proved reserves in each geographic area and by product type for consolidated subsidiaries and equity companies. Gas is converted to an oil-equivalent basis at six million cubic feet per one thousand barrels. The Corporation has reported proved reserves on the basis of the average of the first-day-of-the-month price for each month during the last 12-month period. When crude oil and natural gas prices are in the range seen in early 2016 for an extended period of time, under the Securities and Exchange Commission's (SEC) definition of proved reserves, certain quantities of oil and natural gas could temporarily not qualify as proved reserves. Under the terms of certain contractual arrangements or government royalty regimes, lower prices can also increase proved reserves attributable to ExxonMobil. Otherwise, no major discovery or other favorable or adverse event has occurred since December 31, 2015, that would cause a significant change in the estimated proved reserves as of that date.

| | Crude Oil | Natural Gas Liquids | Bitumen | Synthetic Oil | Natural Gas | Oil-Equivalent Basis |
|---|---|---|---|---|---|---|
| | *(million bbls)* | *(million bbls)* | *(million bbls)* | *(million bbls)* | *(billion cubic ft)* | *(million bbls)* |
| **Proved Reserves** | | | | | | |
| **Developed** | | | | | | |
| **Consolidated Subsidiaries** | | | | | | |
| United States | 1,155 | 272 | - | - | 13,353 | 3,652 |
| Canada/South America *(1)* | 92 | 9 | 4,108 | 581 | 552 | 4,882 |
| Europe | 158 | 34 | - | - | 1,593 | 458 |
| Africa | 738 | 162 | - | - | 750 | 1,025 |
| Asia | 1,586 | 121 | - | - | 4,917 | 2,526 |
| Australia/Oceania | 73 | 34 | - | - | 1,962 | 434 |
| Total Consolidated | 3,802 | 632 | 4,108 | 581 | 23,127 | 12,977 |
| | | | | | | |
| **Equity Companies** | | | | | | |
| United States | 221 | 7 | - | - | 156 | 254 |
| Europe | 25 | - | - | - | 6,146 | 1,049 |
| Asia | 802 | 349 | - | - | 15,233 | 3,690 |
| Total Equity Company | 1,048 | 356 | - | - | 21,535 | 4,993 |
| Total Developed | 4,850 | 988 | 4,108 | 581 | 44,662 | 17,970 |
| | | | | | | |
| **Undeveloped** | | | | | | |
| **Consolidated Subsidiaries** | | | | | | |
| United States | 1,223 | 396 | - | - | 6,027 | 2,624 |
| Canada/South America *(1)* | 168 | 6 | 452 | - | 575 | 722 |
| Europe | 26 | 8 | - | - | 363 | 95 |
| Africa | 225 | 5 | - | - | 43 | 237 |
| Asia | 1,239 | - | - | - | 412 | 1,308 |
| Australia/Oceania | 52 | 31 | - | - | 5,079 | 929 |
| Total Consolidated | 2,933 | 446 | 452 | - | 12,499 | 5,915 |
| | | | | | | |
| **Equity Companies** | | | | | | |
| United States | 33 | 6 | - | - | 64 | 50 |
| Europe | - | - | - | - | 1,757 | 293 |
| Asia | 275 | 52 | - | - | 1,228 | 531 |
| Total Equity Company | 308 | 58 | - | - | 3,049 | 874 |
| Total Undeveloped | 3,241 | 504 | 452 | - | 15,548 | 6,789 |
| **Total Proved Reserves** | 8,091 | 1,492 | 4,560 | 581 | 60,210 | 24,759 |

*(1)   South America includes proved developed reserves of 0.1 million barrels of crude oil and natural gas liquids and 23 billion cubic feet of natural gas.*

5

**App. 016**

In the preceding reserves information, consolidated subsidiary and equity company reserves are reported separately. However, the Corporation operates its business with the same view of equity company reserves as it has for reserves from consolidated subsidiaries.

The Corporation anticipates several projects will come online over the next few years providing additional production capacity. However, actual volumes will vary from year to year due to the timing of individual project start-ups; operational outages; reservoir performance; performance of enhanced oil recovery projects; regulatory changes; the impact of fiscal and commercial terms; asset sales; weather events; price effects on production sharing contracts; changes in the amount and timing of capital investments that may vary depending on the oil and gas price environment; and other factors described in Item 1A. Risk Factors.

The estimation of proved reserves, which is based on the requirement of reasonable certainty, is an ongoing process based on rigorous technical evaluations, commercial and market assessments and detailed analysis of well and reservoir information such as flow rates and reservoir pressure declines. Furthermore, the Corporation only records proved reserves for projects which have received significant funding commitments by management made toward the development of the reserves. Although the Corporation is reasonably certain that proved reserves will be produced, the timing and amount recovered can be affected by a number of factors including completion of development projects, reservoir performance, regulatory approvals and significant changes in projections of long-term oil and natural gas price levels. In addition, proved reserves could be affected by an extended period of low prices which could reduce the level of the Corporation's capital spending and also impact our partners' capacity to fund their share of joint projects.

When crude oil and natural gas prices are in the range seen in late 2015 and early 2016 for an extended period of time, under the SEC definition of proved reserves, certain quantities of oil and natural gas, such as oil sands operations in Canada and natural gas operations in North America could temporarily not qualify as proved reserves. Amounts that could be required to be de-booked as proved reserves on an SEC basis are subject to being re-booked as proved reserves at some point in the future when price levels recover, costs decline, or operating efficiencies occur. Under the terms of certain contractual arrangements or government royalty regimes, lower prices can also increase proved reserves attributable to ExxonMobil. We do not expect any temporary changes in reported proved reserves under SEC definitions to affect the operation of the underlying projects or to alter our outlook for future production volumes.

**B. Technologies Used in Establishing Proved Reserves Additions in 2015**

Additions to ExxonMobil's proved reserves in 2015 were based on estimates generated through the integration of available and appropriate geological, engineering and production data, utilizing well-established technologies that have been demonstrated in the field to yield repeatable and consistent results.

Data used in these integrated assessments included information obtained directly from the subsurface via wellbores, such as well logs, reservoir core samples, fluid samples, static and dynamic pressure information, production test data, and surveillance and performance information. The data utilized also included subsurface information obtained through indirect measurements including high-quality 3-D and 4-D seismic data, calibrated with available well control information. The tools used to interpret the data included proprietary seismic processing software, proprietary reservoir modeling and simulation software, and commercially available data analysis packages.

In some circumstances, where appropriate analog reservoirs were available, reservoir parameters from these analogs were used to increase the quality of and confidence in the reserves estimates.

**C. Qualifications of Reserves Technical Oversight Group and Internal Controls over Proved Reserves**

ExxonMobil has a dedicated Global Reserves group that provides technical oversight and is separate from the operating organization. Primary responsibilities of this group include oversight of the reserves estimation process for compliance with Securities and Exchange Commission (SEC) rules and regulations, review of annual changes in reserves estimates, and the reporting of ExxonMobil's proved reserves. This group also maintains the official company reserves estimates for ExxonMobil's proved reserves of crude and natural gas liquids, bitumen, synthetic oil and natural gas. In addition, the group provides training to personnel involved in the reserves estimation and reporting process within ExxonMobil and its affiliates. The Manager of the Global Reserves group has more than 30 years of experience in reservoir engineering and reserves assessment and has a degree in Engineering. He is an active member of the Society of Petroleum Engineers (SPE) and previously served on the SPE Oil and Gas Reserves Committee. The group is staffed with individuals that have an average of more than 20 years of technical experience in the petroleum industry, including expertise in the classification and categorization of reserves under the SEC guidelines. This group includes individuals who hold advanced degrees in either Engineering or Geology. Several members of the group hold professional registrations in their field of expertise, and a member currently serves on the SPE Oil and Gas Reserves Committee.

6

**App. 017**

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

EXXON MOBIL CORPORATION

By: _____ /s/   REX W. TILLERSON
(Rex W. Tillerson,
Chairman of the Board)

Dated February 24, 2016

**POWER OF ATTORNEY**

Each person whose signature appears below constitutes and appoints Randall M. Ebner, Stephen A. Littleton and Jeffrey S. Lynn and each of them, his or her true and lawful attorneys-in-fact and agents, with full power of substitution and resubstitution, for him or her and in his or her name, place and stead, in any and all capacities, to sign any and all amendments to this Annual Report on Form 10-K, and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents, and each of them, full power and authority to do and perform each and every act and thing requisite and necessary to be done, as fully to all intents and purposes as he or she might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents or any of them, or their or his or her substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities indicated and on February 24, 2016.

| | |
|---|---|
| _____<br>/s/   REX W. TILLERSON<br>(Rex W. Tillerson) | Chairman of the Board<br>(Principal Executive Officer) |
| _____<br>/s/   MICHAEL J. BOSKIN<br>(Michael J. Boskin) | Director |
| _____<br>/s/   PETER BRABECK-LETMATHE<br>(Peter Brabeck-Letmathe) | Director |
| _____<br>/s/   URSULA M. BURNS<br>(Ursula M. Burns) | Director |
| _____<br>/s/   LARRY R. FAULKNER<br>(Larry R. Faulkner) | Director |

115

**App. 018**

| | |
|---|---|
| /s/   JAY S. FISHMAN | Director |
| (Jay S. Fishman) | |
| /s/   HENRIETTA H. FORE | Director |
| (Henrietta H. Fore) | |
| /s/   KENNETH C. FRAZIER | Director |
| (Kenneth C. Frazier) | |
| /s/   DOUGLAS R. OBERHELMAN | Director |
| (Douglas R. Oberhelman) | |
| /s/   SAMUEL J. PALMISANO | Director |
| (Samuel J. Palmisano) | |
| /s/   STEVEN S REINEMUND | Director |
| (Steven S Reinemund) | |
| /s/   WILLIAM C. WELDON | Director |
| (William C. Weldon) | |
| /s/   DARREN W. WOODS | Director |
| (Darren W. Woods) | |
| /s/   ANDREW P. SWIGER | Senior Vice President (Principal Financial Officer) |
| (Andrew P. Swiger) | |
| /s/   DAVID S. ROSENTHAL | Vice President and Controller (Principal Accounting Officer) |
| (David S. Rosenthal) | |

116

**App. 019**