IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| EXXON MOBIL CORPORATION, | § | |
| | § | |
| Plaintiff, | § | |
| v. | § | No. 4:16-CV-469-K |
| | § | |
| ERIC TRADD SCHNEIDERMAN, | § | |
| Attorney General of New York, in his | § | |
| official capacity, and MAURA TRACY | § | |
| HEALEY, Attorney General of | § | |
| Massachusetts, in her official capacity, | § | |
| | § | |
| Defendants. | § | |

**APPENDIX IN SUPPORT OF EXXON MOBIL CORPORATION'S
OPPOSITION TO MAURA TRACY HEALEY'S
MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

| Exhibit | Description | Page(s) |
|---|---|---|
| N/A | Declaration of Justin Anderson (Dec. 16, 2016) | iv – vi |
| A | Transcript of the AGs United for Clean Power Press Conference, held on March 29, 2016, which was prepared by counsel based on a video recording of the event.  The video recording is available at http://www.ag.ny.gov/press-release/ag-schneiderman-former-vice-president-al-gore-and-coalition-attorneys-general-across | MTD App. 1 – MTD App. 21 |
| B | Massachusetts Civil Investigative Demand | MTD App. 22 – MTD App. 51 |
| C | E-mail from Michael Meade, Director, Intergovernmental Affairs Bureau, Office of the New York Attorney General, to Scot Kline, Assistant Attorney General, Office of the Vermont Attorney General, and Wendy Morgan, Chief of Public Protection, Office of the Vermont Attorney General (Mar. 22, 2016, 4:51 PM) | MTD App. 52 – MTD App. 55 |
| D | Climate Change Coalition Common Interest Agreement | MTD App. 56 – MTD App. 75 |

| Exhibit | Description | Page(s) |
|---------|-------------|---------|
| E | Secretary of the Commonwealth of Massachusetts, *ExxonMobil's Massachusetts Registration Filing*, http://corp.sec.state.ma.us/CorpWeb/CorpSearch/CorpSummary.aspx?FEIN=135409005&SEARCH_TYPE=1 (last visited Dec. 15, 2016 7:46 PM) | MTD App. 76 – MTD App. 79 |
| F | Plea in Intervention of the States of Texas & Alabama, *Exxon Mobil Corp.* v. *Walker*, No. 017-284890-16 (Tex. Dist. Ct. May 16, 2016) | MTD App. 80 – MTD App. 87 |
| G | Memorandum of Exxon Mobil Corporation in Support of Its Emergency Motion to Set Aside or Modify the Civil Investigative Demand or Issue a Protective Order, *In re Civil Investigative Demand No. 2016-EPD-36, Issued by the Office of the Attorney General*, No. 16-1888F (Mass. Super. Ct. June 16, 2016) | MTD App. 88 – MTD App. 115 |
| H | Notice of Special Appearance on Behalf of Petitioner Exxon Mobil Corporation, *In re Civil Investigative Demand No. 2016-EPD-36, Issued by the Office of the Attorney General*, No. 16-1888F (Mass. Super. Ct. June 16, 2016) | MTD App. 116 – MTD App. 118 |
| I | The Commonwealth's Cross-Motion to Compel Exxon Mobil Corporation to Comply with Civil Investigative Demand No. 2016-EPD-36, *In re Civil Investigative Demand No. 2016-EPD-36, Issued by the Office of the Attorney General*, No. 16-1888F (Mass. Super. Ct. Aug. 8, 2016) | MTD App. 119 – MTD App. 123 |

Dated:  December 19, 2016

EXXON MOBIL CORPORATION
Patrick J. Conlon
(patrick.j.conlon@exxonmobil.com)
State Bar No. 24054300
(*pro hac vice*)
Daniel E. Bolia
(daniel.e.bolia@exxonmobil.com)
State Bar No. 24064919
1301 Fannin Street
Houston, TX 77002
(832) 624-6336

Theodore V. Wells, Jr.
(*pro hac vice*)
(twells@paulweiss.com)
Michele Hirshman
(*pro hac vice*)
(mhirshman@paulweiss.com)
Daniel J. Toal
(*pro hac vice*)
(dtoal@paulweiss.com)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY  10019-6064
(212) 373-3000
Fax: (212) 757-3990

Justin Anderson
(*pro hac vice*)
(janderson@paulweiss.com)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
2001 K Street, NW
Washington, D.C.  20006-1047
(202) 223-7300
Fax: (202) 223-7420

/s/ Ralph H. Duggins
Ralph H. Duggins
(rduggins@canteyhanger.com)
State Bar No. 06183700
Philip A. Vickers
(pvickers@canteyhanger.com)
State Bar No. 24051699
Alix D. Allison
(aallison@canteyhanger.com)
State Bar. No. 24086261
CANTEY HANGER LLP
600 West 6th Street, Suite 300
Fort Worth, TX 76102
(817) 877-2800
Fax: (817) 877-2807

Nina Cortell
(nina.cortell@haynesboone.com)
State Bar No. 04844500
HAYNES & BOONE, LLP
2323 Victory Avenue
Suite 700
Dallas, TX 75219
(214) 651-5579
Fax: (214) 200-0411

*Counsel for Exxon Mobil Corporation*

## <u>CERTIFICATE OF SERVICE</u>

      This is to certify that on this 19th day of December 2016, a true and correct copy of the foregoing document was filed electronically via the CM/ECF system, which gave notice to all counsel of record pursuant to Local Rule 5.1(d).

/s/ Ralph H. Duggins         
RALPH H. DUGGINS

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| EXXON MOBIL CORPORATION, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | No. 4:16-CV-469-K |
| | § | |
| ERIC TRADD SCHNEIDERMAN, | § | |
| Attorney General of New York, in his | § | |
| official capacity, and MAURA TRACY | § | |
| HEALEY, Attorney General of | § | |
| Massachusetts, in her official capacity, | § | |
| | § | |
| | § | |
| Defendants. | § | |

## DECLARATION OF JUSTIN ANDERSON

I, Justin Anderson, declare as follows:

1.      My name is Justin Anderson.  I have been admitted to practice law *pro hac vice* in the U.S. District Court for the Northern District of Texas and am an attorney with the law firm Paul, Weiss, Rifkind, Wharton & Garrison LLP, counsel of record for Exxon Mobil Corporation ("ExxonMobil") in this matter.  I am over 18 years of age and am fully competent in all respects to make this Declaration.  I have personal knowledge of the facts stated herein, based on my experience or my consultation with others, or they are known to me in my capacity as counsel for ExxonMobil, and each of them is true and correct.

2.      I submit this declaration in support of ExxonMobil's Opposition to Maura Tracy Healey's Motion to Dismiss the First Amended Complaint.

3.      Attached to this declaration as Exhibit A is a transcript of the AGs United for Clean Power Press Conference, held on March 29, 2016, which was prepared by

iv

counsel based on a video recording of the event.  The video recording is available at http://www.ag.ny.gov/press-release/ag-schneiderman-former-vice-president-al-gore-and-coalition-attorneys-general-across.

4.      Attached to this declaration as Exhibit B is a copy of the Civil Investigative Demand served on ExxonMobil by the Massachusetts Attorney General's Office.

5.      Attached to this declaration as Exhibit C is a copy of an e-mail chain, the last of which is from Michael Meade to Scot Kline and Wendy Morgan and is dated March 22, 2016, obtained from http://eelegal.org/wp-content/uploads/2016/04/Gore-is-adding-star-power-and-words-to-avoid.pdf.

6.      Attached to this declaration as Exhibit D is a copy of the Climate Change Coalition Common Interest Agreement, obtained from http://eelegal.org/wp-content/uploads/2016/08/Climate-Change-CIA.pdf.

7.      Attached to this declaration as Exhibit E is a copy of ExxonMobil's Business Entity Summary, obtained from the website of the Secretary of State of the Commonwealth of Massachusetts:  http://corp.sec.state.ma.us/CorpWeb/CorpSearch/CorpSummary.aspx?FEIN=135409005&SEARCH_TYPE=1.

8.      Attached to this declaration as Exhibit F is a copy of the Plea in Intervention of the State of Texas and Alabama in ExxonMobil's state court action against the Virgin Islands Attorney General Claude Walker, dated May 16, 2016 and obtained from https://www.texasattorneygeneral.gov/files/epress/files/2016/2016-05-16_exxon_states_intervention.pdf.

9.     Attached to this declaration as Exhibit G is a copy of ExxonMobil's memorandum in support of its Emergency Motion to Set Aside or Modify the Civil Investigative Demand or Issue a Protective Order in ExxonMobil's Massachusetts state court action against Massachusetts Attorney General Maura Tracy Healey, dated June 16, 2016.

10.     Attached to this declaration as Exhibit H is a copy of a Notice of Special Appearance on Behalf of ExxonMobil, filed by ExxonMobil's counsel in its Massachusetts state court action against Massachusetts Attorney General Maura Healey, dated June 16, 2016.

11.     Attached to this declaration as Exhibit I is a copy of the Commonwealth of Massachusetts's Cross-Motion to Compel ExxonMobil to Comply with Civil Investigative Demand No. 2016-EPD-36, dated August 8, 2016.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 16, 2016.

Justin Anderson
(janderson@paulweiss.com)
(*pro hac vice*)
Paul, Weiss, Rifkind, Wharton &
Garrison LLP
2001 K Street, NW
Washington DC 20006-1047
(202) 223-7321
Fax: (202) 204-7394

# EXHIBIT A

**MTD APP. 001**

**AG Schneiderman:** Thank you, good morning.  I'm New York's Attorney General, Eric Schneiderman.  I thank you for joining us here today for what we believe and hope will mark a significant milestone in our collective efforts to deal with the problem of climate change and put our heads together and put our offices together to try and take the most coordinated approach yet undertaken by states to deal with this most pressing issue of our time.  I want to thank my co-convener of the conference, Vermont Attorney General, William Sorrel, who has been helping in joining us here and been instrumental in making today's events possible, and my fellow attorneys general for making the trip to New York for this announcement.  Many of them had been working for years on different aspects of this problem to try and preserve our planet and reduce the carbon emissions that threaten all of the people we represent.  And I'm very proud to be here today with Attorney General George Jepsen of Connecticut, Attorney General Brian Frosh of Maryland, Attorney General Maura Healey of Massachusetts, Attorney General Mark Herring of Virginia, and Attorney General Claude Walker of the U.S. Virgin Islands.

We also have staff representing other attorneys general from across the country, including: Attorney General Kamala Harris of California, Matt Denn of Delaware, Karl Racine of the District of Columbia, Lisa Madigan of Illinois, Tom Miller of Iowa, Janet Mills of Maine, Lori Swanson of Minnesota, Hector Balderas of New Mexico, Ellen Rosenblum of Oregon, Peter Kilmartin of Rhode Island and Bob Ferguson of Washington.

And finally, I want to extend my sincere thanks to Vice President Al Gore for joining us.  It has been almost ten years since he galvanized the world's attention on climate change with his documentary *An Inconvenient Truth*.

And, I think it's fair to say that no one in American public life either during or beyond their time in elective office has done more to elevate the debate of our climate change or to expand global awareness about the urgency of the need for collective action on climate change than Vice President Gore.  So it's truly an honor to have you here with us today.

---

* The following transcript of the AGs United For Clean Power Press Conference, held on March 29, 2016, was prepared by counsel based on a video recording of the event, which is available at http://www.ag.ny.gov/press-release/ag-schneiderman-former-vice-president-al-gore-and-coalition-attorneys-general-across.

So we've gathered here today for a conference – the first of its kind conference of attorneys general dedicated to coming up with creative ways to enforce laws being flouted by the fossil fuel industry and their allies in their short-sighted efforts to put profits above the interests of the American people and the integrity of our financial markets. This conference reflects our commitment to work together in what is really an unprecedented multi-state effort in the area of climate change. Now, we have worked together on many matters before and I am pleased to announce that many of the folks represented here were on the Amicus Brief we submitted to the United States Supreme Court in the *Friedrichs* v. *California Teacher Association* case. We just got the ruling that there was a four-four split so that the American labor movement survives to fight another day. And thanks, thanks to all for that effort and collaboration. It shows what we can do if we work together. And today we are here spending a day to ensure that this most important issue facing all of us, the future of our planet, is addressed by a collective of states working as creatively, collaboratively and aggressively as possible.

The group here was really formed when some of us came together to defend the EPA's Clean Power Plan, the new rules on greenhouse gases. And today also marks the day that our coalition is filing our brief in the Court of Appeals for the District of Columbia. In that important matter we were defending the EPA's rules. There is a coalition of other states on the other side trying to strike down the rules, but the group that started out in that matter together was 18 states and the District of Columbia. We call ourselves The Green 19, but now that Attorney General Walker of the Virgin Islands has joined us our rhyme scheme is blown. We can't be called The Green 19, so now we're The Green 20. We'll come up with a better name at some point.

But, ladies and gentlemen, we are here for a very simple reason. We have heard the scientists. We know what's happening to the planet. There is no dispute but there is confusion, and confusion sowed by those with an interest in profiting from the confusion and creating misperceptions in the eyes of the American public that really need to be cleared up. The U.S. Defense Department, no radical agency, recently called climate change an urgent and growing threat to our national security. We know that last month, February, was the furthest above normal for any month in history since 1880 when they started keeping meteorological records. The

facts are evident.  This is not a problem ten years or twenty years in the future.  [There are] people in New York who saw what happened with the additional storm surge with Super Storm Sandy. We know the water level in New York Harbor is almost a foot higher than it was.   The New York State Department of Environmental Conservation, not some radical agency, predicts that if we continue at this pace, we'll have another 1.5 feet of water in New York Harbor.  It'll go up by that much in 2050.  So today, in the face of the gridlock in Washington, we are assembling a group of state actors to send the message that we are prepared to step into this breach.  And one thing we hope all reasonable people can agree on is that every fossil fuel company has a responsibility to be honest with its investors and with the public about the financial and market risks posed by climate change.   These are cornerstones of our securities and consumer protection laws.

My office reached a settlement last year based on the enforcement of New York securities laws with Peabody Energy.  And they agreed to rewrite their financials because they had been misleading investors and the public about the threat to their own business plan and about the fact that they had very detailed analysis telling them how the price of coal would be going down in the face of actions taken by governments around the world.  But they were hiding it from their investors.  So they agreed to revise all of their filings with the SEC.   And the same week we announced that, we announced that we had served a subpoena on ExxonMobil pursuing that and other theories relating to consumer and securities fraud.   So we know, because of what's already out there in the public, that there are companies using the best climate science. They are using the best climate models so that when they spend shareholder dollars to raise their oil rigs, which they are doing, they know how fast the sea level is rising.  Then they are drilling in places in the Arctic where they couldn't drill 20 years ago because of the ice sheets.  They know how fast the ice sheets are receding. And yet they have told the public for years that there were no "competent models," was the specific term used by an Exxon executive not so long ago, no competent models to project climate patterns, including those in the Arctic.   And we know that they paid millions of dollars to support organizations that put out propaganda denying that we can predict or measure the effects of fossil fuel on our climate, or even denying that climate change was happening.

There have been those who have raised the question:  aren't you interfering with people's First Amendment rights?   The First Amendment, ladies and gentlemen, does not give you the right to commit fraud.   And we are law enforcement officers, all of us do work, every attorney general does work on fraud cases.   And we are pursuing this as we would any other fraud matter.   You have to tell the truth.   You can't make misrepresentations of the kinds we've seen here.

And the scope of the problem we're facing, the size of the corporate entities and their alliances and trade associations and other groups is massive and it requires a multi-state effort.   So I am very honored that my colleagues are here today assembling with us.   We know that in Washington there are good people who want to do the right thing on climate change but everyone from President Obama on down is under a relentless assault from well-funded, highly aggressive and morally vacant forces that are trying to block every step by the federal government to take meaningful action.   So today, we're sending a message that, at least some of us – actually a lot of us – in state government are prepared to step into this battle with an unprecedented level of commitment and coordination.

And now I want to turn it over to my great colleague, the co-convener of this conference, Vermont Attorney General William Sorrel.

**AG Sorrel:**       I am pleased that the small state of Vermont joins with the big state of New York and are working together to make this gathering today a reality.   Truth is that states, large and small, have critical roles to play in addressing environmental quality issues.   General Schneiderman has mentioned our filing today in the D.C. Circuit on the Clean Power Plan case.   Going back some time, many of the states represented here joined with the federal government suing American Electric Power Company, the company operating several coal-fired electric plants in the Midwest and largely responsible for our acid rain and other air quality issues in the eastern part of the United States, ultimately resulting in what I believe to date is the largest settlement in an environmental case in our country's history.   With help from a number of these states, we successfully litigated Vermont's adoption of the so-called California standard for auto emissions in federal court in Vermont, now the standard in the country.   And right down to the present day, virtually all of the

states represented today are involved in looking at the alleged actions by Volkswagen and the issues relating to emissions from tens of thousands of their diesel automobiles.

But today we're talking about climate change which I don't think there's any doubt, at least in our ranks, is the environmental issue of our time. And in order for us to effectively address this issue, it's going to take literally millions of decisions and actions by countries, by states, by communities and by individuals. And, just very briefly, Vermont is stepping up and doing its part. Our legislature has set goals of 75% reduction – looking from a 1990 base line – a 75% reduction in greenhouse gas emissions by 2050. Similarly, our electric utilities have a goal of 75% use of renewable energy sources by 2032. So, we've been doing our part. Our presence here today is to pledge to continue to do our part. I'm mindful of the fact that I'm between you and the real rock star on this issue, and so I'm going to turn it back to General Schneiderman to introduce the next speaker.

**AG Schneiderman**: Thank you. Thank you. I'm not really a rock star.

[Laughter]

Thank you Bill. It's always a pleasure to have someone here from a state whose U.S. senator is from Brooklyn.

[Laughter]

And doing pretty well for himself. So, Vice President Gore has a very busy schedule. He has been traveling internationally, raising the alarm but also training climate change activists. He rearranged his schedule so he could be here with us to day to meet with my colleagues and I. And there is no one who has done more for this cause, and it is a great pleasure to have him standing shoulder to shoulder with us as we embark on this new round in what we hope will be the beginning of the end of our addiction to fossil fuel and our degradation of the planet. Vice President Al Gore.

**VP Gore**: Thank you very much, Eric. Thank you. Thank you very much.

[Applause]

Thank you very much, Attorney General Schneiderman. It really and truly is an honor for me to join you and your colleagues here,

Bill Sorrel of Vermont, Maura Healey of Massachusetts, Brian Frosh of Maryland, Mark Herring of Virginia, George Jepsen of Connecticut and Claude Walker from the U.S. Virgin Islands, and the ten (let's see 1, 2, 3, 4, 5) how many other – ten other states . . . eleven other state attorneys general offices that were represented in the meetings that took place earlier, prior to this press conference.

I really believe that years from now this convening by Attorney General Eric Schneiderman and his colleagues here today may well be looked back upon as a real turning point in the effort to hold to account those commercial interests that have been – according to the best available evidence – deceiving the American people, communicating in a fraudulent way, both about the reality of the climate crisis and the dangers it poses to all of us.  And committing fraud in their communications about the viability of renewable energy and efficiency and energy storage that together are posing this great competitive challenge to the long reliance on carbon-based fuels.  So, I congratulate you, Attorney General, and all of you, and to those attorneys general who were so impressively represented in the meetings here.  This is really, really important.

I am a fan of what President Obama has been doing, particularly in his second term on the climate crisis.   But it's important to recognize that in the federal system, the Congress has been sharply constraining the ability of the executive branch to fully perform its obligations under [the] Constitution to protect the American people against the kind of fraud that the evidence suggests is being committed by several of the fossil fuel companies, electric utilities, burning coal, and the like.  So what these attorneys general are doing is exceptionally important.  I remember very well – and I'm not going to dwell on this analogy – but I remember very well from my days in the House and Senate and the White House the long struggle against the fraudulent activities of the tobacco companies trying to keep Americans addicted to the deadly habit of smoking cigarettes and committing fraud to try to constantly hook each new generation of children to replenish their stock of customers who were dying off from smoking-related diseases. And it was a combined effort of the executive branch, and I'm proud that the Clinton-Gore administration played a role in that, but it was a combined effort in which the state attorneys general played the crucial role in securing an historic victory for public health.  From the time the tobacco companies were first found out, as evidenced by the historic attorney generals' report of 1964, it

took 40 years for them to be held to account under the law.  We do not have 40 years to continue suffering the consequences of the fraud allegedly being committed by the fossil fuel companies where climate change is concerned.

In brief, there are only three questions left to be answered about the climate crisis.  The first one is: Must we change, do we really have to change?  We rely on fossil fuels for more than 80% of all the energy our world uses.  In burning it we've reduced poverty and raised standards of living and built this elaborate global civilization, and it looks like it'll be hard to change.  So naturally, people wonder:  Do we really have to change?  The scientific community has been all but unanimous for a long time now.  But now mother nature and the laws of physics – harder to ignore than scientists – are making it abundantly clear that we have to change.  We're putting 110 million tons of man-made heat trapping global warming pollution into the thin shell of atmosphere surrounding our planet every day, as if it's an open sewer.  And the cumulative amount of that man-made global warming pollution now traps as much extra heat energy in the earth's system as would be released by 400,000 Hiroshima-class atomic bombs exploding every 24 hours on the surface of our planet.

It's a big planet, but that's a lot of energy.  And it is the reason why temperatures are breaking records almost every year now.  2015 was the hottest year measured since instruments had been used to measure temperature.  2014 was the second hottest.  14 of the 15 hottest have been in the last 15 years.  As the Attorney General mentioned, February continues the trend by breaking all previous records – the hottest in 1,632 months ever measured.  Last December 29th, the same unnatural global warming fuel storm system that created record floods in the Midwest went on up to the Arctic and on December 29th, smack in the middle of the polar winter night at the North Pole, temperatures were driven up 50 degrees above the freezing point.  So the North Pole started thawing in the middle of the winter night.  Yesterday the announcement came that it's the smallest winter extent of ice ever measured in the Arctic.

Ninety-three percent of the extra heat goes into the oceans of the world, and that has consequences.  When Super Storm Sandy headed across the Atlantic toward this city, it crossed areas of the Atlantic that were nine degrees Fahrenheit warmer than normal

and that's what made that storm so devastating. The sea level had already come up because of the ice melting, principally off Greenland and Antarctica. And as the Attorney General mentioned, that's a process now accelerating. But these ocean-based storms are breaking records now. I just came from the Philippines where Super Typhoon Haiyon created 4 million homeless people when it crossed much warmer waters of the Pacific. By the way, it was a long plane flight to get here and I happened to get, just before we took off, the 200-page brief that you all filed in support of the Clean Power Plan. Really excellent work. Footnotes took up a lot of those 200 pages so I'm not claiming to [have] read all 200 of them.

The same extra heat in the oceans is disrupting the water cycle. We all learned in school that the water vapor comes off the oceans and falls as rain or snow over the land and then rushes back to the ocean. That natural life-giving process is being massively disrupted because the warmer oceans put a lot more water vapor up there. And when storm conditions present themselves they, these storms will reach out thousands of kilometers to funnel all that extra humidity and water vapor into these massive record-breaking downpours. And occasionally it creates a snowpocalypse or snowmaggedon but most often, record-breaking floods. We've had seven once-in-a-thousand-year floods in the last ten years in the U.S. Just last week in Louisiana and Arkansas, two feet of rain in four days coming again with what they call the Maya Express off the oceans. And the same extra heat that's creating these record-breaking floods also pull the soil moisture out of the land and create these longer and deeper droughts all around the world on every continent.

Every night on the news now it's like a nature hike through the Book of Revelation. And we're seeing tropical diseases moving to higher latitudes – the Zika virus. Of course the transportation revolution has a lot to do with the spread of Zika and Dengue Fever and Chikungunya and diseases I've never heard of when I was growing up and maybe, probably most of you never did either. But now, they're moving and taking root in the United States. Puerto Rico is part of the United States, by the way – not a state, but part of our nation. Fifty percent of the people in Puerto Rico are estimated to get the Zika virus this year. By next year, eighty percent. When people who are part of the U.S. territory, when women are advised not to get pregnant, that's something new that

ought to capture our attention.  And in large areas of Central America and South America, women are advised now not to get pregnant for two years until they try to get this brand new viral disease under control.

The list of the consequences continues, and I'm not going to go through it all, but the answer to that first question:  "Do we have to change?" is clearly now to any reasonable thinking person:  "yes, we have to change."  Now the second question is:  "Can we change?"  And for quite a few years, I will confess to you that, when I answered that question yes, it was based on the projections of scientists and technologists who said, just wait.  We're seeing these exponential curves just begin, solar is going to win, wind power is going to get way cheaper, batteries are going to have their day, we're going to see much better efficiency.  Well now we're seeing these exponential curves really shoot up dramatically.  Almost 75% of all the new investment in the U.S. in new generating capacity last year was in solar and wind – more than half worldwide.  We're seeing coal companies go bankrupt on a regular basis now.  Australia is the biggest coal exporter in the world.  They've just, just the analysis there, they're not going to build any more coal plants because solar and wind are so cheap.  And we're seeing this happen all around the world.  But, there is an effort in the U.S. to slow this down and to bring it to a halt because part of the group that, again according to the best available evidence, has been committing fraud in trying to convince people that the climate crisis is not real, are now trying to convince people that renewable energy is not a viable option.  And, worse than that, they're using their combined political and lobbying efforts to put taxes on solar panels and jigger with the laws to require that installers have to know the serial number of every single part that they're using to put on a rooftop of somebody's house, and a whole series of other phony requirements, unneeded requirements, that are simply for the purpose of trying to slow down this renewable revolution.  In the opinion of many who have looked at this pattern of misbehavior and what certainly looks like fraud, they are violating the law.  If the Congress would actually work – our democracy's been hacked, and that's another story, not the subject of this press conference – but if the Congress really would allow the executive branch of the federal government to work, then maybe this would be taken care of at the federal level.  But these brave men and women, who are the attorneys general of the states represented in this historic coalition, are doing their job and – just

as many of them did in the tobacco example – they are now giving us real hope that the answer to that third question: "Will we change?" is going to be "yes." Because those who are using unfair and illegal means to try to prevent the change are likely now, finally, at long last, to be held to account. And that will remove the last barriers to allow the American people to move forward and to redeem the promise of our president and our country in the historic meeting in Paris last December where the United States led the global coalition to form the first global agreement that is truly comprehensive. If the United States were to falter and stop leading the way, then there would be no other leader for the global effort to solve this crisis. By taking the action these attorneys general are taking today, it is the best, most hopeful step I can remember in a long time – that we will make the changes that are necessary.

So, I'll conclude my part in this by, once again, saying congratulations to these public servants for the historic step they are taking today. And on behalf of many people, who I think would say it's alright for me to speak for them, I'd like to say thank you.

**AG Schneiderman**:   Thank you very much, and now my other colleagues are going to say a few words. For whatever reason, I've gotten into the habit, since we always seem to do this, we do this in alphabetical order by state, which I learned when I first became an AG but I guess we'll stick with it. Connecticut Attorney General George Jepsen who was our partner in the *Friedrichs* case and stood with me when we announced that we were filing in that case. We've done a lot of good work together. Attorney General Jepsen.

**AG Jepsen:**   I'd like to thank Eric and Bill for their leadership on this important issue and in convening this conference and to recognize the man who has done more to make global warming an international issue than anybody on the entire planet – Vice President Al Gore. In the backdrop, in the backdrop of a very dysfunctional Congress, state attorneys general, frequently on a bipartisan, basis have shown that we can stand up and take action where others have not. The Vice President referenced the tobacco litigation, which was before my time but hugely important in setting the tone and the structures by which we do work together. Since becoming attorney general in 2011, we've taken on the big banks and their mortgage servicing issues, a $25 billion settlement. We've taken on Wall Street's Standard & Poor's for mislabeling mortgage-backed securities – as

a 20-state coalition – mislabeling mortgage-backed securities as AAA when in fact they were junk. Working together on data privacy issues, and now it's time that we stand up once again and take on what is the most important issue of our generation. We owe it to our children, our children's children, to step up and do the right thing, to work together and I'm committed to it. Thank you.

**AG Schneiderman**: Thank you. And now a relatively new colleague but someone who has brought incredible energy to this fight and who we look forward to working with on this and other matters for a long time to come. Maryland Attorney General Brian Frosh.

**AG Frosh**: Well, first thank you again to General Schneiderman and General Sorrel for putting together this group and it's an honor to be with you, Mr. Vice President. Thank you so much for your leadership. I'm afraid we may have reached that point in the press conference where everything that needs to be said has been said, but everyone who needs to say it hasn't said it yet.

[Laughter]

So, I will try to be brief. Climate change is an existential threat to everybody on the planet. Maryland is exceptionally vulnerable to it. The Chesapeake Bay bisects our state. It defines us geographically, culturally, historically. We have as much tidal shoreline as states as large as California. We have islands in the Chesapeake Bay that are disappearing. We have our capital, Annapolis, which is also the nuisance flood capital of the United States. It's under water way, way, way too often. It's extraordinarily important that we address the problem of climate change. I'm grateful to General Sorrel and General Schneiderman for putting together this coalition of the willing. I'm proud to be a part of it in addressing and supporting the President's Clean Power Plan. What we want from ExxonMobil and Peabody and ALEC is very simple. We want them to tell the truth. We want them to tell the truth so that we can get down to the business of stopping climate change and of healing the world. I think that as attorneys general, as the Vice President said, we have a unique ability to help bring that about and I'm very glad to be part of it.

**AG Schneiderman**: Thank you. And, another great colleague, who has done extraordinary work before and since becoming attorney general working with our office on incredibly important civil rights issues,

financial fraud issues, Massachusetts Attorney General Maura Healey.

**AG Healey:** Thank you very much General Schneiderman. Thank you General Schneiderman and General Sorrel for your leadership on this issue. It's an honor for me to be able to stand here today with you, with our colleagues and certainly with the Vice President who, today, I think, put most eloquently just how important this is, this commitment that we make. Thank you for your leadership. Thank you for your continuing education. Thank you for your inspiration and your affirmation.

You know, as attorneys general, we have a lot on our plates: addressing the epidemics of opiate abuse, gun violence, protecting the economic security and well-being of families across this country; all of these issues are so important. But make no mistake about it, in my view, there's nothing we need to worry about more than climate change. It's incredibly serious when you think about the human and the economic consequences and indeed the fact that this threatens the very existence of our planet. Nothing is more important. Not only must we act, we have a moral obligation to act. That is why we are here today.

The science – we do believe in science; we're lawyers, we believe in facts, we believe in information, and as was said, this is about facts and information and transparency. We know from the science and we know from experience the very real consequences of our failure to address this issue. Climate change is and has been for many years a matter of extreme urgency, but, unfortunately, it is only recently that this problem has begun to be met with equally urgent action. Part of the problem has been one of public perception, and it appears, certainly, that certain companies, certain industries, may not have told the whole story, leading many to doubt whether climate change is real and to misunderstand and misapprehend the catastrophic nature of its impacts. Fossil fuel companies that deceived investors and consumers about the dangers of climate change should be, must be, held accountable. That's why I, too, have joined in investigating the practices of ExxonMobil. We can all see today the troubling disconnect between what Exxon knew, what industry folks knew, and what the company and industry chose to share with investors and with the American public.

We are here before you, all committed to combating climate change and to holding accountable those who have misled the public. The states represented here today have long been working hard to sound the alarm, to put smart policies in place, to speed our transition to a clean energy future, and to stop power plants from emitting millions of tons of dangerous global warming pollution into our air. I will tell you, in Massachusetts that's been a very good thing. Our economy has grown while we've reduced greenhouse gas emissions and boosted clean power and efficiency. We're home to a state with an $11 billion clean energy industry that employs nearly 100,000 people. Last year clean energy accounted for 15% of New England's power production. Our energy efficiency programs have delivered $12.5 billion in benefits since 2008 and are expected to provide another $8 billion over the next three years. For the past five years, Massachusetts has also been ranked number one in the country for energy efficiency. So we know what's possible. We know what progress looks like. But none of us can do it alone. That's why we're here today. We have much work to do, but when we act and we act together, we know we can accomplish much. By quick, aggressive action, educating the public, holding accountable those who have needed to be held accountable for far too long, I know we will do what we need to do to address climate change and to work for a better future. So, I thank AG Schneiderman for gathering us here today and for my fellow attorneys general in their continued effort in this important fight. Thank you.

**AG Schneiderman**:    Thank you. And now another great colleague who speaks as eloquently as anyone I've heard about what's happening to his state, and a true hero of standing up in a place where maybe it's not quite as politically easy as it is to do it in Manhattan but someone who is a true aggressive progressive and a great attorney general, Mark Herring from Virginia.

**AG Herring**:    Thank you, Eric. Good afternoon. In Virginia, climate change isn't some theoretical issue. It's real and we are already dealing with its consequences. Hampton Roads, which is a coastal region in Virginia, is our second most populated region, our second biggest economy and the country's second most vulnerable area as sea levels rise. The area has the tenth most valuable assets in the world threatened by sea level rise. In the last 85 years the relative sea level in Hampton Roads has risen 14 inches – that's well over a foot – in just the last century.

Some projections say that we can expect an additional two to five feet of relative sea level rise by the end of this century – and that would literally change the face of our state.  It would cripple our economy and it could threaten our national security as Norfolk Naval, the world's largest naval base, is impacted.  Nuisance flooding that has increased in frequency will become the norm. They call it blue sky flooding.  Storm surges from tropical systems will threaten more homes, businesses and residents.  And even away from the coast, Virginians are expected to feel the impact of climate change as severe weather becomes more dangerous and frequent.  Just a few weeks ago, we had a highly unusual February outbreak of tornadoes in the Commonwealth that was very damaging and unfortunately deadly.

Farming and forestry is our number one industry in Virginia.  It's a $70 billion industry in Virginia that supports around 400,000 jobs and it's going to get more difficult and expensive.  And, the Commonwealth of Virginia local governments and the navy are already spending millions to build more resilient infrastructure, with millions and millions more on the horizon.  To replace just one pier at Norfolk Naval is about $35 to $40 million, and there are 14 piers, so that would be around a half billion right there.

As a Commonwealth and a nation, we can't put our heads in the sand.  We must act and that is what today is about.  I am proud to have Virginia included in this first of its kind coalition which recognizes the reality and the pressing threat of man-made climate change and sea level rise.  This group is already standing together to defend the Clean Power Plan – an ambitious and achievable plan – to enjoy the health, economic and environmental benefits of cleaner air and cleaner energy.  But there may be other opportunities and that's why I have come all the way from Virginia.   I am looking forward to exploring ideas and opportunities, to partner and collaborate, if there are enforcement actions we need to be taking, if there are legal cases we need to be involved in, if there are statutory or regulatory barriers to growing our clean energy sectors and, ultimately, I want to work together with my colleagues here and back in Virginia to help combat climate change and to shape a more sustainable future.

And for any folks who would say the climate change is some sort of made-up global conspiracy, that we're wasting our time, then

come to Hampton Roads.  Come to Norfolk and take a look for yourselves.  Mayor Fraim would love to have you.

**AG Schneiderman**:   Thank you.   And our closer, another great colleague who has traveled far but comes with tremendous energy to this cause and is an inspiration to us all, U.S. Virgin Islands Attorney General Claude Walker.

**AG Walker**:   Thank you.   Thank you, General Schneiderman, Vice President Gore.  One of my heroes, I must say.  Thank you.  I've come far to New York to be a part of this because in the Virgin Islands and Puerto Rico, we experience the effects of global warming.  We see an increase in coral bleaching, we have seaweeds, proliferation of seaweeds in the water, all due to global warming.   We have tourism as our main industry, and one of the concerns that we have is that tourists will begin to see this as an issue and not visit our shores.   But also, residents of the Virgin Islands are starting to make decisions about whether to live in the Virgin Islands – people who have lived there for generations, their families have lived there for generations.   We have a hurricane season that starts in June and it goes until November.  And it's incredibly destructive to have to go through hurricanes, tropical storms annually.  So people make a decision:  Do I want to put up with this, with the power lines coming down, buildings being toppled, having to rebuild annually?   The strengths of the storms have increased over the years.   Tropical storms now transform into hurricanes.   When initially they were viewed as tropical storms but as they get close to the land, the strength increases.  So we're starting to see people make decisions about whether to stay in a particular place, whether to move to higher ground – which is what some have said – as you experience flooding, as you experience these strong storms.  So we have a strong stake in this, in making sure that we address this issue.

We have launched an investigation into a company that we believe must provide us with information about what they knew about climate change and when they knew it.   And we'll make our decision about what action to take.   But, to us, it's not an environmental issue as much as it is about survival, as Vice President Gore has stated.  We try as attorneys general to build a community, a safe community for all.  But what good is that if annually everything is destroyed and people begin to say:  Why am I living here?

So we're here today to support this cause and we'll continue.  It could be David and Goliath, the Virgin Islands against a huge corporation, but we will not stop until we get to the bottom of this and make it clear to our residents as well as the American people that we have to do something transformational.   We cannot continue to rely on fossil fuel.  Vice President Gore has made that clear.   We have to look at renewable energy.   That's the only solution.   And it's troubling that as the polar caps melt, you have companies that are looking at that as an opportunity to go and drill, to go and get more oil.   Why?  How selfish can you be?  Your product is destroying this earth and your strategy is, let's get to the polar caps first so we can get more oil to do what?  To destroy the planet further?   And we have documents showing that.  So this is very troubling to us and we will continue our fight. Thank you.

**AG Schneiderman**:     Thank you and Eric.  And I do want to note, scripture reports David was not alone in fact, Brother Walker.  Eric and Matt will take on-topic questions.

**Moderator**:     Please just say your name and publication.

**Press Person**:     John [inaudible] with *The New York Times*.  I count two people who have actually said that they're launching new investigations.  I'm wondering if we could go through the list and see who's actually in and who is not in yet.

**AG Schneiderman**:     Well, I know that prior to today, it was, and not every investigation gets announced at the outset as you know, but it had already been announced that New York and California had begun investigations with those stories.  I think Maura just indicated a Massachusetts investigation and the Virgin Islands has, and we're meeting with our colleagues to go over a variety of things.  And the meeting goes on into the afternoon.  So, I am not sure exactly where everyone is.   Different states have – it's very important to understand – different states have different statutes, different jurisdictions.  Some can proceed under consumer protection law, some securities fraud laws, there are other issues related to defending taxpayers and pension funds.  So there are a variety of theories that we're talking about and collaborating and to the degree to which we can cooperate, we share a common interest, and we will.  But, one problem for journalists with investigations is, part of doing an investigation is you usually don't talk a lot about what you're doing after you start it or even as you're preparing to start it.

**Press Person**:     Shawn McCoy with *Inside Sources*.  A *Bloomberg Review* editorial noted that the Exxon investigation is preposterous and a dangerous affirmation of power.   *The New York Times* has pointed out that Exxon has published research that lines up with mainstream climatology and therefore there's not a comparison to Big Tobacco.   So is this a publicity stunt?   Is the investigation a publicity stunt?

**AG Schneiderman**:     No.  It's certainly not a publicity stunt.  I think the charges that have been thrown around – look, we know for many decades that there has been an effort to influence reporting in the media and public perception about this.   It should come as no surprise to anyone that that effort will only accelerate and become more aggressive as public opinion shifts further in the direction of people understanding the imminent threat of climate change and other government actors, like the folks represented here step up to the challenge.  The specific reaction to our particular subpoena was that the public reports that had come out, Exxon said were cherry picked documents and took things out of context.  We believe they should welcome our investigation because, unlike journalists, we will get every document and we will be able to put them in context.  So I'm sure that they'll be pleased that we're going to get everything out there and see what they knew, when they knew it, what they said and what they might have said.

**Press Person**:     David [inaudible] with *The Nation*.  Question for General Schneiderman.  What do you hope to accomplish with your Exxon investigation?   I'm thinking with reference to Peabody where really there was some disclosure requirements but it didn't do a great deal of [inaudible].  Is there a higher bar for Exxon?  What are the milestones that you hope to achieve after that investigation?

**AG Schneiderman**:     It's too early to say.  We started the investigation.  We received a lot of documents already.  We're reviewing them.  We're not pre-judging anything, but the situation with oil companies and coal companies is somewhat different because the coal companies right now are, the market is already judging the coal industry very harshly.  Coal companies, including Peabody, are teetering on the brink.  The evidence that we advanced and what was specifically disclosed about Peabody were pretty clear cut examples of misrepresentations made in violation with the Securities and Exchange Commission, made to investors.  It's too early to say what we're going to find with Exxon but we intend to work as

aggressively as possible, but also as carefully as possible. We're very aware of the fact that everything we do here is going to be subject to attack by folks who have a huge financial interest in discrediting us. So we're going to be aggressive and creative but we are also going to be as careful and meticulous and deliberate as we can.

**VP Gore:**  Could I respond to the last couple of questions just briefly. And in doing so, I'd like to give credit to the journalistic community and single out the Pulitzer Prize winning team at *InsideClimate News*, also the *Los Angeles Times* and the student-led project at Columbia School of Journalism under Steve Coll. And the facts that were publicly presented during, in those series of articles that I have mentioned, are extremely troubling, and where Exxon Mobil in particular is concerned. The evidence appears to indicate that, going back decades, the company had information that it used for the charting of its plan to explore and drill in the Arctic, used for other business purposes information that largely was consistent with what the mainstream scientific community had collected and analyzed. And yes, for a brief period of time, it did publish some of the science it collected, but then a change came, according to these investigations. And they began to make public statements that were directly contrary to what their own scientists were telling them. Secondly, where the analogy to the tobacco industry is concerned, they began giving grants – according to the evidence collected – to groups that specialize in climate denial, groups that put out information purposely designed to confuse the public into believing that the climate crisis was not real. And according to what I've heard from the preliminary inquiries that some of these attorneys general have made, the same may be true of information that they have put out concerning the viability of competitors in the renewable energy space. So, I do think the analogy may well hold up rather precisely to the tobacco industry. Indeed, the evidence indicates that, that I've seen and that these journalists have collected, including the distinguished historian of science at Harvard, Naomi Oreskes wrote the book *The Merchants of Doubt* with her co-author, that they hired several of the very same public relations agents that had perfected this fraudulent and deceitful craft working for the tobacco companies. And so as someone who has followed the legislative, the journalistic work very carefully, I think the analogy does hold up.

**Press Person**:  [inaudible] with *InsideClimate News*.  Along the lines of talking about that analogy:  from a legal framework, can you talk about a comparison, similarities and differences between this potential case and that of Big Tobacco?

**AG Schneiderman**:  Well, again, we're at the early stages of the case.  We are not pre-judging the evidence.  We've seen some things that have been published by you and others, but it is our obligation to take a look at the underlying documentation and to get at all the evidence, and we do that in the context of an investigation where we will not be talking about every document we uncover.  It's going to take some time, but that's another reason why working together collectively is so important.  And we are here today because we are all committed to pursuing what you might call an all-levers approach.  Every state has different laws, different statutes, different ways of going about this.  The bottom line is simple.  Climate change is real, it is a threat to all the people we represent.  If there are companies, whether they are utilities or they are fossil fuel companies, committing fraud in an effort to maximize their short-term profits at the expense of the people we represent, we want to find out about it.  We want to expose it, and we want to pursue them to the fullest extent of the law.

**Moderator**:  Last one.

**Press Person**:  Storms, floods will arise they are all going to continue to destroy property and the taxpayers . . .

**Moderator**:  What's your name and . . .

**Press Person**:  Oh, sorry.  Matthew Horowitz from *Vice*.  Taxpayers are going to have to pay for these damages from our national flood insurance claims.  So if fossil fuel companies are proven to have committed fraud, will they be held financially responsible for any sorts of damages?

**AG Schneiderman**:  Again, it's early to say but certainly financial damages are one important aspect of this but, and it is tremendously important and taxpayers – it's been discussed by my colleagues – we're already paying billions and billions of dollars to deal with the consequences of climate change and that will be one aspect of – early foreseeing, it's far too early to say.  But, this is not a situation where financial damages alone can deal with the problem.  We have to change conduct, and as the Vice President indicated, other

places in the world are moving more rapidly towards renewables. There is an effort to slow that process down in the United States. We have to get back on that path if we're going to save the planet and that's ultimately what we're here for.

**Moderator**:        We're out of time, unfortunately.  Thank you all for coming.

# EXHIBIT B

**MTD APP. 022**



# THE COMMONWEALTH OF MASSACHUSETTS
## OFFICE OF THE ATTORNEY GENERAL
### ONE ASHBURTON PLACE
### BOSTON, MASSACHUSETTS 02108

**MAURA HEALEY**
**ATTORNEY GENERAL**

TEL: (617) 727-2200
www.mass.gov/ago

### CIVIL INVESTIGATIVE DEMAND

*BY HAND DELIVERY*

Demand No.: 2016-EPD-36

Date Issued: April 19, 2016

Issued To: Exxon Mobil Corporation
c/o Corporation Service Company, its Registered Agent
84 State Street
Boston, Massachusetts 02109

This Civil Investigative Demand ("CID") is issued to Exxon Mobil Corporation ("Exxon" or "You") pursuant to Massachusetts General Laws c. 93A, § 6, as part of a pending investigation concerning potential violations of M.G.L. c. 93A, § 2, and the regulations promulgated thereunder arising both from (1) the marketing and/or sale of energy and other fossil fuel derived products to consumers in the Commonwealth of Massachusetts (the "Commonwealth"); and (2) the marketing and/or sale of securities, as defined in M.G.L. c. 110A, § 401(k), to investors in the Commonwealth, including, without limitation, fixed- and floating rate-notes, bonds, and common stock, sold or offered to be sold in the Commonwealth.

This CID requires You to produce the documents identified in Schedule A below, pursuant to M.G.L. c. 93A, § 6(1). The Documents identified in Schedule A must be produced by May 19, 2016, by delivering them to:

> I. Andrew Goldberg
> Assistant Attorney General
> Office of the Attorney General
> One Ashburton Place
> Boston, MA 02108

The documents shall be accompanied by an affidavit in the form attached hereto. AAG Goldberg and such other employees, agents, consultants, and experts of the Office of the Attorney General as needed in its discretion, shall review Your affidavit and the documents produced in conjunction with our investigation.

MTD APP. 023

Demand No.: 2016-EPD-36
Date Issued: April 19, 2016
Issued To: Exxon Mobil Corporation

This CID also requires You to appear and give testimony under oath through Your authorized custodian of records that the documents You produce in response to this CID represent all of the documents called for in this CID; that You have not withheld any documents responsive to this CID; and that all of the documents You produce were records made in good faith and kept in the regular course of Your business, and it was the regular course of Your business to make and keep such records. This testimony will be taken on June 10, 2016, beginning at 9:30 a.m. at the Boston Office of the Attorney General, 100 Cambridge Street, 10th Floor, Boston, Massachusetts. The testimony will be taken by AAG Goldberg or an appropriate designee, before an officer duly authorized to administer oaths by the law of the Commonwealth, and shall proceed, day to day, until the taking of testimony is completed. The witness has the right to be accompanied by an attorney. Rule 30(c) of the Massachusetts Rules of Civil Procedure shall apply. Your attendance and testimony are necessary to conduct this investigation.

This CID also requires You to appear and give testimony under oath through one or more of Your officers, directors or managing agents, or other persons most knowledgeable concerning the subject matter areas enumerated in Schedule B, below. This testimony will be taken on June 24, 2016, beginning at 9:30 a.m. at the Boston Office of the Attorney General, 100 Cambridge Street, 10th Floor, Boston, Massachusetts. The testimony will be taken by AAG Goldberg or an appropriate designee, before an officer duly authorized to administer oaths by the law of the Commonwealth, and shall proceed, day to day, until the taking of testimony is completed. The witness has the right to be accompanied by an attorney. Rule 30(c) of the Massachusetts Rules of Civil Procedure shall apply. Your attendance and testimony are necessary to conduct this investigation.

Under G.L. c. 93A, § 6(7), You may make a motion prior to the production date specified in this notice, or within twenty-one days after this notice has been served, whichever period is shorter, in the appropriate court of law to modify or set aside this CID for good cause shown.

If the production of the documents required by this CID would be, in whole or in part, unduly burdensome, or if You require clarification of any request, please contact AAG Goldberg promptly at the phone number below.

Finally, please note that under G.L. c. 93A, §7, obstruction of this investigation, including the alteration or destruction of any responsive document after receipt of

MTD APP. 024

Demand No.: 2016-EPD-36
Date Issued: April 19, 2016
Issued To: Exxon Mobil Corporation

this CID, is subject to a fine of up to five thousand dollars ($5,000.00). A copy of that provision is reprinted at Schedule C.

Issued at Boston, Massachusetts, this 19th day of April, 2016.

COMMONWEALTH OF
MASSACHUSETTS

MAURA HEALEY
ATTORNEY GENERAL

By:

I. Andrew Goldberg
Assistant Attorney General
Office of the Attorney General
One Ashburton Place
Boston, MA 02108
Tel. (617) 727-2200

MTD APP. 025

Demand No.: 2016-EPD-36
Date Issued: April 19, 2016
Issued To: Exxon Mobil Corporation

## **SCHEDULE A**

### **A. General Definitions and Rules of Construction**

1. "Advertisement" means a commercial message made orally or in any newspaper, magazine, leaflet, flyer, or catalog; on radio, television, or public address system; electronically, including by email, social media, and blog post; or made in person, in direct mail literature or other printed material, or on any interior or exterior sign or display, in any window display, in any point of transaction literature, but not including on any product label, which is delivered or made available to a customer or prospective customer in any manner whatsoever.

2. "All" means each and every.

3. "Any" means any and all.

4. "And" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the CID all information or Documents that might otherwise be construed to be outside of its scope.

5. "Communication" means any conversation, discussion, letter, email, memorandum, meeting, note or other transmittal of information or message, whether transmitted in writing, orally, electronically or by any other means, and shall include any Document that abstracts, digests, transcribes, records or reflects any of the foregoing. Except where otherwise stated, a request for "Communications" means a request for all such Communications.

6. "Concerning" means, directly or indirectly, in whole or in part, relating to, referring to, describing, evidencing or constituting.

7. "Custodian" means any Person or Entity that, as of the date of this CID, maintained, possessed, or otherwise kept or controlled such Document.

8. "Document" is used herein in the broadest sense of the term and means all records and other tangible media of expression of whatever nature however and wherever created, produced or stored (manually, mechanically, electronically or otherwise), including without limitation all versions whether draft or final, all annotated or nonconforming or other copies, electronic mail ("e-mail"), instant messages, text messages, personal digital assistant or other wireless device messages, voicemail, calendars, date books, appointment books, diaries, books, papers, files, notes, confirmations, accounts statements, correspondence, memoranda, reports, records, journals, registers, analyses, plans, manuals, policies, telegrams, faxes, telexes, wires, telephone logs, telephone messages, message slips, minutes, notes or records or transcriptions of conversations or

**MTD APP. 026**

Demand No.: 2016-EPD-36
Date Issued: April 19, 2016
Issued To: Exxon Mobil Corporation

Communications or meetings, tape recordings, videotapes, disks, and other electronic media, microfilm, microfiche, storage devices, press releases, contracts, agreements, notices and summaries. Any non-identical version of a Document constitutes a separate Document within this definition, including without limitation drafts or copies bearing any notation, edit, comment, marginalia, underscoring, highlighting, marking, or any other alteration of any kind resulting in any difference between two or more otherwise identical Documents. In the case of Documents bearing any notation or other marking made by highlighting ink, the term Document means the original version bearing the highlighting ink, which original must be produced as opposed to any copy thereof. Except where otherwise stated, a request for "Documents" means a request for all such Documents.

9. "Entity" means without limitation any corporation, company, limited liability company or corporation, partnership, limited partnership, association, or other firm or similar body, or any unit, division, agency, department, or similar subdivision thereof.

10. "Identify" or "Identity," as applied to any Document means the provision in writing of information sufficiently particular to enable the Attorney General to request the Document's production through CID or otherwise, including but not limited to: (a) Document type (letter, memo, etc.); (b) Document subject matter; (c) Document date; and (d) Document author(s), addressee(s) and recipient(s). In lieu of identifying a Document, the Attorney General will accept production of the Document, together with designation of the Document's Custodian, and identification of each Person You believe to have received a copy of the Document.

11. "Identify" or "Identity," as applied to any Entity, means the provision in writing of such Entity's legal name, any d/b/a, former, or other names, any parent, subsidiary, officers, employees, or agents thereof, and any address(es) and any telephone number(s) thereof.

12. "Identify" or "Identity," as applied to any natural person, means and includes the provision in writing of the natural person's name, title(s), any aliases, place(s) of employment, telephone number(s), e-mail address(es), mailing addresses and physical address(es).

13. "Person" means any natural person, or any Entity.

14. "Refer" means embody, refer or relate, in any manner, to the subject of the document demand.

MTD APP. 027

Demand No.: 2016-EPD-36
Date Issued: April 19, 2016
Issued To: Exxon Mobil Corporation

15. "Refer or Relate to" means to make a statement about, embody, discuss, describe, reflect, identify, deal with, consist of, establish, comprise, list, or in any way pertain, in whole or in part, to the subject of the document demand.

16. "Sent" or "received" as used herein means, in addition to their usual meanings, the transmittal or reception of a Document by physical, electronic or other delivery, whether by direct or indirect means.

17. "CID" means this subpoena and any schedules, appendices, or attachments thereto.

18. The use of the singular form of any word used herein shall include the plural and vice versa. The use of any tense of any verb includes all other tenses of the verb.

19. The references to Communications, Custodians, Documents, Persons, and Entities in this CID encompass all such relevant ones worldwide.

## B. Particular Definitions

1. "Exxon," "You," or "Your," means Exxon Mobil Corporation, and any present or former parents, subsidiaries, affiliates, directors, officers, partners, employees, agents, representatives, attorneys or other Persons acting on its behalf, and including predecessors or successors or any affiliates of the foregoing.

2. "Exxon Products and Services" means products and services, including without limitation petroleum and natural gas energy products and related services, offered to and/or sold by Exxon to consumers in Massachusetts.

3. "Carbon Dioxide" or "$CO_2$" means the naturally occurring chemical compound composed of a carbon atom covalently double bonded to two oxygen atoms that is fixed by photosynthesis into organic matter.

4. "Climate" means the statistical description in terms of the mean and variability of relevant quantities, such as surface variables, including, without limitation, temperature, precipitation, and wind, on Earth over a period of time ranging from months to thousands or millions of years. Climate is the state, including a statistical description, of the Climate System. *See* Intergovernmental Panel on Climate Change (IPCC), 2012: Glossary of terms. In: Managing the Risks of Extreme Events and Disasters to Advance Climate Change Adaptation [Field, C.B., V. Barros, T.F. Stocker, D. Qin, D.J. Dokken, K.L. Ebi, M.D. Mastrandrea, K.J. Mach, G.-K. Plattner, S.K. Allen, M. Tignor, and P.M. Midgley (eds.)]. A Special Report of Working Groups I and II of the IPCC. Cambridge University Press, Cambridge, UK, and New York, NY, USA (the "IPCC Glossary"), p. 557.

MTD APP. 028

Demand No.: 2016-EPD-36
Date Issued: April 19, 2016
Issued To: Exxon Mobil Corporation

5. "Climate Change" means a change in the state of Earth's Climate that can be identified (e.g., by using statistical tests) by changes in the mean and/or the variability of its properties and that persists for an extended period, typically decades or longer. *See* IPCC Glossary, p. 557.

6. "Climate Model" means a numerical representation of the Climate System based on the physical, chemical, and biological properties of its components, their interactions, and feedback processes, and that accounts for all or some of its known properties. Climate models are applied as a research tool to study and simulate the climate, and for operational purposes, including monthly, seasonal, interannual, and longer-term climate predictions. *See* IPCC Glossary, p. 557.

7. "Climate Risk" means the risk that variables in the Climate System reach values that adversely affect natural and human systems and regions, including those that relate to extreme values of the climate variables such as high wind speed, high river water and sea level stages (flood), and low water stages (drought). These include, without limitation, such risks to ecosystems, human health, geopolitical stability, infrastructure, facilities, businesses, asset value, revenues, and profits, as well as the business risks associated with public policies and market changes that arise from efforts to mitigate or adapt to Climate Change.

8. "Climate Science" means the study of the Climate on Earth.

9. "Climate System" means the dynamics and interactions on Earth of five major components: atmosphere, hydrosphere, cryosphere, land surface, and biosphere. *See* IPCC Glossary, p. 557.

10. "Global Warming" means the gradual increase, observed or projected, in Earth's global surface temperature, as one of the consequences of radiative forcing caused by anthropogenic emissions.

11. "Greenhouse Gas" means a gaseous constituent of Earth's atmosphere, both natural and anthropogenic, that absorbs and emits radiation at specific wavelengths within the spectrum of infrared radiation emitted by the Earth's surface, the atmosphere, and clouds. Water vapor ($H_2O$), carbon dioxide ($CO_2$), nitrous oxide ($N_2O$), methane ($CH_4$), chlorofluorocarbons (CFCs), and ozone ($O_3$) are the primary Greenhouse Gases in the Earth's atmosphere. *See* IPCC Glossary, p. 560.

12. "Greenhouse Gas Emissions" means the exiting to the atmosphere of Greenhouse Gas.

13. "Methane" or "$CH_4$" means the chemical compound composed of one atom of carbon and four atoms of hydrogen. Methane is the main component of natural gas.

MTD APP. 029

Demand No.: 2016-EPD-36
Date Issued: April 19, 2016
Issued To: Exxon Mobil Corporation

14. "Radiative Forcing Effect" means the influence a factor has in altering the balance of incoming and outgoing energy in the Earth-atmosphere system and is an index of the importance of the factor as a potential climate change mechanism.

15. "Security" has the same meaning as defined in M.G.L. c. 110A, § 401(k), and includes, without limitation, any fixed- and floating rate-notes, bonds, and common stock, available to investors for purchase by Massachusetts residents.

16. "Sustainable Development" means development that meets the needs of the present without compromising the ability of future generations to meet their own needs. *See* IPCC Glossary, p. 564.

17. "Sustainability Reporting" means the practice of measuring, disclosing and being accountable to internal and external stakeholders for organizational performance towards the goals of Sustainable Development.

18. "Acton Institute for the Study of Religion and Liberty" or "Acton Institute" means the nonprofit organization by that name. Acton Institute is located in Grand Rapids, Michigan.

19. "American Enterprise Institute for Public Policy Research" or "AEI" means the nonprofit public policy organization by that name. AEI is based in Washington, D.C.

20. "Americans for Prosperity" means the nonprofit advocacy group by that name. Americans for Prosperity is based in Arlington, Virginia.

21. "American Legislative Exchange Council" or "ALEC" means the nonprofit organization by that name consisting of state legislator and private sector members. ALEC is based in in Arlington, Virginia.

22. "American Petroleum Institute" or "API" means the oil and gas industry trade association by that name. API is based in Washington, D.C.

23. "Beacon Hill Institute at Suffolk University" means the research arm of the Department of Economics at Suffolk University in Boston, Massachusetts, by that name.

24. "Center for Industrial Progress" or "CIP" means the for profit organization by that name. CIP is located in Laguna Hills, California.

25. "Competitive Enterprise Institute" or "CEI" means the nonprofit public policy organization by that name. CEI is based in Washington, D.C.

MTD APP. 030

Demand No.:  2016-EPD-36
Date Issued:  April 19, 2016
Issued To:  Exxon Mobil Corporation

26. "George C. Marshall Institute" means the nonprofit public policy organization by that name. George C. Marshall Institute is based in Arlington, Virginia.

27. "The Heartland Institute" means the nonprofit public policy organization by that name. The Heartland Institute is based in Arlington Heights, Illinois.

28. "The Heritage Foundation" means the nonprofit public policy organization by that name. The Heritage Foundation is based in Washington, D.C.

29. "Mercatus Center at George Mason University" means the university-based nonprofit public policy organization by that name. Mercatus Center at George Mason University is based in Arlington, Virginia.

## C. Instructions

1. Preservation of Relevant Documents and Information; Spoliation. You are reminded of your obligations under law to preserve Documents and information relevant or potentially relevant to this CID from destruction or loss, and of the consequences of, and penalties available for, spoliation of evidence. No agreement, written or otherwise, purporting to modify, limit or otherwise vary the terms of this CID, shall be construed in any way to narrow, qualify, eliminate or otherwise diminish your aforementioned preservation obligations. Nor shall you act, in reliance upon any such agreement or otherwise, in any manner inconsistent with your preservation obligations under law. No agreement purporting to modify, limit or otherwise vary your preservation obligations under law shall be construed as in any way narrowing, qualifying, eliminating or otherwise diminishing such aforementioned preservation obligations, nor shall you act in reliance upon any such agreement, unless an Assistant Attorney General confirms or acknowledges such agreement in writing, or makes such agreement a matter of record in open court.

2. Possession, Custody, and Control. The CID calls for all responsive Documents or information in your possession, custody or control. This includes, without limitation, Documents or information possessed or held by any of your officers, directors, employees, agents, representatives, divisions, affiliates, subsidiaries or Persons from whom you could request Documents or information. If Documents or information responsive to a request in this CID are in your control, but not in your possession or custody, you shall promptly Identify the Person with possession or custody.

3. Documents No Longer in Your Possession. If any Document requested herein was formerly in your possession, custody or control but is no longer available, or no longer exists, you shall submit a statement in writing under oath that: (a) describes

MTD APP. 031

Demand No.: 2016-EPD-36
Date Issued: April 19, 2016
Issued To: Exxon Mobil Corporation

in detail the nature of such Document and its contents; (b) Identifies the Person(s) who prepared such Document and its contents; (c) Identifies all Persons who have seen or had possession of such Document; (d) specifies the date(s) on which such Document was prepared, transmitted or received; (e) specifies the date(s) on which such Document became unavailable; (f) specifies the reason why such Document is unavailable, including without limitation whether it was misplaced, lost, destroyed or transferred; and if such Document has been destroyed or transferred, the conditions of and reasons for such destruction or transfer and the Identity of the Person(s) requesting and performing such destruction or transfer; and (g) Identifies all Persons with knowledge of any portion of the contents of the Document.

4. No Documents Responsive to CID Requests. If there are no Documents responsive to any particular CID request, you shall so state in writing under oath in the Affidavit of Compliance attached hereto, identifying the paragraph number(s) of the CID request concerned.

5. Format of Production. You shall produce Documents, Communications, and information responsive to this CID in electronic format that meets the specifications set out in Schedule D.

6. Existing Organization of Documents to be Preserved. Regardless of whether a production is in electronic or paper format, each Document shall be produced in the same form, sequence, organization or other order or layout in which it was maintained before production, including but not limited to production of any Document or other material indicating filing or other organization. Such production shall include without limitation any file folder, file jacket, cover or similar organizational material, as well as any folder bearing any title or legend that contains no Document. Documents that are physically attached to each other in your files shall be accompanied by a notation or information sufficient to indicate clearly such physical attachment.

7. Document Numbering. All Documents responsive to this CID, regardless of whether produced or withheld on ground of privilege or other legal doctrine, and regardless of whether production is in electronic or paper format, shall be numbered in the lower right corner of each page of such Document, without disrupting or altering the form, sequence, organization or other order or layout in which such Documents were maintained before production. Such number shall comprise a prefix containing the producing Person's name or an abbreviation thereof, followed by a unique, sequential, identifying document control number.

8. Privilege Placeholders. For each Document withheld from production on ground of privilege or other legal doctrine, regardless of whether a production is electronic or in hard copy, you shall insert one or more placeholder page(s) in the

MTD APP. 032

Demand No.: 2016-EPD-36
Date Issued: April 19, 2016
Issued To: Exxon Mobil Corporation

production bearing the same document control number(s) borne by the Document withheld, in the sequential place(s) originally occupied by the Document before it was removed from the production.

9. Privilege. If You withhold or redact any Document responsive to this CID of privilege or other legal doctrine, you shall submit with the Documents produced a statement in writing under oath, stating: (a) the document control number(s) of the Document withheld or redacted; (b) the type of Document; (c) the date of the Document; (d) the author(s) and recipient(s) of the Document; (e) the general subject matter of the Document; and (f) the legal ground for withholding or redacting the Document. If the legal ground for withholding or redacting the Document is attorney-client privilege, you shall indicate the name of the attorney(s) whose legal advice is sought or provided in the Document.

10. Your Production Instructions to be Produced. You shall produce a copy of all written or otherwise recorded instructions prepared by you concerning the steps taken to respond to this CID. For any unrecorded instructions given, you shall provide a written statement under oath from the Person(s) who gave such instructions that details the specific content of the instructions and any Person(s) to whom the instructions were given.

11. Cover Letter. Accompanying any production(s) made pursuant to this CID, You shall include a cover letter that shall at a minimum provide an index containing the following: (a) a description of the type and content of each Document produced therewith; (b) the paragraph number(s) of the CID request to which each such Document is responsive; (c) the Identity of the Custodian(s) of each such Document; and (d) the document control number(s) of each such Document.

12. Affidavit of Compliance. A copy of the Affidavit of Compliance provided herewith shall be completed and executed by all natural persons supervising or participating in compliance with this CID, and you shall submit such executed Affidavit(s) of Compliance with Your response to this CID.

13. Identification of Persons Preparing Production. In a schedule attached to the Affidavit of Compliance provided herewith, you shall Identify the natural person(s) who prepared or assembled any productions or responses to this CID. You shall further Identify the natural person(s) under whose personal supervision the preparation and assembly of productions and responses to this CID occurred. You shall further Identify all other natural person(s) able competently to testify: (a) that such productions and responses are complete and correct to the best of such person's knowledge and belief; and (b) that any Documents produced are authentic, genuine and what they purport to be.

MTD APP. 033

Demand No.: 2016-EPD-36
Date Issued: April 19, 2016
Issued To: Exxon Mobil Corporation

14. Continuing Obligation to Produce. This CID imposes a continuing obligation to produce the Documents and information requested. Documents located, and information learned or acquired, at any time after your response is due shall be promptly produced at the place specified in this CID.

15. No Oral Modifications. No agreement purporting to modify, limit or otherwise vary this CID shall be valid or binding, and you shall not act in reliance upon any such agreement, unless an Assistant Attorney General confirms or acknowledges such agreement in writing, or makes such agreement a matter of record in open court.

16. Time Period. Except where otherwise stated, the time period covered by this CID shall be from April 1, 2010, through the date of the production.

## D. **Documents to be Produced**

1. For the time period from January 1, 1976, through the date of this production, Documents and Communications concerning Exxon's development, planning, implementation, review, and analysis of research efforts to study $CO_2$ emissions (including, without limitation, from fossil fuel extraction, production, and use), and the effects of these emissions on the Climate, including, without limitation, efforts by Exxon to:

    (a) analyze the absorption rate of atmospheric $CO_2$ in the oceans by developing and using Climate Models;

    (b) measure atmospheric and oceanic $CO_2$ levels (including, without limitation, through work conducted on Exxon's *Esso Atlantic* tanker);

    (c) determine the source of the annual $CO_2$ increment that has been increasing over time since the Industrial Revolution by measuring changes in the isotopic ratios of carbon and the distribution of radon in the ocean; and/or

    (d) assess the financial costs and environmental consequences associated with the disposal of $CO_2$ and hydrogen sulfide gas from the development of offshore gas from the seabed of the South China Sea off Natuna Island, Indonesia.

2. For the time period from January 1, 1976, through the date of this production, Documents and Communications concerning papers prepared, and presentations given, by James F. Black, at times Scientific Advisor in the Products Research Division of Exxon Research and Engineering, author of, among others, the paper *The Greenhouse Effect*, produced in or around 1978.

MTD APP. 034

3. For the time period from January 1, 1976, through the date of this production, Documents and Communications concerning the paper *CO₂ Greenhouse Effect A Technical Review*, dated April 1, 1982, prepared by the Coordination and Planning Division of Exxon Research and Engineering Company.

4. For the time period from January 1, 1976, through the date of this production, Documents and Communications concerning the paper *CO₂ Greenhouse and Climate Issues*, dated March 28, 1984, prepared by Henry Shaw, including all Documents:

    (a) forming the basis for Exxon's projection of a 1.3 to 3.1 degree Celsius average temperature rise by 2090 due to increasing $CO_2$ emissions and all Documents describing the basis for Exxon's conclusions that a 2 to 3 degree Celsius increase in global average temperature could:

- Be "amplified to about 10 degrees C at the poles," which could cause "polar ice melting and a possible sea-level rise of 0.7 meter[sic] by 2080"
- Cause redistribution of rainfall
- Cause detrimental health effects
- Cause population migration

    (b) forming the basis for Exxon's conclusion that society could "avoid the problem by sharply curtailing the use of fossil fuels."

5. Documents and Communications with any of Acton Institute, AEI, Americans for Prosperity, ALEC, API, Beacon Hill Institute at Suffolk University, CEI, CIP, George C. Marshall Institute, The Heartland Institute, The Heritage Foundation, and/or Mercatus Center at George Mason University, concerning Climate Change and/or Global Warming, Climate Risk, Climate Science, and/or communications regarding Climate Science by fossil fuel companies to the media and/or to investors or consumers, including Documents and Communications relating to the funding by Exxon of any of those organizations.

6. For the time period from September 1, 1997, through the date of this production, Documents and Communications concerning the API's draft *Global Climate Science Communications Plan* dated in or around 1998.

7. For the time period from January 1, 2007, through the date of this production, Documents and Communications concerning Exxon's awareness of, and/or response to, the Union of Concerned Scientists report *Smoke, Mirrors & Hot Air: How ExxonMobil Uses Big Tobacco's Tactics to Manufacture Uncertainty on Climate Science*, dated January 2007.

MTD APP. 035

Demand No.: 2016-EPD-36
Date Issued: April 19, 2016
Issued To: Exxon Mobil Corporation

8. For the time period from April 1, 1997, through the date of this production,
Documents and Communications concerning the decision making by Exxon in
preparing, and substantiation of, the following statements in the remarks *Energy –
key to growth and a better environment for Asia-Pacific nations*, by then
Chairman Lee R. Raymond to the World Petroleum Congress, Beijing, People's
Republic of China, 10/13/97 (the "Raymond WPC Statements"):

- It is highly unlikely that the temperature in the middle of the next century
  will be significantly affected whether policies are enacted now or 20 years
  from now. (Raymond WPC Statements, p. 11)

- Forecasts of future warming come from computer models that try to
  replicate Earth's past climate and predict the future. They are notoriously
  inaccurate. None can do it without significant overriding adjustments.
  (Raymond WPC Statements, p. 10)

- Proponents of the agreements [that could result from the Kyoto Climate
  Change Conference in December 1997] say they are necessary because
  burning fossil fuels causes global warming. Many people – politicians and
  the public alike – believe that global warming is a rock-solid certainty.
  But it's not. (Raymond WPC Statements, p. 8)

- To achieve this kind of reduction in carbon dioxide emissions most
  advocates are talking about, governments would have to resort to energy
  rationing administered by a vast international bureaucracy responsible to
  no one. (Raymond WPC Statements, p. 10)

- We also have to keep in mind that most of the greenhouse effect comes
  from natural sources, especially water vapor. Less than a quarter is from
  carbon dioxide, and, of this, only four percent of the carbon dioxide
  entering the atmosphere is due to human activities – 96 percent comes
  from nature. (Raymond WPC Statements, p. 9)

9. Documents and Communications concerning Chairman Rex W. Tillerson's June
27, 2012, address to the Council on Foreign Relations, including those sufficient
to document the factual basis for the following statements:

- Efforts to address climate change should focus on engineering methods to
  adapt to shifting weather patterns and rising sea levels rather than trying to
  eliminate use of fossil fuels.

- Humans have long adapted to change, and governments should create
  policies to cope with the Earth's rising temperatures.

14 of 25

Demand No.: 2016-EPD-36
Date Issued:  April 19, 2016
Issued To:   Exxon Mobil Corporation

- Changes to weather patterns that move crop production areas around –
  we'll adapt to that. It's an engineering problem and it has engineering
  solutions.

- Issues such as global poverty [are] more pressing than climate change, and
  billions of people without access to energy would benefit from oil and gas
  supplies.

10. Documents and Communications concerning Chairman Tillerson's statements
regarding Climate Change and Global Warming, on or about May 30, 2013, to
shareholders at an Exxon shareholder meeting in Dallas, Texas, including
Chairman Tillerson's statement "What good is it to save the planet if humanity
suffers?"

11. Documents and Communications concerning Chairman Tillerson's speech
*Unleashing Innovation to Meet Our Energy and Environmental Needs*, presented
to the 36th Annual Oil and Money Conference in London, England, 10/7/15 (the
"2015 Oil and Money Conference Speech"), including Documents sufficient to
demonstrate the factual basis for Chairman Tillerson's representation that
Exxon's scientific research on Climate Change, begun in the 1970s, "led to work
with the U.N.'s Intergovernmental Panel on Climate Change and collaboration
with academic institutions and to reaching out to policymakers and others, who
sought to advance scientific understanding and policy dialogue."

12. Documents and Communications concerning any public statement Chairman
Tillerson has made about Climate Change or Global Warming from 2012 to
present.

13. Documents and Communications concerning changes in the design, construction,
or operation of any Exxon facility to address possible variations in sea level
and/or other variables, such as temperature, precipitation, timing of sea ice
formation, wind speed, and increased storm intensity, associated with Climate
Change, including but not limited to:

   (a) adjustments to the height of Exxon's coastal and/or offshore drilling
   platforms; and

   (b) adjustments to any seasonal activity, including shipping and the movement
   of vehicles.

14. Documents and Communications concerning any research, analysis, assessment,
evaluation, Climate Modeling or other consideration performed by Exxon, or with
funding provided by Exxon, concerning the costs for $CO_2$ mitigation, including,

MTD APP. 037

Demand No.: 2016-EPD-36
Date Issued: April 19, 2016
Issued To: Exxon Mobil Corporation

without limitation, concerning the 2014 Exxon report to shareholders *Energy and Carbon – Managing the Risks* (the "2014 Managing the Risks Report").

15. Documents and Communications substantiating or refuting the following claims in the 2014 Managing the Risks Report:

- [B]y 2030 for the 450ppm $CO_2$ stabilization pathway, the average American household would face an added $CO_2$ cost of almost \$2,350 per year for energy, amounting to about 5 percent of total before-tax median income. (p. 9)
- These costs would need to escalate steeply over time, and be more than double the 2030 level by mid-century. (p. 9)
- Further, in order to stabilize atmospheric GHG concentrations, these $CO_2$ costs would have to be applied across both developed and undeveloped countries. (p. 9)
- [W]e see world GDP growing at a rate that exceeds population growth through [the year 2040], almost tripling in size from what it was globally in 2000 [fn. omitted]. It is largely the poorest and least developed of the world's countries that benefit most from this anticipated growth. However, this level of GDP growth requires more accessible, reliable and affordable energy to fuel growth, and it is vulnerable populations who would suffer most should that growth be artificially constrained. (pp. 3 – 4)
- [W]e anticipate renewables growing at the fastest pace among all sources through [the year 2040]. However, because they make a relatively small contribution compared to other energy sources, renewables will continue to comprise about 5 percent of the total energy mix by 2040. Factors limiting further penetration of renewables include scalability, geographic dispersion, intermittency (in the case of solar and wind), and cost relative to other sources. (p. 6)
- In assessing the economic viability of proved reserves, we do not believe a scenario consistent with reducing GHG emissions by 80 percent by 2050, as suggested by the "low carbon scenario," lies within the "reasonably likely to occur" range of planning assumptions, since we consider the scenario highly unlikely. (p. 16)

16. Documents and Communications that formed the basis for the following statements in Exxon's January 26, 2016, press release on Exxon's 2016 Energy Outlook:

MTD APP. 038

Demand No.: 2016-EPD-36
Date Issued: April 19, 2016
Issued To: Exxon Mobil Corporation

- In 2040, oil and natural gas are expected to make up nearly 60 percent of global supplies, while nuclear and renewables will be approaching 25 percent. Oil will provide one third of the world's energy in 2040, remaining the No. 1 source of fuel, and natural gas will move into second place.

- ExxonMobil's analysis and those of independent agencies confirms our long-standing view that all viable energy sources will be needed to meet increasing demand.

- The Outlook projects that global energy-related carbon dioxide emissions will peak around 2030 and then start to decline. Emissions in OECD nations are projected to fall by about 20 percent from 2014 to 2040.

17. Documents and Communications concerning any research, study, and/or evaluation by Exxon and/or any other fossil fuel company regarding the Climate Change Radiative Forcing Effect of natural gas (Methane), and potential regulation of Methane as a Greenhouse Gas.

18. Documents and Communications concerning Exxon's internal consideration of public relations and marketing decisions for addressing consumer perceptions regarding Climate Change and Climate Risks in connection with Exxon's offering and selling Exxon Products and Services to consumers in Massachusetts.

19. Documents and Communications concerning the drafting and finalizing of text, including all existing drafts of such text, concerning Greenhouse Gas Emissions and the issue of Climate Change or Global Warming filed with the U.S. Securities and Exchange Commission (the "SEC") by Exxon, including, without limitation, Exxon's Notices of Meeting; Form 10-Ks; Form 10-Qs; Form 8-Ks; Prospectuses; Prospectus Supplements; and Free Will Prospectuses; and/or contained in any offering memoranda and offering circulars from filings with the SEC under Regulation D (17 CFR § 230.501, et seq.).

20. Documents and Communications concerning Exxon's consideration of public relations and marketing decisions for addressing investor perceptions regarding Climate Change, Climate Risk, and Exxon's future profitability in connection with Exxon's offering and selling Securities in Massachusetts.

21. Documents and Communications related to Exxon's efforts in 2015 and 2016 to address any shareholder resolutions related to Climate Change, Global Warming, and how efforts to reduce Greenhouse Gas Emissions will affect Exxon's ability to operate profitably.

22. For the time period from January 1, 2006, through the date of this production, Documents and Communications concerning Exxon's development of its program

MTD APP. 039

Demand No.: 2016-EPD-36
Date Issued: April 19, 2016
Issued To: Exxon Mobil Corporation

for Sustainability Reporting addressing Climate Change and Climate Risk, including, without limitation, regarding Exxon's annual "Corporate Citizenship Report" and Exxon's "Environmental Aspects Guide."

23. Documents and Communications concerning information exchange among Exxon and other companies and/or industry groups representing energy companies, regarding marketing of energy and/or fossil fuel products to consumers in light of public perceptions regarding Climate Change and Climate Risk.

24. Exemplars of all advertisements, flyers, promotional materials, and informational materials of any type, including but not limited to web-postings, blog-posts, social media-postings, print ads (including ads on op-ed pages of newspapers), radio and television advertisements, brochures, posters, billboards, flyers and disclosures used by or for You, Your employees, agents, franchisees or independent contractors to solicit or market Exxon Products and Services in Massachusetts, including but not limited to:

  • A copy of each print advertisement placed in the Commonwealth;
  • A DVD format copy of each television advertisement that ran in the Commonwealth;
  • An audio recording of each radio advertisement and audio portion of each internet advertisement;
  • A copy of each direct mail advertisement, brochure, or other written promotional materials;
  • A printout, screenshot or copy of each advertisement, information, or communication provided via the internet, email, Facebook, Twitter, You Tube, or other electronic communications system; and/or
  • A copy of each point-of-sale promotional material used by You or on Your behalf.

25. Documents and Communications sufficient to show where each of the exemplars in Demand No. 24 was placed and the intended or estimated consumers thereof, including, where appropriate, the number of hits on each internet page and all Commonwealth Internet Service Providers viewing same.

26. Documents and Communications substantiating the claims made in the advertisements, flyers, promotional materials, and informational materials identified in response to Demand Nos. 22 through 24.

27. Documents and Communications concerning Your evaluation or review of the impact, success or effectiveness of each Document referenced in Demand Nos. 22 through 24, including but not limited to Documents discussing or referring in any way to: (a) the effects of advertising campaigns or communications; (b) focus groups; (c) copy tests; (d) consumer perception; (e) market research; (f) consumer

MTD APP. 040

Demand No.: 2016-EPD-36
Date Issued: April 19, 2016
Issued To: Exxon Mobil Corporation

> research; and/or (g) other study or survey or the reactions, perceptions, beliefs,
> attitudes, wishes, needs, or understandings of potential consumers of Exxon
> Products and Services in light of public perceptions of Climate Change,
> Greenhouse Gas Emissions, and Climate Risk.

28. Documents sufficient to show Exxon's organizational structure and leadership
over time, including but not limited to organizational charts, reflecting all Exxon
Entities in any way involved in:

> (a) the marketing, advertisement, solicitation, promotion, and/or sale of
> Exxon Products and Services to consumers in the Commonwealth;
> and/or

> (b) the marketing, advertisement, solicitation, promotion, and/or sale to
> investors of Exxon Securities in the Commonwealth.

29. Documents and Communications sufficient to identify each agreement entered
into on or after April 1, 2010, through the present, between and among Exxon and
the Commonwealth of Massachusetts, its agencies, and/or its political
subdivisions, for Exxon to provide Exxon Products and Services in
Massachusetts.

30. Documents sufficient to identify all claims, lawsuits, court proceedings and/or
administrative or other proceedings against You in any jurisdiction within the
United States concerning Climate Change and relating to Your solicitation of
consumers of Exxon Products and Services and/or relating to Your solicitation of
consumers of Exxon Securities, including all pleadings and evidence in such
proceedings and, if applicable, the resolution, disposition or settlement of any
such matters.

31. Documents sufficient to identify and describe any discussion or consideration of
disclosing in any materials filed with the SEC or provided to potential or existing
investors (e.g., in prospectuses for debt offerings) information or opinions
concerning the environmental impacts of Greenhouse Gas Emissions, including,
without limitation, the risks associated with Climate Change, and Documents
sufficient to identify all Persons involved in such consideration.

32. Transcripts of investor calls, conferences or presentations given by You at which
any officer or director spoke concerning the environmental impacts of
Greenhouse Gas Emissions, including, without limitation, the risks associated
with Climate Change.

33. Documents and Communications concerning any subpoena or other demand for
production of documents or for witness testimony issued to Exxon by the New

MTD APP. 041

Demand No.: 2016-EPD-36
Date Issued: April 19, 2016
Issued To: Exxon Mobil Corporation

> York State Attorney General's Office concerning Climate Change and Your
> marketing of Exxon Products and Services and/or Exxon Securities, including,
> through the date of Your production in response to this CID, all Documents
> produced to the New York State Attorney General's Office pursuant to any such
> subpoena or demand.

34. Documents sufficient to Identify all other federal or state law enforcement or
    regulatory agencies that have issued subpoenas or are otherwise currently
    investigating You concerning Your marketing of Exxon Products and Services to
    consumers and/or of Exxon Securities to investors.

35. Documents sufficient to Identify any Massachusetts consumer who has
    complained to You, or to any Massachusetts state or local consumer protection
    agency, concerning Your actions with respect to Climate Change, and for each
    such consumer identified, documents sufficient to identify each such complaint;
    each correspondence between You and such consumer or such consumer's
    representative; any internal notes or recordings regarding such complaint; and the
    resolution, if any, of each such complaint.

36. Documents and communications that disclose Your document retention policies
    in effect between January 1, 1976 and the date of this production.

37. Documents sufficient to Identify Your officers, directors and/or managing agents,
    or other persons most knowledgeable concerning the subject matter areas
    enumerated in Schedule B, below.

38. Documents sufficient to identify all natural persons involved in the preparation of
    Your response to this CID.

MTD APP. 042

Demand No.: 2016-EPD-36
Date Issued: April 19, 2016
Issued To: Exxon Mobil Corporation

## SCHEDULE B

Pursuant to the terms of this CID, you are commanded to produce one or more witnesses at the above-designated place and time, or any agreed-upon adjourned place and time, who is or are competent to testify as to the following subject matter areas:

1. Your compliance with Massachusetts General Law Chapter 93A, § 2, and the regulations promulgated thereunder concerning, the marketing, advertising, soliciting, promoting, and communicating or sale of: (1) Exxon Products and Services in the Commonwealth and/or to Massachusetts residents; and (2) Securities in the Commonwealth and/or to Massachusetts residents.

2. The marketing, advertising, soliciting, promoting, and communicating or sale of Exxon Products and Services in the Commonwealth and/or to Massachusetts residents, including their environmental impacts with respect to Greenhouse Gas Emission, Climate Change and/or Climate Risk.

3. The marketing, advertising, soliciting, promoting, and communicating or sale of Securities in the Commonwealth and/or to Massachusetts residents, including as to Exxon's disclosures of risks to its business related to Climate Change.

4. All topics covered in the demands above.

5. Your recordkeeping methods for the demands above, including what information is kept and how it is maintained.

6. Your compliance with this CID.

MTD APP. 043

Demand No.: 2016-EPD-36
Date Issued: April 19, 2016
Issued To: Exxon Mobil Corporation

## SCHEDULE C

## CHAPTER 93A. REGULATION OF BUSINESS PRACTICES FOR CONSUMERS PROTECTION

### Chapter 93A: Section 7. Failure to appear or to comply with notice

Section 7. A person upon whom a notice is served pursuant to the provisions of section six shall comply with the terms thereof unless otherwise provided by the order of a court of the commonwealth. Any person who fails to appear, or with intent to avoid, evade, or prevent compliance, in whole or in part, with any civil investigation under this chapter, removes from any place, conceals, withholds, or destroys, mutilates, alters, or by any other means falsifies any documentary material in the possession, custody or control of any person subject to any such notice, or knowingly conceals any relevant information, shall be assessed a civil penalty of not more than five thousand dollars.

The attorney general may file in the superior court of the county in which such person resides or has his principal place of business, or of Suffolk county if such person is a nonresident or has no principal place of business in the commonwealth, and serve upon such person, in the same manner as provided in section six, a petition for an order of such court for the enforcement of this section and section six. Any disobedience of any final order entered under this section by any court shall be punished as a contempt thereof.

MTD APP. 044

Demand No.: 2016-EPD-36
Date Issued:  April 19, 2016
Issued To:    Exxon Mobil Corporation

## SCHEDULE D

*See* attached "Office of the Attorney General - Data Delivery Specification."

MTD APP. 045

Demand No.: 2016-EPD-36
Date Issued: April 19, 2016
Issued To: Exxon Mobil Corporation

## **AFFIDAVIT OF COMPLIANCE WITH CIVIL INVESTIGATIVE DEMAND**

State of

County of

I, _____ , being duly sworn, state as follows:

1. I am employed by _____ in the position of
   _____;

2. The enclosed production of documents and responses to Civil Investigative Demand 2016-EPD-36 of the Attorney General of the Commonwealth of Massachusetts, dated April 19, 2016 (the "CID") were prepared and assembled under my personal supervision;

3. I made or caused to be made a diligent, complete and comprehensive search for all Documents and information requested by the CID, in full accordance with the instructions and definitions set forth in the CID;

4. The enclosed production of documents and responses to the CID are complete and correct to the best of my knowledge and belief;

5. No Documents or information responsive to the CID have been withheld from this production and response, other than responsive Documents or information withheld on the basis of a legal privilege or doctrine;

6. All responsive Documents or information withheld on the basis of a legal privilege or doctrine have been identified on a privilege log composed and produced in accordance with the instructions in the CID;

7. The Documents contained in these productions and responses to the CID are authentic, genuine and what they purport to be;

8. Attached is a true and accurate record of all persons who prepared and assembled any productions and responses to the CID, all persons under whose personal supervision the preparation and assembly of productions and responses to the CID occurred, and all persons able competently to testify: (a) that such productions and responses are complete and correct to the best of such person's knowledge and belief; and (b) that any Documents produced are authentic, genuine and what they purport to be; and

9. Attached is a true and accurate statement of those requests under the CID as to

MTD APP. 046

Demand No.: 2016-EPD-36
Date Issued: April 19, 2016
Issued To: Exxon Mobil Corporation

which no responsive Documents were located in the course of the aforementioned search.

_____      _____
Signature of Affiant                                    Date


_____
Printed Name of Affiant

Subscribed and sworn to before me

this ___ day of _____ 2016.


_____
Notary Public
My commission expires:

_____

MTD APP. 047



## Office of the Attorney General - Data Delivery Specification
## ONE – Production Load File

**I. General**

1. Images produced to the Office of the Attorney General should be single page series IV TIFF images, 300 dpi or better quality. TIFFs may be Black & White or color.

2. Bates Numbers should be placed in the lower right hand corner unless to do so would obscure the underlying image. In such cases, the Bates number should be placed as near to that position as possible while preserving the underlying image. Bates numbers should contain no spaces, hyphen or underscores. Example: AG0000000001.

3. Spreadsheets and Powerpoint ESI should be produced as native ESI and name for the bates number associated with the first page of the item. If the item has a confidentiality designation, please *DO NOT* append it to the bates numbered file name. The designation should be stored in a field in the DAT.

4. For any ESI that exists in encrypted format or is password-protected, instructions on means for access should be provided with the production to the AGO. (For example, by supplying passwords.)

5. All records should include at least the following fields of created data:
   a. Beginning Bates Number (where TIFF Images are produced)
   b. Ending Bates Number
   c. Beginning Attachment Range
   d. Ending Attachment Range
   e. RemovedFrom: If records were globally deduplicated, this field should contain a concatenated list of all custodians or sources which originally held the item.
   f. MD5 Hash or other hash value
   g. Custodian / Source
   h. Original file path or folder structure
   i. FamilyID
   j. Path/Link to natives
   k. Path/Link to text files (*do not produce inline text in the dat file*)
   l. Redacted – Bit Character field (1 or 0 where 1=Yes and 0=No)
   m. Production date
   n. Volume name
   o. Confidentiality or other treatment stamps

6. Email should be produced with at least the following fields of metadata:
   a. TO
   b. FROM
   c. CC
   d. BCC
   e. Subject
   f. Path to text file (*do not produce inline text in the dat file*)

Rev. 09-24-2015

**MTD APP. 048**

## Office of the Attorney General - Data Delivery Specification
## ONE – Production Load File

      g.  Sent Date (dates and times must be stored in separate fields)

      h.  Sent Time (dates and times must be stored in separate fields and without time zones)

      i.  File extension (.txt, .msg, etc.)

      j.  Attachment count.

7.   eFiles should be produced with at least the following individual fields of metadata:

      a.  Author

      b.  CreateDate (dates and times must be stored in separate fields)

      c.  CreateTime (dates and times must be stored in separate fields with no time zones or am/pm)

      d.  LastModifiedDate (dates and times must be stored in separate fields)

      e.  LastModifiedTime (dates and times must be stored in separate fields with no time zones or am/pm).

8.   Deduplication (Removed From data field)

      a.  If the producing entity wishes to deduplicate, exact hash value duplicates may be removed on a global basis if the producing entity provides a field of created data for each deduplicated item that provides a concatenated list of all custodians or other sources where the item was original located. This list should be provided in the RemovedFrom data field.

      b.  Any other form of deduplication must be approved in advance by the Office of the Attorney General.

### II.   File Types and Load File Requirements

### a.  File Types

Data: Text, images and native files should each be delivered as subfolders in a folder named "DATA". See screen shot "Example Production Deliverable."

- Images: Single page TIFF images delivered in a folder named "IMAGES."
- Text: Multipage text files (one text file per document), delivered in a folder named "TEXT."
- Natives: Delivered in a folder named 'NATIVES".

Load Files: Concordance format data load file and Opticon format image load file should be delivered in a folder named LOAD (at the same level as the folder DATA in the structure). See screen shot "Example Production Deliverable."

Rev. 09-24-2015

MTD APP. 049

## Office of the Attorney General - Data Delivery Specification
## ONE – Production Load File

- Example Production Deliverable
  - VOL001
    - DATA
      - IMAGES
      - NATIVES
      - TEXT
    - LOAD

### b. Fields to be Produced in ONE Data Load File – Concordance Format

| Field Name | Description/Notes |
|---|---|
| BegBates | Starting Bates Number for document |
| EndBates | Ending Bates Number for document |
| BegAttach | Starting Bates Number of Parent document |
| EndAttach | Ending Bates Number of last attachment in family |
| FamilyID | Parent BegBates |
| Volume | Name of Volume or Load File |
| MD5Hash | |
| Custodian_Source | If the source is a human custodian, please provide the name: Last name, first name. If this results in duplicates, add numbers or middle initials Last name, first name, middle initial or # If the source is not a human custodian, please provide a unique name for the source. Ex: AcctgServer |
| FROM | Email |
| TO | Email |
| CC | Email |
| BCC | Email |
| Subject | Email |
| Sent Date | Email |
| Sent Time | Email |
| File Extension | |
| Attch Count | Email |
| Doc Type | Email, attachment |
| Original FilePath | Original location of the item at time of Preservation. |
| FileName | |
| CreateDate | Loose files or attachments. Date and Time must be in separate fields. |
| CreateTime | Loose files or attachments. Date and Time must be in separate fields and the Time field should not include Time Zone (EDT, EST etc) |
| LastModDate | Loose files or attachments (Date and Time must be in separate fields) |
| LastModTime | Loose files or attachments. Date and Time must be in separate fields and the Time field should not include Time Zone (EDT, EST, AM, PM etc) |
| Redacted | This is a Boolean/bit character field. Data value should be "0" or "1" where 0 = No and 1=Yes. |
| Confidentiality Designation | NOTE: *Do not append the Confidentiality Designation to the native file name* |
| RemovedFrom | Last name, first name with semi colon as separator Lastname, firstname; nextlastname, nextfirstname etc. |

Page **3** of **4**

MTD APP. 050

## Office of the Attorney General - Data Delivery Specification
## ONE – Production Load File

| Encrypted_pwp | This is a single character field. Data value should be "N" or "Y". (File is or is not encrypted/password protected) |
|---|---|
| EncryptKey_password | For those files where Encrypted_pwp is Y, provide password or encryption key information in this field. |
| ProdDate | MM\DD\YYYY |
| TextLink | path to the text files should begin with<br>TEXT\ |
| NativeLink | path to the native files should begin with<br>NATIVES\ |

The Data load file for ONE is the same as a Concordance load file, with the same field delimiters () and text qualifiers (þ). Here is a screen shot of part of a ONE load file with the fields identified above:

þBegBatesþ¦þEndBatesþ¦þBegAttachþ¦þEndAttachþ¦þFamilyIDþ¦þVolumeþ¦þMD5Hashþ¦þCustodian_Sourceþ¦þFROMþ¦þTOþ¦þCCþ¦þBCCþ¦þSubjectþ¦þSent Dateþ¦þSent Timeþ¦þFile Extensionþ¦þD
þAG000004507þ¦þAG000004510þ¦þAG000004507þ¦þAG000004512þ¦þAG000004507þ¦þVOL001þ¦þpþ¦þpDoe, Johnþ¦þpjohndoe@someplace.comþ¦þpjdoe@somewhereelse.comþ¦þptheboss@someplace.comþ¦þpþ¦þp
þAG000004511þ¦þAG000004512þ¦þAG000004507þ¦þAG000004512þ¦þAG000004507þ¦þVOL001þ¦þpþ¦þpDoe, Johnþ¦þpjohndoe@someplace.comþ¦þpjdoe@somewhereelse.comþ¦þpthebossþ@someplace.comþ¦þpþ¦þp

**c. Fields required for an Images Load File – Opticon Format**

The Images load file for ONE is the same as an OPTICON load file. It contains these fields, although Folder Break and Box Break are often not used.

| Field Name | Description/Notes |
|---|---|
| Alias | Imagekey/Image link - Beginning bates or ctrl number for the document |
| Volume | Volume name or Load file name |
| Path | relative path to Images should begin with<br>IMAGES\ and include the full file name and file extension (tif, jpg) |
| Document Break | Y denotes image marks the beginning of a document |
| Folder Break | N/A - leave blank |
| Box Break | N/A - leave blank |
| Pages | Number of Pages in document |

Here is a screen shot of an opticon load file format in a text editor with each field separated by a comma. Alias, Volume, Path, Document Break, Folder Break (blank), Box Break (blank), Pages.

```
AG000004507,VOL001,IMAGES\00\00\AG000004507.TIF,Y,,,4
AG000004508,VOL001,IMAGES\00\00\AG000004508.TIF,,,,
AG000004509,VOL001,IMAGES\00\00\AG000004509.TIF,,,,
AG000004510,VOL001,IMAGES\00\00\AG000004510.TIF,,,,
AG000004511,VOL001,IMAGES\01\00\AG000004511.TIF,Y,,,2
AG000004512,VOL001,IMAGES\01\00\AG000004512.TIF,,,,
```

**Technical questions regarding this specification should be addressed to:**
**Diane E. Barry**
**AAG / eDiscovery Attorney**
**Office of the Attorney General**
**One Ashburton Place**
**Boston MA 02108**
**Diane.E.Barry@state.ma.us**
**(617) 963-2120**

Page **4** of **4**

Rev. 09-24-2015

# EXHIBIT C

MTD APP. 052

**Kline, Scot**

| | |
|---|---|
| **From:** | Michael Meade <Michael.Meade@ag.ny.gov> |
| **Sent:** | Tuesday, March 22, 2016 4:51 PM |
| **To:** | Kline, Scot; Morgan, Wendy |
| **Cc:** | Lemuel Srolovic; Peter Washburn; Eric Soufer; Damien LaVera; Daniel Lavoie; Natalia Salgado; Brian Mahanna |
| **Subject:** | RE: Climate Change Coalition |

A couple of updates to report back to the group. First, after a follow up conversation with our AG, Al Gore will now be joining us for part of the day on 3/29. This will certainly add a little star power to the announcement!

We will also be joined by MA AG Healey, which will bring our total number of AG's to a grand total of 7. I'm waiting to hear back from New Mexico, which is our possible 8th Attorney General. On the staff side, a total of 16 states (including DC and USVI) will be joining us for the meetings.

**From:** Kline, Scot [mailto:scot.kline@vermont.gov]
**Sent:** Tuesday, March 22, 2016 11:41 AM
**To:** Michael Meade; Morgan, Wendy
**Cc:** Lemuel Srolovic; Peter Washburn; Eric Soufer; Damien LaVera; Daniel Lavoie; Natalia Salgado; Brian Mahanna
**Subject:** RE: Climate Change Coalition

Mike:

Looks good. One suggestion. We are thinking that use of the term "progressive" in the pledge might alienate some. How about "affirmative," "aggressive," "forceful" or something similar?

Thanks.

Scot

**From:** Michael Meade [mailto:Michael.Meade@ag.ny.gov]
**Sent:** Monday, March 21, 2016 2:59 PM
**To:** Kline, Scot <scot.kline@vermont.gov>; Morgan, Wendy <wendy.morgan@vermont.gov>
**Cc:** Lemuel Srolovic <Lemuel.Srolovic@ag.ny.gov>; Peter Washburn <Peter.Washburn@ag.ny.gov>; Eric Soufer <Eric.Soufer@ag.ny.gov>; Damien LaVera <Damien.LaVera@ag.ny.gov>; Daniel Lavoie <Daniel.Lavoie@ag.ny.gov>; Natalia Salgado <Natalia.Salgado@ag.ny.gov>; Brian Mahanna <Brian.Mahanna@ag.ny.gov>
**Subject:** Climate Change Coalition

Wendy and Scott,

Below are the broad goals and principles that we'd like to lay out as part of the coalition announcement next week. The filing of the brief and the defense of the EPA regs will highlight these principles. Let us know if you have any thoughts or edits to this. If it looks okay to you, I'll forward this around to the other offices when we have a draft release ready to go out. I'll also be asking the offices to contribute a quote from their respective AG's for the press release.

Let me know if you have any questions or comments.

**MTD APP. 053**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## Climate Coalition of Attorneys General

Principles:

- **Climate Change is Real**

The evidence that global temperatures have been rising over the last century-plus is unequivocal.

- **Climate Change Pollution Is The Primary Driver**

Natural forces do not explain the observed global warming trend.

- **People Are Being Harmed**

Climate change represents a clear and present danger to public health, safety, our environment and our economy — now and in the future.

- **Immediate Action Is Necessary**

Climate change – and its impacts – is worsening.  We must act now to reduce emissions of climate change pollution to minimize its harm to people now and in the future.

Pledge:

We pledge to work together to fully enforce the State and federal laws that require progressive action on climate change and that prohibit false and misleading statements to the public, consumers and investors regarding climate change.

- **Support Progressive Federal Action; Act Against Federal Inaction**

Support the federal government when it takes progressive action to address climate change, and press the federal government when it fails to take necessary action.

- **Support State and Regional Action**

Provide legal support to progressive state and regional actions that address climate change, supporting states in their traditional role as laboratories of innovation.

- **Defend Progress**

Serve as a backstop against efforts to impede or roll-back progress on addressing climate change.

- **Support Transparency And Disclosure**

Ensure that legally-required disclosures of the impacts of climate change are fully and fairly communicated to the public.

- **Engage The Public**

**MTD APP. 054**

Raise public awareness regarding the impacts to public health, safety, our environment and our economy caused by climate change.

**IMPORTANT NOTICE:** This e-mail, including any attachments, may be confidential, privileged or otherwise legally protected. It is intended only for the addressee. If you received this e-mail in error or from someone who was not authorized to send it to you, do not disseminate, copy or otherwise use this e-mail or its attachments. Please notify the sender immediately by reply e-mail and delete the e-mail from your system.

MTD APP. 055

# EXHIBIT D

**MTD APP. 056**

## CLIMATE CHANGE COALITION COMMON INTEREST AGREEMENT

This Common Interest Agreement ("Agreement") is entered into by the undersigned Attorneys General of the States, Commonwealths, and Territories (the "Parties") who are interested in advancing their common legal interests in limiting climate change and ensuring the dissemination of accurate information about climate change. The Parties mutually agree:

1.  Common Legal Interests.  The Parties share common legal interests with respect to the following topics: (i) potentially taking legal actions to compel or defend federal measures to limit greenhouse gas emissions, (ii) potentially conducting investigations of representations made by companies to investors, consumers and the public regarding fossil fuels, renewable energy and climate change, (iii) potentially conducting investigations of possible illegal conduct to limit or delay the implementation and deployment of renewable energy technology, (iv) potentially taking legal action to obtain compliance with federal and state laws governing the construction and operation of fossil fuel and renewable energy infrastructure, or (v) contemplating undertaking one or more of these legal actions, including litigation ("Matters of Common Interest").

2.  Shared Information.  It is in the Parties' individual and common interests to share documents, mental impressions, strategies, and other information regarding the Matters of Common Interest and any related investigations and litigation ("Shared Information").  Shared Information shall include (1) information shared in organizing a meeting of the Parties on March 29, 2016, (2) information shared at and after the March 29 meeting, pursuant to an oral common interest agreement into which the Parties entered at the meeting and renewed on April 12, 2016, and (3) information shared after the execution of this Agreement.

3.  Legends on Documents.  To avoid misunderstandings or inadvertent disclosure, all documents exchanged pursuant to this Agreement should bear the legend "Confidential – Protected by Common Interest Privilege" or words to that effect.  However, the inadvertent failure to include such a legend shall not waive any privilege or protection available under this Agreement or otherwise.  In addition, any Party may, where appropriate, also label documents exchanged pursuant to this Agreement with other appropriate legends, such as, for example, "Attorney-Client Privileged" or "Attorney Work Product."  Oral communications among the Parties shall be deemed confidential and protected under this Agreement when discussing Matters of Common Interest.

4.  Non-Waiver of Privileges.  The exchange of Shared Information among Parties— including among Parties' staff and outside advisors—does not diminish in any way the privileged and confidential nature of such information. The Parties retain all applicable privileges and claims to confidentiality, including the attorney client privilege, work product privilege, common interest privilege, law enforcement privilege, deliberative process privilege and exemptions from disclosure under any public records laws that may be asserted to protect against disclosure of Shared Information to non-Parties (hereinafter collectively referred to as "Privileges").

OAG000184
MTD APP. 057

5.     Nondisclosure.  Shared Information shall only be disclosed to: (i) Parties; (ii) employees or agents of the Parties, including experts or expert witnesses; (iii) government officials involved with the enforcement of antitrust, environmental, consumer protection, or securities laws who have agreed in writing to abide by the confidentiality restrictions of this Agreement; (iv) criminal enforcement authorities; (v) other persons, provided that all Parties consent in advance; and (vi) other persons as provided in paragraph 6.  A Party who provides Shared Information may also impose additional conditions on the disclosure of that Shared Information. Nothing in this Agreement prevents a Party from using the Shared Information for law enforcement purposes, criminal or civil, including presentation at pre-trial and trial-related proceedings, to the extent that such presentation does not (i) conflict with other agreements that the Party has entered into, (ii) interfere with the preservation of the Privileges, or (iii) conflict with court orders and applicable law.

6.     Notice of Potential Disclosure.  The Parties agree and acknowledge that each Party is subject to applicable freedom of information or public records laws, and nothing in this Agreement is intended to alter or limit the disclosure requirements of such laws. If any Shared Information is demanded under a freedom of information or public records law or is subject to any form of compulsory process in any proceeding ("Request"), the Party receiving the Request shall: (i) immediately notify all other Parties (or their designees) in writing; (ii) cooperate with any Party in the course of responding to the Request; and (iii) refuse to disclose any Shared Information unless required by law.

7.     Inadvertent Disclosure.  If a Party discloses Shared Information to a person not entitled to receive such information under this Agreement, the disclosure shall be deemed to be inadvertent and unintentional and shall not be construed as a waiver of any Party's right under law or this Agreement. Any Party may seek additional relief as may be authorized by law.

8.     Independently Obtained Information.  Provided that no disclosure is made of Shared Information obtained pursuant to this Agreement, nothing in this Agreement shall preclude a Party from (a) pursuing independently any subject matter, including subjects reflected in Shared Information obtained by or subject to this Agreement or (b) using or disclosing any information, documents, investigations, or any other materials independently obtained or developed by such Party.

9.     Related Litigation.  The Parties continue to be bound by this Agreement in any litigation or other proceeding that arises out of the Matters of Common Interest.

10.    Parties to the Agreement.  This Agreement may be executed in counterparts. All potential Parties must sign for their participation to become effective.

11.    Withdrawal.  A Party may withdraw from this Agreement upon thirty days written notice to all other Parties.  Withdrawal shall not terminate, or relieve the withdrawing Party of any obligation under this Agreement regarding Shared Information received by the withdrawing Party before the effective date of the withdrawal.

12.    Modification.  This writing is the complete Agreement between the Parties, and any modifications must be approved in writing by all Parties.

OAG000185
**MTD APP. 058**

Dated: ___May 18___, 2016

_Michele Van Gelderen_

Michele Van Gelderen
Supervising Deputy Attorney General
Consumer Law Section
Office of Attorney General Kamala D. Harris
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
Tel. (213) 897-2000

OAG000186
MTD APP. 059

Dated: _May 3_, 2016

Matthew I. Levine
Assistant Attorney General
Office of the Attorney General
55 Elm Street
P.O. Box 120
Hartford, CT 06106

4

OAG000187
**MTD APP. 060**

Dated: _May 2_____ , 2016

Elizabeth Wilkins
Senior Counsel to the Attorney General*
Office of the Attorney General for the District of
Columbia
441 4th Street N.W. Suite 1100S
Washington, D.C. 20001
(202) 724-5568
elizabeth.wilkins@dc.gov

*Admitted to practice only in Maryland.  Practicing in the
District of Columbia under the direct supervision of Natalie O.
Ludaway, a member of the D.C. Bar pursuant to D.C. Court of
Appeals Rule 49(c).

OAG000188
**MTD APP. 061**

Dated: _____May 2_____, 2016

_James Gignac_

James P. Gignac
Environmental and Energy Counsel
Illinois Attorney General's Office
69 W. Washington St., 18th Floor
Chicago, IL  60602
(312) 814-0660
jgignac@atg.state.il.us

6

Dated: April 29, 2016

CHRISTOPHE COURCHESNE
Assistant Attorney General
Chief, Environmental Protection Division
One Ashburton Place
Boston, MA 02108
christophe.courchesne@state.ma.us

7

Dated: _____, 2016

_____
Joshua N. Auerbach
Assistant Attorney General
200 Saint Paul Place
Baltimore, Maryland 21202
(410) 576-6311
jauerbach@oag.state.md.us

OAG000191
**MTD APP. 064**

Dated: _____May 5_____, 2016

_____

Gerald D. Reid
Assistant Attorney General
Chief, Natural Resources Division
Maine Office of the Attorney General
(207) 626-8545
jerry.reid@maine.gov

OAG000192
**MTD APP. 065**

Signature: _Karen D. Olson_ Date: _5/16/16_

Karen D. Olson
Deputy Attorney General
Minnesota Attorney General's Office
445 Minnesota Street, Suite 900
St. Paul, MN  55101
(651) 757-1370
karen.olson@ag.state.mn.us

OAG000193
**MTD APP. 066**

Dated: _April 29___, 2016

JOSEPH A. FOSTER, ATTORNEY GENERAL
K. Allen Brooks, Senior Assistant Attorney General
33 Capitol Street
Concord, NH 03301
(603) 271-3679
allen.brooks@doj.nh.gov

OAG000194
**MTD APP. 067**

Dated: _____, 2016

*Tania Maestas*

Tania Maestas
Deputy Attorney General Civil Affairs
Office of the New Mexico Attorney General
PO Drawer 1508
Santa Fe, NM 87504

OAG000195
**MTD APP. 068**

Dated: _May 2_, 2016

_Monica Wagner_

Monica Wagner
Deputy Chief
Environmental Protection Bureau
Office of the Attorney General of New York
120 Broadway, 26th floor
New York, NY 10271
212-416-6351

13

Dated: April 29 , 2016

Paul Garrahan
Attorney-in-Charge | Natural Resources Section |
General Counsel Division
Oregon Department of Justice
1162 Court St. NE, Salem, OR 97301-4096
971.673.1943 (Tue, Thu, Fri) (Portland)
503.947.4593 (Mon, Wed) (Salem)
503.929.7553 (Mobile)

14

OAG000197
**MTD APP. 070**

Dated: April 28, 2016

Gregory S. Schultz
Special Assistant Attorney General
Rhode Island Department of Attorney General
150 South Main Street Providence, RI 02903
Tel.: (401) 274-4400, Ext. 2400

15

Dated: May 9, 2016

Rhodes B. Ritenour    5/9/16

Rhodes B. Ritenour
Deputy Attorney General
Civil Litigation Division
Office of the Attorney General
900 East Main Street
Richmond, VA 23219
Office: (804) 786-6731
E-mail: RRitenour@oag.state.va.us

John W. Daniel    5/9/16

John W. Daniel
Deputy Attorney General
Commerce, Environmental, and Technology
Division
Office of the Attorney General
900 East Main Street
Richmond, VA 23219
Office: (804) 786-6053
E-mail: JDaniel@oag.state.va.us

OAG000199
**MTD APP. 072**

Dated: May 10th, 2016

Renee A. Gumbs, Esq.
Deputy Attorney General
Department of Justice
34-38 Kronprindsens Gade
GERS Complex, 2nd flr.
St. Thomas, VI 00802
(340) 774-5666. ext. 101
(340) 776-3494 (Fax)
Renee.gumbs@doj.vi.gov

OAG000200
**MTD APP. 073**

Dated: April 29, 2016

Nicholas F. Persampieri
Assistant Attorney General
Office of the Attorney General
109 State Street
Montpelier, VT 05609-1001
(802)-828-6902
nick.persampieri@vermont.gov

18

Dated: _May 1_____, 2016

_Laura J. Watson_ _____

Laura J. Watson
Senior Assistant Attorney General
Washington State Office of the Attorney General
(360)-586-6743
Laura.watson@atg.wa.gov

OAG000202
**MTD APP. 075**

# EXHIBIT E

**MTD APP. 076**



# William Francis Galvin
## Secretary of the Commonwealth of Massachusetts



HOME      DIRECTIONS      CONTACT US

# Corporations Division

## Business Entity Summary

**ID Number: 135409005**

**Summary for:  EXXON MOBIL CORPORATION**

| | |
|---|---|
| **The exact name of the Foreign Corporation:**   EXXON MOBIL CORPORATION | |
| **The name was changed from:** EXXON CORPORATION **on** 12-03-1999 | |
| **Entity type:**   Foreign Corporation | |
| **Identification Number:** 135409005 | |
| **Date of Registration in Massachusetts:**   12-01-1972 | |
| **Last date certain:** | |
| **Organized under the laws of: State:** NJ **Country:** USA **on:** 08-05-1882 | |
| **Current Fiscal Month/Day:** 12/31 | **Previous Fiscal Month/Day:** 00/00 |

**The location of the Principal Office:**

Address:   5959 LAS COLINAS BOULEVARD

City or town, State, Zip code, Country:       IRVING,  TX  75039-2298  USA

**The location of the Massachusetts office, if any:**

Address:

City or town, State, Zip code, Country:

**The name and address of the Registered Agent:**

Name:    CORPORATION SERVICE COMPANY

Address:   84 STATE STREET

City or town, State, Zip code, Country:       BOSTON,  MA  02109  USA

**The Officers and Directors of the Corporation:**

| Title | Individual Name | Address |
|---|---|---|
| TREASURER | ROBERT N. SCHLECKSER | ATTN: OFFICE OF THE SECRETARY, 5959 LAS COLINAS BLVD. IRVING, TX 75039-2298 USA |
| SECRETARY | JEFF J. WOODBURY | ATTN: OFFICE OF THE SECRETARY, 5959 LAS COLINAS BLVD. IRVING, TX 75039-2298 USA |
| VICE PRESIDENT | NEIL A. CHAPMAN | ATTN: OFFICE OF THE SECRETARY, 5959 LAS COLINAS BLVD. IRVING, TX 75039-2298 USA |
| VICE PRESIDENT | S. JACK BALAGIA | ATTN: OFFICE OF THE SECRETARY, 5959 LAS COLINAS BLVD. IRVING, TX 75039-2298 USA |
| SENIOR VICE PRESIDENT | MARK W. ALBERS | ATTN: OFFICE OF THE SECRETARY, 5959 LAS COLINAS BLVD. IRVING, TX 75039-2298 USA |
| VICE PRESIDENT | BRAD W. CORSON | ATTN: OFFICE OF THE SECRETARY, 5959 LAS COLINAS BLVD. IRVING, TX 75039-2298 USA |
| VICE PRESIDENT | JEFF J. WOODBURY | ATTN: OFFICE OF THE SECRETARY, 5959 LAS COLINAS BLVD. IRVING, TX 75039-2298 USA |

| PRESIDENT & CHAIRMAN | | ATTN: OFFICE OF THE SECRETARY, 5959 LAS COLINAS BLVD. IRVING, TX 75039-2298 USA |
|---|---|---|
| VICE PRESIDENT | LYNNE M. LACHENMYER | ATTN: OFFICE OF THE SECRETARY, 5959 LAS COLINAS BLVD. IRVING, TX 75039-2298 USA |
| VICE PRESIDENT | DAVID S. ROSENTHAL | ATTN: OFFICE OF THE SECRETARY, 5959 LAS COLINAS BLVD. IRVING, TX 75039-2298 USA |
| VICE PRESIDENT | THOMAS R. WALTERS | ATTN: OFFICE OF THE SECRETARY, 5959 LAS COLINAS BLVD. IRVING, TX 75039-2298 USA |
| VICE PRESIDENT | D. G. (JERRY) WASCOM | ATTN: OFFICE OF THE SECRETARY, 5959 LAS COLINAS BLVD. IRVING, TX 75039-2298 USA |
| CONTROLLER | DAVID S. ROSENTHAL | ATTN: OFFICE OF THE SECRETARY, 5959 LAS COLINAS BLVD. IRVING, TX 75039-2298 USA |
| VICE PRESIDENT | THERESA M. FARIELLO | ATTN: OFFICE OF THE SECRETARY, 5959 LAS COLINAS BLVD. IRVING, TX 75039-2298 USA |
| VICE PRESIDENT | MALCOLM A. FARRANT | ATTN: OFFICE OF THE SECRETARY, 5959 LAS COLINAS BLVD. IRVING, TX 75039-2298 USA |
| ASSISTANT SECRETARY | JOEL P. WEBB | ATTN: OFFICE OF THE SECRETARY, 5959 LAS COLINAS BLVD. IRVING, TX 75039-2298 USA |
| SENIOR VICE PRESIDENT | MICHAEL J. DOLAN | ATTN: OFFICE OF THE SECRETARY, 5959 LAS COLINAS BLVD. IRVING, TX 75039-2298 USA |
| VICE PRESIDENT | STEPHEN M. GREENLEE | ATTN: OFFICE OF THE SECRETARY, 5959 LAS COLINAS BLVD. IRVING, TX 75039-2298 USA |
| VICE PRESIDENT | JAMES (JAIME) M. SPELLINGS | ATTN: OFFICE OF THE SECRETARY, 5959 LAS COLINAS BLVD. IRVING, TX 75039-2298 USA |
| SENIOR VICE PRESIDENT | ANDREW P. SWIGER | ATTN: OFFICE OF THE SECRETARY, 5959 LAS COLINAS BLVD. IRVING, TX 75039-2298 USA |
| VICE PRESIDENT | ALAN JOHN KELLY | ATTN: OFFICE OF THE SECRETARY, 5959 LAS COLINAS BLVD. IRVING, TX 75039-2298 USA |
| SENIOR VICE PRESIDENT | JACK P. WILLIAMS, JR. | ATTN: OFFICE OF THE SECRETARY, 5959 LAS COLINAS BLVD. IRVING, TX 75039-2298 USA |
| VICE PRESIDENT | ROB S. FRANKLIN | ATTN: OFFICE OF THE SECRETARY, 5959 LAS COLINAS BLVD. IRVING, TX 75039-2298 USA |
| VICE PRESIDENT | WILLIAM M. COLTON | ATTN: OFFICE OF THE SECRETARY, 5959 LAS COLINAS BLVD. IRVING, TX 75039-2298 USA |
| VICE PRESIDENT | MICHAEL G. COUSINS | ATTN: OFFICE OF THE SECRETARY, 5959 LAS COLINAS BLVD. IRVING, TX 75039-2298 USA |
| DIRECTOR | DR. MICHAEL J. BOSKIN | ATTN: OFFICE OF THE SECRETARY, 5959 LAS COLINAS BLVD. IRVING, TX 75039-2298 USA |
| DIRECTOR | PETER BRABECK-LETMATHE | ATTN: OFFICE OF THE SECRETARY, 5959 LAS COLINAS BLVD. IRVING, TX 75039-2298 USA |
| DIRECTOR | URSULA M. BURNS | ATTN: OFFICE OF THE SECRETARY, 5959 LAS COLINAS BLVD. IRVING, TX 75039-2298 USA |
| DIRECTOR | DR. LARRY R. FAULKNER | ATTN: OFFICE OF THE SECRETARY, 5959 LAS COLINAS BLVD. IRVING, TX 75039-2298 USA |
| DIRECTOR | JAY S. FISHMAN | ATTN: OFFICE OF THE SECRETARY, 5959 LAS COLINAS BLVD. IRVING, TX 75039-2298 USA |
| DIRECTOR | HENRIETTA H. FORE | ATTN: OFFICE OF THE SECRETARY, 5959 LAS COLINAS BLVD. IRVING, TX 75039-2298 USA |
| DIRECTOR | KENNETH C. FRAZIER | ATTN: OFFICE OF THE SECRETARY, 5959 LAS COLINAS BLVD. IRVING, TX 75039-2298 USA |
| DIRECTOR | STEVEN S REINEMUND | ATTN: OFFICE OF THE SECRETARY, 5959 LAS COLINAS BLVD. IRVING, TX 75039-2298 USA |
| DIRECTOR | SAMUEL J. PALMISANO | ATTN: OFFICE OF THE SECRETARY, 5959 LAS COLINAS BLVD. IRVING, TX 75039-2298 USA |
| DIRECTOR | REX W. TILLERSON | ATTN: OFFICE OF THE SECRETARY, 5959 LAS COLINAS BLVD. IRVING, TX 75039-2298 USA |
| DIRECTOR | WILLIAM C. WELDON | ATTN: OFFICE OF THE SECRETARY, 5959 LAS COLINAS BLVD. IRVING, TX 75039-2298 USA |

**Business entity stock is publicly traded:**

**The total number of shares and the par value, if any, of each class of stock which this business entity is authorized to issue:**

| Class of Stock | Par value per share | Total Authorized | | Total issued and outstanding |
|---|---|---|---|---|
| | | No. of shares | Total par value | No. of shares |
| CNP | $ 0.00 | 9,000,000,000 | $ 0.00 | 8,019,424,434 |

|  Consent  |  Confidential Data  |  Merger Allowed  |  Manufacturing  |
|---|---|---|---|

**View filings for this business entity:**

ALL FILINGS
Amended Foreign Corporations Certificate
Annual Report
Annual Report - Professional
Application for Reinstatement
Articles of Consolidation - Foreign and Domestic

**Comments or notes associated with this business entity:**

MTD APP. 079

# EXHIBIT F

MTD APP. 080

NO. 017-284890-16

| | | |
|---|---|---|
| EXXON MOBIL CORPORATION | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | |
| CLAUDE EARL WALKER, Attorney | § | |
| General of the United States Virgin | § | TARRANT COUNTY, TEXAS |
| Islands, in his official capacity, | § | |
| COHEN MILSTEIN SELLERS & | § | |
| TOLL, PLLC, in its official capacity | § | |
| as designee, and LINDA SINGER, in | § | |
| her official capacity as designee, | § | |
| | § | |
| *Defendants.* | § | 17TH JUDICIAL DISTRICT |

## PLEA IN INTERVENTION OF THE
## STATES OF TEXAS AND ALABAMA

The States of Texas and Alabama intervene under Rule 60 of the Texas

Rules of Civil Procedure to protect the due process rights of their residents.

## I.    Background.

At a recent gathering on climate change in New York City, Claude Earl

Walker, Attorney General of the United States Virgin Islands, announced an

investigation by his office ("Investigation") into a company whose product he

claims "is destroying this earth." Pl. Compl. Ex. B at 16. A week earlier,

ExxonMobil Corporation, a New Jersey corporation with principal offices in

Texas, was served with a subpoena seeking documents responsive to alleged

violations of the penal code of the Virgin Islands. *Id*. at ¶ 20, Ex. A at 1. Though

General Walker signed the subpoena, it arrived in an envelope postmarked in

Washington, D.C, with a return address for Cohen Milstein, a law firm that

describes itself as a "pioneer in plaintiff class action lawsuits" and "the most effective law firm in the United States for lawsuits with a strong social and political component." *Id.* at ¶¶ 4, 20. ExxonMobil now seeks to quash the subpoena in Texas state court, asserting, *inter alia*, that the Investigation violates the First Amendment and that the participation of Cohen Milstein, allegedly on a contingency fee basis, is an unconstitutional delegation of prosecutorial power. *See generally id.*

The intervenors are States whose sovereign power and investigative and prosecutorial authority are implicated by the issues and tactics raised herein. General Walker's Investigation appears to be driven by ideology, and not law, as demonstrated not only by his collusion with Cohen Milstein, but also by his request for almost four decades worth of material from a company with no business operations, employees, or assets in the Virgin Islands. *Id.* at ¶ 7. And it is disconcerting that the apparent pilot of the discovery expedition is a private law firm that could take home a percentage of penalties (if assessed) available only to government prosecutors. We agree with ExxonMobil that serious jurisdictional concerns exist, but to protect the fundamental right of impartiality in criminal and quasi-criminal investigations, we intervene.

## II.    Standard for Intervention.

Rule of Civil Procedure 60 provides that "[a]ny party may intervene by filing a pleading, subject to being stricken out by the court for sufficient cause on the motion of any party." TEX. R. CIV. P. 60. "Rule 60 . . . provides . . . that

MTD APP. 082

any party may intervene" in litigation in which they have a sufficient interest. *Mendez v. Brewer*, 626 S.W.2d 498, 499 (Tex. 1982). "A party has a justiciable interest in a lawsuit, and thus a right to intervene, when his interests will be affected by the litigation." *Jabri v. Alsayyed*, 145 S.W.3d 660, 672 (Tex. App.— Houston [14th Dist.] 2004, no pet.) (citing *Law Offices of Windle Turley v. Ghiasinejad*, 109 S.W.3d 68, 71 (Tex. App.—Fort Worth 2003, no pet.)). And an intervenor is not required to secure a court's permission to intervene in a cause of action or prove that it has standing. *Guar. Fed. Sav. Bank v. Horseshoe Operating Co.*, 793 S.W.2d 652, 657 (Tex. 1990).

There is no pre-judgment deadline for intervention. *Tex. Mut. Ins. Co. v. Ledbetter*, 251 S.W.3d 31, 36 (Tex. 2008). Texas courts recognize an "expansive" intervention doctrine in which a plea in intervention is untimely only if it is "filed after judgment." *State v. Naylor*, 466 S.W.3d 783, 788 (Tex. 2015) (quoting *First Alief Bank v. White*, 682 S.W.2d 251, 252 (Tex. 1984)). There is no final judgment in this case, thus making the States' intervention timely.

## III.   Intervenors Have an Interest in Ensuring Constitutional Safeguards for Prosecutions of its Residents.

The alleged use of contingency fees in this case raises serious due process considerations that the intervenors have an interest in protecting.

To begin, government attorneys have a constitutional duty to act impartially in the execution of their office. The Supreme Court has explained that attorneys who represent the public do not represent an ordinary party in litigation, but "a sovereignty whose obligation to govern impartially is as

compelling as its obligation to govern at all." *Berger v. United States*, 295 U.S. 78, 88, (1935).

Contingency fee arrangements cut against the duty of impartiality by giving the attorney that represents the government a financial stake in the outcome. Thus, the use of contingency fees is highly suspect in criminal cases and, more generally, when fundamental rights are at stake. *State v. Lead Indus., Ass'n, Inc.*, 951 A.2d 428, 476 n. 48 (R.I. 2008) (doubting that contingent fees would ever be appropriate in a criminal case); *Int'l Paper Co. v. Harris Cty.*, 445 S.W.3d 379, 393 (Tex. App.—Houston [1st Dist.] 2013, no pet.) (contingency fees are impermissible in cases implicating fundamental rights).

Here, the Investigation appears to be a punitive enforcement action, as all of the statutes that ExxonMobil purportedly violated are found in the criminal code of the Virgin Islands. 14 V.I.C. §§ 551, 605, 834. In addition, ExxonMobil asserts a First Amendment interest to be free from viewpoint discrimination. Intervenors, in sum, have a strong interest in ensuring that contingency fee arrangements are not used in criminal and quasi criminal cases where a multitude of fundamental rights, including speech, lie in the balance.

## IV.    Conclusion and Prayer for Relief.

The States identified herein, Texas and Alabama, by and through this intervention, request notice and appearance, and the opportunity to defend the rule of law before this Court.

MTD APP. 084

Respectfully submitted,

| | |
|---|---|
| LUTHER STRANGE<br>Attorney General of Alabama<br>501 Washington Ave.<br>Montgomery, Alabama 36104 | KEN PAXTON<br>Attorney General of Texas<br><br>JEFFREY C. MATEER<br>First Assistant Attorney General<br><br>BRANTLEY STARR<br>Deputy Attorney General for Legal<br>  Counsel<br><br>AUSTIN R. NIMOCKS<br>Associate Deputy Attorney General for<br>  Special Litigation<br><br><u>/s/ Austin R. Nimocks</u><br>AUSTIN R. NIMOCKS<br>Texas Bar No. 24002695<br><br>Special Litigation Division<br>P.O. Box 12548, Mail Code 001<br>Austin, Texas 78711-2548<br><br>*ATTORNEYS FOR INTERVENORS* |

**MTD APP. 085**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing pleading has been served on the following counsel of record on this 16th day of May, 2016, in accordance with Rule 21a of the Texas Rules of Civil Procedure, electronically through the electronic filing manager:

Patrick J. Conlon
patrick.j.conlon@exxonmobil.com
Daniel E. Bolia
daniel.e.bolia@exxonmobil.com
1301 Fannin Street
Houston, TX 77002

Theodore V. Wells, Jr.
twells@paulweiss.com
Michele Hirshman
mhirshman@paulweiss.com
Daniel J. Toal
dtoal@paulweiss.com
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON, LLP
1285 Avenue of the Americas
New York, NY 10019-6064

Justin Anderson
janderson@paulweiss.com
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON, LLP
2001 K Street, NW
Washington, D.C. 20006-1047

Ralph H. Duggins
rduggins@canteyhanger.com
Philip A. Vickers
pvickers@canteyhanger.com
Alix D. Allison
aallison@canteyhanger.com
CANTEY HANGER LLP
600 W. 6th St. #300
Fort Worth, TX 76102

MTD APP. 086

Nina Cortell
nina.cortell@haynesboone.com
HAYNES & BOONE, LLP
301 Commerce Street
Suite 2600
Fort Worth, TX 76102

*Counsel for Exxon Mobil Corporation*

Cohen Milstein Sellers & Toll PLLC
lsinger@cohenmilstein.com
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, D.C. 20005

Linda Singer, Esq.
lsinger@cohenmilstein.com
Cohen Milstein Sellers & Toll PLLC
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, D.C. 20005

Claude Earl Walker, Esq.
claude.walker@doj.vi.gov
Attorney General
3438 Kronprindsens Gade
GERS Complex, 2nd Floor
St. Thomas, U.S. Virgin Islands 00802

/s/ Austin R. Nimocks
Austin R. Nimocks
Associate Deputy Attorney General for
Special Litigation

MTD APP. 087

# EXHIBIT G

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.
                                        SUPERIOR COURT DEPARTMENT
                                        OF THE TRIAL COURT
                                        CIVIL ACTION NO. _16-1888 F_

_____ )
                                        )
IN RE CIVIL INVESTIGATIVE              )
DEMAND NO. 2016-EPD-36,                )
ISSUED BY THE OFFICE OF THE            )
ATTORNEY GENERAL                       )
_____ )


## MEMORANDUM OF EXXON MOBIL CORPORATION IN SUPPORT OF ITS EMERGENCY MOTION TO SET ASIDE OR MODIFY THE CIVIL INVESTIGATIVE DEMAND OR ISSUE A PROTECTIVE ORDER



**MTD APP. 089**

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ......................................................................... 1

II.    STATEMENT OF FACTS ............................................................ 3

      A.     The Attorney General's Misuse of Law Enforcement Tools ...................... 3

      B.     In Closed-Door Meetings, the Green 20 Plotted with Climate Activists and Plaintiffs' Lawyers ................................................... 4

      C.     The CID's Burdensome Demands and Targeting of Perceived Dissent ............................................................................... 5

      D.     ExxonMobil's Lack of Relevant Conduct in Massachusetts ...................... 6

      E.     ExxonMobil's Motion for a Preliminary Injunction in Federal Court ............................................................................... 7

III.   ARGUMENT .............................................................................. 7

      A.     There Is No Personal Jurisdiction over ExxonMobil ................................ 7

      B.     The Court Should Disqualify the Attorney General and her Office and Appoint an Independent Investigator .................................... 8

      C.     The CID and the Investigation Violate ExxonMobil's Constitutional, Statutory, and Common Law Rights ............................... 11

            1.     The CID and the Investigation Violate ExxonMobil's Free Speech Rights under Article XVI ............................... 11

                   (a)     The CID Is an Impermissible Content-Based Discrimination ................................................. 11

                   (b)     The CID Impermissibly Probes ExxonMobil's Political Speech .................................................. 12

                   (c)     The CID Is Not Narrowly Tailored ................................ 13

                   (d)     The CID Is an Impermissible Form of Official Harassment ...................................................... 14

            2.     The CID's Demands Are Irrelevant and Unduly Burdensome ................................................................. 14

(a) The CID's Irrelevant Demands Are Arbitrary and Capricious ........................................................................ 15

(b) The Attorney General's Fishing Expedition Is Impermissible .................................................................. 15

(c) The CID Imposes an Undue Burden on ExxonMobil ...... 16

(d) The CID Lacks Proper Specificity .................................... 17

(e) The CID Improperly Demands the Production of Privileged Documents ...................................................... 18

D. The Court Should Stay Adjudication of this Motion Pending Resolution of the Related Federal Action ................................................. 19

IV. CONCLUSION ................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Associated Indus. of Mass.* v. *Attorney Gen.*,
  418 Mass. 279 (1994) ................................................................12

*Borman* v. *Borman*,
  378 Mass. 775 (1979) ................................................................10

*Cardone* v. *Pereze*,
  No. 01-P-92, 2003 WL 118605 (Mass. App. Ct. Jan. 14, 2003) ................14

*Comm'r of Revenue* v. *Boback*,
  12 Mass. App. Ct. 602 (1981)......................................................18

*Cronin* v. *Strayer*,
  392 Mass. 525 (1984) ................................................................4

*CUNA Mut. Ins. Soc.* v. *Attorney Gen.*,
  380 Mass. 539 (1980) ................................................................15

*Daimler AG* v. *Bauman*,
  134 S. Ct. 746 (2014).................................................................8

*Doe* v. *Sex Offender Registry Bd.*,
  84 Mass. App. Ct. 537 (2013)........................................................9

*Donaldson* v. *Akibia, Inc.*,
  No. 03CV1009E, 2008 WL 4635848 (Mass. Super. Ct. Aug. 30, 2008) ..........17

*Commonwealth* v. *Dwyer*,
  448 Mass. 122 (2006) ................................................................15

*Commonwealth* v. *Ellis*,
  429 Mass. 362 (1999) ..............................................................9, 10

*Enargy Power (Shenzhen) Co.* v. *Xiaolong Wang*,
  No. 13-11348-DJC, 2014 WL 4687542 (D. Mass. Sept. 17, 2014) ............18

*Ethicon Endo-Surgery, Inc.* v. *Pemberton*,
  No. 10-3973-B, 2010 WL 5071848 (Mass. Super. Ct. Oct. 27, 2010)......19

*Fafard* v. *Conservation Comm'n of Reading*,
  41 Mass. App. Ct. 565 (1996)......................................................15

**MTD APP. 092**

*Fin. Comm'n of City of Bos.* v. *McGrath*,
   343 Mass. 754 (1962) ...................................................................................15

*Gardner* v. *Mass. Tpk. Auth.*,
   347 Mass. 552 (1964) ...............................................................................16, 17

*Harmon Law Offices, P.C.* v. *Attorney Gen.*,
   83 Mass. App. Ct. 830 (2013)......................................................................15

*Jones* v. *Brockton Pub. Mkts., Inc.*,
   369 Mass. 387 (1975) ...................................................................................14

*Long* v. *Comm'r of Pub. Safety*,
   26 Mass. App. Ct. 61 (1988).........................................................................15

*Commonwealth* v. *Lucas*,
   472 Mass. 387 (2015) ..............................................................................11, 13

*Makrakis* v. *Demelis*,
   No. 09-706-C, 2010 WL 3004337 (Mass. Super. Ct. July 15, 2010) ..........16

*Mun. Lighting Comm'n* v. *Stathos*,
   13 Mass. App. Ct. 990 (Mass. App. Ct. 1982) .............................................19

*Ott* v. *Bd. of Registration in Med.*,
   276 Mass. 566 (1931) .....................................................................................9

*Pisa* v. *Commonwealth*,
   378 Mass. 724 (1979) ................................................................................9, 10

*In re Reorganization of Elec. Mut. Liab. Ins. Co., Ltd. (Bermuda)*,
   425 Mass. 419 (1997) .....................................................................................8

*In re Roche*,
   381 Mass. 624 (1980) ......................................................................12, 14, 18

*Seidman* v. *Cent. Bancorp, Inc.*,
   No. 030547BLS, 2003 WL 369678 (Mass. Super. Ct. Feb. 3, 2003)..........19

*Commonwealth* v. *Torres*,
   424 Mass. 153 (1997) ..............................................................................15, 16

*In re United Shoe Machinery Corp.*,
   7 F.R.D. 756 (D. Mass. 1947).......................................................................17

*Walden* v. *Fiore*,
   134 S. Ct. 1115 (2014)....................................................................................8

*Ward* v. *Peabody*,
    380 Mass. 805 (1980) ...................................................................................14, 18

*In re Yankee Milk, Inc.*,
    372 Mass. 353 (1977) .............................................................................15, 16, 17

**Statutes**

15 U.S.C. § 77c(a)(3) ......................................................................................................7

G.L. c. 93A ...................................................................................................................15

G.L. c. 93A, § 2 ........................................................................................................6, 15

G.L. c. 93A, § 6(1) .......................................................................................................15

G.L. c. 93A, § 6(4) .......................................................................................................17

G.L. c. 93A, § 6(7) ...........................................................................................1, 11, 16

G.L. c. 110A, § 402(a)(10) ............................................................................................7

G.L. c. 260, § 5A ............................................................................................................6

G.L. c. § 402(a)(10) .......................................................................................................7

**Other Authorities**

U.S. Constitution First Amendment ..............................................................................18

Mass. R. Civ. P. 26(c) ...........................................................................................11, 16

Massachusetts Constitution Article XII .......................................................................10

Massachusetts Constitution Article XIV ......................................................................15

Massachusetts Constitution Article XVI .........................................................11, 12, 13

Massachusetts Constitution Article XXIX .....................................................................9

## I.    INTRODUCTION

Petitioner Exxon Mobil Corporation ("ExxonMobil") has filed an emergency motion

under G.L. c. 93A, § 6(7) to set aside or modify Civil Investigative Demand No. 2016-EPD-36

issued by the Attorney General's Office (the "CID").[1]  The CID commands ExxonMobil to

produce 40 years of corporate documents related to climate change, notwithstanding the absence

of any reason to believe that ExxonMobil engaged in conduct that would subject it to liability in

Massachusetts under the relevant statutes.[2]  The CID was issued on April 19, 2016, according to

a plan devised by partisan public officials, climate change activists, and plaintiffs' side

environmental attorneys.[3]  The public officials made their intentions known at a highly

publicized joint press conference held on March 29, 2016.[4]  There, a coalition of attorneys

general announced their frustration with what they viewed as insufficient congressional action on

climate change and pledged to use law enforcement tools "creatively" and "aggressively," not to

investigate violations of law, but to impose their preferred policy response to climate change.[5]

Attorney General Maura T. Healey (the "Attorney General"), a member of that coalition,

shared these concerns, emphasizing her "moral obligation" to "speed our transition to a clean

energy future" by "sound[ing] the alarm" and holding accountable fossil fuel companies that

allegedly failed to disclose the risks of climate change.[6]  To advance this shared agenda on

climate change policy, the Attorney General announced that she "too, ha[d] joined in

investigating the practices of ExxonMobil."[7]  She then unambiguously revealed her preordained

---

[1]   ExxonMobil has submitted an Appendix in Support of its Petition and Emergency Motion.  The Appendix
      contains the affidavits and exhibits referenced in this Memorandum.
[2]   Ex. B at App. 23-51.
[3]   *See* Ex. C at App. 63.
[4]   Ex. A at App. 2-21.
[5]   *Id.* at App. 3.
[6]   *Id.* at App. 13-14.
[7]   *Id.* at App. 14.

conclusion regarding the outcome of the investigation, stating: "We can all see today the troubling disconnect between what Exxon knew . . . and what the company . . . chose to share with investors and with the American public."[8]

The CID is a product of this misguided enterprise to target ExxonMobil for its participation in public discourse on climate change policy.  Because the investigation and the CID has infringed, is infringing, and will continue to infringe ExxonMobil's federal constitutional rights, ExxonMobil has requested a preliminary injunction barring enforcement of the CID.[9]  ExxonMobil sought that relief in the United States District Court for the Northern District of Texas, which has jurisdiction to hear ExxonMobil's constitutional claims arising from the Attorney General's efforts to commit constitutional torts against ExxonMobil in Texas.  This Court, by contrast, lacks personal jurisdiction over ExxonMobil in connection with any violation of law contemplated by the Attorney General's investigation.  The absence of personal jurisdiction over ExxonMobil in connection with any claims that have been identified by the Attorney General is reason enough to set aside the CID.

For the sole purpose of protecting its rights and preserving its objections, however, ExxonMobil requests that, if this Court determines that it can exercise personal jurisdiction over ExxonMobil, it (1) recuse the Attorney General's Office and appoint an independent investigator and (2) set aside, modify, or issue a protective order concerning the CID.  This relief is appropriate because the Attorney General is impermissibly biased against ExxonMobil and has violated ExxonMobil's constitutional, statutory, and common law rights.  Moreover, in view of the pending federal action, judicial economy warrants a brief stay of these proceedings pending a ruling on ExxonMobil's application for a preliminary injunction in federal court.

---

[8]   *Id.* at App. 13.
[9]   Ex. BB at App. 212-45; Ex. CC at App. 246-51; Ex. DD at App. 252-84.

## II.      STATEMENT OF FACTS

### A.      The Attorney General's Misuse of Law Enforcement Tools

The CID is the result of a coordinated campaign of partisan state officials urged on by climate change activists and privately interested attorneys.  This campaign first exposed itself to the public on March 29, 2016, when the New York Attorney General hosted a press conference in New York City, featuring the remarks of private citizen and former Vice President Al Gore, with certain other attorneys general as the self-proclaimed "AGs United For Clean Power."[10] The attorneys general, calling themselves "the Green 20" (a reference to the number of participating attorneys general), explained that their mission was to "com[e] up with creative ways to enforce laws being flouted by the fossil fuel industry."[11]  Expressing dissatisfaction with what they perceived to be "gridlock in Washington" regarding climate-change policy, the New York Attorney General said that the coalition had to work "creatively" and "aggressively" to advance that agenda.[12]  Former Vice President Gore went on to condemn those who question the sufficiency or cost-effectiveness of renewable energy sources, faulting them for "slow[ing] down this renewable revolution" by "trying to convince people that renewable energy is not a viable option."[13]

During her turn at the podium, the Attorney General articulated her view that "there's nothing we need to worry about more than climate change," and that she has "a moral obligation to act" to alleviate the threat to "the very existence of our planet."[14]  She therefore pledged to "address climate change and to work for a better future"[15] by investigating ExxonMobil.[16]  She

---

[10]   Ex. A at App. 2-21.
[11]   *Id.* at App. 3.
[12]   *Id.*
[13]   *Id.* at App. 10.
[14]   *Id.* at App. 13.
[15]   *Id.* at App. 14.
[16]   *Id.* at App. 13.

also contemporaneously reported the findings of her investigation, before ExxonMobil had even received the CID, stating:

> Fossil fuel companies that deceived investors and consumers about the dangers of climate change should be, must be, held accountable. That's why I, too, have joined in investigating the practices of ExxonMobil. We can all see today the troubling disconnect between what Exxon knew, what industry folks knew, and what the company and industry chose to share with investors and with the American public.[17]

This results-oriented approach to investigating fossil fuel companies and ExxonMobil struck a discordant note with those who rightfully expect government attorneys to conduct themselves in a neutral and unbiased manner. It was evident that the Attorney General and the other attorneys general had prejudged the very investigation they proposed to undertake, prompting one reporter to question whether the press conference and these investigations were "publicity stunt[s]."[18]

## B.    In Closed-Door Meetings, the Green 20 Plotted with Climate Activists and Plaintiffs' Lawyers

The impropriety of the attorneys general's public statements was compounded by what they said behind closed doors during two presentations held the morning of the press conference.[19] Peter Frumhoff, the director of science and policy for the Union of Concerned Scientists, an organization that criticizes entities that "downplay and distort the evidence of climate change," gave the first presentation on the "imperative of taking action now on climate change."[20] The second presentation—on "climate change litigation"[21]—was led by Matthew Pawa of Pawa Law Group, which boasts of its "role in launching global warming litigation."[22]

For years, Frumhoff and Pawa have sought to initiate legal actions against fossil fuel

---

[17]   *Id.*
[18]   *Id.* at App. 18.
[19]   Ex. M at App. 132-33.
[20]   *Id.* at App. 133; Ex. P at App. 155.
[21]   Ex. M at App. 133.
[22]   Ex. R at App. 166.

companies to promote their partisan agenda and to generate private benefit.  In 2012, Frumhoff

hosted and Pawa presented at a conference, in which the attendees discussed at considerable

length "Strategies to Win Access to Internal Documents" of companies like ExxonMobil and

noted that "a single sympathetic state attorney general might have substantial success in bringing

key internal documents to light."[23]  Indeed, attendees were "nearly unanimous" regarding "the

importance of legal actions, both in wresting potentially useful internal documents from the

fossil fuel industry and, more broadly, in maintaining pressure on the industry that could

eventually lead to its support for legislative and regulatory responses to global warming."[24]

The attorneys general at the press conference understood that the participation of

Frumhoff and Pawa, if reported, could expose the private, financial, and political interests behind

the investigations.  When *The Wall Street Journal* called Pawa the next day, the environmental

bureau chief at the New York Attorney General's Office told Pawa, "[m]y ask is if you speak to

the reporter, to not confirm that you attended or otherwise discuss the event" in order to conceal

from the press and public Pawa's presence at the meeting.[25]

### C.    The CID's Burdensome Demands and Targeting of Perceived Dissent

Three weeks after the press conference, on April 19, 2016, the Attorney General's Office

served the CID on ExxonMobil.[26]  Spanning 25 pages and containing 38 broadly worded

document requests, the CID requests essentially all of ExxonMobil's documents related to

climate change dating back, in some instances, to 1976.  For example, the CID requests all

documents concerning ExxonMobil's "research efforts to study $CO_2$ emissions" and their effects

on the climate since 1976.[27]  Some of the more specific requests are more troubling than the

---

[23]   Ex. C at App. 63.
[24]   Ex. D at App. 89.
[25]   *Id.*
[26]   Ex. B at App. 23.
[27]   *Id.* at App. 34 (Request No. 1); *see also* App. 34-35 (Request Nos. 2-4).

overly broad ones because they appear to target groups holding views with which the Attorney General disagrees. The CID demands that ExxonMobil produce all climate change related documents concerning its discussions with 12 named organizations,[28] all of which have been identified by environmental advocacy groups as holding views on climate change with which they disagree.[29] By stark contrast, the CID does not seek production of ExxonMobil's communications with organizations that have expressed views on climate change with which she agrees.

### D. ExxonMobil's Lack of Relevant Conduct in Massachusetts

According to the CID, the Attorney General's investigation concerns ExxonMobil's alleged violation of G.L. c. 93A, § 2,[30] which prohibits "unfair or deceptive acts or practices" in "trade or commerce" and has a four-year statute of limitations. *See* G.L. c. 93A, § 2(a); G.L. c. 260, § 5A. It specifies two types of transactions under investigation: (1) ExxonMobil's "marketing and/or sale of energy and other fossil fuel derived products to consumers in the Commonwealth," and (2) ExxonMobil's "marketing and/or sale of securities" to Massachusetts investors.[31]

During the limitations period, however, ExxonMobil has not engaged in the type of Massachusetts-based trade or commerce out of which any violation of G.L. c. 93A, § 2, as alleged in the CID, could arise. In that time, ExxonMobil has not sold fossil fuel derived products to Massachusetts consumers,[32] and it has not marketed or sold any securities to the

---

[28] *Id.* at App. 35 (Request No. 5).
[29] Affidavit of Justin Anderson, dated June 14, 2016 ("Anderson Aff.") ¶ 3.
[30] Ex. B. at App. 23.
[31] *Id.*
[32] Affidavit of Geoffrey Grant Doescher, dated June 10, 2016 ("Doescher Aff.") ¶ 3-4. Service stations selling fossil fuel derived product under an "Exxon" or "Mobil" banner are owned and operated independently. *Id.*

general public in Massachusetts.[33]  Moreover, ExxonMobil has made no statements concerning climate change in the limitations period that could give rise to fraud as identified in the CID. Importantly—for more than a decade—ExxonMobil has publicly acknowledged that climate change presents significant risks that could affect its business.  ExxonMobil's 2006 Corporate Citizenship Report, for example, expressly recognized that "the risk to society [posed by] greenhouse gas emissions could prove significant" and that "strategies that address the risk need to be developed and implemented."[34]

### E.   ExxonMobil's Motion for a Preliminary Injunction in Federal Court

On June 15, 2016, ExxonMobil filed a complaint in the U.S. District Court for the Northern District of Texas and a motion for a preliminary injunction against enforcement of the CID because it violates ExxonMobil's federal constitutional rights.[35]  The federal court in Texas has jurisdiction because a substantial part of the events giving rise to ExxonMobil's federal constitutional claims occurred there.

## III.   ARGUMENT

### A.   There Is No Personal Jurisdiction Over ExxonMobil

The Court should set aside the CID because this Court has no general or specific personal jurisdiction over ExxonMobil in connection with any violation of law contemplated by the Attorney General's investigation.[36]  ExxonMobil is incorporated in New Jersey, headquartered in Texas, and maintains all of its central operations in Texas.[37]  It cannot be "regarded as at home"

---

[33]  Affidavit of Robert Luettgen, dated June 14, 2016 ("Luettgen Decl.") at ¶ 7.  During the limitations period, ExxonMobil has sold short-term, fixed-rate notes in Massachusetts in specially exempted commercial paper transactions.  *See* G.L. c. 110A, § 402(a)(10); *see also* 15 U.S.C. § 77c(a)(3).  These notes, which mature in 270 days or less, were sold to institutional investors, not individual consumers.  Luettgen Aff. ¶¶ 9-10.

[34]  Ex. F at App. 104; *see also* Ex. W at App. 189 (stating that the "risks of global climate change" "have been, and may in the future" continue to impact its operations).

[35]  Ex. BB at App. 212-45; Ex. CC at App. 246-51; Ex. DD at App. 252-84.

[36]  Counsel for ExxonMobil have filed a special appearance to make this motion to set aside the CID; ExxonMobil does not consent to jurisdiction through this emergency motion.

[37]  Luettgen Aff. ¶¶ 5-6.

in Massachusetts, and is thus not subject to general jurisdiction there.  *See Daimler AG* v. *Bauman*, 134 S. Ct. 746, 760 (2014).

ExxonMobil is also not subject to specific jurisdiction in Massachusetts because it has no "suit-related" contacts with Massachusetts.  *See Walden* v. *Fiore*, 134 S. Ct. 1115, 1121-23 (2014).  It is inconceivable that ExxonMobil deceived Massachusetts consumers or investors during the limitations period.  In the past five years, ExxonMobil has neither (1) sold fossil fuel derived products to consumers in Massachusetts, nor (2) owned or operated a single retail store or gas station in the Commonwealth.[38]  As to the sale of securities, ExxonMobil has not issued any form of equity for sale to the general public in Massachusetts in the past five years.[39] Furthermore, ExxonMobil's only sales of debt in the past decade were to underwriters residing outside Massachusetts.[40]  Those sales fall outside the ambit of the CID, which states that it is investigating the sale of securities to "investors in the Commonwealth."  Because the Constitution prohibits the exercise of personal jurisdiction over a foreign corporation with no in-state, suit-specific contacts, the Court should set aside the CID.  *See Walden*, 134 S. Ct. at 1121-23.

### B.       The Court Should Disqualify the Attorney General and her Office and Appoint an Independent Investigator

If the Court were to determine that it can exercise personal jurisdiction over ExxonMobil, it nevertheless should disqualify the Attorney General and her Office from conducting this investigation because the Attorney General's public remarks demonstrate that she has predetermined the outcome of the investigation and is biased against ExxonMobil.  ExxonMobil

---

[38]   Doescher Aff. ¶¶ 3-4.
[39]   Luettgen Aff. ¶ 8.
[40]   Ex. B at App. 23.  This is subject to the one exception discussed above—*i.e.*, short-term fixed-rate notes, which ExxonMobil has sold to a handful of sophisticated institutions in the Commonwealth.  *See supra* n.33.

recognizes that it is not immune from legitimate governmental inquiries.  But, like any other company, it is entitled to an inquiry conducted by a fair, impartial, and evenhanded investigator.

The Attorney General's statements at the Green 20 press conference reveal a partisan bias that disqualifies her and her Office from serving as disinterested investigators.  Article XXIX of the Declaration of Rights guarantees the "impartial interpretation of the laws, and administration of justice."  Due process safeguards are abridged where a state official's prejudicial comments indicate bias and a predisposition over a pending matter.  *See Doe* v. *Sex Offender Registry Bd.*, 84 Mass. App. Ct. 537, 541-43 (2013) (vacating administrative board's order as violative of plaintiff's due process rights because hearing examiner's comments demonstrated his bias against plaintiff and his prejudicial predisposition of the matter); *see also Ott* v. *Bd. of Reg. in Medicine*, 276 Mass. 566, 574 (1931) (affirming order vacating administrative board's decision based, in part, on board's adverse remarks about petitioner that were "incompatible with an open and an unbiased mind").  Moreover, "[a] prosecuting attorney's obligation is to secure a fair and impartial trial for the public and for the defendant."  *Commonwealth* v. *Ellis*, 429 Mass. 362, 367 (1999).  Because a "prosecutor has considerable discretion, the exercise of which in most instances is outside the supervision of a judge," she "may not compromise h[er] impartiality." *Id.* at 367-68.  The rules governing disqualification are designed "to avoid even the *appearance of impropriety.*"  *Pisa* v. *Commonwealth*, 378 Mass. 724, 728-29 (1979) (emphasis added).

The Attorney General's conclusory comments concerning ExxonMobil and the fossil fuel industry create just such "an appearance of impropriety," undermining public confidence in any investigation conducted by her office.  *Pisa*, 378 Mass. at 728-29.  The Attorney General revealed personal and partisan bias against ExxonMobil by invoking her "moral obligation" to act because, "in [her] view, there's nothing we to need to worry about more than climate

change."[41]   While the Attorney General is certainly entitled to her policy views, she must not allow them to impair her impartiality.   But a lack of impartiality is exactly what her comments at the Green 20 conference indicate.   The Attorney General took aim at "certain companies, certain industries [that] may not have told the whole story, leading many to doubt whether climate change is real and to misunderstand and misapprehend the catastrophic nature of its impacts."[42] And then, before even serving the CID, she announced to the public the preordained conclusion of her investigation:   "We can all see today the troubling disconnect between what Exxon knew . . . and what the company . . . chose to share with investors and with the American public."[43]

Statements of this kind are entirely inconsistent with the impartiality that Massachusetts law and fundamental principles of fairness require of law enforcement officers vested with the power to investigate, prosecute, and punish.   *See Borman* v. *Borman*, 378 Mass. 775, 788 (1979). Moreover, the Attorney General's bias against ExxonMobil violates ExxonMobil's due process right to a disinterested investigator under Article XII of the Massachusetts Constitution.   Due process guarantees ExxonMobil a prosecutor who neither is nor "appear[s] to be influenced" by "her personal interests."   *Ellis*, 429 Mass. at 371 (1999).

Importantly, the rules governing disqualification do not require a showing of the probabilities of actual harm or prejudice in the absence of disqualification.   *See Pisa*, 378 Mass. at 728.   Rather, "[t]he rules are applied not only to prevent prejudice to a party, but also to avoid even the appearance of impropriety."   *See id*.   Nonetheless, ExxonMobil would be prejudiced by allowing the Attorney General or any of her subordinates, who are well aware of the Attorney General's public statements and personal bias, to conduct a results-oriented investigation.

---

[41]   Ex. A at App. 13.
[42]   *Id.*
[43]   *Id.*

Consequently, this Court should disqualify the Attorney General's Office and appoint an independent investigator, who is not paid on a contingency-fee basis, to determine whether an investigation is warranted and, if so, to conduct the investigation.

**C.    The CID and the Investigation Violate ExxonMobil's Constitutional, Statutory, and Common Law Rights**

Should the Court find that it can exercise personal jurisdiction, it nevertheless should set aside, modify, or issue a protective order concerning the CID because the CID violates ExxonMobil's constitutional, statutory, and common law rights, as well as the standards set forth in Mass. R. Civ. P. 26(c).  *See* G.L. c. 93A, § 6(7).

**1.    The CID and the Investigation Violate ExxonMobil's Free Speech Rights under Article XVI**

The CID is a direct and deliberate assault on ExxonMobil's right under Article XVI of the Massachusetts Constitution to participate in a public debate over climate change policy.  The Attorney General has burdened ExxonMobil's right to participate in that debate in two ways. First, as her comments at the press conference and the CID itself make clear, the Attorney General has chosen to regulate ExxonMobil's speech because she disagrees with ExxonMobil's views about how the United States should respond to climate change.  Second, the CID impermissibly intrudes on ExxonMobil's political speech.

**(a)    The CID Is an Impermissible Content-Based Discrimination**

Article XVI forbids state officials from regulating speech because of its "message, its ideas, its subject matter, or its content."  *Commonwealth* v. *Lucas*, 472 Mass. 387, 392 (2015). Such regulation is "presumptively invalid," meaning that the government bears the burden of showing that such a regulation is narrowly tailored to serve a compelling state interest.  *Id.* at 395.

The same statements that disqualify the Attorney General from serving as a disinterested

prosecutor also reveal that the CID is an impermissible content-based regulation of ExxonMobil's speech. The Attorney General and the other speakers at the press conference left no doubt that their decision to target ExxonMobil for investigation followed from their disagreement with the company's perceived views concerning which policies the United States should implement in response to climate change. The Attorney General herself characterized the investigation as one aspect of her campaign "to address climate change," and remedy "the problem . . . of public perception," by "holding accountable those who have needed to be held accountable for far too long."[44]

The CID's demands confirm these impermissible motives because they expressly target organizations holding views about climate change or climate change policy with which the Attorney General disagrees. The CID requests ExxonMobil's documents and communications with 12 named organizations,[45] all of which have been identified by advocacy organizations as, at times, opposing the views and policies favored by those advocacy organizations with respect to climate change science or policy.[46] A state official's targeting of speakers based on their views is improper content-based discrimination. *Cf. In re Roche*, 381 Mass. 624, 637 (1980). Because that is precisely what the Attorney General has done here through the issuance of the CID, the CID is presumptively invalid.

      **(b)**      **The CID Impermissibly Probes ExxonMobil's Political Speech**

Political speech concerning how a government should operate is "at the very heart" of speech protected by Article XVI. *See Associated Indus. of Mass.* v. *Attorney Gen.*, 418 Mass. 279, 287-88 (1994). This protection is no less stringent when the speaker is a corporation rather than a person. *See id.* at 288. State action that infringes on political speech is subject to strict

---

[44]  *Id.* at App. 13-14.
[45]  Ex. B at App. 35 (Request No. 5).
[46]  Anderson Aff. ¶ 3.

scrutiny.  *See id.* at 289.

The CID impermissibly infringes ExxonMobil's political speech.  It requires ExxonMobil to produce documents that reflect its participation in the long-running and still unfolding national debate about the most appropriate policy approach the United States should take in response to the risks of climate change.  The CID effectively demands all of ExxonMobil's communications and documents related to the subject of climate change.  For example, it compels ExxonMobil to produce any and all documents related to ExxonMobil's speeches, press releases, SEC filings, papers, and presentations about climate change.[47]  It also requests virtually all of ExxonMobil's research related to climate change since 1976.[48]  Research of that kind is indispensable to determining what the proper policy response to climate change is, and it therefore falls comfortably within the protections of Article XVI.

### (c)    The CID Is Not Narrowly Tailored

Because the CID infringes ExxonMobil's speech in two significant ways, the Attorney General bears the burden of showing that the CID's demands are narrowly tailored to achieve a compelling state interest.  *See Lucas*, 472 Mass. at 398.  She cannot meet this burden.  The only interest that the Attorney General discussed at the press conference was her "moral obligation" to combat climate change by identifying and suppressing the speech of fossil fuel companies that stand in the way of that goal.[49]  Far from qualifying as a compelling interest, the Attorney General's desire to target companies that hold views with which she disagrees is itself illegal.

Even if the Attorney General could identify a compelling state interest, the CID is not narrowly tailored to advance any such interest.  The CID's overly broad and unduly burdensome demands for, inter alia, 40 years of research into climate change cannot possibly qualify as

---

[47]  *See* Ex. B at App. 34-41 (Request Nos. 2-4, 8-12, 14-17, 19, 22, 32).
[48]  *See id.* at App. 34-35 (Request Nos. 1-4).
[49]  *See* Ex. A at App. 13-14.

narrowly tailored.  Indeed, such requests would not survive even an ordinary motion to quash, let alone the searching inquiry required where free speech rights are threatened.  *See, e.g.*, *Cardone* v. *Pereze*, No. 01-P-92, 2003 WL 118605, *4 (Mass. App. Ct. Jan. 14, 2003) (affirming denial of motion to compel a request for "all documents relating to all services, billings, and accounts of the fertility center covering four and one-half years").

### (d)      The CID Is an Impermissible Form of Official Harassment

The Attorney General's public statements also demonstrate that the CID is being wielded as an improper tool of official harassment.  A government agency must not employ "harassing tactics unjustified by the requirements of sober investigation."  *Ward* v. *Peabody*, 380 Mass. 805, 814 (1980).  Courts, therefore, have broad discretion to set aside a civil investigative demand if it was issued to harass an entity for expressing a particular point of view.  *See In re Roche*, 381 Mass. 636-37; *Cronin* v. *Strayer*, 392 Mass. 525, 536 (1984).

As described in Section III.C.1, the Attorney General's statements indicate that ExxonMobil was targeted based on its speech.  State actors' attempts to "chill a particular point of view," amount to official harassment, and courts may refuse to order the production of materials demanded for that unlawful reason.[50]  *In re Roche*, 381 Mass. at 636-37 (internal quotation marks omitted).

### 2.      The CID's Demands Are Irrelevant and Unduly Burdensome

The CID is itself defective in its entirety because it launches a baseless fishing expedition, demanding unreasonable volumes of materials of no relevance to the violations purportedly under investigation.  Because the Massachusetts Constitution, G.L. c. 93A, § 6, and rules of civil procedure prohibit such dragnet investigations, the Court should set aside the CID.

---

[50]      For the same reasons, the Attorney General's issuance of the CID constitutes an abuse of process.  *See Jones* v. *Brockton Pub. Mkts., Inc.*, 369 Mass. 387, 389 (1975).

### (a)    The CID's Irrelevant Demands Are Arbitrary and Capricious

When the Attorney General "believes" that a corporation has violated G.L. c. 93A, § 2,

she is authorized to request materials that are "relevant" to the alleged violation of law.  *See* G.L.

c. 93A, § 6(1).  The Attorney General may not, however, "act arbitrarily or in excess of [her]

statutory authority."  *CUNA Mut. Ins. Soc.* v. *Attorney Gen.*, 380 Mass. 539, 542 n.5 (1980).

When analyzing whether a government agency's action was arbitrary and capricious, a court

must examine whether the agency action "was authorized by the governing statute . . . in light of

the facts."  *Fafard* v. *Conservation Comm'n of Reading*, 41 Mass. App. Ct. 565, 568 (1996).

Here, the Attorney General has acted arbitrarily and in excess of her authority because

the CID was issued in "willful . . . disregard of [the] facts" that ExxonMobil has engaged in no

trade or commerce in Massachusetts during the relevant statute of limitations period which could

potentially give rise to liability for the state-law claims alleged in the CID.  *Long* v. *Comm'r of

Pub. Safety*, 26 Mass. App. Ct. 61, 65 (1988).  *See* Section III.A.  Because the materials sought

are plainly irrelevant to any conceivable claim under G.L. c. 93A identified in the CID, the CID

violates the statutory requirement that an Attorney General may seek only those documents that

are "relevant" to a "valid investigation."  *In re Yankee Milk, Inc.*, 372 Mass. 353, 357 (1977)

(discussing G.L. c. 93A, § 6(1)); *see also Harmon Law Offices, P.C.* v. *Attorney Gen.*, 83 Mass.

App. Ct. 830, 837 (2013).

### (b)    The Attorney General's Fishing Expedition Is Impermissible

For similar reasons, the CID's demands constitute a baseless fishing expedition in

violation of ExxonMobil's Article XIV rights.  Pursuant to Article XIV, "unreasonable" civil

investigative demands "must be quashed or modified."  *See Fin. Comm'n of City of Bos.* v.

*McGrath*, 343 Mass. 754, 764-65 (1962).  This restriction bars the government from "fish[ing]"

into the records of an entity until it has "caught something."  *Commonwealth* v. *Torres*, 424

Mass. 153, 161 (1997); *see also Commonwealth* v. *Dwyer*, 448 Mass. 122, 145 (2006) (barring baseless "fishing expeditions for possibly relevant information").

This roving investigation contravenes the prohibition on fishing expeditions.  First, the CID requires ExxonMobil to produce documents that bear no relation to ExxonMobil's trade or commerce in the Commonwealth.  *See* Sections III.A, III.B.  Second, the Attorney General's stated theory, that ExxonMobil "deceived investors and consumers about the dangers of climate change"[51] lacks a factual basis.  For the last decade, ExxonMobil has publicly "recognize[d] that the risk to society posed by greenhouse gas emissions may prove significant," that "action is justified now,"[52] and that the "risks of global climate change" "have been, and may in the future" continue to impact its operations.[53]  The CID lacks any legitimate investigatory purpose and must be set aside.

### (c)   The CID Imposes an Undue Burden on ExxonMobil

A civil investigative demand issued pursuant to G.L. c. 93A, § 6(7) must not place an undue burden on its recipient.  *See In re Yankee Milk*, 372 Mass. at 360-61 (citing G.L. c. 93A, § 6(5)); *see also* G.L. c. 93A, § 6(7) (incorporating the standards of Mass. R. Civ. P. 26(c), including that a discovery request must now impose an "undue burden or expense" on a party).  A civil investigative demand imposes an undue burden if it requests a "quantum of material" that "exceed[s] reasonable limits."  *In re Yankee Milk*, 372 Mass. at 360-61.

Here, the CID demands 40 years of documents, despite the four-year statute of limitations applicable to the alleged violation.  A state agency may not request documents over "such a long period of time as to exceed reasonable limits."  *Gardner* v. *Mass. Tpk. Auth.*, 347 Mass. 552, 561

---

[51]   Ex. A at App. 13.
[52]   Ex. E at App. 94; *see also* Ex. F at App. 104 ("Because the risk to society and ecosystems from rising greenhouse gas emissions could prove to be significant, strategies that address the risk need to be developed and implemented.").
[53]   Ex. W at App. 188-89.

(1964) (internal quotation marks omitted). For example, in *Makrakis* v. *Demelis*, the court held that a request for records over a 22-year period placed "an unreasonable burden" on the recipient because it was "not limited to a narrow time frame." No. 09-706-C, 2010 WL 3004337, at *2 (Mass. Super. Ct. July 15, 2010); *see also In re United Shoe Machinery Corp.*, 7 F.R.D. 756, 757 (D. Mass. 1947) (reducing subpoena requesting documents dating back 27 years to just 10 years, which "seem[ed] to be the longest period of time which has been allowed by any court" at that time). Similarly, an agency may not request documents "beyond the relevant time period" of an action. *See Donaldson* v. *Akibia, Inc.*, No. 03CV1009E, 2008 WL 4635848, at *15 (Mass. Super. Ct. Aug. 30, 2008).

In contravention of these holdings, the CID requests all documents and communications since 1976 concerning ExxonMobil's "research efforts to study $CO_2$ emissions" and their effects on the climate.[54] The CID also requests all documents since 1976 concerning the papers and presentations given by three ExxonMobil scientists and all documents since 1997 concerning an ExxonMobil executive's statements about climate change.[55] Even the requests that seek ExxonMobil's documents over the past six to ten years[56] exceed reasonable limits in light of the four-year statute of limitations. At a minimum, the CID must be modified to limit the scope of its demands to the four-year limitations period.

### (d) The CID Lacks Proper Specificity

The lack of specificity of the CID's document requests also violates Massachusetts restrictions on civil investigative demands. Under G.L. c. 93A, § 6(4), a civil investigative demand must be set aside if it fails to describe with "reasonable specificity" the documents sought "so as to fairly indicate the material demanded." *See In re Yankee Milk*, 372 Mass. at

---

[54] Ex. B at App. 34 (Request No. 1).
[55] *Id.* at App. 34-36 (Request Nos. 2-4, 8).
[56] *See, e.g., id.* at App. 34-42 (Request Nos. 5, 9-35, 37-38).

361. A civil investigative demand that seeks "all classes of records" on a single topic "without limitation" fails this requirement, as does a request for documents related to a vague or generic topic. *See Comm'r of Revenue* v. *Boback*, 12 Mass. App. Ct. 602, 603 n.2 & 610 (1981).

The CID suffers from both flaws. It fails to properly specify the material demanded by seeking essentially all documents related to climate change. In addition, several of the demands are impermissibly vague, seeking, for instance, documents and communications related to ExxonMobil's "awareness," "internal considerations," and "decision making" with respect to certain climate change matters, and "information exchange" with "other companies and/or industry groups representing energy companies."[57] *See Enargy Power (Shenzhen) Co.* v. *Xiaolong Wang*, No. 13-11348-DJC, 2014 WL 4687542, at *3 (D. Mass. Sept. 17, 2014) (noting that a document request that "call[s] for all" documents related to a broad topic "without any restriction as to the subject matter of" that topic because such a request is "overly broad").

### (e) The CID Improperly Demands the Production of Privileged Documents

Massachusetts courts protect entities from compelled disclosure of documents protected by privilege, such as the attorney-client privilege, work product, and the First Amendment privilege. *See, e.g.*, *In re Reorganization of Elec. Mut. Liab. Ins. Co., Ltd. (Bermuda)*, 425 Mass. 419, 421 (1997) (attorney-client privilege); *Ward*, 380 Mass. at 817 (work product); *In re Roche*, 381 Mass. at 632 (First Amendment privilege). While the CID contains provisions requiring documentation if ExxonMobil withholds a document based on privilege, it does not affirmatively state that ExxonMobil may withhold privileged documents. ExxonMobil therefore requests that if the CID is not set aside, it should be modified or a protective order should be issued to prevent

---

[57] *Id.* at App. 35-36, 39-40 (Request Nos. 7-8, 18, 23); *see also id.* at App. 39 (Request Nos. 18, 20 (requesting information about ExxonMobil's "marketing decisions")).

the disclosure of privileged information.

> **D.    The Court Should Stay Adjudication of this Motion Pending Resolution of the Related Federal Action**

ExxonMobil's motion for a preliminary injunction is now pending in the United States District Court for the Northern District of Texas.[58] If granted, the relief sought in that action would render this Petition and motion moot. This Court should therefore stay adjudication of this motion, pending decision in the earlier-filed action.

Courts presume that a second action should be stayed or dismissed when it seeks relief that would be redundant of the relief sought in an earlier-filed suit. *See Ethicon Endo-Surgery, Inc.* v. *Pemberton*, No. 10-3973-B, 2010 WL 5071848, at *3 (Mass. Super. Ct. Oct. 27, 2010). When determining whether special circumstances justify permitting the second suit to proceed, courts consider: "judicial and litigant economy, the just and effective disposition of disputes, the possible absence of jurisdiction over all necessary desirable parties, as well as a balancing of conveniences that may favor the second forum." *Id.*

Here, ExxonMobil has moved in federal court in Texas for a preliminary injunction barring the enforcement of the CID. That action was filed first, presented to a court with jurisdiction over the matter, and raises important constitutional claims. A presumption thus attaches in favor of permitting the federal court to adjudicate that motion before this Court takes any action here. *See Mun. Lighting Comm'n* v. *Stathos*, 13 Mass. App. Ct. 990, 991 (Mass. App. Ct. 1982); *see also Seidman* v. *Cent. Bancorp, Inc.*, No. 030547BLS, 2003 WL 369678, at *2-3 (Mass. Super. Ct. Feb. 3, 2003) (staying a later filed Massachusetts state court action in light of an earlier filed action in Massachusetts federal court).

None of the relevant factors rebuts this presumption. First, it is expected that the federal

---

[58]    Ex. BB at App. 212-45; Ex. CC at App. 246-51; Ex. DD at App. 252-84.

court will promptly resolve the pending motion.  Second, the federal court is "fully capable of furnishing complete relief to the parties," so it can justly and effectively resolve ExxonMobil's motion.  *See Stathos*, 13 Mass. App. Ct. at 991.  Third, jurisdictional considerations favor staying this action, since Massachusetts courts lack jurisdiction over ExxonMobil.  Finally, any "balancing of conveniences" supports the application of the presumption.  The documents that are subject to the CID are located in Texas, where ExxonMobil alleges that it will feel the effects of the unconstitutional CID.[59]  Accordingly, the relevant considerations confirm—rather than rebut—the presumption permitting the earlier-filed action to proceed.

## IV.    CONCLUSION

The Attorney General's personal views on climate change cannot justify a warrantless fishing expedition into the records of a company that conducts no relevant activities in Massachusetts.  The Attorney General's public statements leave no ambiguity about the outcome of any investigation to be conducted by her office and demonstrate a personal bias against ExxonMobil.  Results-oriented government investigations shake the public's confidence in the impartial administration of justice.  It is the special role of courts to provide a check against misuse of government power.  Under these circumstances, finding an absence of personal jurisdiction is a sound exercise of judicial authority.  The Court should grant ExxonMobil's motion, and enter an order setting aside the CID.

Respectfully submitted,

EXXON MOBIL CORPORATION

By its attorneys,

---

[59]    Ex. BB at App. 212-45; Ex. CC at App. 246-51; Ex. DD at App. 252-84.

EXXON MOBIL CORPORATION

By:  /s/ Patrick J. Conlon
Patrick J. Conlon
(patrick.j.conlon@exxonmobil.com)
(*pro hac vice* pending)
Daniel E. Bolia
(daniel.e.bolia@exxonmobil.com)
(*pro hac vice* pending)
1301 Fannin Street
Houston, TX 77002
(832) 624-6336

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON, LLP

By:  /s/ Justin Anderson
Theodore V. Wells, Jr.
(*pro hac vice* pending)
Michele Hirshman
(*pro hac vice* pending)
Daniel J. Toal
(*pro hac vice* pending)
1285 Avenue of the Americas
New York, NY  10019-6064
(212) 373-3000
Fax: (212) 757-3990

Justin Anderson
(*pro hac vice* pending)
2001 K Street, NW
Washington, D.C.  20006-1047
(202) 223-7300
Fax: (202) 223-7420

Dated:  June 16, 2016

FISH & RICHARDSON P.C.

By:  /s/ Thomas C. Frongillo
Thomas C. Frongillo (BBO# 180690)
(frongillo@fr.com)
Caroline K. Simons (BBO# 680827)
(simons@fr.com)
One Marina Park Drive
Boston, MA 02210
(617) 542-5070

## CERTIFICATE OF SERVICE

I, Caroline K. Simons, hereby certify that a true and correct copy of the above document was
served upon the Attorney General's Office by hand on this 16th day of June, 2016.

/s/ Caroline K. Simons
Caroline K. Simons

# EXHIBIT H

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
CIVIL ACTION NO. 16-1888 F

)
IN RE CIVIL INVESTIGATIVE )
DEMAND NO. 2016-EPD-36, )
ISSUED BY THE OFFICE OF THE )
ATTORNEY GENERAL )
)

RECEIVED
JUN 16 2016
SUPERIOR COURT CIVIL
MICHAEL JOSEPH DONOVAN
CLERK/MAGISTRATE

## NOTICE OF SPECIAL APPEARANCE
## ON BEHALF OF PETITIONER EXXON MOBIL CORPORATION

PLEASE TAKE NOTICE that Patrick J. Conlon and Daniel E. Bolia of Exxon Mobil

Corporation; Thomas C. Frongillo and Caroline K. Simons, of Fish & Richardson P.C.; and

Theodore V. Wells, Jr., Michele Hirshman, Daniel J. Toal, and Justin Anderson, of Paul, Weiss,

Rifkind, Wharton & Garrison, LLP, hereby enter their special appearances as counsel for Exxon

Mobil Corporation for the limited purpose of contesting the jurisdiction of the Massachusetts

Attorney General's Civil Investigative Demand No. 2016-EPD-36, served upon Exxon Mobil

Corporation, in the above-captioned action.

Motions for Leave to Appear *Pro Hac Vice* have been filed concurrently on behalf of

Patrick J. Conlon, Daniel E. Bolia, Theodore V. Wells, Jr., Michele Hirshman, Daniel J. Toal,

and Justin Anderson.

Respectfully submitted,

EXXON MOBIL CORPORATION

By its attorneys,

EXXON MOBIL CORPORATION

By: /s/ Patrick J. Conlon
Patrick J. Conlon
(patrick.j.conlon@exxonmobil.com)
(*pro hac vice* pending)
Daniel E. Bolia
(daniel.e.bolia@exxonmobil.com)
(*pro hac vice* pending)
1301 Fannin Street
Houston, TX 77002
(832) 624-6336

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON, LLP

By: /s/ Justin Anderson
Theodore V. Wells, Jr.
(*pro hac vice* pending)
Michele Hirshman
(*pro hac vice* pending)
Daniel J. Toal
(*pro hac vice* pending)
1285 Avenue of the Americas
New York, NY 10019-6064
(212) 373-3000
Fax: (212) 757-3990

Justin Anderson
(*pro hac vice* pending)
2001 K Street, NW
Washington, D.C. 20006-1047
(202) 223-7300
Fax: (202) 223-7420

Dated: June 16, 2016

FISH & RICHARDSON P.C.

By: /s/ Thomas C. Frongillo
Thomas C. Frongillo (BBO# 180690)
(frongillo@fr.com)
Caroline K. Simons (BBO# 680827)
(simons@fr.com)
One Marina Park Drive
Boston, MA 02210
(617) 542-5070

## CERTIFICATE OF SERVICE

I, Caroline K. Simons, hereby certify that a true and correct copy of the above document was served upon the Attorney General's Office by hand on this 16th day of June, 2016.

/s/ Caroline K. Simons
Caroline K. Simons

MTD APP. 118

# EXHIBIT I

**MTD APP. 119**

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.                                    SUPERIOR COURT
                                               CIVIL ACTION NO.: 16-1888F

```
                                           )
IN RE CIVIL INVESTIGATIVE                  )
DEMAND NO. 2016-EPD-36,                     )
ISSUED BY THE OFFICE OF THE                 )
ATTORNEY GENERAL                           )
                                           )
```

### THE COMMONWEALTH'S CROSS-MOTION TO COMPEL EXXON MOBIL CORPORATION TO COMPLY WITH CIVIL INVESTIGATIVE DEMAND NO. 2016-EPD-36

The Commonwealth of Massachusetts (the "Commonwealth"), acting by and through the Office of Attorney General Maura Healey (the "Attorney General"), hereby cross-moves pursuant to the Consumer Protection Act ("Chapter 93A"), G.L. c. 93A, § 7, for an order compelling the petitioner Exxon Mobil Corporation ("Exxon") to comply with Civil Investigative Demand No. 2016-EPD-36 (the "CID"), issued by the Attorney General on April 19, 2016, pursuant to her authority under G.L. c. 93A, § 6. As grounds therefor, the Attorney General states the following.

1.     On June 16, 2016, Exxon filed its Petition and so-called Emergency Motion to Set Aside or Modify the Civil Investigative Demand or Issue a Protective Order in this case.

2.     In response to Exxon's motion, and in support of this cross-motion,[1] the Attorney General is submitting the accompanying: (i) Consolidated Memorandum Opposing Exxon's Motion to Set Aside or Modify the CID or For a Protective Order and Supporting the Commonwealth's Cross-Motion to Compel Exxon to Comply with the CID (the "Consolidated

---

[1] This cross-motion is being served in accordance with the agreed upon schedule set forth in this Court's order of June 23, 2016 (Ames, J.), and is being served without a certificate pursuant to Suffolk Superior Court Rule 9C because under the circumstances no Rule 9C certificate is required.

Memorandum");[2] and (ii) an Appendix in the Consolidated Memorandum.

3.      The Attorney General issued the CID to Exxon pursuant to G.L. c. 93A, § 6, as part of the Attorney General's pending investigation of Exxon's potential violations of G.L. c. 93A, § 2, and the regulations promulgated thereunder, for unfair and deceptive acts or practices in its marketing and/or sale of energy and other fossil fuel derived products to consumers in Massachusetts, and its marketing and/or sale of securities, as defined by G.L. c. 110A, § 401(k), to Massachusetts investors.

4.      The CID seeks information related to *what Exxon knew* about the impacts of burning fossils fuels (its primary product) on climate change and climate-driven risk to Exxon's own business and assets; *when Exxon knew those facts*; and *what Exxon told the world, including investors and consumers in Massachusetts*, about climate change over time. The Attorney General is seeking this information because it appears that Exxon had extensive knowledge of what one of Exxon's own scientists described as the potentially "catastrophic" impacts of climate change, and nevertheless took and continues to take public positions directed to investors, consumers, and the public that misleadingly minimize and fail to fully disclose the risks associated with climate change, to induce investors to invest in Exxon's securities or to induce consumers to purchase its products, in violation of G.L. c. 93A, § 2, and its implementing regulations.

5.      Chapter 93A, G.L. c. 93A, § 6(1), grants the Attorney General broad authority to investigate entities she believes have engaged or are engaging in any method, act or practice declared to be unlawful. *Attorney General v. Bodimetric Profiles*, 404 Mass. 152, 157-158 (1987). And pursuant to her investigatory powers, the Attorney General may examine or cause to

---

[2] The Attorney General was granted leave to file such a consolidated memorandum by order of this Court (Brieger, J.) on July 29, 2016.

be examined, through a CID, any material that is relevant to any alleged unlawful method, act or practice. Chapter 93A, G.L. c. 93A, § 6(1)(b).

6. As explained more fully in the accompanying Consolidated Memorandum, Exxon is unable to establish good cause or otherwise meet its burden to set aside or modify the CID or be granted a protective order. Instead, Chapter 93A provides lawful authority for the Attorney General's investigation, and the CID is both reasonable and imposes no undue burden on Exxon. Accordingly, this Court should compel Exxon to comply with it.

WHEREFORE, the Commonwealth requests that the Court issue an order: (i) denying in its entirety Exxon's motion to set aside or modify the CID or for a protective order; (ii) compelling Exxon to comply in all respects with the CID, including by forthwith producing to the Attorney General's Office the documents identified in the CID; and (iii) granting the Commonwealth such other and further relief as is just and proper in the circumstances.

Respectfully submitted,

THE COMMONWEALTH OF
MASSACHUSETTS

By its attorney:

MAURA HEALEY
ATTORNEY GENERAL

Richard J. Johnston, BBO# 253420
Chief Legal Counsel
    richard.johnston@state.ma.us
Melissa A. Hoffer, BBO# 641667
Chief, Energy and Environment Bureau
    melissa.hoffer@state.ma.us
Christophe Courchesne, BBO# 660507
Chief, Environmental Protection Division
    christope.courchesne@state.ma.us
I. Andrew Goldberg, BBO# 560843
    andy.goldberg@state.ma.us

3

Peter C. Mulcahy, BBO # 682958
    peter.mulcahy@state.ma.us
Assistant Attorneys General
Environmental Protection Division
Office of the Attorney General
One Ashburton Place, 18th Floor
Boston, MA 02108
(617) 727-2200

Dated: August 8, 2016

CERTIFICATE OF SERVICE

I, I. Andrew Goldberg, hereby certify that on this 8th day of August, 2016, I caused a copy of the foregoing document to be served upon counsel of record by regular mail.

I. Andrew Goldberg

4

**MTD APP. 123**