IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| EXXON MOBIL CORPORATION, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| ERIC TRADD SCHNEIDERMAN, | § | No. 4:16-CV-469-K |
| Attorney General of New York, in his | § | |
| official capacity, and MAURA TRACY | § | |
| HEALEY, Attorney General of | § | |
| Massachusetts, in her official capacity, | § | |
| | § | |
| Defendants. | § | |
| | § | |

## EXXON MOBIL CORPORATION'S BRIEF IN SUPPORT OF
## THIS COURT'S PERSONAL JURISDICTION OVER THE DEFENDANTS

Patrick J. Conlon (*pro hac vice*)
Daniel E. Bolia
EXXON MOBIL CORPORATION
1301 Fannin Street
Houston, TX 77002
(832) 624-6336

Theodore V. Wells, Jr. (*pro hac vice*)
Michele Hirshman (*pro hac vice*)
Daniel J. Toal (*pro hac vice*)
Justin Anderson (*pro hac vice*)
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Tel: (212) 373-3000
Fax: (212) 757-3990

Nina Cortell
HAYNES & BOONE, LLP
2323 Victory Avenue
Suite 700
Dallas, TX 75219
Tel: (214) 651-5579
Fax: (214) 200-0411

Ralph H. Duggins
Philip A. Vickers
Alix D. Allison
CANTEY HANGER LLP
600 W. 6th St. #300
Fort Worth, TX 76102
Tel: (817) 877-2800
Fax: (817) 877-2807

*Counsel for Exxon Mobil Corporation*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ............................................................................................ ii

PRELIMINARY STATEMENT ...................................................................................... 1

STATEMENT OF FACTS ............................................................................................... 2

      A.    The Conspiracy to Violate ExxonMobil's Rights. ....................................... 3

           1.    The Attorneys General Pledge to Suppress Speech Because of Opposition to its Content............................................................. 3

           2.    The Attorneys General Conceal Their Links to Private Interests Antagonistic to Free Speech on Climate Change Policy. ........................................................................................... 5

           3.    The Conspiracy's Improper Purpose Is Documented in Instruments the Attorneys General Executed. ................................. 7

      B.    The Attorneys General Reached into Texas to Inhibit Speech and Fish Through Records.................................................................................. 9

      C.    The National Dialogue on Climate Policy Includes Diverse Viewpoints. ................................................................................................ 11

ARGUMENT................................................................................................................... 11

I.     The Texas Long Arm Statute Reaches the Attorneys General. ............................ 12

II.    Due Process Authorizes Jurisdiction over the Attorneys General. ....................... 15

      A.    The Attorneys General Committed Intentional Torts in Texas. ................ 16

      B.    ExxonMobil's Complaint Arises from the Attorneys General's Contacts with this Forum.......................................................................... 23

      C.    Jurisdiction over the Attorneys General is Fair and Reasonable. ............. 23

III.   Any Gaps in the Factual Record Should Be Resolved By Jurisdictional Discovery. ............................................................................................................. 24

CONCLUSION................................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*21 Turtle Creek Square, Ltd.* v. *N.Y. State Teachers' Ret. Sys.*,
    425 F.2d 1366 (5th Cir. 1970) ..................................................................14

*Allred* v. *Moore & Peterson*,
    117 F.3d 278 (5th Cir. 1997) ...................................................................23

*Am. Refrigeration Co. v. Tranter, Inc.*,
    No. 02-15-00265-CV, 2016 WL 5957018 (Tex. App.—Fort Worth Oct.
    13, 2016)...................................................................................................15

*Asgeirsson* v. *Abbott*,
    773 F. Supp. 2d 684 (W.D. Tex. 2011), *aff'd*, 696 F.3d 454 (5th Cir.
    2012).........................................................................................................20

*Aviva Life & Annuity Co.* v. *Goldstein*,
    722 F. Supp. 2d 1067 (S.D. Iowa 2010) ..................................................17

*Bd. of Cty. Comm'rs of Beaver Cty.* v. *Amarillo Hosp. Dist.*,
    835 S.W.2d 115 (Tex. App.—Amarillo 1992, no writ)..............................14

*Bear Stearns Cos.* v. *Lavalle*
    No. 3:00 Civ. 1900-D, 2001 WL 406217 (N.D. Tex. Apr. 18, 2001) .......18

*Beasley* v. *Fairchild Hiller Corp.*,
    401 F.2d 593 (5th Cir. 1968) ...................................................................14

*Blessey Marine Servs., Inc.* v. *Jeffboat, LLC*,
    No. CIV.A. 10-1863, 2011 WL 651999 (E.D. La. Feb. 10, 2011) .............25

*Brown* v. *Flowers Indus., Inc.*,
    688 F.2d 328 (5th Cir. 1982) ...................................................................17

*Calder* v. *Jones*,
    465 U.S. 783 (1984)..................................................................................19

*Competitive Enter. Inst.* v. *Attorney Gen. of N.Y.*,
    No. 5050-16, slip. op. (N.Y. Sup. Ct. Albany Cty. Nov. 21, 2016) .............8

*In re DePuy Orthopaedics, Inc. Pinnacle Hip Implant Prods. Liab. Litig.*,
    Nos. 3:11-CV-03590-K, 3:12-CV-4975-K, 2014 WL 3557392 (N.D.
    Tex. July 18, 2014) ...................................................................................23

*Dudnikov* v. *Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063 (10th Cir.
    2008) ........................................................................................................16

ii

*Elton* v. *McClain*,
  No. SA-11-CV-00559-XR, 2011 WL 6934812 (W.D. Tex. Dec. 29,
  2011) ............................................................................................................18

*Enriquez* v. *City of Houston*,
  No. H-08-3466, 2010 WL 1609212 (S.D. Tex. Apr. 20, 2010) ..................16

*Evercom Sys., Inc.* v. *Mannis*,
  No. 3:03-CV-2956-M, 2004 WL 396885 (N.D. Tex. Feb. 20, 2004) .........19

*Future* v. *La. Bd. of Ethics*,
  No. 14-CV-0368, 2014 WL 1514234 (E.D. La. Apr. 16, 2014)..................20

*U.S. ex rel. George* v. *Boston Sci. Corp.*,
  864 F. Supp. 2d 597 (S.D. Tex. 2012) .......................................................16

*Goddard* v. *Nat'l Ass'n of Physician Recruiters, Inc.*,
  No. 3:04-CV-1424-H, 2005 WL 50871 (N.D. Tex. Jan. 11, 2005)............18

*Gore* v. *Experian Info. Sols., Inc.*,
  No. 3:04-CV-1069-H, 2004 WL 2008520 (N.D. Tex. Sept. 8, 2004)........16

*Guerrero* v. *Total Renal Care, Inc.*,
  932 F. Supp. 2d 769 (W.D. Tex. 2013) ......................................................16

*Gulf Coast Int'l, LLC* v. *Research Corp. of Univ. of Haw.*,
  490 S.W.3d 577 (Tex. App.—Houston [1st Dist.] 2016, pet. denied) .......15

*Hale* v. *Richey*,
  No. 10-11-00187-CV, 2012 WL 89920 (Tex. App.—Waco Jan. 11,
  2012) ............................................................................................................15

*Hunt Capital Partners, L.L.C.* v. *Berk*,
  No. 14-CV-2726, 2015 WL 4397137 (E.D. La. July 13, 2015) .................18

*Jama* v. *Immigration & Customs Enf't*,
  543 U.S. 335 (2005)......................................................................................14

*Kalman* v. *Cortes*,
  646 F. Supp. 2d 738 (E.D. Pa. 2009) ..........................................................20

*KEC Int'l Ltd.* v. *Jyoti Structures Ltd.*,
  No. 09-15-00378-CV, 2016 WL 7177695 (Tex. App.—Beaumont Dec.
  8, 2016) ........................................................................................................15

*Lewis* v. *Fresne*,
  252 F.3d 352 (5th Cir. 2001) .......................................................................17

*Long* v. *Grafton Executive Search, LLC*,
  263 F. Supp. 2d 1085 (N.D. Tex. 2003) ......................................................18

*Loritz* v. *Dumanis*,
    No. 2:06-CV-00735-KJD-RJJ, 2007 WL 1892109 (D. Nev. June 27,
    2007) ............................................................................................................20

*McFadin* v. *Gerber*,
    587 F.3d 753 (5th Cir. 2009) ....................................................................23

*McVea* v. *Crisp*,
    No. SA-07-CA-353-XR, 2007 WL 4205648 (W.D. Tex. Nov. 5, 2007),
    *aff'd*, 291 F. App'x 601 (5th Cir. 2008) ........................................................1

*Middlebrook* v. *Anderson*,
    No. 3:04-CV-2294, 2005 WL 350578 (N.D. Tex. Feb. 11, 2005) ..............17

*Native Vill. of Kivalina* v. *ExxonMobil Corp.*,
    663 F. Supp. 2d 863 (N.D. Cal. 2009), *aff'd*, 696 F.3d 849 (9th Cir.
    2012) ..............................................................................................................5

*Perez Bustillo* v. *Louisiana*,
    718 S.W.2d 844 (Tex. App.—Corpus Christi 1986, no writ).....................15

*Proppant Sols., LLC* v. *Delgado*,
    471 S.W.3d 529 (Tex. App.—Houston [1st Dist.] 2015)...........................15

*Retamco Operating, Inc.* v. *Republic Drilling Co.*,
    278 S.W.3d 333 (Tex. 2009) ....................................................................12

*Saxton* v. *Faust*,
    No. 3:09- CV-2458-K, 2010 WL 3446921 (N.D. Tex. Aug. 31, 2010) .....................15

*Spir Star AG* v. *Kimich*,
    310 S.W.3d 868 (Tex. 2010) ....................................................................15

*Stripling* v. *Jordan Prod. Co.*,
    234 F.3d 863 (5th Cir. 2000) ....................................................................16

*Stroman Realty, Inc.* v. *Antt*,
    528 F.3d 382 (5th Cir. 2008) ....................................................................21

*Stroman Realty, Inc.* v. *Wercinski*,
    513 F.3d 476 (5th Cir. 2008) ..............................................................13, 21

*Tansey* v. *City of Keller, Tex.*,
    No. 3:11-CV-03289-N(BF), 2012 WL 2092935 (N.D. Tex. May 21,
    2012)..............................................................................................................21

*Tisdale* v. *VFG, LLC*,
    No. 2:12-CV-166-KS-MTP, 2013 WL 150441 (S.D. Miss. Jan. 14,
    2013) ............................................................................................................18

*TransFirst Holdings, Inc.* v. *Phillips*,
No. 3:06-CV-2303-P, 2007 WL 631276 (N.D. Tex. Mar. 1, 2007)...........................18

*Valtech Sols. Inc.* v. *Davenport*,
No. 3:15-CV-3361-D, 2016 WL 2958927 (N.D. Tex. May 23, 2016)......................25

*Vanderbilt Mortg. & Fin., Inc.* v. *Flores*,
692 F.3d 358 (5th Cir. 2012) ...................................................................................16

*Walden* v. *Fiore*
134 S. Ct. 1115 (2014)..................................................................................19, 22

*Ward* v. *Hawkins*,
418 S.W.3d 815 (Tex. App.—Dallas 2013) .............................................................15

*Wien Air Alaska, Inc.* v. *Brandt*,
195 F.3d 208 (5th Cir. 1999) ...................................................................................19

*Yahoo! Inc.* v. *La Ligue Contre Le Racisme Et L'Antisemitisme*,
433 F.3d 1199 (9th Cir. 2006) (en banc) .................................................................19

*Ex parte Young*,
209 U.S. 123 (1908)..................................................................................................13

## STATUTES

Tex. Civ. Prac. & Rem. Code Ann. § 17.041(1)–(2) ........................................................12

## OTHER AUTHORITIES

U.S. Const. amend. I .....................................................................................1, 9, 19, 20, 23

U.S. Const. amend. IV ..............................................................................1, 19, 20, 21, 23

U.S. Const. amend. XIV, § 1 ..............................................................................12, 15

v

Exxon Mobil Corporation ("ExxonMobil") respectfully submits this brief in support of this Court's exercising personal jurisdiction over Defendant Attorneys General Eric Tradd Schneiderman and Maura Tracy Healey (together, the "Attorneys General").

## PRELIMINARY STATEMENT

The Attorneys General find themselves before this Court because they have committed and are committing constitutional torts in this judicial district.  They have no good cause to complain about being here.  ExxonMobil exercises its First Amendment right to free speech and its Fourth Amendment right to be free from unreasonable searches and seizures in Texas.  Those rights are now under siege by a conspiracy that stretches north into New York and Massachusetts.  The Attorneys General of those states, acting in concert with others known and unknown, have launched pretextual investigations of ExxonMobil because they disagree with its perceived views on climate change policy and seek to deter ExxonMobil from participating in this debate over public policy.  However far-flung that conspiracy might be and wherever the coconspirators might reside, the object of the conspiracy is squarely focused on Texas: The Attorneys General endeavor to silence speech occurring in Texas and to unreasonably search and seize papers located in Texas.  The exercise of personal jurisdiction over those who commit such tortious conduct is entirely consistent with constitutional principles and statutory requirements, which boil down to a rule of thumb that guides federal courts in this state: "[I]f you are going to pick a fight in Texas, it is reasonable to expect that it be settled there."  *McVea* v. *Crisp*, No. SA-07-CA-353-XR, 2007 WL 4205648, at *2 (W.D. Tex. Nov. 5, 2007) (citation omitted) (internal quotation marks omitted), *aff'd*, 291 F. App'x 601 (5th Cir. 2008).

There is no question that the Attorneys General intended to pick a fight in Texas.  The compulsory process they issued confirms as much: The New York subpoena is addressed to ExxonMobil's offices in Texas and the Massachusetts civil investigative demand refers

repeatedly to statements made in Texas.  The Attorneys General cannot credibly claim that their activities were not directed at Texas and one of its residents.  As demonstrated by the rival coalitions of states that filed amicus briefs in this case, there is not a single perspective that applies uniformly across the country on climate policy, the possible risks it presents, and the proper government response.  It is no coincidence that Texas, a leader among oil-producing states, finds one of its prominent residents under assault by a coalition of Attorneys General pursuing an agenda that is popular in states that are primarily consumers, not producers, of energy.  It is also no surprise that the Attorneys General believe they would have some advantage if this dispute were resolved in courts outside of Texas.  But that preference is not only misguided; it also carries no force of law.  Under well-settled precedent, this Court is authorized to exercise personal jurisdiction over those like the Attorneys General who initiate contact with a forum and, as a consequence, cause an intentional tort or injury in the forum.  It is proper to hold the Attorneys General to account before this Court.

## STATEMENT OF FACTS

The Attorneys General are at the forefront of a conspiracy to violate ExxonMobil's constitutional rights.  ExxonMobil has long recognized the risks presented by climate change, acknowledges that nuclear and renewables will provide an increasing share of energy over time, and supports a revenue-neutral carbon tax.  But that is not enough for the Attorneys General. They seek conformity of thought when it comes to climate change policy, an objective that animates a conspiracy that has come into view partially through statements the Attorneys General made to the press and the public, but even more so in documents and events they tried to conceal.  The evidence identified to date shows that the Attorneys General have agreed to suppress speech they disfavor by using the coercive tools of law enforcement to harass, annoy,

2

and burden the speaker, ExxonMobil. The focus of that conspiracy is on statements made and documents stored here in Texas, and its objective is to violate rights that ExxonMobil exercises here. The facts now in the public record provide ample support for exercising personal jurisdiction over the Attorneys General for their unconstitutional conduct; additional documents made available through discovery would likely provide further support.

### A.     The Conspiracy to Violate ExxonMobil's Rights.

Evidence of the conspiracy to violate ExxonMobil's constitutional rights has emerged over time in public statements betraying the improper purpose of the investigations conducted by the Attorneys General. It has also been memorialized in document demands and in previously concealed documents shedding light on coordinated activity that once appeared independent. This evidence paints a disturbing picture of intentional constitutional torts directed at Texas.

### 1.     The Attorneys General Pledge to Suppress Speech Because of Opposition to its Content.

On March 29, 2016, a press conference in New York City drew national attention. At that press conference, the Attorneys General, members of the self-styled "AGs United for Clean Power," announced a plan to regulate speech they considered an obstacle to their "clean power" agenda.[1] Attorney General Schneiderman declared that there could be "no dispute" about climate change policy, only "confusion" attributed to those "with an interest in profiting from the confusion."[2] Attorney General Healey also considered the public's failure to embrace her views on climate change to be the result of speech that caused "many to doubt whether climate change is real and to misunderstand and misapprehend the catastrophic nature of its impacts."[3]

---

[1]   Ex. A at App. 2–21.
[2]   *Id.* at App. 3.
[3]   *Id.* at App. 13.

3

For the Attorneys General, the public policy debate on climate change was over and any perceived dissent was intolerable.   To enforce their views on climate change policy, the Attorneys General unleashed their law enforcement authority against perceived dissenters. Attorney General Schneiderman lamented the "misperceptions in the eyes of the American public that really need to be cleared up" and denounced the "morally vacant forces that are trying to block every step by the federal government to take meaningful action" on climate change.[4] He linked his investigation of ExxonMobil to those concerns, noting that he "had served a subpoena on ExxonMobil."[5]   Attorney General Healey promised that those who "deceived" the public—by purportedly disagreeing with her about climate change policy—"should be, must be, held accountable."[6]   In the next breath, Attorney General Healey declared that she too had "joined in investigating the practices of ExxonMobil."[7]   Revealing the prejudgment tainting her investigation, Attorney General Healey promised "quick, aggressive action" to "hold[] accountable those who have needed to be held accountable for far too long," a thinly veiled reference to ExxonMobil.[8]

The Attorneys General were particularly disturbed by the views of those who are perceived to question the necessity of an immediate and total transition away from fossil fuels. Attorney General Healey told those assembled that she was "committed" to "speed[ing] our transition to a clean energy future."[9]   Agreeing with that view, Attorney General Schneiderman opined that "we have to change conduct" to "mov[e] more rapidly towards renewables" and overcome "an effort to slow that process down in the United States."[10]   The Attorneys General

---

[4]   *Id.* at App. 3, 5.
[5]   *Id.* at App. 4.
[6]   *Id.* at App. 13.
[7]   *Id.*
[8]   *Id.* at App. 14.
[9]   *Id.* at App. 13.
[10]   *Id.* at App. 20.

were joined on stage by private citizen and former Vice President Al Gore, a prominent investor and promoter of the renewable energy industry, who urged the state officials to investigate his business competitors for "slow[ing] down this renewable revolution" by "trying to convince people that renewable energy is not a viable option."[11]

> ## 2. The Attorneys General Conceal Their Links to Private Interests Antagonistic to Free Speech on Climate Change Policy.

While the press conference was open to the public, the Attorneys General or members of their staff also attended closed-door, private meetings earlier in the day that came to light only because of public record requests filed by third parties.[12]  During one of those secret meetings, Peter Frumhoff, the Director of Science and Policy for the Union of Concerned Scientists,[13] delivered a presentation on the "imperative of taking action now on climate change."[14]  Frumhoff has tried to silence ExxonMobil on climate change policy since at least 2007, when he contributed to the publication "Smoke, Mirrors, & Hot Air: How ExxonMobil Uses Big Tobacco's Tactics to Manufacture Uncertainty on Climate Science."[15]  This inflammatory propaganda promoted strategies for "[p]utting the [b]rakes" on ExxonMobil's alleged "[d]isinformation [c]ampaign" on climate policy.[16]  Also at these private meetings, a presentation on "climate change litigation" was delivered by Matthew Pawa,[17] who had previously sued ExxonMobil for allegedly causing global warming and whose law firm boasts of its "role in launching global warming litigation."[18]

---

[11]   *Id.* at App. 10.
[12]   *See* Ex. B at App. 23-32.
[13]   Ex. C at App. 35.
[14]   Ex. B at App. 24.
[15]   Ex. D at App. 39-106.
[16]   *Id.* at App. 41.
[17]   Ex. B at App. 24.
[18]   *See* Ex. E at App. 108.; *see also Native Vill. of Kivalina* v. *ExxonMobil Corp.*, 663 F. Supp. 2d 863, 871–77 (N.D. Cal. 2009), *aff'd*, 696 F.3d 849 (9th Cir. 2012).

These and other private interests have worked for years to persuade state law enforcement officers to silence perceived political opponents, advance preferred policy responses to climate change, and obtain documents for private lawsuits. For example, a 2012 workshop of climate activists and environmental attorneys held in La Jolla, California, examined ways to obtain the internal documents of companies like ExxonMobil for the purpose of "maintaining pressure on the industry that could eventually lead to its support for legislative and regulatory responses to global warming."[19] The attendees at that workshop—which included Pawa and Frumhoff—concluded that "a single sympathetic state attorney general might have substantial success in bringing key internal documents to light."[20]

That agenda has been promoted by other well-funded private interests, including the Rockefeller Family Fund (the "Fund"). The President and Director of the Fund recently acknowledged that it had "informed [unnamed] state attorneys general of [its] concern" about alleged inaccuracies in ExxonMobil's statements about climate change policy and was "encouraged by [Defendant] Schneiderman's interest in this matter."[21] The purpose of the Fund's efforts, by its own telling, was "to make it difficult for elected officials to accept ExxonMobil's money and do its bidding."[22] That objective was also present in a meeting the Fund convened in January 2016, which counted Pawa among the attendees.[23] The agenda for that meeting included a discussion of the goals of a so-called "Exxon campaign" to (i) "establish in [the] public's mind that Exxon is a corrupt institution that has pushed humanity (and all creation) toward climate chaos and grave harm," (ii) "delegitimize [ExxonMobil] as a political

---

[19]   Ex. F at App. 137.
[20]   *Id.* at App. 121.
[21]   Ex. G at App. 150.
[22]   *Id.* at App. 151.
[23]   Ex. H at App. 157; *see also* Ex. I at App. 159-60.

actor," and (iii) "force officials to disassociate themselves from Exxon . . . ."[24]  In this manner, private interests devised the playbook later followed by the Attorneys General to violate ExxonMobil's constitutional rights, and they have provided support and advocacy along the way.

The Attorneys General recognized that the behind-the-scenes involvement of these private organizations and individuals—especially Pawa, an attorney likely to seek fees from any private litigation made possible by attorney general-led investigations of ExxonMobil—could expose the special interests driving these efforts and the bias underlying their deployment of law enforcement resources for political and partisan ends.  That is why the Attorneys General attempted to conceal Pawa's involvement from the public.  Shortly after the March 29 press conference, Pawa was contacted by a reporter who asked about his involvement in the event.  Pawa turned to Attorney General Schneiderman's office for advice and was asked by the Chief of the Environmental Protection Bureau not to confirm that he attended the conference.[25]  Notwithstanding these efforts to conceal the involvement of well-funded private interests, public record requests have revealed the truth.

### 3. The Conspiracy's Improper Purpose Is Documented in Instruments the Attorneys General Executed.

The preoccupation of the Attorneys General with suppressing disfavored voices is reflected in the content of documents they executed.  The compulsory process issued to ExxonMobil by the Attorneys General—the subpoena from New York and the civil investigative demand ("CID") from Massachusetts—is trained on speakers and speech that the Attorneys General perceive to run counter to climate change policy that they and their behind-the-scenes allies promote.  The subpoena demands ExxonMobil's communications with trade associations and industry groups that promote oil and gas interests, rather than the alternative fuels favored by

---

[24]   Ex. H at App. 157.
[25]   *See* Ex. J at App. 162.

the Attorneys General.[26]  Even more chillingly, the CID requests production of ExxonMobil's communications with twelve specific organizations, all of which have been associated with positions on climate policy of which the Attorneys General disapprove.[27]  The CID also targets statements that are not in accord with the Massachusetts Attorney General's preferred views on climate change.  These include statements of pure opinion on policy, including ExxonMobil's suggestion that "[i]ssues such as global poverty [are] more pressing than climate change, and billions of people without access to energy would benefit from oil and gas supplies."[28]  It is inconceivable that such a statement of opinion on a political question could ever provide a proper basis for a fraud case, and the Attorneys General certainly have not articulated any legitimate basis for this inquiry.

The Attorneys General's efforts to promote one side of a political debate and restrict speech on the other side were expressly memorialized in a common interest agreement that was never meant to be seen by the press or public.  Notwithstanding those efforts to conceal, the agreement was obtained through public record requests that were strenuously resisted (and still are) in several jurisdictions, including New York, where the New York Attorney General has been sanctioned once so far for non-compliance.[29]  The so-called "Climate Change Coalition Common Interest Agreement," executed by the Attorneys General (among others), has a primary goal of "limiting climate change," which reflects a focus on policy, not law enforcement.[30]  The second goal, "ensuring the dissemination of accurate information about climate change," confirms the coalition's willingness to violate First Amendment rights to carry out its political

---

[26]  Ex. K at App. 171 (Request No. 6).
[27]  *Compare, e.g.*, Ex. L at App. 183-85, *with* Ex. M at App. 199 (Request No. 5).
[28]  Ex. M at App. 201 (Request No. 9) (second alteration in original).
[29]  *Competitive Enter. Inst.* v. *Attorney Gen. of N.Y.*, No. 5050-16, slip. op. at 4 (N.Y. Sup. Ct. Albany Cty. Nov. 21, 2016).
[30]  Ex. N at App. 217.

agenda.[31]   Under the agreement, the Attorneys General have appointed themselves arbiters of accuracy when it comes to speech about climate policy and stand ready to use law enforcement tools against those who challenge their orthodoxy.

### B.     The Attorneys General Reached into Texas to Inhibit Speech and Fish Through Records.

Texas is the focal point of the Attorneys General's efforts to carry out their conspiracy:  It is where they directed their document demands.  It is where the speech they intend to suppress occurs.  And it is the repository for the records they hope to unreasonably search and seize.

Both the subpoena and CID were trained on the State of Texas—one was emailed directly into Texas, and the other was transmitted there through a registered agent.  The subpoena expressly acknowledges that it was meant to be transmitted to Texas, listing as the recipient ExxonMobil's general counsel and identifying his location as the following address in Texas:

Exxon Mobil Corporation
Corporate Headquarters
5959 Las Colinas Boulevard
Irving, Texas 75039-2298[32]

Indeed, the New York Attorney General e-mailed the subpoena directly to ExxonMobil's general counsel in Irving, Texas.[33]   The Massachusetts Attorney General, in turn, issued her CID to ExxonMobil's registered agent, whose role is to transmit legal process to ExxonMobil in Texas.[34]   And Massachusetts state records, maintained by the Massachusetts Secretary of State, confirm that ExxonMobil's principal office is located in Texas at the same address that the New York Attorney General listed in his subpoena.[35]   It is not reasonably disputed—and the Attorneys General have not contested—that the subpoena and CID were directed at ExxonMobil in Texas.

---

[31]   *Id.* at App. 217.
[32]   Ex. K at App. 164.
[33]   Ex. O at App. 237.
[34]   Ex. M at App. 187.
[35]   Ex. R at App. 251.

The speech and activities scrutinized—and targeted for suppression—by the Attorneys General occur in Texas.   For example, the subpoena requests documents regarding "the integration of Climate Change-related issues . . . into Your business decisions."[36]   Those activities occur largely at ExxonMobil's corporate offices in Texas where strategic decisions are made, not in New York.   Likewise, the subpoena's request for materials showing whether and how "the impacts of Climate Change" are disclosed in "filings with the U.S. Securities and Exchange Commission" implicates Texas, not New York.[37]   ExxonMobil's regulatory filings are generally prepared, reviewed, and approved at its corporate offices in Texas.   The CID is also focused on speech and events that occur in Texas, and several of its requests expressly acknowledge that fact.   Among the materials requested by the CID are documents concerning a speech given by an ExxonMobil executive "in Dallas, Texas" and a press release that was issued from ExxonMobil's offices in Irving, Texas.[38]   Other requests pertain to matters, such as regulatory filings, that are generally addressed at ExxonMobil's corporate offices in Texas, and not in Massachusetts.[39]

Finally, the materials that the Attorneys General intend to unreasonably search and seize are largely maintained in Texas.   This is not a theoretical assertion.   For nearly a year, ExxonMobil has produced materials to the New York Attorney General in response to its subpoena, and the vast majority of those materials have been obtained from ExxonMobil employees based in Texas.   As of January 31, 2017, a majority of the more than 400,000 documents ExxonMobil has produced were stored in Texas or in the files of ExxonMobil

---

[36]   Ex. K at App. 171 (Request No. 3).
[37]   *Id*. (Request No. 4).
[38]   Ex. M at App. 201-03 (Request Nos. 10, 16).
[39]   *Id*. at App. 203-05 (Request Nos. 19, 31).

employees who have worked for the company here, in Texas.[40]  By contrast, it appears that no documents have been produced from the custodial files of ExxonMobil employees based in New York or Massachusetts.[41]  The CID is directed at the same universe of materials, only broader. For there to be compliance with the subpoena and CID, a large volume of material must be collected in Texas and transmitted to New York and Massachusetts.

### C.    The National Dialogue on Climate Policy Includes Diverse Viewpoints.

The Attorneys General believe that there is "no dispute" about the correct policy outcomes when it comes to climate change.[42]  Even if that were true (or close to it) in their home states of New York and Massachusetts, where little energy is produced,[43] it assuredly is not elsewhere.  For many others, the proper policy response to climate change is not settled and rigorous public discourse is encouraged.  That is why the top law enforcement officers of eleven states, including Texas (the leading state for energy production), filed an amicus brief in support of ExxonMobil's application to enjoin the abusive investigations launched by the Attorneys General.  (Dkt. 63-2.)  Those officials contest the view of the Attorneys General "that the scientific debate regarding climate change is somehow settled, along with the related and equally important public policy debate on how to respond to what science has found." (*Id.* at 6.)  They consider it vital to democracy that free and open debate about climate policy continue, and that all voices, including ExxonMobil's, be allowed to participate freely in that dialogue.

## ARGUMENT

The Attorneys General have unlawfully reached into the State of Texas to violate the constitutional rights of a prominent Texas-based corporation by suppressing its speech in Texas

---

[40]    Anderson Declaration ¶ 3.
[41]    *Id.*
[42]    Ex. A at App. 3.
[43]    Ex. P at App. 239-40 (N.Y. #23 and Mass. #45).

and unreasonably searching and seizing papers maintained in Texas.  Under these circumstances, Texas courts provide the appropriate forum for challenging the actions of the Attorneys General. Well-settled precedent construing the scope of Texas's long-arm statute and the Due Process Clause of the U.S. Constitution confirm that conclusion.  The Attorneys General should be held to account in this forum.

## I.     The Texas Long Arm Statute Reaches the Attorneys General.

Texas courts have jurisdiction over the Attorneys General because they are "nonresidents" who are "doing business" in the state.  *See Retamco Operating, Inc.* v. *Republic Drilling Co.*, 278 S.W.3d 333, 337 (Tex. 2009).   Texas law defines "nonresidents" to include "an individual who is not a resident of this state."   Tex. Civ. Prac. & Rem. Code Ann. § 17.041(1).  Both of the Attorneys General qualify as nonresidents because they reside outside of Texas in New York and Massachusetts respectively.   The statutory definition of "doing business" in Texas includes "commit[ting] a tort in whole or in part in this state."   Tex. Civ. Prac. & Rem. Code Ann. § 17.042(2).   Based on the allegations in the Amended Complaint, which must be accepted as true at this stage of the litigation, the Attorneys General have committed a tort at least "in part" in Texas by suppressing ExxonMobil's speech in Texas and unreasonably searching and seizing papers stored here.   Under the express terms of the long-arm statute, the Attorneys General are subject to the jurisdiction of Texas courts because they are nonresidents who committed torts in Texas.

The Attorneys General do not seriously contest this construction of the long-arm statute's text.  In their prior briefs, they asked to be excluded from the meaning of "individual" because they have been sued in their official, rather than personal, capacities under *Ex parte Young*, 209 U.S. 123 (1908).   The Attorneys General have identified no support whatsoever for this proposition in any decision of any Texas state court (the authoritative body for construing the

scope of the long-arm statute), and ExxonMobil is aware of none. They rely exclusively on a decision that simply raised questions about the Texas long-arm statute and reached no conclusion one way or the other about the statute's scope.

The entirety of the Attorneys General's argument is premised on *Stroman Realty, Inc.* v. *Wercinski*, which made no definitive statement about the scope of the Texas long-arm statute. 513 F.3d 476 (5th Cir. 2008). Far more modestly, the majority simply raised a "question" about the reach of the long-arm statute and observed that "[w]hether the long-arm statute's definition of nonresidents ignores or subsumes the *Ex Parte Young* fiction *is uncertain*." 513 F.3d at 483 (emphasis added). The holding of *Stroman* had nothing to do with that uncertainty or any aspect of the long-arm statute because the case was decided on constitutional, not statutory, grounds. *Id.* at 483–89. The majority acknowledged this fact unambiguously, observing that the defendant state official had conceded that he fell within the reach of the long-arm statute and thereby "relieve[d] [the Court] of an obligation to pursue these interpretive questions," which were "preserved[] . . . for posterity." *Id.* at 483. It reached no conclusion about the statute's reach.

Even if the *Stroman* majority had reached a conclusion about the construction of the long-arm statute, it would carry no force for two separate and independently sufficient reasons. First, any such conclusion would amount to non-binding dicta. Recognizing that the reach of the long-arm statute was not presented for appellate review, the third member of the *Stroman* panel wrote that he did "not concur in the opinion's extensive dicta, including parts about: whether the Texas long-arm statute applies (part A), the parties having conceded it does." *Id*. at 489–90 (Barksdale, J., concurring in part). That concurrence did little more than state explicitly what the majority itself acknowledged—the resolution of any question about the long-arm statute was unnecessary to decide the case. *Id.* Any statements about that statute therefore amount to dicta,

which "settles nothing, even in the court that utters it." *Jama* v. *Immigration & Customs Enf't*, 543 U.S. 335, 351 n.12 (2005). The acknowledged dicta about the long-arm statute in *Stroman* cannot bind this Court's interpretation of the long-arm statute.

Second, had the *Stroman* Court carved out state officials from the reach of the long-arm statute, it would have construed the statute in a manner inconsistent with the precedents of Texas state courts, which are authoritative in this area. It is axiomatic that "federal courts do not make state law" but rather "have the duty of ascertaining and applying state law." *Beasley* v. *Fairchild Hiller Corp.*, 401 F.2d 593, 596 (5th Cir. 1968). Under this principle, the *Stroman* Court was not empowered to decide a question of state law in a manner inconsistent with Texas state courts.

Here, Texas courts have expressly held that the long-arm statute allows Texas courts to assert jurisdiction over sister states. *See, e.g.*, *Bd. of Cty. Comm'rs of Beaver Cty.* v. *Amarillo Hosp. Dist.*, 835 S.W.2d 115, 119 (Tex. App.—Amarillo 1992, no writ) (finding that Texas long-arm statute applied to subdivision of Oklahoma state government); *see also 21 Turtle Creek Square, Ltd.* v. *N.Y. State Teachers' Ret. Sys.*, 425 F.2d 1366, 1368 (5th Cir. 1970) (federal court asserting personal jurisdiction over New York state agency under Texas long-arm statute). It is therefore irrelevant that the Attorneys General were sued in their official, rather than personal, capacities. The long-arm statute, as construed by Texas state courts, permits jurisdiction over them both as individuals and as proxies for their respective states.

Texas state courts have also implicitly recognized that principle. Precedents abound where courts evaluate the sufficiency of an out-of-state official's contacts with Texas. *See, e.g.*, *Gulf Coast Int'l, LLC* v. *Research Corp. of Univ. of Haw.*, 490 S.W.3d 577, 583–84 (Tex. App.—Houston [1st Dist.] 2016, pet. denied); *Perez Bustillo* v. *Louisiana*, 718 S.W.2d 844, 846 (Tex. App.—Corpus Christi 1986, no writ); *see also Saxton* v. *Faust*, No. 3:09- CV-2458-K,

2010 WL 3446921, at *3 (N.D. Tex. Aug. 31, 2010).  That analysis, which is required by the Due Process Clause of the United States Constitution, could occur only if the court considered the out-of-state official to be within the reach of the long-arm statute in the first place.

Even if there were any ambiguity on this point, Texas state courts have recognized a policy of construing the long-arm statute broadly, which counsels strongly in favor of rejecting limitations found nowhere in the statute's text.  Texas state courts have repeatedly held that the long-arm statute should not be artificially narrowed, but rather interpreted to "reach[] 'as far as the federal constitutional requirements for due process will allow.'"  *Spir Star AG* v. *Kimich*, 310 S.W.3d 868, 872 (Tex. 2010) (citation omitted).[44]  As the Texas Supreme Court has held, "the statute's requirements are satisfied if exercising jurisdiction comports with federal due process limitations."  *Id.* (citing *Am. Type Culture Collection, Inc.* v. *Coleman*, 83 S.W.3d 801, 806 (Tex. 2002)).  In light of this controlling precedent, there is no basis in state law—not in statutory text, precedent, or policy—to exempt the Attorneys General from the reach of the long-arm statute.

## II.    Due Process Authorizes Jurisdiction over the Attorneys General.

Exercising personal jurisdiction over the Attorneys General is also fully consonant with the requirements of the Due Process Clause.  For personal jurisdiction over a non-resident to comport with due process, three elements must be satisfied.  First, a defendant must have "directed its activities toward the forum state or purposefully availed itself of the privileges of conducting activities there."  *Vanderbilt Mortg. & Fin., Inc.* v. *Flores*, 692 F.3d 358, 375 (5th Cir. 2012).  Second, the plaintiff's cause of action must arise from "the defendant's forum-related contacts."  *Id.*    Third, "the exercise of personal jurisdiction [must be] fair and

---

[44]    *See also, e.g.*, *KEC Int'l Ltd.* v. *Jyoti Structures Ltd.*, No. 09-15-00378-CV, 2016 WL 7177695, at *3 (Tex. App.—Beaumont Dec. 8, 2016); *Am. Refrigeration Co. v. Tranter, Inc.*, No. 02-15-00265-CV, 2016 WL 5957018, at *4 (Tex. App.—Fort Worth Oct. 13, 2016); *Proppant Sols., LLC* v. *Delgado*, 471 S.W.3d 529, 536 (Tex. App.—Houston [1st Dist.] 2015); *Ward* v. *Hawkins*, 418 S.W.3d 815, 823 (Tex. App.—Dallas 2013); *Hale* v. *Richey*, No. 10-11-00187-CV, 2012 WL 89920, at *2 (Tex. App.—Waco Jan. 11, 2012).

15

reasonable." *Id.* The facts alleged in ExxonMobil's Amended Complaint and the reasonable inferences drawn from those facts, which are accepted as true at this stage of the litigation, *Gore* v. *Experian Info. Sols., Inc.*, No. 3:04-CV-1069-H, 2004 WL 2008520, at *1 (N.D. Tex. Sept. 8, 2004), satisfy each of those three elements.

The adequacy of ExxonMobil's allegations is particularly clear when measured against the exceedingly light burden it faces prior to any court-supervised development of the factual record. In the absence of jurisdictional discovery and an evidentiary hearing, it is ExxonMobil's burden "only [to] present a prima facie case of personal jurisdiction." *Stripling* v. *Jordan Prod. Co.*, 234 F.3d 863, 869 (5th Cir. 2000). Courts throughout the Fifth Circuit have recognized that this requirement presents a "low bar" that is easily cleared. *Guerrero* v. *Total Renal Care, Inc.*, 932 F. Supp. 2d 769, 790 (W.D. Tex. 2013); *U.S. ex rel. George* v. *Boston Sci. Corp.*, 864 F. Supp. 2d 597, 608 (S.D. Tex. 2012); *Enriquez* v. *City of Houston*, No. H-08-3466, 2010 WL 1609212, at *7 (S.D. Tex. Apr. 20, 2010). The allegations contained in the Amended Complaint easily clear the "low bar" applicable at this early stage of the litigation.

### A. The Attorneys General Committed Intentional Torts in Texas.

The first element of the due process inquiry—purposeful availment of the forum—is satisfied by the contact the Attorneys General initiated with Texas: They issued compulsory process into the forum that gave rise to an intentional tort in the forum. As alleged in the Amended Complaint, Attorney General Schneiderman's subpoena was sent to Texas in an email addressed to ExxonMobil's General Counsel at the company's corporate offices in Texas. Am. Compl. ¶¶ 19–20. Likewise, Attorney General Healey's CID was delivered to ExxonMobil's registered agent in Massachusetts so it could be transmitted to corporate offices in Texas. *See* Am. Compl. ¶¶ 19, 69; *cf. Dudnikov* v. *Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1075 (10th Cir. 2008) (finding jurisdiction where "defendants intended to send [a cease and desist

16

letter] to eBay in California, but they did so with the ultimate purpose of cancelling plaintiffs' auction in Colorado."); *Aviva Life & Annuity Co.* v. *Goldstein*, 722 F. Supp. 2d 1067, 1070, 1075 (S.D. Iowa 2010) (contacts established "despite the use of an agent as an intermediary").   The Attorneys General issued this compulsory process to commit the intentional torts of suppressing ExxonMobil's speech and unreasonably searching and seizing its papers, both of which cause injury in Texas.  Am. Compl. ¶¶ 13–14, 18–19, 88–91, 97–99, 101–04, 109–14.   Under settled precedent, those allegations satisfy the "purposeful availment" element of the due process inquiry.  *See, e.g., Middlebrook* v. *Anderson*, No. 3:04-CV-2294, 2005 WL 350578, at *3, *5 (N.D. Tex. Feb. 11, 2005) ("A defendant's transmission of a communication into the forum state is sufficient to be considered purposeful availment if the content of that communication gives rise to an intentional tort cause of action.").

It is no answer for the Attorneys General to say that the contact they initiated with Texas was limited in duration.  The Attorneys General need not have frequent or continuous contact with this forum to be subject to the jurisdiction of its courts.  To the contrary, a single contact will suffice.  That contact can take the form of an email, letter, telephone call, or other communication so long as it (i) is directed at the forum and (ii) causes an intentional tort here.  Applying that principle, the Fifth Circuit approved personal jurisdiction based on a single telephone call made to a resident of the forum where the defendant "initiated the telephone call and allegedly committed an intentional tort."  *Brown* v. *Flowers Indus., Inc.*, 688 F.2d 328, 333–34 (5th Cir. 1982) (internal footnote omitted); *see also Lewis* v. *Fresne*, 252 F.3d 352, 358–59 (5th Cir. 2001) ("A single act by a defendant can be enough to confer personal jurisdiction if that act gives rise to the claim being asserted." (citing *Brown*, 688 F.2d at 332–33)).   Where contact

17

with the forum—no matter how limited—gives rise to an intentional tort, the purposeful availment element is satisfied.

District courts in Texas and throughout the Fifth Circuit have faithfully applied this teaching, regardless of the extent or number of contacts initiated by defendants. For example, in *Long* v. *Grafton Executive Search, LLC*, Judge Godbey found jurisdiction proper where a Missouri defendant sent one derogatory email and placed three telephone calls to Texas, reasoning that "[t]he injurious effect of the intentional tort, if committed, occurred in Texas. This injury was felt entirely by a Texas resident." 263 F. Supp. 2d 1085, 1089-90 (N.D. Tex. 2003). Judge Solis reached a similar conclusion in *TransFirst Holdings, Inc.* v. *Phillips*, where a defendant sent to a Texas recipient emails and letters containing fraudulent misrepresentations. No. 3:06-CV-2303-P, 2007 WL 631276, at *4, *6 (N.D. Tex. Mar. 1, 2007). In light of the defendant's alleged "tortious conduct with foreseeable effects in Dallas," Judge Solis concluded that the complaint contained "a sufficient allegation of minimum contacts to support the court's exercise of personal jurisdiction." *Id.* at *6. The allegations at issue in *Bear Stearns Cos.* v. *Lavalle* concerned "harassing telephone calls" and "harassing e-mails" sent by the plaintiff to Texas recipients. No. 3:00 Civ. 1900-D, 2001 WL 406217, at *3 (N.D. Tex. Apr. 18, 2001). Judge Fitzwater found personal jurisdiction in that case because the defendant "knowingly aimed his intentional actions at Texas and knows that the plaintiff will feel the brunt of the injury in Texas." *Id.* at *4. Other courts in this Circuit have ruled similarly.[45]

---

[45]   *See, e.g.*, *Hunt Capital Partners, L.L.C.* v. *Berk*, No. 14-CV-2726, 2015 WL 4397137, at *5 (E.D. La. July 13, 2015) ("[T]he Court finds Plaintiffs' claims that Berk made defamatory communications about Plaintiffs . . . sufficiently allege that Berk purposefully availed himself of the privilege of causing a consequence in the forum state." (internal footnote omitted)); *Tisdale* v. *VFG, LLC*, No. 2:12-CV-166-KS-MTP, 2013 WL 150441, at *3 (S.D. Miss. Jan. 14, 2013) ("[Defendant] purposefully availed himself 'of the privilege of causing a consequence' in Mississippi," when he made misrepresentations to plaintiff located in Mississippi.); *Elton* v. *McClain*, No. SA-11-CV-00559-XR, 2011 WL 6934812, at *3 (W.D. Tex. Dec. 29, 2011) (Defendant solicited business in Texas by making fraudulent misrepresentations and thus "purposefully avail[ed] himself of 'the privilege of causing a consequence' in Texas."); *Goddard* v. *Nat'l Ass'n of Physician Recruiters, Inc.*, No. 3:04-

The critical inquiry conducted by these courts is not about whether the contact with the forum was extensive but whether it was connected to an intentional tort arising in the forum. Under *Calder* v. *Jones*, 465 U.S. 783 (1984)—the validity of which was recently reaffirmed by the Supreme Court in *Walden* v. *Fiore*, 134 S. Ct. 1115, 1123 (2014)—it is appropriate to focus on "the forum in which the defendant's actions were felt, whether or not the actions themselves occurred within the forum." *Yahoo! Inc.* v. *La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1206 (9th Cir. 2006) (en banc) (citing, *inter alia*, *Calder*, 465 U.S. at 789–90). Applying that precedent, when an out-of-state actor reaches into Texas to contact one of its residents and that contact gives rise to an intentional tort, the Fifth Circuit has held that the nonresident "purposefully avail[ed] [it]self of the privilege of causing a consequence in Texas." *Wien Air Alaska, Inc.* v. *Brandt*, 195 F.3d 208, 213 (5th Cir. 1999) (internal quotation marks omitted). Those circumstances satisfy the first element of the due process inquiry.

Here, there is no room to dispute that, according to the allegations of the Amended Complaint, the Attorneys General's contact with the forum has given rise to intentional torts in Texas. ExxonMobil has alleged that the Attorneys General issued the subpoena and CID to commit constitutional torts involving violations of ExxonMobil's rights under the First and Fourth Amendments. Those torts arise in Texas where ExxonMobil exercises its right to free speech and maintains corporate records.

ExxonMobil's First Amendment rights have been and are being violated by the viewpoint discrimination that motivated the Attorneys General's issuance of the subpoena and CID to

---

CV-1424-H, 2005 WL 50871, at *4 (N.D. Tex. Jan. 11, 2005) (Defendants caused a consequence in Texas when they made defamatory communications to plaintiffs in Texas which gave rise to business disparagement and civil conspiracy claims); *Evercom Sys., Inc.* v. *Mannis*, No. 3:03-CV-2956-M, 2004 WL 396885, at *2 (N.D. Tex. Feb. 20, 2004) (When Defendant made fraudulent misrepresentations to employees in plaintiff's Texas office, "[s]uch a communication constitutes purposeful availment because the defendant is purposefully availing himself of the 'privilege of causing a consequence' in the forum state.").

suppress ExxonMobil's speech.  ExxonMobil exercises its First Amendment rights in Texas, where it issues official statements on behalf of the corporation and engages in dialogue concerning climate change policy with other individuals and entities.  Courts across the country have agreed that a  "plaintiff suing because his freedom of expression has been unjustifiably restricted . . . suffers harm only where the speech would have taken place, as opposed to the district in which . . . the decision to restrict this plaintiff's speech was made." *Kalman* v. *Cortes*, 646 F. Supp. 2d 738, 742 (E.D. Pa. 2009); *see also Fund for La.'s Future* v. *La. Bd. of Ethics*, No. 14-CV-0368, 2014 WL 1514234, at *12 (E.D. La. Apr. 16, 2014) (First Amendment injury occurs where "First Amendment rights have been denied."); *Asgeirsson* v. *Abbott*, 773 F. Supp. 2d 684, 693 (W.D. Tex. 2011), *aff'd*, 696 F.3d 454 (5th Cir. 2012) (First Amendment injury occurred at the location of "the alleged suppression of First Amendment rights."); *Loritz* v. *Dumanis*, No. 2:06-CV-00735-KJD-RJJ, 2007 WL 1892109, at *12 (D. Nev. June 27, 2007) (First Amendment injury occurred in the state in which defendant tried to "suppress [plaintiff's] speech and intimidate him.").  This precedent identifies Texas as the location where ExxonMobil has suffered a violation of its First Amendment rights, a constitutional tort, arising from the Attorneys General's issuance of the subpoena and CID into the forum.

Texas is also the location where ExxonMobil's rights under the Fourth Amendment have been and are being violated by the Attorneys General.  According to the Amended Complaint, the Attorneys General issued the subpoena and CID to conduct an unreasonable search and seizure of ExxonMobil's papers.  This constitutionally impermissible "fishing expedition" has occurred and will continue to occur in Texas, where ExxonMobil maintains the bulk of its corporate records.  As of January 31, 2017, Attorney General Schneiderman has used the subpoena to extract more than 400,000 documents, totaling over 2.57 *million* pages from

ExxonMobil, a majority of which were either stored in Texas or from the files of employees who have worked for ExxonMobil here, in Texas.[46]  If Attorney General Healey is permitted to obtain records under the CID, those records will also be largely collected in and transmitted from Texas.  As with any violation of the Fourth Amendment, the injury arises in the location where the unlawful search and seizure occurs.  *See Tansey* v. *City of Keller, Tex.*, No. 3:11-CV-03289-N(BF), 2012 WL 2092935, at *2 (N.D. Tex. May 21, 2012) ("The place of the alleged wrong was clearly in the City of Keller, Texas," where the "search and seizure violations" occurred.), *report and recommendation adopted*, 2012 WL 2092900 (N.D. Tex. June 8, 2012).  Here, that location is Texas, where the papers are maintained.

Resisting this straightforward application of settled precedent, the Attorneys General insist that this Court lacks personal jurisdiction over them.  In prior briefing, they relied principally on the *Stroman* cases, *see Stroman Realty, Inc.* v. *Wercinski*, 513 F.3d 476 (5th Cir. 2008) ("*Stroman I*"), and *Stroman Realty, Inc.* v. *Antt*, 528 F.3d 382 (5th Cir. 2008) ("*Stroman II*"), drawing strained analogies between the facts of those cases and the starkly different allegations ExxonMobil has made here.  In those cases, Stroman Realty, Inc., a Texas company, sued out-of-state officials for trying to prevent it from engaging in unlicensed real estate sales in the officials' home states.  In *Stroman I*, Arizona officials sought to keep Stroman from illegally marketing properties to Arizona residents.  513 F.3d at 480–81.  In *Stroman II*, Florida and California officials tried to prevent Stroman from unlawfully offering properties for sale to their citizens.  528 F.3d at 384–85.  Neither involved any effort to restrict Stroman's business practices in Texas.  The only connection to Texas was correspondence that the out-of-state officials sent to Stroman in Texas, telling it to cease its unlicensed activities in the officials' home states.  Moreover, there were no allegations in the *Stroman* cases that the out-of-state

---

[46]   Anderson Declaration ¶ 3.

officials had committed intentional torts, let alone that they had done so in bad faith.  The facts of the *Stroman* cases bear no resemblance to those at issue in this litigation.  Here, the Attorneys General have issued broad document demands to restrict ExxonMobil's speech in Texas and fish through the papers it stores here.  The focus of their activity is on Texas, where ExxonMobil speaks and predominantly stores its records, not New York and Massachusetts.  And ExxonMobil has alleged that the Attorneys General have committed intentional torts in the state. The *Stroman* cases have no application here.

The Attorneys General also have repeatedly invoked the holding in *Walden* v. *Fiore* that "the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there" are the focus of the jurisdictional inquiry.  134 S. Ct. 1115, 1122 (2014).  That is common ground between the parties.  *Walden*'s holding is fully consistent with exercising personal jurisdiction over the Attorneys General based on the direct contact they initiated with Texas (*i.e.*, issuing a subpoena and CID into the forum) and the intentional tort that arose in Texas from that contact (*i.e.*, the violation of ExxonMobil's constitutional rights).  The out-of-state officials in *Walden*, by contrast, were not alleged to have initiated any direct contact with Nevada, the forum state, and were not alleged to have caused an intentional tort in Nevada based on any contact they had with the state.  *Id.* at 1124.  Their connection to Nevada was derived entirely from their interaction with one of that state's residents that occurred wholly outside of Nevada.  *Id.* at 1125.  It is no surprise that the Supreme Court concluded there was no personal jurisdiction over the out-of-state officials under those circumstances, which are nothing like those at issue here.  *Id.*  Here, by contrast, jurisdiction is proper based on the contacts with the forum the Attorneys General themselves directly initiated.

**B.      ExxonMobil's Complaint Arises from the Attorneys General's Contacts with this Forum.**

The second element of the due process inquiry is also satisfied because ExxonMobil's claims arise from the Attorneys General's contacts with Texas.  As alleged in the Amended Complaint, the Attorneys General initiated contact with the forum by directing the subpoena and CID at Texas.  The effect of the subpoena and CID was to violate ExxonMobil's First and Fourth Amendments rights in Texas where they are exercised.  Because those constitutional torts "arise out of or relate to" the Attorneys General's contact with the forum, the second element is satisfied.  *In re DePuy Orthopaedics, Inc. Pinnacle Hip Implant Prods. Liab. Litig*., Nos. 3:11-CV-03590-K, 3:12-CV-4975-K, 2014 WL 3557392, at *2 (N.D. Tex. July 18, 2014).[47]

**C.      Jurisdiction over the Attorneys General is Fair and Reasonable.**

In light of the facts alleged in this case, exercising jurisdiction over the Attorneys General is fair and reasonable, thus satisfying the third element of the due process inquiry.  To contest this point, the Attorneys General bear a heavy burden because "'it is rare to say the assertion [of jurisdiction] is unfair'" after minimum contacts with the forum have been established.  *McFadin* v. *Gerber*, 587 F.3d 753, 759-60 (5th Cir. 2009) (quoting *Wien Air*, 195 F.3d at 215).   In previous submissions, the Attorneys General have pointed vaguely to burdens they might face if required to appear in Texas courts, but such burdens are presumably no different from those ExxonMobil bears when appearing in New York and Massachusetts courts.  In any event, "'once minimum contacts are established, the interests of the forum and the plaintiff justify even large

---

[47]   Attorney General Schneiderman argued—for the first time in reply in support of his motion to dismiss—that this case should be dismissed notwithstanding his service of a subpoena into Texas, in purported reliance on *Allred* v. *Moore & Peterson*, 117 F.3d 278 (5th Cir. 1997).  (Dkt. 170 at 3.)  But in *Allred*, the Fifth Circuit found that service of process was not sufficient to confer jurisdiction because it did not give rise to the tort claim plaintiff had asserted.  117 F.3d at 285 ("Allred failed to allege that any element of the abuse of tort claim occurred in" the forum).   Here, by contrast, the direction of legal process into Texas for the purposes of intimidating a political opponent and fishing indiscriminately through Texas-based records gave rise to ExxonMobil's claims.  *Allred* is therefore inapposite.

burdens on the defendant.'"  *Id.* at 764 (quoting *Guidry* v. *U.S. Tobacco Co.*, 188 F.3d 619, 628 (5th Cir. 1999)).

Litigating this case in Texas is also aligned with the interests of the interstate judicial system and constitutes good policy.  When out-of-state officials reach into Texas to violate the constitutional rights of a resident, it is proper for that resident to seek relief in Texas courts. "Texas has an interest in protecting its residents' . . . rights and providing a convenient forum for its residents to resolve their disputes." *Id.* at 763.  Consistent with that principle, the Texas Attorney General has joined in these proceedings and in those ExxonMobil brought against the Virgin Islands Attorney General because of Texas's interest in protecting its citizens' rights.[48] And that interest should not be set aside by alarmist warnings about out-of-state officials being dragged into courts in other jurisdictions.  Where, as here, out-of-state officials contact a state and cause intentional torts within it, they are properly held to account in those states.  Where the facts are different, jurisdiction will either be appropriate or inappropriate, and courts remain fully capable of drawing that distinction as shown by the ample body of precedent discussed above.

## III.   Any Gaps in the Factual Record Should Be Resolved By Jurisdictional Discovery.

If the Court has any doubts about the sufficiency of ExxonMobil's allegations regarding whether the Attorneys General (i) directed the subpoena and CID at Texas or (ii) caused an intentional tort in Texas as a result of that contact, jurisdictional discovery should be ordered. Although compelling evidence of viewpoint discrimination and official bias has already come to light, the secrecy that has characterized the Attorneys General's conduct indicates that the full record has yet to be developed in this very important case.  If any doubts remain about the factual basis for asserting personal jurisdiction, discovery is warranted to complete the record.

---

[48]   Ex. Q at App. 243-47; Br. of Texas, Louisiana, South Carolina, Alabama, Michigan, Arizona, Wisconsin, Nebraska, Oklahoma, Utah, and Nevada as *Amici Curiae* in Supp. of Pl.'s Mot. for Prelim. Inj. (Dkt. 63-2.)

Plaintiffs are entitled to discovery where they "present factual allegations that suggest with reasonable particularity the possible existence of the requisite contacts." *Valtech Sols. Inc.* v. *Davenport*, No. 3:15-CV-3361-D, 2016 WL 2958927, at *2 (N.D. Tex. May 23, 2016) (alterations and internal quotation marks omitted). ExxonMobil has cleared this low bar by stating with particularity the contacts with the forum initiated by the Attorneys General and the intentional torts that resulted. *See Blessey Marine Servs., Inc.* v. *Jeffboat, LLC*, No. CIV.A. 10-1863, 2011 WL 651999, at *6-7 (E.D. La. Feb. 10, 2011).

## CONCLUSION

The Attorneys General are properly before this Court. The Texas long-arm statute reaches those who do not reside in Texas whenever they commit a tort, in whole or in part, in the state. That is exactly what ExxonMobil has alleged here. No binding precedent—state or federal—creates an exception to that statute for out-of-state officials sued in their official capacities, and this Court should not invent one out of whole cloth. It is also consistent with the Due Process Clause for the Attorneys General to remain in this Court. They initiated contact with the forum by directing a subpoena and CID at Texas, which gave rise to intentional torts suffered by a Texas resident in Texas. Exercising personal jurisdiction over the Attorneys General based on that conduct is firmly rooted in Supreme Court and Fifth Circuit precedent. But precedent is not at the heart of the Attorneys General's challenge to personal jurisdiction. It has long been clear that they perceive a tactical advantage in litigating this case in their home states where they hope political sympathies will weigh in their favor. Regardless of whether they are right or wrong in their hopes, the preferences of the Attorneys General for a different forum carry no force of law. This Court has jurisdiction over the defendants, and ExxonMobil urges the Court to exercise it.

Dated: February 1, 2017


EXXON MOBIL CORPORATION

By: /s/ Patrick J. Conlon                              /s/ Nina Cortell
Patrick J. Conlon                                      Nina Cortell
(*pro hac vice*)                                       State Bar No. 04844500
State Bar No. 24054300                                 nina.cortell@haynesboone.com
patrick.j.conlon@exxonmobil.com                        HAYNES & BOONE, LLP
Daniel E. Bolia                                        2323 Victory Avenue
State Bar No. 24064919                                 Suite 700
daniel.e.bolia@exxonmobil.com                          Dallas, TX 75219
1301 Fannin Street                                     (214) 651-5579
Houston, TX 77002                                      Fax: (214) 200-0411
(832) 624-6336


/s/ Theodore V. Wells, Jr.                             /s/ Ralph H. Duggins
Theodore V. Wells, Jr.                                 Ralph H. Duggins
(*pro hac vice*)                                       State Bar No. 06183700
twells@paulweiss.com                                   rduggins@canteyhanger.com
Michele Hirshman                                       Philip A. Vickers
(*pro hac vice*)                                       State Bar No. 24051699
mhirshman@paulweiss.com                                pvickers@canteyhanger.com
Daniel J. Toal                                         Alix D. Allison
(*pro hac vice*)                                       State Bar. No. 24086261
dtoal@paulweiss.com                                    aallison@canteyhanger.com
PAUL, WEISS, RIFKIND, WHARTON &                        CANTEY HANGER LLP
GARRISON, LLP                                          600 West 6th Street, Suite 300
1285 Avenue of the Americas                            Fort Worth, TX 76102
New York, NY 10019-6064                                (817) 877-2800
(212) 373-3000                                         Fax: (817) 877-2807
Fax: (212) 757-3990

Justin Anderson
(*pro hac vice*)
janderson@paulweiss.com
2001 K Street, NW
Washington, D.C. 20006-1047
(202) 223-7300
Fax: (202) 223-7420

*Counsel for Exxon Mobil Corporation*

26

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on this 1st day of February 2017, a true and correct copy of the foregoing document was filed electronically via the CM/ECF system, which gave notice to all counsel of record pursuant to Local Rule 5.1(d).

/s/ Ralph H. Duggins

RALPH H. DUGGINS
